UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | No.   2:19-cr-00013 |
| v. ) | |
| ) | Chief Judge Crenshaw |
| ) | |
| GEORGIANNA A.M. GIAMPIETRO, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER
PERTAINING TO THE TESTIMONY OF UNDERCOVER
AND ONLINE COVERT EMPLOYEES**

**INTRODUCTION**

The United States of America, by and through its attorneys, the United States Attorney for the Middle District of Tennessee and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, moves for the entry of a protective order authorizing the use of certain measures to protect the identities and security of undercover employees of the Federal Bureau of Investigation (FBI) who will be government witnesses providing testimony at trial. As set forth in the Declaration of Jill Sanborn, Assistant Director of the FBI's Counterterrorism Division, attached as Exhibit A, public disclosure of the true identity, the physical images, and other information that could identify these individuals would jeopardize other undercover investigations and pose a risk of danger to these individuals and their families.[1] Accordingly, this relief is necessary to ensure the safety of the witnesses and to protect other

---

[1] The FBI's position as original classification authority is that the identities of the undercover employees are classified, based on their connection to a national security investigation. Contemporaneous with this motion, the government is submitting to the Court *ex parte in camera* and under seal a separate classified declaration of Assistant Director Sanborn, based upon the nature of the information contained therein.

1

compelling interests of the United States. The security measures outlined in this motion are consistent with measures used in other national security prosecutions, and were most recently approved by this Circuit in *United States v. Hendricks*, 950 F.3d 348 (6th Cir. 2020).

## BACKGROUND

Beginning in approximately October 2015, an online undercover FBI employee ("OCE-1"), posing as an individual interested in Islamic teachings, came into contact with the defendant through an open source social media platform. OCE-1 began documenting the defendant's online activity, including her frequent name changes on social media.

In May 2016, OCE-1, using a social media platform that permits users to send encrypted messages, photographs, and other files, communicated with the defendant online in a conversation about the defendant's Islamic postings. Specifically, and over a period of months, the defendant and OCE-1 discussed various aspects of Islamic teachings and current events.

OCE-1 later introduced the defendant to a second undercover FBI employee, UCE-1. UCE-1 presented herself as a woman married to a man who wanted to contribute in a meaningful way to jihadists overseas. On November 28, 2017, UCE-1 met face-to-face with the defendant in Cookeville, Tennessee. FBI agents surveilled that meeting. During that meeting, the defendant expressed her desire to travel to Syria.

On February 22, 2018, UCE-1 again met face-to-face with the defendant, in a hotel room in Cookeville. FBI agents obtained surreptitious audio and video recordings of that meeting. During that meeting, the defendant again expressed her desire to travel to Syria, where she explained that she intended to join her fiancé, whom she identified as "Abu Abdullah." The defendant also explained that her fiancé supported numerous "rebel groups" in Syria, and that he was affiliated primarily with "JFS," an alias for Jabhat al-Nusrah.

The defendant explained further that she believed it to be every Muslim man's duty to wage "jihad," meaning holy war, and that it was the duty of their women to support them. The defendant explained that women could assist in that effort by, for example, fighting alongside their husbands, carrying bodies from the battlefield, and providing food and water to the mujahideen. The defendant also expressed her desire to cook and provide food for the "brothers" who were fighting jihad. She explained that she hoped to die alongside her husband in Syria, possibly in an airstrike, on a Friday during Ramadan while she and her husband were praying.

During this conversation, the defendant provided UCE-1 with directions on how to travel to Syria without drawing suspicion from law enforcement authorities. UCE-1 asked the defendant if Abdullah had contacts who could obtain false documents to facilitate UCE-1's travel to and entry into Syria. The defendant replied in the affirmative. She also told UCE-1 that she and Abdullah had discussed bringing the defendant's son to Syria, and that the defendant planned to tell her son's father in the United States that she was only taking her son on a trip to Italy. The defendant said further, however, that according to Islamic teachings, she could not travel to Syria until she had repaid her student loan debts, which were substantial.

During the conversation, the defendant mentioned that she was in a private chat group on a social media platform with other "girls" who also wanted to travel to Syria. The defendant invited UCE-1 to join this chat group. Between approximately September 23, 2018 and October 4, 2018, the defendant communicated with UCE-1 online in this chat group and in other formats.

