# IN THE UNITED DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:19-cr-00013** |
| | ) | |
| | ) | |
| **GEORGIANNA A.M. GIAMPIETRO** | ) | **Chief Judge Waverly D. Crenshaw, Jr.** |
| **Defendant.** | ) | |

## RESPONSE TO GOVERNMENT'S NOTICE REGARDING 404(b) EVIDENCE
## AND MEMORANDUM OF LAW

Ms. Georgianna A.M. Giampietro, the defendant, through undersigned counsel, respectfully submits this Response to the Government's Notice Regarding 404(b) evidence ("Government's Notice"). Doc. 102. The government seeks to admit at trial documents containing allegations and suggestions of uncharged acts and speech that serves little, if any, probative value. These documents are not relevant to the charged offenses, are not admissible under Rule 404(b), and should be excluded as more prejudicial than probative under Federal Rule of Evidence 403 and 404(a) and (b). For these reasons, as set forth below, the Court should exclude the government's 404(b) evidence.

By: /s/ Charles Swift
Charles D. Swift,
Pro Hac Vice Attorney for Giampietro
CLCMA
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
(972) 914-2507

1

# MEMORANDUM OF LAW

## I.  Summary of the Argument

The government seeks admission of evidence of the defendant's alleged approval and praise of terrorist groups and acts; photographs from the defendant's cellphone depicting fighters in Syria, combat activities and statements of Anwar Al-Awlaki[1]; statements regarding the defendant's desire to travel to Syria in order to marry an alleged fighter; creation of a GoFundMe page to pay her debts; and alleged counter-surveillance techniques. The government argues that this evidence serves as a prelude to the charged offense and, as such, is intrinsic to the charged offense and therefore admissible independent of Fed. R. Evid.404(a)'s proscription against the admission of character evidence of the defendant. The government further argues that, even if the evidence regarding the defendant's support of terrorist organizations and desire to travel to Syria constitutes character evidence, it is nevertheless admissible under Rule 404(b) to establish the defendants "motive, intent, preparation for, plan regarding, knowledge underlying, or absence of mistake or lack of accident" with respect to the defendant introducing UCE-1 and UCE-2 to Individual A. Doc. 102 at 8. The government argues that the counter-surveillance evidence prior to March 2018 is similarly admissible. Finally, the government argues that the evidence is further necessary to rebut the anticipated defenses in this case.

The defendant asserts that the proposed evidence concerning her speech activity and desire to travel to Syria is neither part of a continuing pattern of illegality, nor inextricably intertwined with the indicted crime of attempting to provide material support to Hayat Tahrir Al-Sham (HTS) in the form of providing UCE-1 and UCE-2 as personnel, because the speech activity predated the

---

[1] Anwar Al-Awlaki is the American cleric who promoted violent resistance to the West as a religious duty and was killed in an airstrike in Yemen on September 30, 2011.

2

actions with UCE-1 and the speech activity is not criminal. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010). Further, the defendant's plans to travel to Syria to marry an alleged fighter had been abandoned.[2] Likewise, the defendant maintains that the speech and desire to travel are not admissible under Rule 404(b) because the acts are not probative of any material issue other than character. See *Huddleston v. United States*, 108 S. Ct. 1496 (1988). To the extent that they are probative, the probative value is outweighed by the prejudicial effect.

## II. Argument

For analysis purposes, the government's proposed 404(b) evidence can be broken into two categories. The first category is statements regarding terrorist groups present in Syria between 2015 and 2018. All of these statements are political speech and presumptively outside the charged period of time. These statements include:

- Posts to a social media platform in 2015 reflecting her support at the time for ISIS, a notorious foreign terrorist organization;
- Posts to a social media platform in 2015 espousing support for terrorist attacks against the United States;
- Researched, and demonstrated a familiarity with, the conflict in Syria and the various militia groups operating in the region between 2015 and 2018;
- Disseminated radical Islamic teachings via an encrypted social media platform between approximately 2016 and 2018;
- Statements during online communications with others on social media platforms between approximately 2017 and 2018, evincing knowledge of, and support for, various Islamic extremist organizations;
- Made statements to W-1, who reported that GIAMPIETRO (during the period when GIAMPIETRO supported ISIS) posted supportive comments about "Jihadi John,"

---

[2] With respect to the use of Telegram's secret chat feature and code words to avoid detection by other persons, including members of law enforcement, such activity is First Amendment protected conduct in the furtherance of private speech and does not constitute illegal activity in and of itself. The defendant concedes, however, that to the extent this Court accepts the government's arguments to the contrary, that the defendant's prior instruction to W-1 and W-2 would be admissible as to intent under Rule 404(b).

