IN THE UNITED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff, | )<br>)<br>)<br>) | |
| v. | )<br>) | Case No.: 2:19-cr-00013 |
| | )<br>) | |
| GEORGIANNA A.M. GIAMPIETRO<br>Defendant. | )<br>) | Chief Judge Waverly D. Crenshaw, Jr. |

## RESPONSE TO GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER PERTAINING TO UNDERCOVER AND ONLINE COVERT EMPLOYEES

The defendant, Georgianna A.M. Giampietro, by and through her attorneys, responds to the government's Motion for a Protective Order Pertaining to Undercover and Online Covert Employees which seeks thirteen protective measures for critical undercover ("UCE") and online covert ("OCE") employee (hereafter, collectively, "undercover") witnesses. Doc. 108. Pursuant to the Confrontation Clause of the Sixth Amendment of the United States, the right to an impartial jury under the Sixth Amendment of the United States and *Roviaro v. United States*, 77 S. Ct. 623, (1957), to the extent that this Court finds that protective measures are necessary, the defendant moves this Court to: (1) find that the government's proposed protective prohibitions on relevant issues for cross-examination violate the defendant's right to confront the witnesses against her; (2) reject the government's proposed restrictions on the facial appearance of the undercovers in order to prevent closure of the Court, in favor of the superior option of limited closure of the Court as outlined in *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 491 (S.D.N.Y. 2018)*;* (3) ensure the jury is not prejudiced by knowledge of any protective measures; and (4) order that the government

1

expansively produce any negative *Giglio* and *Brady* material related to the undercovers. *Giglio v. United States,* 92 S. Ct. 763 (1972) and *Brady v. Maryland*, 83 S. Ct. 1194 (1963).

### I.     Protective Measures Sought by the Government

The government has requested a proposed protective order setting forth the below:

1. The UCEs and the OCEs may testify at trial using undercover pseudonyms without publicly disclosing their true identities;

2. The defense shall be prohibited from asking any questions that would reveal personally identifiable information or could lead to the discovery of the true identities of the UCE and the OCEs (to include name, contact information, address, or date or place of birth);

3. The defense shall be prohibited from asking any questions designed to identify certain online monikers or personas;

4. The defense shall be prohibited from asking any questions about other investigations in which the UCE and OCEs may have been or may be involved, including any ongoing investigations;

5. The defense shall be prohibited from asking any questions that would reveal the nature or extent of the FBI's undercover techniques or undercover training program;

6. The UCE and OCEs may testify in a manner that prevents their facial appearance from being revealed to the public, and their appearance will be obscured in any video or photographic evidence introduced during trial;

7. The UCE and OCEs may testify in light disguise;

8. Any recordings of the voices of the UCE and OCEs, apart from the official court record, are prohibited;

9. No public disclosure of any audio or video recording, or similar reproduction of the voices or visual images of the UCE or OCEs while testifying, shall be permitted;

10. All non-official recording devices shall be prohibited from being in the courtroom in which the UCE and OCEs testify, including personal cellular phones;

11. No courtroom sketches of the UCE or OCEs appearing as witnesses shall be permitted;

12. The UCE and OCEs shall be permitted to use a non-public entrance to and exit from the courthouse and the courtroom; and

13. The Protective Order sought by this motion may only be modified through a written superseding order issued by this Court.[1]

## II. Argument

The government's requested protective measures implicate two separate but related constitutional rights: the defendant's rights to due process and to confront the witnesses against her under the Fifth and Sixth Amendments, as well as the requirement of a public trial and the ability to report on such a trial under the First and Sixth Amendments.

