# IN THE UNITED DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:19-cr-00013** |
| | ) | |
| | ) | |
| **GEORGIANNA A.M. GIAMPIETRO** | ) | **Chief Judge Waverly D. Crenshaw, Jr.** |
| **Defendant.** | ) | |

## <u>MOTION IN LIMINE REGARDING 404(b) EVIDENCE AND MEMORANDUM OF LAW IN SUPPPORT</u>

Ms. Georgianna A.M. Giampietro, the defendant, through undersigned counsel, respectfully submits this Motion in Limine regarding the 404(b) evidence of which the government has given notice ("Government's Notice"). Doc. 102. Specifically, the defendant through counsel, moves, in limine, for this Court to prohibit the government from introducing the following evidence in its case-in-chief:

- Posted supportive comments about "Jihadi John," an ISIS fighter who became notorious for beheading captured prisoners, and about the man responsible for the Pulse nightclub shooting in Orlando, Florida.

- Made posts to a social media platform in 2015 reflecting her support at the time for ISIS, a notorious foreign terrorist organization, including supportive comments about "Jihadi John," an ISIS fighter who became notorious for beheading captured prisoners.

- Made posts to a social media platform in 2015 espousing support for terrorist attacks against the United States including positive comments concerning Omar Mateen and his attack of the Pulse night club in Orlando, Florida.

- Shared posts of radical Islamic teachings on a Telegram channel including posting Anwar Al-Awlaki's "44 Ways to Support Jihad".

1

In addition to these statements and posts, the government then seeks to introduce evidence that the defendant:

- Maintained photographs on her cell phone of foreign fighters accompanied by phrases urging persons to engage in violent jihad;

- Maintained photographs on her cell phone of dead bodies, including what appear to be photographs of victims of foreign fighters;

- Maintained photographs on her cell phone of what appear to be improvised explosive devices;

- Maintained photographs on her cell phone of statements by Anwar al-Awlaki; and

- Maintained photographs on her cell phone of images related to organizations espousing contributions to the cause of foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING.

For the reasons set forth in the attached Memorandum of Law, defendant respectfully requests that this Court find that the evidence concerning each of the above topics is extrinsic to the charges in this case and inadmissible under Federal Rule of Evidence 404(b) and/or is more prejudicial than probative under Rule 403.

Respectfully submitted this 3rd day of August, 2020.

By: /s/ Charles Swift
Charles D. Swift,
Pro Hac Vice Attorney for Giampietro
CLCMA
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
(972) 914-2507

## MEMORANDUM OF LAW

### A.  Summary of the Argument

The government's 404(b) notice includes intent to offer evidence concerning the defendant's statements  between January 2015 and February 21, 2018, expressing approval and praise of terrorist groups and acts; photographs from the defendant's cellphone depicting fighters in Syria, combat activities and statements of Anwar Al-Awlaki[1]. The government also provides notice of the intent to offer the defendant's statements regarding her intent to travel to Syria in 2016 to marry an alleged ISIS fighter. The government also seeks to offer the defendant's statements regarding an online relationship with a man in Syria (Abu Abdullah) and her desire to travel to marry him; and her creation of a GoFundMe page to pay her debts.

The government argues that the above evidence serves as a prelude to the charged offense and, as such, is intrinsic to the charged offense and therefore admissible independent of Fed. R. Evid.404(a)'s proscription against the admission of character evidence of the defendant. The government further argues that, even if the evidence regarding the defendant's support of terrorist organizations and desire to travel to Syria constitutes character evidence, it is nevertheless admissible under Rule 404(b) to establish the defendants "motive, intent, preparation for, plan regarding, knowledge underlying, or absence of mistake or lack of accident" with respect to the defendant introducing UCE-1 and UCE-2 to Individual A. Doc. 102 at 8. Finally, the government asserts in its notice, that the evidence is alternatively necessary to rebut the anticipated defense of entrapment, and/or, the defense that the defendant lacked the requisite intent to support HTS when she provided contact information to the undercover (UCE-1).

---

[1] Anwar Al-Awlaki is the American cleric who promoted violent resistance to the West as a religious duty and was killed in an airstrike in Yemen on September 30, 2011.