On October 2, 2018, the defendant provided UCE-1 with an individual's contact information, and directed UCE-1 to message that individual, so that the individual could assist UCE-1 and UCE-1's spouse in traveling to Syria.

On October 4, 2018, after receiving the contact information from the defendant, a second

online undercover FBI employee "OCE-2" made online contact with that individual, posing as UCE-1's spouse. OCE-2 greeted the individual, telling defendant's contact that OCE-2 had been given the contact information, and that OCE-2 understood this individual to be someone who could help brothers and sisters making "Hijrah," meaning emigration, to Syria. When the individual asked who had provided OCE-2 with the contact information, OCE-2 said that "Umm Roses" had provided the information to UCE-1. "Umm Roses" was a social media moniker used by the defendant.

OCE-2 asked the individual if the individual had helped people make Hijrah before, and if it was still possible to do so. The defendant's contact replied, "Yes akhi [brother]. You can but safest to wait" to travel to Syria, explaining that "there isn't any fighting at the moment," and that OCE-2 would primarily be doing "guard duty" "5 or 7 days a month." OCE-2 asked the individual whether he could get UCE-1 and OCE-2 "across" to Syria, if they made it to Turkey. The defendant's contact replied that he could. The individual explained further, however, that he had talked to "another brother," who said that it was very difficult to cross into Syria at present, and that UCE-1 and OCE-2 should wait and cross later.

The defendant's contact also provided OCE-2 with information about how to travel to Turkey undetected. The individual stated, for example, that OCE-2 should have a good cover story, and that OCE-2 should take certain steps to make it look like UCE-1 and OCE-2's travel was legitimate. The individual advised, "Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like your [sic] an aid worker. Then you have a good defence." When OCE-2 asked the defendant's contact why he needed a "good defense," and whether the individual was referring to the possibility of being questioned by Turkish authorities, the individual replied, "Yea. Also if you get stopped you have evidence to support your story."

4

In a discussion on or about October 3-4, 2018, between UCE-1 and the defendant, UCE-1 thanked the defendant for providing UCE-1 with the contact, and conveyed to the defendant that this contact could help UCE-1 get to Syria. The defendant replied, "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." The defendant informed UCE-1 further that she did not want to talk about this anymore, saying, "You're going to get me arrested." After this conversation, the defendant deleted the encrypted social media account she had been using to communicate with UCE-1, and had no further contact with UCE-1.

On October 11, 2018, OCE-1 initiated a social media platform chat with the defendant. During the chat, the defendant expressed her frustration with UCE-1, who had reached out to the contact provided by the defendant. The defendant complained to OCE-1 that UCE-1 never gave the defendant an opportunity to explain that she provided the contact information for "charity" purposes. The defendant added that UCE-1 had "better destroy her phone… because [sic] they will break into their home and search everything once missing."

On August 14, 2019, the defendant was charged by indictment with one count of attempting to provide material support and resources to Hay'at Tahrir al-Sham, also known as HTS, a designated foreign terrorist organization. (Doc. 3). On December 18, 2019, the defendant was charged in a superseding indictment with one count of attempting to provide material support and resources to HTS, a designated foreign terrorist organization, and two counts of obstruction of justice. (Doc. 77). These allegations are based on evidence that the defendant introduced UCE-1 and her purported husband, OCE-2, to an individual, the Middle East-based user of a social media account, whom the defendant believed to be supportive of members of terrorist organizations operating in Syria, and whom the defendant also believed could facilitate the safe travel of UCE-

5

1 and OCE-2 into Syria to join the conflict there. The defendant had planned to travel to Syria herself to marry her fiancé, a foreign fighter in Syria, and had posted numerous images to her social media profile expressing sympathy for and solidarity with foreign fighters operating in Syria as well as antipathy toward the United States. The defendant also used self-destruct timers in text messaging applications, deleted social media accounts, and deleted text messages, after becoming aware of federal investigations into other subjects of this investigation. As part of the guidance provided to UCE-1, the defendant directed UCE-1 to delete information about the defendant from UCE-1's cell phone before traveling to Syria to join HTS.

The government's evidence at trial will show that the defendant believed in and supported jihadists in general and those fighting for HTS, in particular. The government intends to offer as evidence some of the online exchanges between the defendant and OCE-1, as well as online conversations between the defendant and UCE-1. The defendant also contributed funds to certain organizations that support the activities of jihadists. Although the defendant may claim that her monetary support was for charitable purposes, the evidence, obtained in part by an online FBI undercover employee ("OCE-3"), will establish that these organizations publicly solicited donations to be used to assist jihadi fighters in obtaining weapons, ammunition, and uniforms, and other forms of support.