3

an ISIS fighter who became notorious for beheading captured prisoners, the man responsible for the Pulse nightclub shooting in Orlando;

- Maintained photographs on her cell phone of "Abu Abdullah" wearing military fatigues and posing with various firearms, as well as photographs of other foreign fighters accompanied by phrases urging persons to engage in violent jihad;

- Maintained photographs on her cell phone of dead bodies, including what appear to be photographs of victims of foreign fighters;

- Maintained photographs on her cell phone of what appear to be improvised explosive devices;

- Maintained photographs on her cell phone of statements by Anwar al-Awlaki, a radical Islamic cleric who has preached that Muslims have a religious duty to kill Americans;

- Maintained photographs on her cell phone of images related to organizations espousing contributions to the cause of foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING;

- Made statements to W-2, a minor, who followed GIAMPIETRO's channel, "Islamic Literature," on an encrypted social media platform, as well as GIAMPIETRO's profiles on other social media platforms; that GIAMPIETRO supported Jabhat al-Nusrah and HTS.

The second category of evidence is the defendant's prior potential travel to Syria to marry

Abu Abdullah. These statements include:

- Statement to W-2 that she wanted to take her son with her to Syria, where she planned to marry "Abu Abdullah";

- Expressed a desire to travel to Syria and marry a foreign fighter named "Abu Abdullah" during online communications which included OCE-1 (an online covert employee) between 2016 and 2018, and which included UCE-1 between 2017 and 2018, and with others on social media platforms between approximately 2016 and 2018;

- Communicated with "Abu Abdullah" via a social media platform in 2016 and 2017; Expressed a desire, during a face-to-face meeting with UCE-1 on November 28, 2017, to travel to Syria;

- Set up a GoFundMe page online in approximately 2017 so that others could help pay down her student loan debt, which was substantial, and which would enable her to travel to Syria herself.

**a.** **The defendant's statements are not intrinsic to the charged crime**

The Sixth Circuit has held that,

4

> [w]hen the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed 'extrinsic.' 'Intrinsic' acts, on the other hand, are those that are part of a single criminal episode. Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity.

United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir. 1995).

The government maintains that all of this proposed evidence is intrinsic to the charged count of attempted provision of material support to HTS. For this proposition, the government cites the 11th Circuit's holding in *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018). In *Springer*, the 11th Circuit held that a defendant's statements in support of ISIS were intrinsic to determining whether the defendant's threats were "true threats" or just hyperbole.

The defendant in this case, however, is not charged with making threats that must be subjected to analysis of whether the defendant made a "true threat" under the "objective listener" standard, but rather with providing material support to HTS in the form of services and personnel in violation of 18 U.S.C. § 2339B(a)(1). Section 2339B(a)(1) does not require the same subjective analysis of the facts surrounding the speech because § 2339B(a)(1), unlike 18 U.S.C. 115(a)(1)(B)[3], does not prohibit speech. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) (holding that, "[t]he statute [§ 2339B(a)(1)] does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. . . . What [§ 2339B] prohibits is the act of giving material support . . ." *Id.* at 2730 citing *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000). The mens rea required to violate 18

---

[3] 18 U.S.C. 115(a)(1)(B) prohibits speech in the form of threats to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section. Key to conviction under 18 USCS § 115(a)(1)(B) was whether defendant intentionally communicated threat. *United States v. Schiefen*, 139 F.3d 638 (8th Cir. 1998). Whether defendant's utterance was intended as a "true threat" had to be evaluated under "objective listener" standard. *United States v. D'Amario*, 461 F. Supp. 2d 298 (D.N.J. 2006).

U.S.C. § 2339B(a)(1) is knowledge about the organization's connection to terrorism and not the specific intent to further the organization's activities.

Unlike *Springer*, where the defendant's statements were intrinsically intertwined with an element of the offense, here, all the government need show is that the defendant knew about HTS's terrorist activities. Apart from the singular fact that the defendant, prior to the charged conduct, liked HTS, all of the speech reflects the defendant's general approval of radical Islamic teachings[4] which is protected speech, and therefore not part of a continuing pattern of illegality. Further, the defendant's prior approval of HTS would only be intrinsic if the theory of prosecution was that the defendant recruited UCE-1 and UCE-2 to the HTS cause[5]. But those are not the facts here. The facts here are clear that, rather than the defendant recruiting UCE-1 and UCE-2, they instead presented the defendant with their desire to join HTS and the defendant, instead of encouraging them, sought multiple times to discourage their involvement with HTS by telling them that HTS was "no good", that swearing allegiance to HTS was unnecessary, and that UCE-2's HTS contacts were untrustworthy. Exhibits A, B, C, D, F, G.