The government argues that its requested protective measures are necessary in order to avoid the closure of the courtroom during testimony of the undercovers. In so doing, the government necessarily places a higher premium on the public's right to attend a trial than the potential resulting prejudice to the defendant. That, of course, can never be the case. As the Supreme Court explained, at trial "the need for a truthful verdict outweighs society's need for the [confidential] privilege." *McCray v. Illinois*, 87 S. Ct. 1056, 1060 (1967) . Accordingly, as discussed below, every court to consider the issue has erred on the side of closure to protect the

---

[1] The government's proposed protective measures include standard restrictions on federal proceedings in items 8 and 10 which the defense does not oppose, with one caveat. In order to prevent the jury from perceiving that there is a particular threat posed by the defendant (which has not been alleged by the government), any announcements regarding cellphones should be made outside of the jury's presence. Additionally, the defense respectfully submits that as officers of the Court, counsel should be permitted to retain their personal cellphones, as long as they are turned off during proceedings. In addition to these standard restrictions, the government proposes restrictions on courtroom sketch artists in item 11 and permission to use a non-public entrance in item 12. With regard to item 11, the defense herein seeks partial closure of the courtroom as an alternative to the measures suggested by the government, potentially mooting the issue of courtroom sketch artists as they would not be present in the courtroom. In the event that the Court adopts alternative measures to partially closing the courtroom, the defense has no objection to a prohibition of sketches of any of the undercover witnesses provided the courtroom sketch artists, should there be any, are directed outside the presence of the jury. With regard to item 12, the defense has no objection.

defendant's rights, rather than putting in place the measures suggested by the government that would prejudice the defendant.

In fact, the requirement to consider alternatives to closure is not even before this Court. Under the Sixth Circuit's case law, a defendant or a third party must raise the objection to a closed hearing before the Court is required to consider alternatives. *See Johnson v. Gidley*, No. 16-1373, 2016 U.S. App. LEXIS 23477, *6 (6th Cir. Dec. 6, 2016) (holding that "[a] defendant is only entitled to have the trial court weigh the various interests discussed in Waller and Presley if the defendant objects"), citing *Waller v. Georgia*, 104 S. Ct. 2210, 2215 (1984). Here, the defendant not only does not object to partial closure, but urges the Court to utilize this protective measure as the purportedly least impactful to the defendant.[2]

A. **The defendant's rights to due process under the Fifth Amendment and right to confront the witness under the Sixth Amendment**

In assessing the appropriateness of the protective order requested by the government, the government maintains a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," but "[t]he scope of the privilege is limited by its underlying purpose." *Roviaro v. United States*, 77 S. Ct. 623, 627

---

[2] Courts distinguish between "full courtroom closures and partial courtroom closures." *See Garcia v. Bertsch,* 470 F.3d 748, 752 (8th Cir. 2006) ("Many courts ... have distinguished the complete closure in *Waller* from partial closures"). "Whether a closure is total or partial ... depends not on how long a trial is closed, but rather who is excluded during the period of time in question." *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013). A total closure is the exclusion of all persons from the courtroom for some period while a partial closure involves excluding one or more, but not all, individuals for some period. *Judd v. Haley*, 250 F.3d 1308, 1316 (11th Cir. 2001). Partial closures generally extend to the public but permit close family members or other persons with a significant interest to attend. The defendant submits that, in this case, a partial closure is appropriate. However, the defendant notes that in the present case this is likely to be a distinction without a difference because the defendant's close family relatives will likely be listed on the defense's witness list and therefore excludable on an alternative basis.

4

(1957). "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id*. at 628. In conducting this analysis, "no fixed rule with respect to disclosure is justifiable." "[T]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 629. Whether the informant's identity is material "depend[s] on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*

As a starting point, the government has not offered any specific evidence to support their request. Instead, the government provides only general information concerning the undercovers. It cites to FBI Assistant Director Jill Sanborn's declaration, which generically states that the FBI's undercover personnel are a small group of highly trained individuals that use important techniques central to the FBI's national security mission. The threat posed by disclosure is described, without particularization, as preventing assets from working in the future, revealing the nature and training of the assets and dissuading others from joining the undercover program. Ms. Sanborn states that this threat is not imaginary because terrorist organizations in the past have posted personal identifying information of other undercovers online. Doc. 108 at 15. What the government does not say, however, is whether any of the undercovers in this case continue to work undercover in the same area, whether any of the undercovers have ever been threatened, whether they have ever encountered suspects in the courthouse or faced any direct threats during this investigation. It is that level of particularization that would justify the protection of the undercovers' identity in the courtroom. *See Okonkwo v. Lacy*, 104 F.3d 21, 25 (2d Cir. 1996) (holding that revealing the undercover's identity has to cause "jeopardy to the undercover officer's effectiveness," or

5

jeopardize his life by reason of exposure of his identity); *see also id.* To do otherwise is to create a blanket rule for terrorism cases where the identity for undercover employees may always be withheld.