The defendant asserts that the proposed evidence concerning her speech activity and desire to travel to Syria is neither part of a continuing pattern of illegality, nor inextricably intertwined with the indicted crime of attempting to provide material support to Hayat Tahrir Al-Sham (HTS) in the form of providing UCE-1 and UCE-2 as personnel, because the speech activity predated the actions with UCE-1 and the speech activity is not criminal. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010). Further, the defendant's plans to travel to Syria to marry an alleged fighter had been abandoned.[2] Likewise, the defendant maintains that the speech and desire to travel are not admissible under Rule 404(b) because the acts are not probative of any material issue other than character. See *Huddleston v. United States*, 108 S. Ct. 1496 (1988). To the extent that they are probative, the probative value is outweighed by the prejudicial effect.

### B.  Factual Background

The Court must decide whether to admit or exclude evidence in this case against the backdrop of the charged offenses. The government alleges that between February 22, 2018 and October 23, 2018, the defendant knowingly attempted to provide material support and resources, namely, personnel and services, to Hay'at Tahrir al-Sham, also known as HTS, a designated foreign terrorist organization, in violation of 18 U.S.C. 2339B(a)(1). (Doc. 77 at 1.)

Prior to 2015, the defendant converted to Islam. Beginning in 2015, she began studying international relations with a focus on learning about the Middle East. The defendant also had various social media accounts where she would post pictures and comments. These social media

---

[2] With respect to the use of Telegram's secret chat feature and code words to avoid detection by other persons, including members of law enforcement, such activity is First Amendment protected conduct in the furtherance of private speech and does not constitute illegal activity in and of itself. The defendant concedes, however, that to the extent this Court accepts the government's arguments to the contrary, that the defendant's prior instruction to W-1 and W-2 would be admissible as to intent under Rule 404(b).

4

posts expressed a clear support for the religious insurgency occurring in Iraq and Syria as well as against Bashar al-Assad, including supportive messages for the designated terrorist organizations of Al-Qaeda, ISIS and Jabhat al-Nusrah. Beginning in 2015, the defendant also joined social media groups and channels where she and others discussed jihad, the political situation in Iraq and travel to Iraq. In one of these channels, the defendant was befriended by an online covert employee (OCE-1).

In May 2016, the defendant shared and discussed an article with OCE-1 about ISIS declaring that Osama Bin Laden and others were infidels[3]. The defendant told OCE-1 that this meant ISIS was creating disunity and stated that she did not support any groups in the Middle East, only "brothers who fight and follow the word." In 2016 the defendant continued to post images and articles about the situation in Iraq and Syria while also telling OCE-1 about her online relationship with a fighter in Syria who she had considered traveling to marry. That relationship failed and the defendant explained to OCE-1 in June 2016 that she no longer supported any groups based on specific Islamic teachings that she shared with OCE-1 which discourage joining any groups where there is confusion, stating that in those circumstances, it is better to remain in the home.

Between 2015 and early 2018, the defendant was active online and discussed a relationship with a man in Syria along with the Syrian regime's gas attacks and civilian casualties, the political situation in Iraq and Syria, Islam, and various teachings. In particular, during these early discussions and posts, the defendant:

- Posted supportive comments about "Jihadi John," an ISIS fighter who became notorious for beheading captured prisoners, and about the man responsible for the Pulse nightclub shooting in Orlando, Florida. (See, for example, Exhibit A).

- Made posts to a social media platform in 2015 reflecting her support at the time for ISIS, a notorious foreign terrorist organization including supportive comments about "Jihadi John,"

_____

[3] Non-believers.

an ISIS fighter who became notorious for beheading captured prisoners. (See, for example, Exhibit A and B).

- Made posts to a social media platform in 2015 espousing support for terrorist attacks against the United States including positive comments concerning Omar Mateen and his attack of the Pulse night club. (See, for example, Exhibit A).

- Shared posts of radical Islamic teachings on a Telegram channel including posting Anwar Al-Awlaki's "44 Ways to Support Jihad".

In addition to these statements and posts, the government the seeks to introduce evidence

that the defendant:

- Maintained photographs on her cell phone of foreign fighters accompanied by phrases urging persons to engage in violent jihad. (See, for example, Exhibits B, C, and D).

- Maintained photographs on her cell phone of dead bodies, including what appear to be photographs of victims of foreign fighters.

- Maintained photographs on her cell phone of what appear to be improvised explosive devices.

- Maintained photographs on her cell phone of statements by Anwar al-Awlaki. (See, for example, Exhibits A and D).

- Maintained photographs on her cell phone of images related to organizations espousing contributions to the cause of foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING. (See, for example, Exhibits B and C).