The evidence will show that the defendant sought to travel to Syria to join HTS personnel there. The government intends to offer as evidence portions of the consensual audio and video recordings made by the FBI during in person meetings between the defendant and UCE-1. Although the defendant claimed that she was unable to travel to Syria to join her fiancé, she encouraged and provided guidance to others who wanted to travel to Syria. The defendant practiced and counseled operational security as she communicated with like-minded individuals,

and once she began to suspect that law enforcement might be investigating her actions and those of her online friends and associates, she affirmatively attempted to destroy evidence of her criminal conduct and advised others to do the same.

## **PROTECTIVE MEASURES SOUGHT**

Based upon the need to prevent disclosure of the identities of the UCE and OCEs, to protect the UCE and the OCEs, and to avoid compromising other undercover investigations and undercover investigative procedures, the government respectfully requests the adoption of certain security measures for the testimony of these law enforcement witnesses at trial. The proposed measures, based on similar measures endorsed by other courts, are narrowly tailored. They assure that the identity and security of these witnesses and the integrity of other undercover investigations will not be compromised by the appearance of the witnesses at trial, without impairing the defendant's Sixth Amendment rights. Specifically, the government requests that the Court implement the following measures:

1. The UCE and the OCEs may testify at trial using undercover pseudonyms without publicly disclosing their true identities;

2. The defense shall be prohibited from asking any questions that would reveal personally identifiable information or could lead to the discovery of the true identities of the UCE and the OCEs (to include name, contact information, address, or date or place of birth);

3. The defense shall be prohibited from asking any questions designed to identify certain online monikers or personas;

4. The defense shall be prohibited from asking any questions about other investigations in which the UCE and OCEs may have been or may be involved, including any ongoing investigations;

7

5. The defense shall be prohibited from asking any questions that would reveal the nature or extent of the FBI's undercover techniques or undercover training program;

6. The UCE and OCEs may testify in a manner that prevents their facial appearance from being revealed to the public, and their appearance will be obscured in any video or photographic evidence introduced during trial;

7. The UCE and OCEs may testify in light disguise;

8. Any recordings of the voices of the UCE and OCEs, apart from the official court record, are prohibited;

9. No public disclosure of any audio or video recording, or similar reproduction of the voices or visual images of the UCE or OCEs while testifying, shall be permitted;

10. All non-official recording devices shall be prohibited from being in the courtroom in which the UCE and OCEs testify, including personal cellular phones;

11. No courtroom sketches of the UCE or OCEs appearing as witnesses shall be permitted;

12. The UCE and OCEs shall be permitted to use a non-public entrance to and exit from the courthouse and the courtroom; and

13. The Protective Order sought by this motion may only be modified through a written superseding order issued by this Court.

A proposed protective order setting forth the above conditions is submitted with this motion.

## ARGUMENT

I. The Court Should Order Reasonable Security Measures to Protect From Public Disclosure the True Identities of the Undercover Employees Who Testify at Trial

The most drastic step used by courts to protect the identities of undercover personnel would be the closing of the courtroom during trial. While this option can be exercised in certain cases,[2] the government is not asking the Court to close the courtroom in this case. Rather, the government is requesting that the Court apply reasonable security measures to prevent the public disclosure of the true identities, facial images, and other information that would tend to identify the undercover personnel called to testify in this case. The government respectfully submits that adoption of these security measures would obviate the need to consider a partial closing of the courtroom during the testimony of the undercover witnesses.

The Confrontation Clause of the Sixth Amendment gives a defendant the right to confront and cross-examine the government's witnesses who testify against the defendant. *See Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois,* 390 U.S. 129 (1968). As the Supreme Court