Instead, the prior speech is clearly being offered by the government to show that the defendant's extrinsic statements demonstrate her intent in providing Individual A's contact information to provide material support to HTS, instead of some alternative reason. Under Fed. R. Evid. 404, these acts may only be admissible if they fall within the exceptions set out in 404(b).

---

[4] The government's proffered list of statements omits the fact that later, during the charged conduct, the defendant expressed strong disapproval for ISIS, and most importantly, strong disapproval for HTS.
[5] See e.g. *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (finding in part that recruitment of individuals to support the ISIS cause in the United States constituted material support.)

6

**b.  The defendant's prior intent to travel to Syria is not intrinsic to the charged conduct**

Unlike the defendant's statements and posts regarding radical Islam and groups in Syria, her expressed desire to travel to Syria to marry and support an alleged fighter is not protected speech and indeed, had the defendant carried it out, it most likely would have constituted a crime. That fact, however, does not make it intrinsic to the current offense. First, the government has not proffered that the defendant's intent was to attempt to provide material support to HTS (the charged offense). Second, the intent to travel to Syria had been abandoned until the defendant could pay off her student debt, a prospect that had no likelihood of immediate fulfillment. Third, despite the undercover agents' best efforts, the defendant did not express an intent to travel with them to Syria in order to fulfill her prior desires. Finally, during the charged period, the defendant expressed that jihad was no longer appropriate in Syria because of infighting among the groups and she no longer maintained contact with the Syrian fighter she had expressed a desire to marry. Thus, the defendant's intent to travel is not intrinsically part of the charged conduct. Instead, it is again being offered to show that the defendant's desire to travel to Syria caused her to support the undercover's desire to travel Syria. In other words, the evidence is being offered to show that the defendant, in aiding UCE-1, was acting in accordance with her prior expressed desires to travel to Syria herself.

**c.  The defendant's statements are not admissible under 404(b)**

"The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Huddleston v. United States*, 108 S. Ct. 1496 (1988). Similar acts evidence "may be admissible for another purpose [other than showing character], such as proving motive, opportunity, intent,

7

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

Prior bad acts are inadmissible if they "are too unrelated" to the charged conduct or "too far apart in time to be probative of" the defendant's specific intent. *United States v. Clay*, 667 F.3d 689, 696 (6th Cir. 2012). These acts are also usually inadmissible under Fed. R. Evid. 403, because they have "a powerful impact on a juror's mind" despite their "slim probative value." *Ibid.* As the *Clay* Court noted, despite limiting instructions there is "too much of a risk that the jury will generalize from prior examples of bad character." *Id.* at 697.

The government's proffered reason here is that this evidence is admissible "as evidence of the defendant's motive, intent, preparation for, plan regarding, knowledge underlying, or absence of mistake or lack of accident" with respect to the defendant introducing UCE-1 and UCE-2 to Individual A as alleged in Count One. Doc. 102 at 8. The government does not offer further explanation of how the evidence concerning the defendant's prior statements expressing approval of so-called radical Islamic teachings and groups will further any of those objectives, citing instead to cases where similar statements have been admitted. See *United States v. Kaziu*, 559 F. App'x 32, 35-36 (2d Cir. 2014); *United States v. Mehanna*, 735 F.3d 32, 59-61 (1st Cir. 2013); *United States v. Abu-Jihaad*, 630 F.3d 102, 131-34 (2d Cir. 2010).

The defendant respectfully submits that this Court cannot analyze whether the 404(b) evidence is admissible for a proper purpose, and whether the probative value outweighs the prejudicial effect, independently of the factual background of the defendant's alleged provision of Individual A as a contact to UCE-1 and UCE-2. *See* <u>*Old Chief v. United States*, 117 S. Ct. 644 (1997)</u> (holding that with regard to the probative value of the evidence, the district court should

consider "the full evidentiary context of the case as the court understands it when the ruling must be made." *Id.* at 647.)