### B. <u>Impact on the defendant's right to confront the witness</u>

The Confrontation Clause of the Sixth Amendment protects a criminal defendant's right to cross-examine adverse witnesses. *See Smith v. Illinois*, 88 S. Ct. 748 (1968). Nevertheless, the right is not absolute and "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 106 S. Ct. 1431, 1435 (1986).

The government requested protective measures 2, 3, 4 and 5 to restrict the defendant's right to cross-examine the undercovers, thereby implicating the Confrontation Clause. The proposed protective measures prohibit the defense from: (a) asking any questions that would reveal personally identifiable information or could lead to the discovery of the true identities of the UCE (protective measure 2); (b) asking any questions about other investigations in which the UCE and OCEs may have been or may be involved, including any ongoing investigations (protective measure 4); (c) asking any questions that would reveal the nature or extent of the FBI's undercover techniques or undercover training program (protective measure 5); and (d) asking any questions designed to identify certain online monikers or personas (protective measure 3).

6

### 1. Restrictions on cross-examination that could reveal true identities

The defense does not dispute that questions about a witness' name, contact information, address, or date or place of birth are rarely relevant in cross-examination.[3] Accordingly, where courts have found that there is an interest in protecting the undercover's identity, courts have routinely restricted this area of cross-examination absent a showing of particular relevance. *See United States v. Alimehmeti*, 284 F. Supp. 3d 477, 491 (S.D.N.Y. 2018) (finding that the undercover's identity was neither exculpatory nor went to his credibility). The defense, however, notes that such a restriction cannot be license by the government to raise issues related to the witness's true identity free from cross-examination. For example, were the government to offer evidence citing the reports of confidential informants for the reasons that they instituted the present investigation, then the identity of these confidential informants becomes directly at issue. *See, e.g.*, *United States v. Hearn,* 500 F.3d 479, 483 (6th Cir. 2007) (holding that restriction on the defendant's right to cross-examination on identities of confidential informants was prejudicial error, when the government entered testimony regarding the details of reports from confidential informants).

### 2. Restrictions on cross-examination concerning undercover techniques and/or FBI training, other undercover investigations, and online personas and monikers.

In addition to restricting cross-examination directly bearing on the undercovers' identities, the government also proposes restricting the cross-examination of undercover agents on a broad variety of topics. The Supreme Court observed in *Rovario* that "[t]he scope of the privilege [undercover identity] is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are

---

[3] This information more generally pertains to locating a witness, which is not at issue here.

not privileged." *Rovario*, 77 S. Ct. at 627. Facially, none of these topics are directly related to the undercover informant privilege recited in *Rovario* because they do not tend to reveal the identity of the undercovers. The undercovers' participation in other investigations would only reveal their identity where that investigation had resulted in the discovery of their true identity. Likewise, the undercovers' techniques and training would not reveal the identities of the undercovers unless the information was publicly available and would enable a third party to discover their identities by means of comparing their publicly available experience to their in-court testimony. Finally, the online personas and monikers used by the undercovers in this case have no potential to reveal their identity. Presumably, these fictional names were chosen specifically because they did not directly relate to the undercover and would protect them from discovery. Accordingly, the undercover privilege is not relevant to any of these.