- Statement to W-2 that she wanted to take her son with her to Syria, where she planned to marry "Abu Abdullah".

- Expressed a desire to travel to Syria and marry a foreign fighter named "Abu Abdullah" during online communications which included OCE-1 (an online covert employee) between 2016 and 2018, and which included UCE-1 between 2017 and 2018, and with others on social media platforms between approximately 2016 and 2018.

- Communicated with "Abu Abdullah" via a social media platform in 2016 and 2017; Expressed a desire, during a face-to-face meeting with UCE-1 on November 28, 2017, to travel to Syria.

- Set up a GoFundMe page online in approximately 2017 so that others could help pay down her student loan debt, which was substantial, and which would enable her to travel to Syria herself. (See, for example, Exhibit E).

6

The defendant also expressed a desire to travel to Syria to marry two different individuals. The first was Abu Talha. Abu Talha had represented that he was a fighter in Syria in his communications with the defendant. The relationship however, ended in 2016 after many arguments, including regarding which group he joined. Thereafter, they ceased communications.

In 2017, the defendant began a second online romance with a man in Syria named Abu Abdullah.[4] Abu Abdullah did not indicate that he was a member of any particular organization in his communications with the defendant. The defendant repeatedly expressed a desire to go to Syria to marry Abu Abdullah. Blocking the defendant, however, was the fact that she had significant student loan debt and her Islamic belief prevented her from traveling until her debt was paid. On May 28, 2017, a Muslim friend of the defendant set up a GoFundMe page titled "Revert sister in debt" to help raise funds to support the defendant with financial difficulties and debts. The defendant raised some monies towards her debts and other items from this fund and other sources. However, the student debt balance has remained largely outstanding.

In 2018, OCE-1 introduced UCE-1 to the defendant online. UCE-1 represented that she was a Muslim convert who was married to a Muslim man (UCE-2). In February 2018, the defendant met with UCE-1 in person and they discussed travel to Syria, the defendant's online romance, Islam, the political situation in Iraq and hijrah. In 2018, the defendant also created a Telegram group chat that she invited UCE-1 to join. The two other members were a woman from Alabama and a woman from California. This group chat was used to share articles and messages about the defendant's relationship, the women's shared interest in the news and politics related to various groups in Iraq

---

[4] The government has not indicated, and the defense assumes, that Count One does not charge the defendant's discussions regarding her desire to travel to Syria for marriage as an attempt to provide material support as those discussions amounted to mere planning and would not be sufficient for a conviction under 18 U.S.C. 2339B(a)(1). *See United States v. Farhane*, 634 F.3d 127, 151 (2d Cir. 2011).

and Syria, the defendant's financial situation and Islamic teachings.

Throughout 2018 the defendant had numerous conversations with UCE-1 online. In June 2018, the defendant and UCE-1 discussed the possibility of travel to Syria and the defendant's insistence that she could not travel anywhere until her debt was paid. In August 2018, the defendant tells UCE-1 that her online relationship with the man in Syria had ended. After the end of her online relationship the defendant begins applying for new jobs in Tennessee.

On September 23, 2018, UCE-1 informed the defendant that her husband had sworn allegiance to HTS and that they both had a plan to travel to Syria to join HTS soon. In response, the defendant told UCE-1 that HTS was not good, and that "[t]here are no known groups right now. And there's Hadith about that also. When this situation approaches…that when theres no known group then stay in your home" UCE-1 said that because she intended to go to Syria with her husband they were required to pick a group to join. The defendant told UCE-1 that this was not true because the borders were open. The defendant counseled UCE-1 to be careful and that she was worried for her safety.

Between September 23 and October 2, 2018, UCE-1 shared details of her plans to travel to Syria with the defendant and asked the defendant for advice. The defendant told UCE-1 that their plan seemed unwise and asked which contacts UCE-1 was using in London to help them. The defendant told UCE-1 she would ask an online friend in Syria about UCE-1 and UCE-2's plans to travel. In a private chat between the defendant and Individual A, Individual A told the defendant that there was no fighting in Syria for the UCE's to join, that they were not required to swear allegiance to HTS and discouraged them from traveling if they did not have jobs there already.

The defendant shared this info with UCE-1 and told her that she thought the UCE's plans to travel seemed like a bad idea based on what Individual A had told her. UCE-1 asked for Individual A's contact information to give to her husband (UCE-2) so that he could discuss their plans with

8

him directly. The defendant gave Individual A's contact information to UCE-1. UCE-1 then asked the defendant what the purpose was for her providing the contact information and the defendant old UCE-1 that she did not want to talk about it anymore and that she felt it was suspicious.