---

2   As the Supreme Court has long recognized, the right to a public trial is not absolute, and "may give way in certain cases to other rights or interests, such as . . . the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia,* 467 U.S. 39, 45 (1984); *see also United States v. Simmons,* 797 F.3d 409, 412 (6th Cir. 2015); *United States v. Eisner,* 533 F.2d 987, 993 (6th Cir.), *cert. denied,* 429 U.S. 919 (1976). Partial closures of court proceedings have been upheld to protect the safety and responsibilities of undercover employees. *See United States v. Hendricks,* 950 F.3d 350, 355-56 (6th Cir. 2020) (no abuse of discretion in limited closure of courtroom during testimony of undercover FBI agent where district court clearly articulated that the witness's safety and the integrity of active investigations would be jeopardized if general public could observe his physical appearance); *Ayala v. Speckard,* 131 F.3d 62, 72 (2d Cir. 1997) (en banc) ("[t]he state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and . . . this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom."); *Rodriguez v. Miller,* 537 F.3d 102, 110 (2d Cir. 2008) ("It is clear that the State has an 'overriding interest' in protecting the identity of its undercover officers."); *United States v. Lucas,* 932 F.2d 1210, 1217 (8th Cir. 1991) (government established two 'overriding interest[s]' likely to be prejudiced if [female detective's] identity was not concealed: the ability of the police to conduct effective law enforcement operations, and the physical welfare of the officers involved."). Courtroom closures were justified because they were limited to the time of the employee's testimony. *See, e.g., Smillie v. Greitner,* 99 F. App'x 324, 326-27 (2d Cir. 2004); *Bobb v. Senkowski,* 196 F.3d 350, 352-55 (2d Cir. 1999); *Brown v. Kuhlman,* 142 F.3d 529, 538 (2d Cir. 1998); *Ayala v. Speckard,* 131 F.3d at 72; *accord United States v. Leos-Hermosillo,* No. 90-50546, 2000 WL 300967 at *1 (9th Cir. 2000), 213 F.3d 644 (unpublished opinion).

9

explained, the "elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig,* 497 U.S. at 846. "The rule is that once cross-examination reveals sufficient information to appraise the witness' veracity, confrontation demands are satisfied." *United States v. Falsia,* 724 F.2d 1339, 1343 (9th Cir. 1983); *United States v. Lanier,* 33 F.3d 639, 656 (6th Cir. 1994); *United States v. Jenkins,* 4 F.3d 1338, 1348 (6th Cir. 1993).

It is well established that a defendant has no absolute control over cross-examination. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (emphasis in original). The extent of cross-examination is within the sound discretion of the trial court. *Alford v. United States,* 282 U.S. 687, 694 (1931). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *accord Smith v. Illinois,* 390 U.S. at 133-34 (questions tending to endanger personal safety of witness go beyond proper bounds of cross-examination) (White, J. concurring). This Circuit has considered the authority of the trial court in managing cross-examination:

> Courts have striven to distinguish between the core values of the confrontation right and more peripheral concerns which remain within the ambit of the trial judge's discretion. . . Beyond certain 'essentials of cross-examination,'. . . the right to cross-examine is subject to limits imposed by the trial court in the exercise of its discretion. . . . Moreover, even when the core values of the Sixth Amendment are

invaded by a denial of cross-examination, the confrontation right may be displaced by 'competing interests [which], if closely examined,' may warrant dispensing with confrontation at trial.'

*Dorsey v. Parke,* 872 F.2d 163, 166 (6th Cir.), *cert. denied sub nom. Dorsey v. Sowders,* 493 U.S. 831 (1989) (citations omitted). The *Dorsey* court observed,

Where it is merely the extent of cross-examination that is limited, the trial judge retains a much wider latitude of discretion, though of course, that discretion may be abused. . . This Court has recognized that the test in such circumstances is whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory. '[O]nce cross-examination reveals sufficient information to appraise the witness's veracity, confrontation demands are satisfied,' The key word here is 'information.'

872 F.2d at 167 (citations omitted).

Courts have observed that "where there is a threat to the life of the witness, the right of the defendant to have the witness's true name, address and place of employment is not absolute." *United States v. Palermo,* 410 F.2d 468, 472 (7th Cir. 1969) (citation omitted); *see generally United States v. Fife,* 573 F.2d 369, 377 (6th Cir. 1976), *cert. denied,* 430 U.S. 933 (1977) (*Alford* and *Smith* do "not lay down a *per se* rule that a witness must always be required to give his residential address."); *see also Siegfriedt v. Fair,* 982 F.2d 14, 18 (1st Cir. 1992); *United States v. George,* Cr. Nos. 91-0521 and 92-0215 (RCL), 1992 WL 200027 (July 29, 1992) (names and identities of testifying CIA officers withheld from public disclosure, identities only revealed to the defendant, the court and jury on a "key card" filed under seal); *Clark v. Ricketts,* 958 F.2d 851, 855 (9th Cir. 1991), *cert. denied sub nom. Clark v. Lewis,* 506 U.S. 838 (1992) (name and address of DEA agent witness properly protected from cross-examination); *United States v. Contreras,* 602 F.2d 1237, 1238-40 (5th Cir. 1979) (where there was reasonable fear the disclosure of DEA agent's home address and frequent locations would endanger him and his family, no error precluding cross-examination as to home address and other background information even though