**Factual background concerning Individual A**

On September 23, 2018, the female undercover officer (UCE-1) told the defendant via a secret chat on Telegram that her husband Yusef (UCE-2) had sworn bayat[6] on both of their behalves to Hayat Tahrir al-Sham (HTS) and that she and her husband intended to travel via London to Syria in October of 2018. The defendant's immediate reaction was "no. HTS is no good. Abu has told me way too many stories." UCE-1 then tells the defendant that she had discussed HTS and Al-Qaeda (AQ) with her husband. The defendant responded "there are no known groups right now. And there's Hadith[7] about that also. When this situation approaches. That when there's no known group then stay in your home." UCE-1 then stated that in order to go over to fight, UCE-2 (her husband) had to pick a group to swear bayat to. The defendant tells her "no that's not true. The borders are open right now. 250ds to enter 3500ds to leave." UCE-1 tells the defendant "Right, but the brother was saying that HTS and AQ were working together against Assad." The defendant responds "mmmm. Don't believe everything you hear." Exhibit B at 1-22.

The defendant also expressed concern that UCE-2's contact was unreliable asking UCE-1 "where did he [UCE-2] find this person? He needs to be careful" and stating she was unsure about information that was given to UCE-1 and UCE-2 and about the trustworthiness of their contacts. Exhibits B, D, F. In response, UCE-1 asked the defendant if she knew someone that could serve as an alternative contact. The defendant indicated that she did. Later that day, the undercover again contacted the defendant via secret chat and related that she had told her husband that "(you) said

---

[6] Bay'at is an Arabic term used to describe a promise of allegiance to a leader.
[7] Islamic teachings from the life and times of the Prophet Muhammad.

she had some better travel agents we should talk to (your connections) for our vacation (traveling over)." Exhibit B at 30. UCE-1 then asked whether the contacts were brothers or sisters and told the defendant that her husband had directed her (UCE-1) to get their contact information from the defendant. Exhibit B at 38. The defendant responded that the contacts were brothers. UCE-1 then responded, "ok then he needs to reach out to them…do they have TG (Telegram)?" The defendant responded, "let me contact one of them first And I will get back to you in'shaAllah[8]". Exhibit B at 39. The defendant also told UCE-1 that "it might take a few days because they're not always by their phone." Exhibit B at 43. At 10:48 pm, UCE-1 asked "are these brothers in the U.K. Or S[9]?". The defendant replied, "T[10] and S". At 10:53pm, UCE-1 said, "I hope you don't feel like you have to do any of this, I really don't want you to feel like you have to… You have so much going on in your situation and have so much on your own plate with [redacted] and work and school…I feel like I'm adding to it." The defendant responded "na it's one text message to someone". Exhibit B at 45.

On September 26, 2018, the defendant indicated "I'm still waiting on this individual to message back. They haven't been to their phone." Exhibit C. On September 30, 2018, the defendant indicated "I'm surprised that person hasn't messaged me back I'm worried". Exhibit D. UCE-1 asked "have they read it?" and the defendant responded "no". Later on September 30, 2018, the defendant messaged with Individual A (AlsadaqahSyria) via Telegram secret chat and the defendant recorded screenshots of this conversation. In the conversation, the defendant told

---

[8] In'shaAllah is Arabic for God willing.
[9] S is short for Syria.
[10] T is short for Turkey.

Individual A of UCE-1 and UCE-2's desire to travel to Syria and asked if there was anyone who could help them. In response, Individual A asked "what's there intentions. There is no work. No jihad. Mashallah[11]". He says "There's a peace treaty now Allah knows best but I think jihad is finished for now. As in fighting. But still there is ribat[12]". Exhibit E. The defendant also asked "anyone can come in they don't have to make ba'yah before they come". Individual A replied "that is definitely not correct. Anyone who asks you to give ba'yah you must avoid completely. Total nonsense". Exhibit E.

After receiving this message, the defendant contacted UCE-1 and related what she had learned, telling UCE-1 "there is no work. There is no jhd right now. They're in a peace treaty. Also the one from hts, it is a lie. You don't give ba'yah to come." UCE-1 responded, I only know what [redacted UCE-2] told me" and asked "so they can't help us?". The defendant replied "No one will help unless you have work. They don't need anyone else to support". "There is no work right now". "And what ppl work is less than 5ds a day". "They don't want ppl coming unless they have plans. What are your plans". Exhibit F at 1-5. UCE-1 asked "Plans for what we will do there or what do you mean?" The defendant replied, "yes what are your plans for hijrah[13] and what will you do there." "No one is fighting." "They're in a peace treaty." The defendant then sent the recorded screenshots of her conversation with Individual A to UCE-1. Then the defendant told UCE-1 "only ribat is what they do. If that. Bc T (Turkey) are on the borders too with observations". The undercover responded "well [redacted UCE-2] can support physically in many ways, he's really strong. So if the jihad is that for now then that's what he will likely do…I haven't been privy

---

[11] Mashallah is Arabic for God has willed it.
[12] In this context, ribat refers to a complex used to house military volunteers.
[13] Hijrah is an Islamic term that means migration for the cause of Allah, usually from a non-Muslim country to a Muslim country.