Instead, the *Alimehmeti* court, cited by the government, approached these topic areas from the Fed. R. Evid. 402 and 403 balancing test. *Alimehmeti*, 284 F. Supp. 3d at 494. Unlike *Alimehmeti*, the defendant here can articulate a theory of relevance for each of these specific areas of cross-examination. With regard to FBI undercover techniques and training, the defense has separately indicated that it does not intend to pursue an entrapment instruction.[4] Nevertheless, each

---

[4] The decision to forego an entrapment defense is a tactical one by counsel as there is ample evidence to suggest that the defendant here was entrapped, including the government's initiation of travel to Syria, the use of a fictitious religious leader and the invocation of the fictional friendship between the undercover and the defendant to aid the undercover and her husband in their efforts to travel to Syria. The defendant nevertheless has chosen to forego the entrapment defense based on the existence of propensity evidence which could lead a reasonable finder of fact to conclude that the defendant was not entrapped. The decision, however, is contingent on the Court's exclusion of the propensity evidence that the government seeks to separately admit. Should this evidence be admitted for a purpose other than showing propensity, then counsel would necessarily reconsider the decision to forego the entrapment defense. Pursuing the entrapment defense provides a separate basis for the necessity of information. *See Rovario*, 77 S. Ct. at 627 (holding that "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a

of these areas is relevant. Training is relevant to show the bias of the undercover agents and to explore their understanding of the defendant's conversations. For instance, the defendant and the undercover repeatedly use Arabic phrases and Quranic passages and teachings in their conversations. The undercovers' understanding of what the defendant was attempting to communicate is a product of their training and experience. Likewise, the undercovers' observations are a product of their experience. Unfortunately, some FBI agents have been exposed to anti-Muslim propaganda as part of their training. *See* Southern Poverty Law Center Intelligence Report, *FBI Used Training Materials from Anti-Muslim Extremists: Controversy erupted in July when it was revealed that the FBI was using anti-Muslim propaganda in the training of some counterterrorism agents*. SPLC, November 15, 2011, *located at* https://www.splcenter.org/fighting-hate/intelligence-report/2011/fbi-used-training-materials-anti-muslim-extremists (describing anti-Muslim materials provided to FBI counterterrorism agents during training). Cross-examining FBI agents regarding their training on Islam and Muslims is, under the circumstances, completely appropriate. Finally, the defense notes that *Giglio* material has not yet been produced regarding the undercover agents which may well open other areas of cross-examination.[5] In short, the broad prohibitions requested by the government on questions

---

cause[,]" and finding that the withholding of the informant's identity prejudiced the ability of the defendant) *Id.* Here, any defense of entrapment would encompass the areas the government seeks to preclude.

[5] The government's request not to disclose the identities of their undercover and covert employees does not diminish the requirement that it search for negative *Giglio* material on each of these employees. In fact, because the defendant will not have the identities of these employees to conduct its own investigation, the government should view its duties under *Giglio* and *Brady* more expansively in producing any adverse information relating to any of the undercover or covert employees. Specifically, the defendant requests that the government provide not just material related to the employees' professional performance, but any negative material outside of their performance (i.e. lawsuits, arrest and criminal records, personal matters etc.) *See United States v. Overton*, No. 15-CR-9S, 2017 U.S. Dist. LEXIS 22398, *8 (W.D.N.Y. Feb. 16, 2017).

related to undercover training and techniques only tangentially affect, if at all, the witness' identity, and would infringe upon the defendant's right to confront the witnesses against her.

   a. **Restrictions on questions concerning other investigations**

In this case, the defendant and the undercovers participated in group chats with two other women, both of whom are potential witnesses in this case.[6] Both of these women were simultaneously investigated by the government utilizing the same undercovers. W-1 was subsequently charged in a separate action in Alabama and W-2 may still be under investigation. Although a conspiracy is not charged in this case, the investigations of W-1 and W-2 are inextricably intertwined with the investigation of the defendant. Under the government's proposed protective order, the defense would be prohibited from asking the undercovers or the witnesses about their dealings with each other and conversations where both of the witnesses, along with the undercover and the defendant, were all participants. Foreclosing cross-examination about these investigations as the government suggests not only would exclude relevant information, it would permit the government to tell a one-sided story that obscures the truth.

   b. **Restrictions on questions concerning online personas and monikers**

Contrary to the government's representation that all of the restrictions proposed are similar to measures endorsed by other courts, the proposal regarding online personas and monikers is novel.[7] Not only do the online personas and monikers not constitute evidence that would reveal