On October 4, 2018, UCE-2 contacted Individual A (@Alsadaqahsyria) via Telegram secret chat. UCE-2 asked if it was still possible to make hijrah, and Individual A replied "yes akhi. You can but safest to wait. There isn't any fighting at the moment. So you will be doing not much. Mainly guard duty. 5 or 7 days a month. The rest you at home unless you have other skills." UCE-2 then asked if Individual A can help UCE-2 and his wife (UCE-1) across if they made it to Turkey. Individual A replied "yes I can inshallah." UCE-2 then states that he had spoken to another brother who had mentioned it was very difficult to cross now. UCE-2 replies "It depends bro. Look. It's important you have a cover story." "Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like you're an aid worker. Then you have a good defence." UCE-2 asked why he would need a good defense and if it was in case they were stopped by Turkish authorities, Individual A responded "Yea. Also if you get stopped you have evidence to support your story."

Later, on October 4, 2018, UCE-1 contacted the defendant via secret chat on Telegram to tell the defendant that UCE-2 had contacted Individual A saying, "Hey sis I just wanted to let you know that Yusuf [UCE-2] talked to that alsadaqasyria brother…he said he can help us get over alhamdulilah[5]…Jazak Allahu Khayran[6] for your help…" The defendant responds "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." UCE-1 responded "That's a big risk I thought you said you trusted him?" The defendant tells UCE-1 "Remember I don't want to talk about this and also if you remember I said to forget it. And not to worry about it. I never said he was for H.

---

[5] Alhamduliah is the Arabic word for the phrase Praise be to God
[6] Jazak Allahu Khayran is the Arabic phrase for May God Always Reward You (or Thank You).

But that charity is trustable. You're going to get me arrested. Let's just not talk about this. Nor mention my name in anything. Jazakallahu Khayran."

**C.** <u>**Argument**</u>

a. **The defendant's statements regarding ISIS, Omar Mateen, Jihadi John, and Anwar Al-Awlaki are not intrinsic to the charged crime**

The Sixth Circuit has held that,

> [w]hen the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed 'extrinsic.' 'Intrinsic' acts, on the other hand, are those that are part of a single criminal episode. Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity.

<u>United States v. Barnes</u>, 49 F.3d 1144, 1149 (6th Cir. 1995).

Under Barnes, the defendant's statements regarding ISIS, Omar Mateen, Al-Qaeda, Al-Nusrah etc. made prior to the charged period of February 22, 2018 to October 2018, are extrinsic. First, they fall outside of the charged period. Further, they are not part of a continuing pattern of illegal activity.

Section 2339B(a)(1) makes it a federal crime to "knowingly provide[] material support or resources to a foreign terrorist organization," as well as to "attempt[] or conspire[]" to do the same. 18 U.S.C. § 2339B(a)(1). The term "material support or resources" is defined to include the provision of any "service" or "personnel." *Id*. § 2339A(b)(1). A person, however, does not work under the "direction or control" of a terrorist organization if she "act[s] entirely independently of the . . . organization to advance its goals or objectives." *Id.; see also Holder v. Humanitarian Law Project, 561 U.S. 1, 23 (2010)* (emphasizing that the term "personnel" excludes "independent advocacy").

There is no evidence that the defendant made her statements while acting under the direction or control of any of these organizations, instead they represent her political thought, and as the Supreme Court held in *Holder*, they are not in and of themselves criminal. *See Holder 561 U.S. 1,*

10

*23*. Nor are they part of a continuing criminal enterprise. Subsequent to making the statements, the defendant later disavowed ISIS and many of the earlier statements she had made as the situation in Iraq and Syria changed rapidly. Most importantly, the defendant is not charged with providing material support to Al-Nusrah, ISIS, or Al-Qaeda. She is charged with providing material support to HTS, thus her earlier statements are not part of a continuing course of conduct.

The government, nevertheless, maintained in its 404 (b) Notice that these statements were intrinsic to the charged count of attempted provision of material support to HTS. For this proposition, the government cites the 11th Circuit's holding in *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018). In *Springer*, the 11th Circuit held that a defendant's statements in support of ISIS were intrinsic to determining whether the defendant's threats were "true threats" or just hyperbole.