11

agent was "instrumental in defendant's arrest."); *United States v. Smaldone,* 484 F.2d 311, 318 (10th Cir. 1973) (informant's present address protected); *Kallstrom v. City of Columbus,* 165 F.Supp.2d 686, 696 n.9 (S.D. Ohio 2001).

Cross-examination into a witness's recent activities and employment has likewise been restricted to protect the testifying witness, upon a proper showing. *See United States v. Navarro,* 737 F.2d 625, 634 (7th Cir.), *cert. denied sub nom. Mugercia v. United States,* 469 U.S. 1020 (1974); *United States v. Watson,* 599 F.2d 1149, 1157 (2d Cir. 1979), *amended on reh'g on other grounds,* 690 F.2d 15, *modified en banc sub nom. United States v. Muse,* 633 F.2d 1041 (2d Cir. 1980); *see generally United States v. Gutierrez de Lopez,* 761 F.3d 1123, 1142-34 (10th Cir.), *cert. denied,* 574 U.S. 1053 (2014).

Courts have also approved the use of pseudonyms for witnesses whose identities require protection from public disclosure. *See, e.g., United Samos-Cruz,* 667 F.3d 487, 500 (4th Cir. 2012) (trial court decision to allow two government witnesses to testify under pseudonyms without revealing names, home and work addresses or dates and places of birth affirmed); *United States v. El-Mezain,* 664 F.3d 467, 493 (5th Cir. 2011), *cert. denied,* 568 U.S. 977 (2012) (prosecution for providing material support to a designated foreign terrorist organization; trial court found a "serious and clear need to protect the true identities" of two Israeli Security Agency witnesses who testified in pseudonym; although the defense could not verify the witnesses' credentials, defense had significant information concerning witnesses' employment, nationalities and background to conduct meaningful cross-examination); *United States v. Celis,* 608 F.3d 818, 834 (D.C. Cir. 2010) (protective order permitting government witnesses to use pseudonyms affirmed; order "involved a delicate balance of interests necessitated by extraordinary circumstances warranting special measures to protect key witnesses."); *Brown v. Kuhlman,* 142 F.3d at 532 n.3 (2d Cir. 1998)

12

(undercover detective who testified in closed courtroom permitted to testify using his badge number instead of true name, and on appeal, was referred to by pseudonym); *United States v. Naseer,* 10 CR 19 (S-4) (RJD), 2015 WL 13843166 at *3 (E.D. N.Y. Jan. 26, 2015) (district court allowed MI-5 officers to testify using pseudonyms in prosecution for conspiracy to bomb locations in New York City); *United States v. Mohamud,* 941 F. Supp.2d 1303, 1317 (D. Or. 2013) (UCEs permitted to use pseudonyms at trial in prosecution for attempted use of weapon of mass destruction; court noted that "[t]rue identities of trial witnesses have been withheld from the defense before, particularly when national security is at issue."); *United States v. Abu Ali,* 395 F. Supp.2d 338, 344 (E.D. Va. 2005) (use of pseudonyms by witnesses testifying during pre-trial Rule 15 deposition conducted from foreign country via satellite real time video to federal courthouse permitted).

Witnesses whose identities require protection have also been permitted to testify using a light disguise without violating the defendant's Sixth Amendment right to confrontation. The Supreme Court has recognized that exceptions exist to the defendant's right to confront face-to-face accusatory witnesses when (1) denial of such confrontation is necessary to further an important public policy; (2) a case-specific inquiry is conducted and/or where particularized findings are made determining that the denial of a face-to-face confrontation was necessary for the witness in question and to further public policy; and (3) only where the reliability of the testimony is otherwise assured. *Maryland v. Craig,* 497 U.S. at 855-57; *accord United States v. de Jesus-Casteneda,* 705 F.3d 1117 (9th Cir. 2013). The use of light disguise, such as wearing a wig, glasses and/or the addition of facial hair, is permissible if the changed appearance does not interfere with facial gestures or otherwise prevent the Court, the defendant and the jury from making assessments of a witness's demeanor and credibility. The Second Circuit has even allowed a witness to wear