11

to their conversations." Exhibit F. The defendant responds saying "there is no jihad. That's what I'm saying." UCE-1 responds "well if it's building/rebuilding, whatever he must do he will… Doesn't that seem strange to you that there is no jihad??" The defendant responds "I understand where these individuals are coming from they don't want you all hurt or homeless or without work." "Even when I spoke to Abu. He said no one is fighting." "He didn't know what will happen. Bc if you all go and there's no work or houses that means those people will have to support you." The defendant continued "They already have issues now with charity there. They recommend find a job before entering and a place to stay." UCE-1 replies "well we don't want that either." The defendant tells UCE-1 "They recommend find a job before entering and a place to stay." UCE-1 responds "I will have to ask [redacted UCE-2] about all of this…" The defendant responds "and to make sure it's legit. Bc whatever that hts individual said to him is a complete lie. Which I already told you that lol." Exhibit F and G.

UCE-1 later asks the defendant if the individual she had spoken to was with the people who were going to help her (the defendant) go over (referring to going to Syria). The defendant responds "Yes". UCE-1 then asks "I'll ask [redacted UCE-2] … should he just talk to them? I don't wanna put you in the middle on stuff. I feel bad because I feel like you do so much for me already." The defendant responds "Mmm they already said they won't help bc they don't know intentions." UCE-1 asks "what do you mean intentions?" The defendant responds "like I said before you alls plans. Work housing etc…" UCE-1 replies "I'll have to ask [redacted UCE-2]…" Exhibit F.

On October 2, 2018, the defendant asks UCE-1 if she had heard back from a woman in Syria that UCE-1 had messaged. UCE-1 replies that she has not responded to the woman yet but was "thinking of asking her what all I should bring, other than the google cards, what to expect

when we get there, are we staying with them or their family…". The defendant responds that she thinks the woman's message is "bait" and UCE-1 asks "is there a way to tell?". Exhibit G. The defendant replied "I asked someone about Google cards and the person said no they don't use. So I'm asking another person". The defendant then asks if UCE-1's female contact is "from the London brother?". Then the defendant tells UCE-1 "Have your husband message this account. @Alsadaqahsyria. I was told to give him this." UCE-1 asks "…ok is this the person that can help get us over??? Or who is this?" The defendant replies "just message him". UCE-1 tells the defendant that her husband (UCE-2) is "going to want to know why he should do this…I won't know what to tell him. Like for what purpose ya know." The defendant responds "If you have someone to help you then forget it. Khaloss. Very suspicious." UCE-1 then says "we do have someone, but what will this person serve as that's all…I mean if he's someone you trust to help us get over…". The defendant responds "Na forget it. Everything is too suspicious." UCE-1 responds "Ok I'm confused." The defendant tells UCE-1 "and I don't want to discuss this anymore." UCE-1 replies "Ok sis I didn't mean to upset you…I just don't have anyone to talk to about this stuff and you've always been that person." The defendant responds "I don't want to be involved anymore." UCE-1 says "Im really sorry" and the defendant responds "I don't like suspicious ppl." UCE-1 then tells the defendant that she is her most trusted friend and that she is scared, she apologizes again. The defendant responds "Let's not speak about this anymore. And you can use Google translate to translate her messages don't get eeman involved either." UCE-1 says that Google translate did not make sense of the messages, says that she did not mean to upset the defendant and then says that she would ask UCE-2 "to reach out to that brother". Exhibit G.

On October 4, 2018, UCE-2 contacted Individual A (@Alsadaqahsyria) via Telegram secret chat. In their conversation, UCE-2 told Individual A that he got Individual A's contact

13

information from Umm Roses.[14] UCE-2 asked if it was still possible to make hijrah, and Individual A replied "yes akhi. You can but safest to wait. There isn't any fighting at the moment. So you will be doing not much. Mainly guard duty. 5 or 7 days a month. The rest you at home unless you have other skills." UCE-2 then asked if Individual A can help UCE-2 and his wife (UCE-1) across if they made it to Turkey. Individual A replied "yes I can inshallah." UCE-2 then states that he had spoken to another brother who had mentioned it was very difficult to cross now. UCE-2 replies "It depends bro. Look. It's important you have a cover story." "Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like you're an aid worker. Then you have a good defence." UCE-2 asked why he would need a good defence and if it was in case they were stopped by Turkish authorities, Individual A responded "Yea. Also if you get stopped you have evidence to support your story." Exhibit H.