---

[6] Government's Notice of 404(b) Evidence, Doc. 102, at 6.
[7] The government's request here also necessarily implicates Fed. R. Evid. 1002. Presumably, the government intends to introduce electronic documents in this case with the monikers and online personas of the government's undercovers redacted. This redaction violates Fed. R. Evid. 1001(4)'s requirement that a duplicate "accurately reproduces the original" and Fed. R. Evid. 1003's requirement that the circumstances do not make it unfair to admit the duplicate. The defendant argues in full its opposition to the government's proposal for the undercovers to testify

the true identity of the undercovers, such an order will lead to confusion by the finder of fact and prejudice the defendant. The online monikers and personas are used throughout the defendant's conversations, both online and in-person with the undercovers. Eliminating the ability to reference these documents by name creates confusion because, without them, it is not readily apparently who the individuals are talking about. Imagine for a moment cross-examining W-1 with one of the conversations:

> Counsel: "Well this conversation occurred between you and UCE-1."
>
> Witness: "I don't know who UCE-1 is."
>
> Counsel: "Well that's the person indicated in this document."
>
> Witness: "I don't know who that person is."
>
> Counsel: "Did you subsequently learn that one of the persons you contacted was an undercover?"
>
> Witness: "Yes."
>
> Counsel: "Is that the person in this document?"
>
> Witness: "I don't know."

In addition to prejudicing the right to effectively confront witnesses, the redaction of the online personas and monikers confuses the jury. The defense represents that there are at least 100 conversations between the undercovers, the defendant and other witnesses in this case. During the course of reviewing these materials, the defense itself has often become confused as to who is making the relevant statements in any particular conversation. Without using the online personas and monikers, the jury is also highly likely to be confused.

---

"in a manner that prevents their facial appearance from being revealed to the public, and *their appearance will be obscured in any video or photographic evidence introduced during trial*" (emphasis added).

11

Case 2:19-cr-00013   Document 124   Filed 06/19/20   Page 11 of 16 PageID #: 1030

Finally, and most importantly, the prohibition of evidence concerning the online persons and monikers will prejudice the defendant by suggesting to the jury that the defendant poses a threat to the government agents. In the primary case cited by the government, it was this prejudice that led the court to reject suggested alternative measures to partial closure of the court to protect the identity of the undercover informants. *See Alimehmeti*, 284 F. Supp. 3d at 494 (rejecting the use of disguise or a screen in favor of partial closure due to the risk that the jury would infer that the defendant presents a danger.); *see also United States v. Hernandez*, No. S1 12 CR 809 PKC, 2013 U.S. Dist. LEXIS 107221, 2013 WL 3936185, *2 (S.D.N.Y. July 29, 2013) (rejecting the use of a screen or disguise). "And because the jury would likely discern the fact of an [undercover's] disguise—including to the extent the undercover presented differently in the court than in a video recording—the jury might infer a potential for danger or retaliation against the [undercover], and draw negative inferences adverse to [the defendant]." *Alimehmeti* 284 F. Supp. 3d at 489, citing Memorandum and Order, *United States v. Pugh*, 1:15-cr-00116-NGG, 2016 U.S. Dist. LEXIS 194544 ("Pugh") (E.D.N.Y. Feb. 24, 2016).

Obscuring the names that the undercovers used online is likewise a red flag, unfairly signaling to the jury that the defendant poses a risk. *Alimehmeti* is relevant not only by way of analogy to a red flag, but also is illustrative of the inappropriate balance that the government would have this Court strike by adopting its proposed protective measures. Prioritizing the government's interest in an open trial, with thirteen protective measures, over the significant resulting potential for prejudice to the defendant cannot be the case. Like the courts in *Alimehmeti*, *Hernandez,* and

*Pugh,* this Court, to the extent it believes that protecting the online personas and monikers is necessary should instead implement partial closure.[8]

### c. Restrictions permitting the undercovers to testify in a manner that prevents their facial appearance from being revealed to the public, including obscuring their faces in any video or photographic evidence, using light disguise and testifying behind a screen.