The defendant in this case, however, is not charged with making threats that must be subjected to analysis of whether the defendant made a "true threat" under the "objective listener" standard, but rather with providing material support to HTS in the form of services and personnel in violation of 18 U.S.C. § 2339B(a)(1). Section 2339B(a)(1) does not require the same subjective analysis of the facts surrounding the speech because § 2339B(a)(1), unlike 18 U.S.C. 115(a)(1)(B)[7], does not prohibit speech. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) (holding that, "[t]he statute [§ 2339B(a)(1)] does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. . .

_____

[7] 18 U.S.C. 115(a)(1)(B) prohibits speech in the form of threats to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section. Key to conviction under 18 USCS § 115(a)(1)(B) was whether defendant intentionally communicated threat. *United States v. Schiefen*, 139 F.3d 638 (8th Cir. 1998). Whether defendant's utterance was intended as a "true threat" had to be evaluated under "objective listener" standard. *United States v. D'Amari*o, 461 F. Supp. 2d 298 (D.N.J. 2006).

What [§ 2339B] prohibits is the act of giving material support.......” *Id.* at 2730 citing *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000). The mens rea required to violate 18 U.S.C. § 2339B(a)(1) is knowledge about the organization's connection to terrorism and not the specific intent to further the organization's activities.

Unlike *Springer*, where the defendant's statements were intrinsically intertwined with an element of the offense, here, all the government need show is that the defendant knew about HTS's terrorist activities. Apart from the singular fact that the defendant, prior to the charged conduct, liked HTS, all of the speech reflects the defendant's general approval of radical Islamic teachings[8] which is protected speech, and therefore not part of a continuing pattern of illegality. Further, the defendant's prior approval of HTS would only be intrinsic if the theory of prosecution was that the defendant recruited UCE-1 and UCE-2 to the HTS cause[9]. But those are not the facts here. The facts here are clear that, rather than the defendant recruiting UCE-1 and UCE-2, they instead presented the defendant with their desire to join HTS and the defendant, instead of encouraging them, sought multiple times to discourage their involvement with HTS by telling them that HTS was "no good", that swearing allegiance to HTS was unnecessary, and that UCE-2's HTS contacts were untrustworthy.

Instead, the prior speech is clearly being offered by the government to show that the defendant's extrinsic statements demonstrate her intent in providing Individual A's contact information to provide material support to HTS, instead of some alternative reason. Under Fed. R.

---

[8] The government's proffered list of statements omits the fact that later, during the charged conduct, the defendant expressed strong disapproval for ISIS, and most importantly, strong disapproval for HTS.

[9] See e.g. *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (finding in part that recruitment of individuals to support the ISIS cause in the United States constituted material support.)

12

Evid. 404, these acts may only be admissible if they fall within the exceptions set out in 404(b).

**b. The defendant's prior intent to travel to Syria is not intrinsic to the charged conduct**

Unlike the defendant's statements and posts regarding radical Islam and groups in Syria, her expressed desire to travel to Syria to marry and support an alleged fighter is not protected speech and indeed, had the defendant carried it out, it most likely would have constituted a crime. That fact, however, does not make it intrinsic to the current offense. First, the government has not proffered that the defendant's intent was to attempt to provide material support to HTS (the charged offense). Second, the intent to travel to Syria had been abandoned until the defendant could pay off her student debt, a prospect that had no likelihood of immediate fulfillment. Third, despite the undercover agents' best efforts, the defendant did not express an intent to travel with them to Syria in order to fulfill her prior desires. Finally, during the charged period, the defendant expressed that jihad was no longer appropriate in Syria because of infighting among the groups and she no longer maintained contact with the Syrian fighter she had expressed a desire to marry. Thus, the defendant's intent to travel is not intrinsically part of the charged conduct. Instead, it is again being offered to show that the defendant's desire to travel to Syria caused her to support the undercover's desire to travel Syria. In other words, the evidence is being offered to show that the defendant, in aiding UCE-1, was acting in accordance with her prior expressed desires to travel to Syria herself.

**c. The defendant's statements are not admissible under 404(b)**

"The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Huddleston v. United States*, 108 S. Ct. 1496 (1988). Similar acts evidence "may be admissible for another purpose [other than showing character], such as proving motive, opportunity, intent,

13

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

Prior bad acts are inadmissible if they "are too unrelated" to the charged conduct or "too far apart in time to be probative of" the defendant's specific intent. *United States v. Clay*, 667 F.3d 689, 696 (6th Cir. 2012). These acts are also usually inadmissible under Fed. R. Evid. 403, because they have "a powerful impact on a juror's mind" despite their "slim probative value." *Ibid.* As the *Clay* Court noted, despite limiting instructions there is "too much of a risk that the jury will generalize from prior examples of bad character." *Id.* at 697.