13

dark sunglasses, concluding that the jurors had an unimpaired opportunity to assess the delivery of the witness's testimony, observe her demeanor and body movements and evaluate the traditional bases for evaluating testimony. *Morales v. Artuz,* 281 F.3d 55, 61-62 (2d Cir. 2002). Other courts have authorized a variety of light disguises to protect the identity of witnesses. *See, e.g., United States v. Pungitore,* 910 F.2d 1084, 1128 (3d Cir. 1990), *cert. denied,* 500 U.S 915 (1991); *United States v. Salemme,* No. 16-cr-10258-ADB, 2018 WL 2465359 at *4 (D. Mass. June 1, 2018); *United States v. Naseer,* 2015 WL 13843166 at *4: *United States v. Martinez,* 06 CR 0591 (RPP), 2007 WL 2710430 (S.D. N.Y. Sept. 13, 2007); *United States v. George,* 1992 WL 200027 (D. D.C. July 29, 1992).

When requested, courts have specifically directed that sketch artists be removed from the courtroom, or have prohibited the sketching of witnesses whose identities are to be protected while testifying. *See United States v. Kaufman,* No. CRIM. A. 04-40141-01, CRIM. A. 04-40141-02, 2005 WL 2648070 (D. Kan. Oct. 17, 2005); *United States v. Jacobson,* 785 F. Supp. 563 (E.D. Va. 1992); *George,* 1992 WL 200027. Images of undercover employees appearing on videotape that are presented as evidence during trial have also been ordered blurred and their voices altered to protect the identity of these witnesses from public disclosure. *United States v. Alimehmeti,* 284 F. Supp.3d 477, 486-87 (S.D. N.Y. 2018) (court authorized pixelating or as court exhibits); *United States v. Trofimoff,* No. 8:00-CR-197-T-24EAJ, 2001 WL 1644230 at *3 (M.D. Fla. June 12, 2011).

As an additional measure of security for witnesses who require protection, courts have permitted these witnesses to use a private entrance to and exit from the courthouse and the courtroom. *United States v. Schulte,* S2 17 Cr 548 (PAC), 2020 WL 534515 at *7 (S.D. N.Y. Jan. 31, 2020); *United States v. Abu Marzook,* 412 F. Supp.2d 913, 925-28 (N.D. Ill. 2006); *George,*

14

1992 WL 200027.

## II. The Proposed Protective Measures Are Narrowly Tailored to Protect the Identities of the Covert Government Employees Who Are Expected to Testify in this Case

The case law establishes that protection of the identity of witnesses requires the Court to engage in a fact-dependent analysis, considering the need for the protection and the potential effect of such protection on cross-examination. The Declaration of Assistant Director Jill Sanborn explains the compelling reasons to adopt the security measures proposed by the government. The FBI's undercover programs rely upon a small, selective group of highly trained and certified personnel. Declaration at ¶ 7. As Assistant Director Sanborn states, the undercover techniques employed through these programs provide "an important tool in the detection, prevention and prosecution of numerous investigations that are central to the FBI's national security and law enforcement missions." *Id.* at ¶ 6. The success of the FBI in countering terrorist and espionage activities depends in large measure on the specialized training that prepares covert assets to engage suspects effectively before destructive plans are undertaken. In fact, the true identities and extent to which FBI assets participate in national security matters are themselves classified. *Id.* at ¶ 10. Publically disclosing these assets would render these few, specially qualified people unavailable to work in ongoing or future investigations. It would also reveal the scope and nature of the training of these assets and disclose law enforcement strategies in dealing with national security threats. If effective law enforcement strategies are compromised, targets and the groups with which they are associated can be expected to undertake countermeasures to evade detection, conduct operational security and effectively render undercover techniques useless. *Id.* at ¶ 13.