Later, on October 4, 2018, UCE-1 contacted the defendant via secret chat on Telegram to tell the defendant that UCE-2 had contacted Individual A saying, "Hey sis I just wanted to let you know that Yusuf [UCE-2] talked to that alsadaqasyria brother…he said he can help us get over alhamdulilah[15]…Jazak Allahu Khayran[16] for your help…" The defendant responds "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." UCE-1 responded "That's a big risk I thought you said you trusted him?" The defendant tells UCE-1 "Remember I don't want to talk about this and also if you remember I said to forget it. And not to worry about it. I never said he was for H. But that charity is trustable. You're going to get me arrested. Let's just not talk about this. Nor mention my name in anything. Jazakallahu Khayran." Exhibit I.

---

[14] Telegram screenname for the defendant.
[15] Alhamduliah is the Arabic word for the phrase Praise be to God
[16] Jazak Allahu Khayran is the Arabic phrase for May God Always Reward You (or Thank You).

### d.  **Motive and Intent**

"To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *United States v. Haywood,* 280 F.3d 715, 721 (6th Cir. 2002) quoting *United States v. Blankenship,* 775 F.2d 735, 739 (6th Cir. 1985). Here, the statements are not substantially similar and, most importantly, not reasonably near in time. First, all but one of the statements relate to other terrorist groups, not HTS. As such, they cannot be simply substituted for an intent on the part of the defendant to support HTS, despite her statements to the contrary. Equally important, they are not reasonably near in time. The Sixth Circuit has not set a fixed limit on what is reasonably near in time. (*See United States v. Ismail,* 756 F.2d 1253, 1260 (6th Cir. 1985) (stating "the rule is that the prior conduct must be reasonably near in time under the facts of the particular case.")(internal citations omitted).

In this case, the defendant's initial attitudes toward groups in Syria, and the Syrian conflict in general, are not reasonably near in time because during the intervening period, the situation on the ground in Syria changed and the defendant's attitudes changed with it. Specifically, the defendant objected to the groups fighting among themselves, which was referred to as a time of fitna[17]. The defendant and other members of the Telegram group discussed that, under those circumstances of disunity, jihad was impermissible because it meant fighting Muslims and that individuals should refrain from being part of the conflict and stay at home. The defendant's statements to UCE-1 telling her that there were no righteous groups in Syria and that during these times it was best to stay at home, are consistent with this belief. Exhibit B, C, D, F, G. These

---

[17] Fitna is an Arabic and Islamic term referring to a feeling of disorder or unrest and to describe the oppression of the powerful against the weak, or to describe individuals or communities giving in to the "whispers" of Satan and becoming divided.

15

statements are the best evidence of her intent and the religious rulings regarding going to fight. Because of the dissimilarities among the groups, and the tenuous relationship to the defendant's intent in furnishing UCE-1, introducing her speech also violates the First Amendment. *See Dawson v. Delaware,* 112 S.Ct. 1093 (1992) (where the defendant's membership in a racist group was introduced at trial, despite the fact that the victim was of the same race. The Court held this prejudicial because there was no relationship between the crime for which he was being tried and mere membership in the group.) Likewise, here, the relationship has been attenuated by the change in circumstances in Syria eliminating the appropriateness of jihad in the defendant's mind.

Whatever probative value the defendant's prior statements might have is likewise outweighed by its prejudicial effect. As the Sixth Circuit Court of Appeals has observed, in situations where the bad acts are no longer substantially similar, the court may exclude the evidence "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." *United States v. Snyde*r, 789 F. App'x 501, 506 (6th Cir. 2019) citing Fed. R. Evid. 403. This is particularly true here. The defendant's earlier statements regarding terrorism will undoubtedly pose a risk of luring the factfinder into declaring guilt on grounds different from proof specific to the offense charged (i.e. the knowing attempted material support of HTS). The more lurid the statement, the worse the potential for prejudicial effect. For instance, the government's proffered evidence concerning Anwar Al-Awlaki, ISIS, Jihadi John, praise of attacks in the United States, pictures of dead bodies and pictures of improvised explosive devices bear little to no relationship to the charged crime and would have serious prejudicial effect. This type of evidence in particular should be excluded under Fed. R. Evid. 403. See *United States v. Al-Moayad*, 545 F.3d 139, 159-66 (2d Cir. 2008).