Obscuring the undercovers' faces in video and photographic evidence, like the use of monikers, is unprecedented. In *Alimehmeti*, the government sought to obscure the images in publicly available materials, stating "[a]ny videos, photographs, or other images of the UCs that are shown in open court, or otherwise made available to the public, [will] . . . be altered to pixelate or otherwise obscure the UCs' faces". There was, however, a critical caveat because the measure did not apply "to materials viewed only *by the Court, essential courtroom personnel, the jury, the defendant and his counsel, and the Government's trial team.*" 284 F. Supp. 3d at 482 (emphasis added). The court's understanding of the caveat was that the government proposed showing the unpixelated videos to the jury, defendant, and counsel on their screens, while simultaneously broadcasting a pixelated video to the courtroom. The government further proposed that the undercovers testify in light disguise or behind a partition to prevent their recognition. The court ultimately found that this measure was not going to work, as explained above, and held that the differences in light disguise and what the jury saw on the video would necessarily create prejudice. The government now seeks to eliminate this issue by pixelating the image that everyone sees. This is not a solution, as the court noted in *Alimehmeti* "the jury would likely discern the fact of a UC's disguise—including to the extent the UC presented differently in the court than in a video recording—the jury might infer a potential for danger or retaliation against the UC, and draw

---

[8] The defendant notes again that this consideration should only be made if the Court is satisfied that the disclosure of the online personas or monikers will reveal the identity of the undercover persons, a dubious proposition at best.

13

negative inferences adverse [to the defendant]". *Alimehmeti*, 284 F. Supp. 3d at 489. If the slight difference between light disguise and a video is sufficient to cause a potential for prejudice, which may or may not be noticed, the pixilation is a flashing red light improperly suggesting that the defendant poses a potential for danger or retaliation against the undercovers. Moreover, the government's proposed protective order backdoors admission of altered recording evidence under Fed. R. Evid. 1002 as a duplicate. Courts have allowed enhancements to videos where the enhancement makes it easier to identify the persons in the video, finding that the enhancement changes the image only in a metaphysical sense and has no effect on the accuracy of the image. *See United States v. Seifert*, 351 F. Supp. 2d 926, 928 (D. Minn. 2005). But no court has ever permitted a video to be redacted to prohibit the finder of fact from identifying the persons in the image. The plain language of Fed. R. Evid. 1001(4) defines a duplicate as an accurate reproduction of the original. The government's proposal fails to meet this requirement because it would not be an accurate reproduction. Further, Fed. R. Evid. 1003 prohibits the introduction of a duplicate under circumstances where it would be unfair. As the *Alimehmeti* court explained, the duplicate here would clearly be unfair to the defendant because it would suggest that she is dangerous.

The solution here, as it was in *Alimehmeti*, is to close the courtroom during the undercover's testimony. This solution presents minimal prejudice to the defendant. Because the courtroom has been closed in the past, there has been no media attention to this case and no spectators for any of the earlier proceedings. Accordingly, the jury is not likely to even note a partial closure. Further, the prevention of the dissemination of the undercover's images can be easily accomplished by substituting, in the record of trial, the pixelated videos.

### III.   Conclusion

For the reasons stated above, to the extent the Court finds that protective measures are necessary, the defendant respectfully submits that the Court should find that the government's proposed protective restrictions on cross-examination prohibiting the defense from asking questions designed to identify certain online monikers or personas; other investigations; undercover techniques and training, infringe on relative areas of cross-examination and violate the defendant's right to confront the witnesses against her. Additionally, the Court should reject the government's proposed restrictions on the facial appearances of the undercovers in favor of the superior option of limited closure of the court as outlined in *Alimehmeti*. Lastly, restriction of the undercovers identities precludes defense investigation of the undercover witnesses and the defense respectfully requests the Court order that the government expansively produce any negative *Giglio* and *Brady* material related to the undercovers.

Respectfully submitted this 19th day of June, 2020.

By: /s/ *Charles D. Swift*
Charles D. Swift,
*Pro Hac Vice* Attorney for Giampietro
CLCMA
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
(972) 914-2507

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of June, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ *Charles D. Swift*
Charles D. Swift, *Pro Hac Vice*
Attorney for Giampietro
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