The government's proffered reason here is that this evidence is admissible "as evidence of the defendant's motive, intent, preparation for, plan regarding, knowledge underlying, or absence of mistake or lack of accident" with respect to the defendant introducing UCE-1 and UCE-2 to Individual A as alleged in Count One. Doc. 102 at 8. The government does not offer further explanation of how the evidence concerning the defendant's prior statements expressing approval of so-called radical Islamic teachings and groups will further any of those objectives, citing instead to cases where similar statements have been admitted. See *United States v. Kaziu*, 559 F. App'x 32, 35-36 (2d Cir. 2014); *United States v. Mehanna*, 735 F.3d 32, 59-61 (1st Cir. 2013); *United States v. Abu-Jihaad*, 630 F.3d 102, 131-34 (2d Cir. 2010).

The defendant respectfully submits that this Court cannot analyze whether the 404(b) evidence is admissible for a proper purpose, and whether the probative value outweighs the prejudicial effect, independently of the factual background of the defendant's alleged provision of Individual A as a contact to UCE-1 and UCE-2. *See* <u>Old Chief v. United States</u>, <u>117 S. Ct. 644</u> <u>(1997) </u>(holding that with regard to the probative value of the evidence, the district court should consider "the full evidentiary context of the case as the court understands it when the ruling must be made." *Id.* at 647.)

14

### d. Motive and Intent

"To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *United States v. Haywood,* 280 F.3d 715, 721 (6th Cir. 2002) quoting *United States v. Blankenship,* 775 F.2d 735, 739 (6th Cir. 1985). Here, the statements are not substantially similar and, most importantly, not reasonably near in time. First, all but one of the statements relate to other terrorist groups, not HTS. As such, they cannot be simply substituted for an intent on the part of the defendant to support HTS, despite her statements to the contrary. Equally important, they are not reasonably near in time. The Sixth Circuit has not set a fixed limit on what is reasonably near in time. (*See United States v. Ismail,* 756 F.2d 1253, 1260 (6th Cir. 1985) (stating "the rule is that the prior conduct must be reasonably near in time under the facts of the particular case.")(internal citations omitted).

In this case, the defendant's initial attitudes toward groups in Syria, and the Syrian conflict in general, are not reasonably near in time because during the intervening period, the situation on the ground in Syria changed and the defendant's attitudes changed with it. Specifically, the defendant objected to the groups fighting among themselves, which was referred to as a time of fitna[10]. The defendant and other members of the Telegram group discussed that, under those circumstances of disunity, jihad was impermissible because it meant fighting Muslims and that individuals should refrain from being part of the conflict and stay at home. The defendant's statements to UCE-1 telling her that there were no righteous groups in Syria and that during these times it was best to stay at home, are consistent with this belief. These statements are the best

---

[10] Fitna is an Arabic and Islamic term referring to a feeling of disorder or unrest and to describe the oppression of the powerful against the weak, or to describe individuals or communities giving in to the "whispers" of Satan and becoming divided.

evidence of her intent and the religious rulings regarding going to fight. Because of the dissimilarities among the groups, and the tenuous relationship to the defendant's intent in furnishing UCE-1, introducing her speech also violates the First Amendment. *See Dawson v. Delaware,* 112 S.Ct. 1093 (1992) (where the defendant's membership in a racist group was introduced at trial, despite the fact that the victim was of the same race. The Court held this prejudicial because there was no relationship between the crime for which he was being tried and mere membership in the group.) Likewise, here, the relationship has been attenuated by the change in circumstances in Syria eliminating the appropriateness of jihad in the defendant's mind.