There is a great public interest in preventing acts of terrorism both at home and abroad, and as Assistant Director Sanborn states, the personal threat to FBI assets from members of terrorist

15

organizations or terrorist sympathizers is real. In recent years, the threat to the welfare of FBI assets and their families has been documented on websites established and used by terrorist sympathizers. *See id.* at ¶ 12. Personal information, including names, addresses and photographs of law enforcement undercover agents and officers, has been posted and disseminated, together with messages encouraging retaliation against these employees based upon their work. Dissemination of personally identifiable information on the Internet not only threatens current covert assets and their families, but could dissuade others from participating in the FBI's Undercover Programs. *Id.* at ¶ 11. Given the small group of qualified law enforcement personnel certified to undertake this work, the loss of any of the FBI assets, or of the ability to recruit additional assets, could cause considerable harm to national security.

In a recent prosecution of a case involving the attempt to provide material support to a designated foreign terrorist organization, a trial court in the Southern District of New York adopted several security measures sought in this case to protect the identity of four FBI undercover witnesses during trial, acknowledging the importance of their work and the serious consequences to law enforcement efforts to combat terrorism that exposing the identities of such witnesses would bring. In the words of the court, undercover agents

> are sophisticated professionals who, by role, training and experience, serve to ferret out terrorist plots. Were their identities or physiognomies to become known, the [undercovers'] lives would be endangered and they would be unable to continue their lines of work. And the [undercovers'] compelled early retirement from this role would in turn compromise important national security interests. , , ,The history of [terrorism] prosecutions underscores the vital role that skilled and proactive [undercovers] play in exposing and intercepting deadly plots. A system of criminal justice that was so inflexible as effectively to require exposure of [undercovers] as an incident to prosecution would soon run dry of [undercovers], crippling the Government's ability to bring many cases in this area.

*Alimehmeti,* 284 F. Supp. 3d at 488.

16

The security measures proposed by the government in this case are narrowly tailored to protect the identities of the covert employees who have committed to this type of work but who are expected to testify at trial. The government has not requested the Court to close the courtroom, but rather, as reasonable alternatives to closure, seeks the maximum protection of the identities of its covert law enforcement personnel to ensure their ability to continue their important work. The security measures proposed by the government will not adversely affect the ability of the defendant to effectively cross-examine each witness as to the basis for their testimony, their interactions with the defendant, or the nature of their relationship with the defendant. The security measures will not restrict the defendant in the presentation of whatever defenses she seeks to maintain. The Court, the defendant and the jury will be given a full opportunity to observe the demeanor of each witness. The proposed security measures in this case, therefore, should be adopted.

## **CONCLUSION**

For all of the foregoing reasons, the government respectfully requests that the Court grant the government's motion for a protective order and adopt the government's proposed security measures to assure the safety of the FBI covert employees and their families. The government further requests that the Court make the following findings based on the law and the information presented herein: (1) The security measures proposed by the government are reasonable, narrowly tailored and necessary to protect from disclosure the true identity and identifying information of FBI covert employees at trial; (2) Disclosure of the true identities of the FBI covert employees would jeopardize their safety and their work, including ongoing investigations in which they are involved; (3) There is a substantial risk of danger to the FBI covert employees and their families if their true names and other identifying information were to be disclosed to the public; and (4) The defendant's constitutional rights would not be violated by adoption of the requested security

17

measures in this case.

                                        Respectfully submitted,

                                        DONALD Q. COCHRAN
                                        United States Attorney
                                        Middle District of Tennessee

By:     *s/Ben Schrader*
        BEN SCHRADER
        Assistant U.S. Attorney
        110th Avenue South, A96l
        Nashville, Tennessee 37203
        Phone: (615) 736-5151

By:     *s/Philip Wehby*
        PHILIP WEHBY
        Assistant U.S. Attorney
        110th Avenue South, A96l
        Nashville, Tennessee 37203
        Phone: (615) 736-5151

By:     *s/Jennifer Levy*
        JENNIFER LEVY
        Trial Attorney
        Counterterrorism Section
        U.S. Department of Justice
        950 Pennsylvania Avenue, N.W., Suite 7600
        Washington, D.C. 20530
        Phone: (202) 514-1092

**CERTIFICATE OF SERVICE**

       I hereby certify that on June 4, 2020 I filed one copy of the government's Motion for a Protective Order Pertaining to the Testimony of Undercover and Online Covert Employees via the CM/ECF case docketing system, which will send a Notice of Electronic Filing to counsel for defendant.

       *s/Ben Schrader*
BEN SCHRADER
Assistant U.S. Attorney
110th Avenue South, A96l
Nashville, Tennessee 37203
Phone: (615) 736-5151