### e. **Preparation and Plan**

The admission of the defendant's prior statements regarding her desire to travel to Syria in order to marry Abu Abdullah present a closer question. Presumably these statements would be introduced to substantiate the defendant's initial claim to UCE-1 that Individual A was a trusted person whom she had intended to use to help her go to Syria. The defendant later indicated to the contrary, that she did not know Individual A and had just found him on the internet. The defense does not dispute the potential relevance of the evidence regarding the defendant's prior plan to travel to Syria for the limited purpose of showing a prior relationship with Individual A as the source of her knowledge regarding travel and the absence of mistaken belief by the defendant that Individual A would not assist UCE-1 and UCE-2.[18]

However, the defense respectfully submits that the factual predicate for such evidence is, at present, missing. In order for the Court to evaluate the facts and circumstances of the defendant's relationship with Individual A, Individual A has to be identified. Without Individual A's identification, the potential to mislead and confuse the jury as to facts is heightened and the defendant suffers unfair prejudice. Individual A's statements to UCE-2, if offered for proof of the matter asserted (that he could help him get to Syria), are hearsay and do not fall within the exclusions provided by Fed. R. Evid. 803. Accordingly, the only way they may be admitted is under Fed. R. Evid. 807's residual exception, which permits admission when the statement is supported by sufficient guarantees of trustworthiness. "In order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth

---

[18] The defense maintains, as a matter of law, that voluntarily furnishing Individual A does not constitute a violation of 18 U.S.C. 2339B(a)(1)(B). See *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 394-401 (D. Conn. 2009) , finding that information does not constitute a physical asset sufficient to constitute material support and that volunteering information to a believed member of a terrorist organization does not sufficiently constitute service or personnel.

17

when the statement was made.'" *United States v. Washington*, 106 F.3d 983, 1001-02 (D.C. Cir. 1997). The defense respectfully submits that in the absence of evidence concerning the identity, location, and position of Individual A, it is impossible to determine whether he is credible. In the absence of Individual A's statements that he could assist UCE-2 to cross from Turkey to Syria, the evidence concerning the defendant's prior plans lose their relevance to the proceeding. Accordingly, the defendant urges this Court to withhold a ruling on the admissibility on the defendant's prior plans until the admissibility of Individual A's statements to UCE-2 are determined.

    **f.**   **The evidence is not necessary to pre-empt potential defenses**

Finally, the government argues that the 404(b) evidence is appropriate to rebut potential defenses including "… arguments that her online activity involving terrorist organizations related to research she was conducting into the Syrian conflict and into participants in that conflict; that she advocated for the establishment of a religious state, but opposed ISIS and other terrorist organizations as 'false' versions of that state; that she planned to travel to Syria to marry 'Abu Abdullah,' but abandoned that idea because of substantial student loan debt she had accrued; and that the government went to great lengths to convince her to aid UCE-1 and UCE-2 in their effort to travel to Syria to join HTS, eventually persuading her to provide them with the name of an overseas contact who could facilitate their travel into Syria." Doc. 102 at 9.

The government argues that the evidence is necessary to rebut a defense of entrapment to demonstrate that the defendant's research created a predisposition to aid UCE-1 and UCE-2, to rebut that she no longer approved of ISIS, to rebut that she had abandoned her interest in traveling to Syria because Abu Abdullah had stopped communicating with her, rather than her student debt

holding her back, and to show that the length of the government's investigation was justified by her suspicious and potentially criminal conduct over a period of years.

The defense agrees that predisposition evidence is admissible to rebut a defense of entrapment. *See United States v. Young*, 916 F.3d 368, 374-75, 378-79 (4th Cir. 2019); *United States v. Mohamud*, 843 F.3d 420, 423-24, 432-35 (9th Cir. 2016); and *United States v. Siraj*, No. 07-0221-cr, 2008 WL 2675826, at *2 (2d Cir. July 9, 2008). In fact, *Siraj* and *Mohamud* do not even analyze whether the evidence is admissible under 404(b) because the defense put forward a defense of entrapment. But, as much as the government anticipates, based on their conduct, that there will be such a defense, the defendant represents to this Court that she does not intend to offer a defense of entrapment or seek such an instruction. Accordingly, the holdings in *Young* and *Mohamud*, where the evidence was admitted to rebut the defendant's entrapment theory, are of no consequence here. Thus, in the absence of a defense of entrapment, the defendant's predisposition is not relevant and, in fact, the exact evidence that Rule 404(a) and (b) preclude.