Whatever probative value the defendant's prior statements might have is likewise outweighed by its prejudicial effect. As the Sixth Circuit Court of Appeals has observed, in situations where the bad acts are no longer substantially similar, the court may exclude the evidence "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." *United States v. Snyder*, 789 F. App'x 501, 506 (6th Cir. 2019) citing Fed. R. Evid. 403. This is particularly true here. The defendant's earlier statements regarding terrorism will undoubtedly pose a risk of luring the factfinder into declaring guilt on grounds different from proof specific to the offense charged (i.e. the knowing attempted material support of HTS). The more lurid the statement, the worse the potential for prejudicial effect. For instance, the government's proffered evidence concerning Anwar Al-Awlaki, ISIS, Jihadi John, praise of attacks in the United States, pictures of dead bodies and pictures of improvised explosive devices bear little to no relationship to the charged crime and would have serious prejudicial effect. This type of evidence in particular should be excluded under Fed. R. Evid. 403. See *United States v. Al-Moayad*, 545 F.3d 139, 159-66 (2d Cir. 2008).

e. **Preparation and Plan**

The admission of the defendant's prior statements regarding her desire to travel to Syria in

order to marry Abu Abdullah present a closer question. Presumably these statements would be introduced to substantiate the defendant's initial claim to UCE-1 that Individual A was a trusted person whom she had intended to use to help her go to Syria. The defendant later indicated to the contrary, that she did not know Individual A and had just found him on the internet. The defense does not dispute the potential relevance of the evidence regarding the defendant's prior plan to travel to Syria for the limited purpose of showing a prior relationship with Individual A as the source of her knowledge regarding travel and the absence of mistaken belief by the defendant that Individual A would not assist UCE-1 and UCE-2.[11]

However, the defense respectfully submits that the factual predicate for such evidence is, at present, missing. In order for the Court to evaluate the facts and circumstances of the defendant's relationship with Individual A, Individual A has to be identified. Without Individual A's identification, the potential to mislead and confuse the jury as to facts is heightened and the defendant suffers unfair prejudice. Individual A's statements to UCE-2, if offered for proof of the matter asserted (that he could help him get to Syria), are hearsay and do not fall within the exclusions provided by Fed. R. Evid. 803. Accordingly, the only way they may be admitted is under Fed. R. Evid. 807's residual exception, which permits admission when the statement is supported by sufficient guarantees of trustworthiness. "In order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth when the statement was made.'" *United States v. Washington*, 106 F.3d 983, 1001-02 (D.C. Cir. 1997). The defense respectfully submits that in the absence of evidence concerning the identity,

---

[11] The defense maintains, as a matter of law, that voluntarily furnishing Individual A does not constitute a violation of 18 U.S.C. 2339B(a)(1)(B). See *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 394-401 (D. Conn. 2009), finding that information does not constitute a physical asset sufficient to constitute material support and that volunteering information to a believed member of a terrorist organization does not sufficiently constitute service or personnel.

location, and position of Individual A, it is impossible to determine whether he is credible. In the absence of Individual A's statements that he could assist UCE-2 to cross from Turkey to Syria, the evidence concerning the defendant's prior plans lose their relevance to the proceeding.

Accordingly, the defendant urges this Court to withhold a ruling on the admissibility on the defendant's prior plans until the admissibility of Individual A's statements to UCE-2 are determined.

### f. The evidence is not necessary to pre-empt potential defenses

Finally, the government argues that the 404(b) evidence is appropriate to rebut potential defenses including "… arguments that her online activity involving terrorist organizations related to research she was conducting into the Syrian conflict and into participants in that conflict; that she advocated for the establishment of a religious state, but opposed ISIS and other terrorist organizations as 'false' versions of that state; that she planned to travel to Syria to marry 'Abu Abdullah,' but abandoned that idea because of substantial student loan debt she had accrued; and that the government went to great lengths to convince her to aid UCE-1 and UCE-2 in their effort to travel to Syria to join HTS, eventually persuading her to provide them with the name of an overseas contact who could facilitate their travel into Syria." Doc. 102 at 9.

The government argues that the evidence is necessary to rebut a defense of entrapment to demonstrate that the defendant's research created a predisposition to aid UCE-1 and UCE-2, to rebut that she no longer approved of ISIS, to rebut that she had abandoned her interest in traveling to Syria because Abu Abdullah had stopped communicating with her, rather than her student debt holding her back, and to show that the length of the government's investigation was justified by her suspicious and potentially criminal conduct over a period of years.

The defense agrees that predisposition evidence is admissible to rebut a defense of

18

entrapment. *See United States v. Young*, 916 F.3d 368, 374-75, 378-79 (4th Cir. 2019); *United States v. Mohamud*, 843 F.3d 420, 423-24, 432-35 (9th Cir. 2016); and *United States v. Siraj*, No. 07-0221-cr, 2008 WL 2675826, at *2 (2d Cir. July 9, 2008). In fact, *Siraj* and *Mohamud* do not even analyze whether the evidence is admissible under 404(b) because the defense put forward a defense of entrapment. But, as much as the government anticipates, based on their conduct, that there will be such a defense, the defendant represents to this Court that she does not intend to offer a defense of entrapment or seek such an instruction. Accordingly, the holdings in *Young* and *Mohamud*, where the evidence was admitted to rebut the defendant's entrapment theory, are of no consequence here. Thus, in the absence of a defense of entrapment, the defendant's predisposition is not relevant and, in fact, it is the exact evidence that Rule 404(a) and (b) preclude.