Instead of entrapment, the defense intends to argue that the evidence is insufficient to satisfy the requirement that the defendant knowingly attempted to provide material support to a foreign terrorist organization in the form of services and personnel. In making this defense, the defendant does not dispute that she had knowledge of HTS's designation. Instead, the defendant intends to argue that the provision of Individual A's contact information was with the intent to persuade UCE-1 not to go ahead with her plan to join HTS and alternatively, that the mere furnishing of information to a potential member of a designated terrorist organization is insufficient to constitute providing personnel or services to the organization.[19] Accordingly, the

---

[19] See *United States v. Dhirane*, 896 F.3d 295, 303 (4th Cir. 2018) citing *Holder v. Humanitarian Law Project* at 16-17 (clarifying that the requisite "mental state" required to violate § 2339B is "knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities").

government's proposed 404(b) evidence does not rebut either of these claims. Unlike in *United States v. Kadir*, 718 F.3d 115, 123-24 (2d Cir. 2013), where evidence of the defendant posing with weapons was admissible to rebut a claim that he merely engaged in peaceful fundraising activities, or *United States v. Hammond*, 381 F.3d 316, 342-44 (4th Cir. 2004), where knowledge of a terrorist organizations unlawful activities was admissible to rebut the defendant's claim that he only sympathized with the humanitarian goals of the organization, evidence of the defendant's statements regarding jihadist groups and her prior intent to travel to Syria does not rebut this defense any more than it makes it more likely that the defendant committed a crime.

## III. <u>Conclusion</u>

For the reasons set forth above, the defendant respectfully requests that this Court deny admission of the following evidence on the grounds of Fed. R. Evid. 404(b):

- Posts to a social media platform in 2015 reflecting her support at the time for ISIS, a notorious foreign terrorist organization;
- Posts to a social media platform in 2015 espousing support for terrorist attacks against the United States;
- Researched, and demonstrated a familiarity with, the conflict in Syria and the various militia groups operating in the region between 2015 and 2018;
- Disseminated radical Islamic teachings via an encrypted social media platform between approximately 2016 and 2018;
- Statements during online communications with others on social media platforms between approximately 2017 and 2018 evincing knowledge of, and support for, various Islamic extremist organizations;
- Made statements to W-1, who reported that GIAMPIETRO (during the period when GIAMPIETRO supported ISIS) posted supportive comments about "Jihadi John," an ISIS fighter who became notorious for beheading captured prisoners, and about the man responsible for the Pulse nightclub shooting in Orlando;
- Maintained photographs on her cell phone of "Abu Abdullah" wearing military fatigues and posing with various firearms, as well as photographs of other foreign fighters accompanied by phrases urging persons to engage in violent jihad;
- Maintained photographs on her cell phone of dead bodies, including what appear to be photographs of victims of foreign fighters;
- Maintained photographs on her cell phone of what appear to be improvised explosive devices;

20

- Maintained photographs on her cell phone of statements by Anwar al-Awlaki, a radical Islamic cleric who has preached that Muslims have a religious duty to kill Americans;
- Maintained photographs on her cell phone of images related to organizations espousing contributions to the cause of foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING;
- Made statements to W-2, a minor, who followed GIAMPIETRO's channel, "Islaamic Literature," on an encrypted social media platform, as well as GIAMPIETRO's profiles on other social media platforms; that GIAMPIETRO supported Jabhat al-Nusrah and HTS.

The defendant further seeks that this Court defer admission of the following evidence regarding the defendant's prior intent to travel to Syria pending a determination of the admissibility of Individual A's conversation with UCE-2:

- Statement to W-2 that she wanted to take her son with her to Syria, where she planned to marry "Abu Abdullah";
- Expressed a desire to travel to Syria and marry a foreign fighter named "Abu Abdullah" during online communications which included OCE-1 (an online covert employee) between 2016 and 2018, and which included UCE-1 between 2017 and 2018, and with others on social media platforms between approximately 2016 and 2018;
- Communicated with "Abu Abdullah" via a social media platform in 2016 and 2017; Expressed a desire, during a face-to-face meeting with UCE-1 on November 28, 2017, to travel to Syria;
- Set up a GoFundMe page online in approximately 2017 so that others could help pay down her student loan debt, which was substantial, and which would enable her to travel to Syria herself.

Respectfully submitted this 12th day of June, 2020.

By: /s/ Charles Swift
Charles D. Swift,
Pro Hac Vice Attorney for Giampietro
CLCMA
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
(972) 914-2507

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of June, 2020, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of

electronic filing to all counsel of record.

By: /s/ Charles Swift

Charles D. Swift, Pro Hac Vice

Attorney for Giampietro

833 E. Arapaho Rd., Suite 102

Richardson, TX 75081