Instead of entrapment, the defense intends to argue that the evidence is insufficient to satisfy the requirement that the defendant knowingly attempted to provide material support to a foreign terrorist organization in the form of services and personnel. In making this defense, the defendant does not dispute that she had knowledge of HTS's designation. Instead, the defendant intends to argue that the provision of Individual A's contact information was with the intent to persuade UCE-1 not to go ahead with her plan to join HTS and alternatively, that the mere furnishing of information to a potential member of a designated terrorist organization is insufficient to constitute providing personnel or services to the organization.[12] Accordingly, the government's proposed 404(b) evidence does not rebut either of these claims. Unlike in *United States v. Kadir*, 718 F.3d 115, 123-24 (2d Cir. 2013), where evidence of the defendant posing with weapons was admissible to rebut a claim that he merely engaged in peaceful fundraising activities,

---

[12] See *United States v. Dhirane*, 896 F.3d 295, 303 (4th Cir. 2018) citing *Holder v. Humanitarian Law Project* at 16-17 (clarifying that the requisite "mental state" required to violate § 2339B is "knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities").

19

or *United States v. Hammond*, 381 F.3d 316, 342-44 (4th Cir. 2004), where knowledge of a terrorist organizations unlawful activities was admissible to rebut the defendant's claim that he only sympathized with the humanitarian goals of the organization, evidence of the defendant's statements regarding jihadist groups and her prior intent to travel to Syria does not rebut this defense any more than it makes it more likely that the defendant committed a crime.

### D. Conclusion

For the reasons set forth above, the defendant respectfully requests that this Court deny admission of the following evidence on the grounds of Fed. R. Evid. 404(b):

- Posted supportive comments about "Jihadi John," an ISIS fighter who became notorious for beheading captured prisoners, and about the man responsible for the Pulse nightclub shooting in Orlando, Florida.

- Made posts to a social media platform in 2015 reflecting her support at the time for ISIS, a notorious foreign terrorist organization including supportive comments about "Jihadi John," an ISIS fighter who became notorious for beheading captured prisoners.

- Made posts to a social media platform in 2015 espousing support for terrorist attacks against the United States including positive comments concerning Omar Mateen and his attack of the Pulse night club.

- Shared posts of radical Islamic teachings on a Telegram channel including posting Anwar Al-Awlaki's "44 Ways to Support Jihad".

- Maintained photographs on her cell phone of foreign fighters accompanied by phrases urging persons to engage in violent jihad.

- Maintained photographs on her cell phone of dead bodies, including what appear to be photographs of victims of foreign fighters.

- Maintained photographs on her cell phone of what appear to be improvised explosive devices.

- Maintained photographs on her cell phone of statements by Anwar al-Awlaki.

- Maintained photographs on her cell phone of images related to organizations espousing contributions to the cause of foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING.

- Statement to W-2 that she wanted to take her son with her to Syria, where she planned to

20

marry "Abu Abdullah".

- Expressed a desire to travel to Syria and marry a foreign fighter named "Abu Abdullah" during online communications which included OCE-1 (an online covert employee) between 2016 and 2018, and which included UCE-1 between 2017 and 2018, and with others on social media platforms between approximately 2016 and 2018.

- Communicated with "Abu Abdullah" via a social media platform in 2016 and 2017; Expressed a desire, during a face-to-face meeting with UCE-1 on November 28, 2017, to travel to Syria.

- Set up a GoFundMe page online in approximately 2017 so that others could help pay down her student loan debt, which was substantial, and which would enable her to travel to Syria herself.

Respectfully submitted this 3rd day of August, 2020.

By: /s/ Charles Swift
Charles D. Swift,
Pro Hac Vice Attorney for Giampietro
CLCMA
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
(972) 914-2507

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 3rd day of August, 2020, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of

electronic filing to all counsel of record.

By: <u>/s/ Charles Swift</u>
Charles D. Swift, Pro Hac Vice
Attorney for Giampietro
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
