IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | No. | 2:19-cr-00013 |
| v. | ) | | |
| | ) | | Chief Judge Crenshaw |
| GEORGIANNA A.M. GIAMPIETRO | ) | | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING 404(b) EVIDENCE AND MEMORANDUM OF LAW IN SUPPORT

The United States of America respectfully opposes defendant Georgianna A.M. GIAMPIETRO's Motion in Limine Regarding 404(b) Evidence and Memorandum of Law in Support. (Doc. 143.) The evidence GIAMPIETRO seeks to exclude is intrinsic to the offenses with which she is charged. Additionally, or alternatively, given that GIAMPIETRO has made clear that her intent in providing UCE-1[1] with Individual A's contact information will be the central issue at trial, this evidence is admissible under Federal Rule of Evidence 404(b).

## I.    This Evidence is Inextricably Intertwined with the Charged Offenses and, Alternatively, is Admissible Under Rule 404(b)

The evidence GIAMPIETRO seeks to exclude can be divided into five categories. Those categories are (1) GIAMPIETRO's research into and familiarity with the conflict in Syria and with militias there between 2015 and 2018; (2) GIAMPIETRO's longstanding support for Islamic terror groups; (3) GIAMPIETRO's communications with "Abu Abdullah," a foreign fighter in Syria, and her desire to travel to Syria to marry him; (4) GIAMPIETRO's desire to travel to Syria herself, and her encouragement of others to do so, for jihad; and (5) GIAMPIETRO's history of obstructive

---

[1]    In this Opposition, references to "OCE-1" are to an online covert employee who began engaging GIAMPIETRO online in approximately 2015. References to "UCE-1" are to an undercover employee who began engaging GIAMPIETRO online in approximately 2017 and later engaged UCE-1 in person. References to "UCE-2" are to an undercover employee who played the role of UCE-1's husband.

1

conduct vis-à-vis her online activity. These categories of evidence are inextricably intertwined with the allegations underlying the indictment. Additionally, or alternatively, all of these categories of evidence are admissible under Rule 404(b). And as outlined below in Section III.E, the probative value of these categories of evidence is not substantially outweighed by the danger of unfair prejudice, as it must be in order for this evidence to be excluded.

### A. GIAMPIETRO's Research Into, and Demonstrated Familiarity with, the Conflict in Syria and with Militias Operating in the Region Between 2015 and 2018

The government anticipates introducing evidence at trial that GIAMPIETRO conducted research into, and demonstrated familiarity with, the conflict in Syria and militias operating in the region between approximately 2015 and 2018. The government also anticipates introducing evidence that GIAMPIETRO wrote at least one academic paper about how terrorist groups in Syria raised money through "charities." This evidence is intrinsic to Count One, because it serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. It also forms an integral part of witness testimony, including the testimony of OCE-1 and UCE-1. And it completes the story of GIAMPIETRO's attempt to provide material support to HTS in 2018. Specifically, GIAMPIETRO's extensive research into militias in Syria, and her writings regarding "charities" which provided support to organizations in Syria, establish that GIAMPIETRO was deeply familiar with groups operating there, and would therefore have been aware of the activities groups were engaged in, how groups raised money, the fact that certain groups had been designated as foreign terrorist organizations ("FTOs") by the United States,[2] and the differences between FTOs and "rebel" groups fighting against the Assad regime.

---

[2]     GIAMPIETRO admitted to agents that she knew that the United States had designated HTS as an FTO.

2

Furthermore, even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). Evidence that GIAMPIETRO actively researched militias in Syria between 2015 and 2018 helps establish that GIAMPIETRO was familiar with these militias, and thus helps establish that GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1 was to assist UCE-1 and UCE-2 in traveling to Syria to join HTS, and that providing that information was part of her preparation or plan, and was neither a mistake nor an accident. Similarly, evidence that GIAMPIETRO engaged in academic writing about "charities" which provided support to organizations in Syria helps establish that GIAMPIETRO knew how groups received funding, and thus helps establish GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1 to assist UCE-1 and UCE-2 in traveling to Syria to join HTS, and that providing that information was part of her preparation or plan, and was neither a mistake nor an accident.

B.    **GIAMPIETRO's Support for Islamic Terror Groups**

The government anticipates introducing a significant body of evidence that GIAMPIETRO maintained a longstanding support for Islamic terror groups. That evidence includes GIAMPIETRO's posts to a social media platform in 2015 espousing her support for ISIS[3] and for terrorist attacks against the United States; GIAMPIETRO's statements during online communications on social media platforms between approximately 2017 and 2018 evincing her knowledge of and support for Islamic terrorists; and GIAMPIETRO's dissemination of radical

---

[3]    On May 15, 2014, the United States Secretary of State first added ISIS to the FTO designation of al-Qaida in Iraq ("AQI") as an alias of AQI. AQI was originally designated as an FTO by the Secretary of State on October 15, 2004, under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224. "ISIS" was reconfirmed by the Secretary of State as an alias of AQI on September 21, 2015. ISIS remains a designated FTO.

Islamic teachings via an encrypted social media platform (Telegram) between approximately 2016 and 2018. That evidence also includes GIAMPIETRO's statements to W-1 in support of "Jihadi John," an ISIS fighter infamous for beheading prisoners, and about the man responsible for the Pulse nightclub shooting in Orlando; GIAMPIETRO's statements to W-1 regarding GIAMPIETRO's "connections" with persons who operated Islamic channels online; GIAMPIETRO's statements to W-2 (a minor) in support of Jabhat al-Nusrah[4] and HTS; and GIAMPIETRO's providing W-2 with a Telegram page associated with Individual A, which W-2 reported was a page that persons could use to send money to support the mujahideen. Lastly, that evidence includes GIAMPIETRO's keeping photographs on her cell phone of dead bodies, including photographs of what appear to be victims of foreign fighters and improvised explosive devices; photographs of statements by Anwar Al-Awlaki, a radical Islamic cleric who has preached that Muslims have a religious duty to kill Americans;[5] and photographs of images related to organizations espousing contributions to foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING."[6]

That evidence is intrinsic to Count One, because evidence of GIAMPIETRO's support for

---

[4]    Al-Nusrah Front ("ANF") is an affiliate of AQI. On December 11, 2012, the Secretary of State amended the designation of AQI to include various aliases, including al-Nusrah Front. On May 15, 2014, the Secretary of State amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State designated al-Nusrah Front, also known as Jabhat al-Nusrah, as an FTO and as a Specially Designated Global Terrorist entity. ANF has been present in Syria since at least 2016. ANF's goal is to oust the Syrian regime.

[5]    As GIAMPIETRO acknowledges, "Anwar Al-Awlaki is the American cleric who promoted violent resistance to the West as a religious duty and was killed in an airstrike in Yemen on September 30, 2011." (Doc. 143 at 3 n.1.)

[6]    Just last week, the United States unsealed a forfeiture complaint in connection with an investigation into the unlawful use of cryptocurrency to support and finance terrorism. That complaint is attached as Exhibit A. By that complaint, the United States seeks the forfeiture of wallets and cryptocurrency accounts used by foreign "charities" soliciting donations for ANF and HTS, including Al Sadaqah. Among the images from foreign "charities" included in that complaint is the image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING," which, as noted, is also an image that was recovered from GIAMPIETRO's phone. (*See* Exhibit A at 14.)

Islamic terrorists serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. It also forms an integral part of witness testimony, including the testimony of OCE-1, who observed posts GIAMPIETRO made in support of ISIS. And it completes the story of GIAMPIETRO's attempt to provide material support to HTS in 2018. Indeed, with respect to her demonstrations of support in 2015 and 2016, this evidence is the *beginning* of the story of her support for radical Islamic causes. GIAMPIETRO's demonstrations of support for Islamic terrorists help establish that, years before she provided Individual A's contact information to UCE-1, GIAMPIETRO supported radical Islamic terrorism.[7]

Furthermore, even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). To prove Count One, the government must show that GIAMPIETRO provided or attempted to provide material support or resources to HTS, knowing that HTS was an FTO.[8] Indeed, GIAMPIETRO's intent in providing UCE-1 with Individual A's contact information will be a central issue at trial. That is because GIAMPIETRO has made clear that she intends to argue that her intent in providing Individual A's contact information to UCE-1 was not to assist UCE-1 and UCE-2 in traveling to Syria to join HTS, but to dissuade them from doing so because of what GIAMPIETRO believed Individual A would tell UCE-1 and UCE-2 about the lack of "fighting" in Syria. In seeking to explain her intent and motivation for providing Individual A's contact information to UCE-1, GIAMPIETRO puts her intent and motivation squarely at issue in this case. Evidence which establishes that GIAMPIETRO actually supported

---

[7] This evidence also helps establish that GIAMPIETRO knew that the social media platform associated with Individual A helped fund the mujahideen and was not a "charity" providing support to victims of the Syrian conflict.

[8] *See* § 2339B(a)(1) ("To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism . . . ."); *see also United States v. Warsame*, 537 F. Supp. 2d 1005, 1013-14 (D. Minn. 2008); Doc. 143 at 12 ("The mens rea required to violate 18 U.S.C. § 2339B(a)(1) is knowledge about the organization's connection to terrorism and not the specific intent to further the organization's activities.").

5

Islamic terrorists for years before providing UCE-1 with Individual A's contact information thus helps establish that GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1 was to assist UCE-1 and UCE-2 in traveling to Syria to join HTS, and that providing that information was part of GIAMPIETRO's preparation or plan, and was neither a mistake nor an accident. Put differently, GIAMPIETRO's providing Individual A's contact information to UCE-1 should not be viewed in isolation, but rather as the culmination of her years-long demonstrations of support for terrorist activity.

C.     **Abu Abdullah**

The government anticipates introducing evidence at trial that GIAMPIETRO communicated with a foreign fighter in Syria named "Abu Abdullah" between 2016 and 2018, and that she expressed a desire to travel to Syria to marry him during online communications involving OCE-1 between 2016 and 2018, during online communications involving UCE-1 between 2017 and 2018, and during online communications involving others between approximately 2016 and 2018, including W-2. The government also anticipates introducing statements GIAMPIETRO made to W-1 expressing a desire to marry "Abu Abdullah" because he was a fighter and because GIAMPIETRO wanted to support him in his efforts. The government also anticipates introducing evidence that GIAMPIETRO kept photographs on her cell phone of "Abu Abdullah" wearing military fatigues and posing with various firearms, as well as photographs of other foreign fighters accompanied by phrases urging violent jihad.

This evidence is intrinsic to Count One, because GIAMPIETRO's desire to travel to Syria, marry a foreign fighter, and support foreign fighters serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. This evidence forms an integral part of witness testimony, including the testimony of OCE-1 and UCE-1. And it completes

6

the story of GIAMPIETRO's attempt to provide material support to HTS in 2018. Specifically, it establishes that GIAMPIETRO maintained a longstanding interest in traveling to Syria herself to marry and support a foreign fighter, and therefore helps to explain why she provided Individual A's contact information to UCE-1 so that UCE-1 and UCE-2 could travel to Syria to join HTS.

Furthermore, even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). Evidence that GIAMPIETRO expressed a desire to travel to Syria and marry "Abu Abdullah," and that she supported foreign fighters more generally, helps establish why she would provide Individual A's contact information to UCE-1, and helps establish GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1 to assist UCE-1 and UCE-2 in traveling to Syria to join HTS. It also establishes that providing that information was part of GIAMPIETRO's preparation or plan, and that providing that information was neither a mistake nor an accident.

### D. Traveling to Syria

The government anticipates introducing evidence at trial that GIAMPIETRO expressed a desire, during a face-to-face meeting with UCE-1 on November 28, 2017, to travel to Syria; that GIAMPIETRO informed W-2 that she intended to take her son with her to Syria; that she explained to others how to travel to Syria for jihad; and that she set up a GoFundMe page in 2017 so that others could help pay down her student loans, which were substantial, and which would enable her to travel to Syria. This evidence is intrinsic to Count One, because GIAMPIETRO's desire to travel to Syria, the measures she took to pay down her loans, and her instructions to others about how to travel to Syria, serve as a prelude to, and are directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. They also form an integral part of witness testimony, including the testimony of OCE-1, UCE-1, and W-2, all of whom discussed these topics with

7

GIAMPIETRO. And they complete the story of GIAMPIETRO's attempt to provide material support to HTS, which culminated in 2018. Specifically, this evidence helps establish that, in the years before she provided Individual A's contact information to UCE-1, GIAMPIETRO was planning to travel to Syria herself and was also encouraging others to travel to Syria for jihad.

Furthermore, even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). Evidence that GIAMPIETRO had a desire to travel to Syria, that she took steps enabling her travel to Syria, and that she explained to others how to travel to Syria for jihad, helps establish why she would provide Individual A's contact information to UCE-1. It also helps explain how she would know what information and guidance to provide to UCE-1 in order to travel to Syria undetected by law enforcement. It thus helps establish GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1 to assist UCE-1 and UCE-2 in traveling to Syria to join HTS. This evidence also demonstrates that providing Individual A's contact information to UCE-1 was part of GIAMPIETRO's preparation or plan, and was neither a mistake nor an accident.

### E. <u>Obstructive Conduct</u>

The government anticipates introducing evidence at trial that GIAMPIETRO engaged in a wide array of obstructive conduct. That evidence includes GIAMPIETRO's use of countersurveillance measures on social media platforms between 2015 and 2018, including frequent changes in her username and her use of an encrypted platform, coded language, and self-destruct timers in order to conceal her online activity; GIAMPIETRO's teaching W-1 between 2015 and 2018 to use measures like "destructive timers" during their chats, which would destroy these chats after a period of time, so that W-1 would not be detected by law enforcement; and GIAMPIETRO's teaching W-1 and W-2 to use code words online to mask their activities. That

8

evidence also includes GIAMPIETRO's directing followers of her Telegram account to "unfollow" her after GIAMPIETRO provided Individual A's contact information to UCE-1.

This evidence is intrinsic to Counts Two and Three. Count Two alleges that, beginning in or about March 2018, and continuing until on or about October 23, 2018, GIAMPIETRO altered, destroyed, mutilated, concealed, and covered up a record and document, including but not limited to social media accounts, text messages, chat conversations, and other electronic communications, with the intent to obstruct a federal investigation. (Doc. 77 at 2.) Count Three alleges that, between on or about September 23, 2018 and on or about October 23, 2018, GIAMPIETRO corruptly altered, destroyed, mutilated, and concealed a record and document, including but not limited to contact information, text messages, electronic communications, and a cell phone, and attempted to do so, with the intent to impair the record and document's integrity and availability for use in a federal grand jury proceeding. (*Id.* at 3.) Evidence that GIAMPIETRO used countersurveillance measures for years prior to providing Individual A's contact information to UCE-1, that she taught others to use such measures, and that she directed followers of her encrypted social media account to "unfollow" the account after providing Individual A's contact information to UCE-1, is intrinsic to Counts Two and Three because that conduct serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to obstruct justice as alleged in Counts Two and Three. It also forms an integral part of witness testimony, including the testimony of OCE-1 (who engaged GIAMPIETRO on an encrypted platform) and UCE-1 (who engaged GIAMPIETRO on an encrypted platform, and used coded language and self-destruct timers in conversations with GIAMPIETRO) underlying Counts Two and Three. And it completes the story of GIAMPIETRO's attempt to obstruct justice as alleged in Counts Two and Three. Indeed, GIAMPIETRO's directing followers to "unfollow" an account she had used to disseminate radical

9

Islamic teachings is precisely the sort of obstructive conduct she is alleged to have committed.

Furthermore, even if this evidence were not intrinsic to Counts Two and Three, it is nevertheless admissible under Rule 404(b). To prove Count Two, the government must show that GIAMPIETRO intended to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of a department or agency of the United States or in contemplation of or in relation to any such matter. *See United States v. Powell*, 680 F.3d 350, 355-56 (4th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 710 (8th Cir. 2011). To prove Count Three, the government must show that GIAMPIETRO intended to impair a record, document, or tangible object's integrity or availability for use in an official proceeding. *United States v. Akiti*, 701 F.3d 883, 887-88 (8th Cir. 2012); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007). Evidence that GIAMPIETRO used countersurveillance measures and directed account followers to "unfollow" her after she provided Individual A's contact information to UCE-1 helps establish GIAMPIETRO's motive intent, knowledge, preparation, and plan in obstructing justice as alleged in Counts Two and Three. It also establishes that GIAMPIETRO's use of these measures was part of her preparation or plan, and was neither a mistake nor an accident.[9]

## II.     GIAMPIETRO's Objections to the Admissibility of This Evidence Are Meritless

Notwithstanding that the evidence outlined above is admissible as intrinsic evidence of the charged offenses, as Rule 404(b) evidence, or both, GIAMPIETRO advances a panoply of misguided arguments seeking its exclusion. These arguments all lack merit and should be rejected.

---

[9]     It is also consciousness-of-guilt evidence. GIAMPIETRO told FBI agents during a non-custodial interview that she used self-destruct timers because she and persons she was communicating with "didn't want anyone to know" what they were talking about, and acknowledged that she knew that what they were talking about was "wrong."

**A.** **This Evidence is Admissible as Intrinsic Evidence and Alternatively as Rule 404(b) Evidence**

GIAMPIETRO argues that this evidence is inadmissible because it is not probative of any issue other than character, and also "predates" the offense. (Doc. 143 at 4.) These arguments lack merit. For the reasons above, this evidence is intrinsic to her offenses and is admissible as direct evidence of those offenses. Additionally, or alternatively, it is admissible under Rule 404(b).

This evidence also does not "predate" the charged offenses, in the way GIAMPIETRO claims. In a purported effort to contextualize the evidence above, GIAMPIETRO provides the Court with a self-serving and incomplete account of communications involving GIAMPIETRO, UCE-1, and Individual A between September 23, 2018 and October 4, 2018. (*See* Doc. 143 at 8-10.) GIAMPIETRO also inadvertently highlights what is almost certain to be the central issue at trial, namely, her intent in providing Individual A's contact information to UCE-1.

For example, in GIAMPIETRO's summary, she explains that, on September 23, 2018, UCE-1 informed GIAMPIETRO that UCE-2 had sworn allegiance to HTS, and that UCE-1 and UCE-2 intended to travel to Syria to join HTS. (Doc. 143 at 8.) But GIAMPIETRO omits that GIAMPIETRO took steps to conceal this conversation and UCE-1's conduct, including by asking UCE-1 to "unfollow" her Telegram channel; by instructing UCE-1 to delete GIAMPIETRO's name, number, and any photos or text messages of GIAMPIETRO from UCE-1's phone; by informing UCE-1, "[o]nly contact me when you arrive there [Syria] in'sha'Allah"; by advising UCE-1 that UCE-2 should pack and bring supplies in a way that was not "obvious" because "they look at that stuff" and because their luggage "will be searched"; by telling UCE-1 that UCE-1 and UCE-2 "should of [sic] asked me before you all planned"; and by further informing UCE-1 that GIAMPIETRO's "plan [for when GIAMPIETRO traveled to Syria] was to delete everyone 6 to 8

11

months before leaving and have no contact with anyone." (*See* Exhibit B at 40-42, 49-55, 60-61.)[10] GIAMPIETRO can hardly contend that evidence that she planned to travel to Syria herself "predates" the charged offenses when she referenced those plans explicitly in her conversation with UCE-1 on September 23, 2018. Indeed, GIAMPIETRO advised UCE-1 of her experience in planning her own travel to Syria as a way of providing reliable advice on how to safely travel there without being detected by law enforcement.

Similarly, in GIAMPIETRO's summary, she explains that, on September 30, 2018, GIAMPIETRO informed UCE-1 that GIAMPIETRO had communicated with Individual A, and that Individual A had informed GIAMPIETRO that "there was no fighting in Syria for the UCEs to join"; that the UCEs "were not required to swear allegiance to HTS"; and that Individual A would "discourage[]them from traveling if they did not have jobs there already." (Doc. 143 at 8.) But GIAMPIETRO omits that she, after informing UCE-1 that there was "no work" in Syria, asked UCE-1, "Have you thought about Afghanistan? They're still fighting there." (*See* Exhibit C at 60-87.) GIAMPIETRO is hard-pressed to claim that evidence that she sympathized with terrorist causes should be inadmissible at trial, given that GIAMPIETRO encouraged UCE-1 on September 30, 2018 to consider Afghanistan as an alternative to Syria because, as GIAMPIETRO said, there was "no work" in Syria and but that they were "still fighting" in Afghanistan.

Crucially, GIAMPIETRO also omitted a damning Telegram exchange between GIAMPIETRO and an associate of Individual A's (whom the government refers to as "Individual B") who operated "SyriaCareTurkey," another Telegram channel soliciting funds for the mujahideen. That exchange, which took place between October 5 and October 18, 2018, is attached

---

[10]     The government has attached as Exhibits B, C, and D several lengthy chat conversations, given that GIAMPIETRO referenced those conversations in her motion, and so that the Court can review them itself if necessary.

as Exhibit D. The exchange provides key insights into GIAMPIETRO's motivations for providing Individual A's contact information to UCE-1, and into GIAMPIETRO's consciousness of guilt when she became concerned that law enforcement might learn of her conduct.

As background, in an online conversation between UCE-2 and Individual A on October 10, 2018, UCE-2 sent Individual A the following message:

> Asalaam aleikum wr wb. ive made it to London and am deleting this telegram account. im waiting on my wife but ill contact you once im in turkey from a new telegram. ill have same name 'Yusuf'. jazakAllah khair for your help akhi. inshAllah we will speak soon.

(*See* Exhibit E at 1-2.) In the October 5-18, 2018 Telegram exchange between GIAMPIETRO and Individual B described above, Individual B sent GIAMPIETRO a verbatim copy of the message UCE-2 sent to Individual A on October 10, 2018, with the accompanying message, "The brother [Individual A] sent this message." (*See* Exhibit D at 31.) In other words, (1) GIAMPIETRO told UCE-1 to have UCE-2 contact Individual A; (2) UCE-2 contacted Individual A seeking assistance in traveling to Syria; and (3) UCE-2 again contacted Individual A and sent the message above on October 10, 2018, after UCE-2 arrived in London. Individual A then (4) sent the message above to Individual B, who relayed the message to GIAMPIETRO in a conversation on October 10, 2018.

Furthermore, during the October 5-18, 2018 Telegram exchange above, GIAMPIETRO made inculpatory admissions about her conduct vis-à-vis UCE-1 and UCE-2, likely because she believed no one would become aware of the exchange. For example:

- When Individual B told GIAMPIETRO that Individual A "was willing to help" UCE-1 and UCE-2 and "gave simple advice," GIAMPIETRO informed Individual B, "He needs not to bc if they are spies I will be arrested," and "Let me know if your friend [Individual A] is helping him since supposedly leaving tonight so I can break my phone loooool and get a new one."

- When Individual B told GIAMPIETRO to "factory reset" her cell phone in order to

13

ensure that messages related to GIAMPIETRO's conversations with UCE-1 were deleted and not retrievable by law enforcement, GIAMPIETRO replied, "There's nothing on my device," "I don't have her number I deleted everything," and "So I can say someone used my number," meaning that GIAMPIETRO could say that someone else used her number to communicate with UCE-1.

- When Individual B sent the message above to GIAMPIETRO, GIAMPIETRO replied, "WOW"; "Please don't get me in trouble"; "I need him [Individual A] not to help him [UCE-2] in'sha'Allah"; "[o]ne small mess up and I get 30 years"; "I can hear it now 'she gave us the information'"; and, "Is your friend helping him?/I need to know/If so I'm destroying my phone and not getting one for months."

- When Individual B asked GIAMPIETRO, "What's wrong with them coming anyway" and "I thought you wanted them to come in no?" GIAMPIETRO replied, "Nothing wrong if they're actually real and truthful."

- When Individual B told GIAMPIETRO, "Inshallah they get in safely," GIAMPIETRO replied, "In'sha'allah/I really want them to be honest. Bc I was going to send her money to get me a house there/Sigh/This is my dream: house by a river and caves, open fields, a garden, and a horse loooool/I know in the north west of S they have that/Abu showed me/Sigh/I miss him."

- When Individual B told GIAMPIETRO, "We will see it [sic] he [UCE-2] contacts the brother again" and "[I]f he comes in then inshallah he arranges it for you," GIAMPIETRO replied, "Khayr in'sha'Allah."

- When Individual B told GIAMPIETRO that her "friends" UCE-1 and UCE-2 were "weird," GIAMPIETRO advised Individual B that her "other friend just went Madkhali on me" and that her friend told GIAMPIETRO "not to listen to anwar [Anwar al-Awlaki] and qutb etc. etc.," but that GIAMPIETRO had rejected that advice.

- When Individual B lamented that there were many people in the West who "loved 'jojo'" (meaning ISIS) but did not act on their support, GIAMPIETRO replied, "I mean right now tbh there's no real group to support." Individual B replied, "Except tell everyone on Twitter lol/Support jihad and Islam/That's it," GIAMPIETRO replied, "Yes I call them keyboard Warriors/I cannot wait to move there in'sha'Allah/Wallahi I'm working hard to get there in'sha'Allah."

- When Individual B and GIAMPIETRO were discussing the possibility of GIAMPIETRO moving to Syria, GIAMPIETRO informed Individual B, "A close sister just messaged me/Saying there's an investigation on her/The same sister who gave that sister (yosuf wife) information of that brother to make H." (The government knows the "close sister" to be the subject of another FBI investigation in Alabama.) Individual B told GIAMPIETRO, "Listen please just reset factory reset your phone";

14

GIAMPIETRO replied, "Okay I will in'sha'Allah."

(*See* Exhibit D.) As this exchange demonstrates, GIAMPIETRO, as of October 2018, (1) still wished to travel to Syria, and was "working hard to get there"; (2) still adhered to the teachings of radical Islamic clerics like Anwar al-Awlaki; and (3) was taking steps to destroy evidence and intended to obstruct any investigation into her providing UCE-1 with Individual A's contact information. GIAMPIETRO's omission of this exchange in her summary of relevant evidence at the heart of this case also seriously undercuts her arguments for exclusion.

### B. This Evidence Does Not Constitute "Protected Speech"

Next, GIAMPIETRO boldly contends that evidence that she supported terrorists, disseminated radical Islamist teachings, researched the conflict in Syria, and kept photographs depicting foreign fighters, dead bodies, improvised explosive devices, and statements by radical Islamic clerics, as well as photographs of images related to organizations espousing contributions to foreign fighters on her cell phone, constitutes "protected speech," which the government may not use for any purpose at trial. GIAMPIETRO is mistaken. It is criminal to provide, or attempt to provide, material support to designated FTOs. The case law is clear that statements in support of such organizations are relevant and admissible as intrinsic evidence of material support charges, as evidence of a defendant's intent in providing material support (or some other Rule 404(b) purpose), or both. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489-90 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012); *see also Haupt v. United States*, 330 U.S. 631, 642 (1947); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 251-52 (1989);

15

*Street v. New York*, 394 U.S. 576, 594 (1969).

Rather than offer legal support for her claim, GIAMPIETRO attempts to distinguish *United States v. Springer*, 753 F. App'x 821 (11th Cir. 2018), a case the government cited in its Notice Regarding 404(b) Evidence (Doc. 102) in support of the proposition that the evidence described above is inextricably intertwined with the charged offenses. GIAMPIETRO contends that the evidence at issue in *Springer*—the defendant's statements of support for ISIS—were properly admitted because the defendant had been charged with threatening to murder a judge, and because the government therefore had to show that the threats were "true threats" and not mere hyperbole to meet the elements of the offense. (*See* Doc. 116 at 5.) Under GIAMPIETRO's logic, the defendant's statements in *Springer* were admissible because the defendant had been charged with a crime that was, at its heart, one involving allegedly criminal speech, and were therefore relevant to determining whether the threat at issue was truly criminal. By extension, GIAMPIETRO contends that because the violation of § 2339B alleged in Count One cannot prohibit the exercise of "protected speech," statements GIAMPIETRO made in support of terrorists are inadmissible.

GIAMPIETRO is wrong. She cites no authority for the proposition that a defendant's statements in support of terrorists are inadmissible for any purpose in a criminal trial on the grounds that such statements constitute "protected speech." To the contrary, the First Amendment emphatically does *not* prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Nor do the cases distinguish, as GIAMPIETRO imagines, between the use of speech where the charge is based on a defendant's utterances as opposed to his actions.

Furthermore, although GIAMPIETRO seeks to distinguish *Springer*, she makes no effort to distinguish *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1988), a case which the government cited for the same proposition as *Springer*. Nor does GIAMPIETRO attempt to distinguish *United*

16

*States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014), *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013), or *United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010), other cases which the government cited in its Notice. Instead, GIAMPIETRO complains that the government "does not offer further explanation of how the evidence concerning the defendant's prior statements expressing approval of so-called radical Islamic teachings and groups will further any of [the Rule 404(b)] objectives, citing instead to cases where similar statements have been admitted." (Doc. 143 at 14.) To the extent GIAMPIETRO complains that the government has failed sufficiently to explain the 404(b) rationale underlying this evidence, this complaint falls flat, given the government's articulation of justifications for the admissibility of each category of evidence above. And to the extent GIAMPIETRO complains about the case citations the government has offered, that complaint falls flat as well, given that GIAMPIETRO has failed to explain why the rationale in those cases would not also apply to the admission of the evidence at issue here.

C.  **GIAMPIETRO Had Not Abandoned Her Plans to Travel to Syria to Marry a Fighter and, Even if She Had, this Evidence Would Still be Admissible**

GIAMPIETRO next contends that her statements of desire to travel to Syria to marry a foreign fighter are inadmissible because they are not intrinsic to the charged offense of attempting to provide material support to HTS, and because she had "abandoned" her plans to travel by the time she provided Individual A's contact information to UCE-1. (Doc. 143 at 13.) GIAMPIETRO is mistaken. Her longstanding desire to travel to Syria to marry a foreign fighter is plainly intrinsic to the charges in the indictment and/or admissible as Rule 404(b) evidence, for the reasons above. Furthermore, the evidence demonstrates that GIAMPIETRO had *not* abandoned her plans to travel to Syria by the time she provided Individual A's contact information to UCE-1. During GIAMPIETRO's online conversation with UCE-1 on September 23, 2018, when UCE-2 first

17

informed GIAMPIETRO that UCE-2 was traveling to Syria to join HTS, GIAMPIETRO—in a text message conspicuously absent from GIAMPIETRO's summary of that conversation, *see* Doc. 143 at 8-9—told UCE-2, "But listen in'sha'Allah when you get there… I will have someone meet you with money in'sha'Allah I want you to buy me a small house by a river AND I AM SERIOUS." (*See* Exhibit B at 103.) In a text message sent to Individual A on September 30, 2018, GIAMPIETRO asked Individual A whether Individual A "kn[e]w anyone who can help" UCE-1 and UCE-2, and informed Individual A further that "[s]he [UCE-1] can find me a house in'sha'Allah." (*See* Exhibit C at 69.) And, as noted, GIAMPIETRO told Individual B on October 15, 2018—only eight days before her FBI interview—that she was "working hard to get there" and "cannot wait to move there." GIAMPIETRO had therefore plainly *not* abandoned her plans to travel to Syria by the time she provided Individual A's contact information to UCE-1.

GIAMPIETRO also quarrels with the admission of her statements regarding her desire to travel to Syria to marry "Abu Abdullah," for "hearsay" reasons. GIAMPIETRO "does not dispute the potential relevance of the evidence regarding the defendant's prior plan to travel to Syria for the limited purpose of showing a prior relationship with Individual A as the source of her knowledge regarding travel and the absence of mistaken belief by the defendant that Individual A would not assist UCE-1 and UCE-2." (Doc. 143 at 17.) But GIAMPIETRO contends that before such statements may be introduced, Individual A must be "identified." (*Id.* at 17-18.)

GIAMPIETRO's argument makes a muddle of the facts and relevant case law. As outlined above, evidence of GIAMPIETRO's desire to travel to Syria and marry "Abu Abdullah" is admissible as intrinsic evidence and as Rule 404(b) evidence. These statements have nothing to do (as GIAMPIETRO posits) with "substantiat[ing] the defendant's initial claim to UCE-1 that Individual A was a trusted person whom she had intended to use to help her go to Syria." (*Id.* at

18

16-17.) The identity of Individual A is irrelevant to whether GIAMPIETRO believed that he was someone she trusted personally. Consequently, it is not necessary for the government to "identify" Individual A, or for this Court to assess his "credibility," to determine whether statements GIAMPIETRO made about traveling to Syria to marry "Abu Abdullah" are admissible at trial. Instead, these statements are intrinsic to the charges in the indictment and/or admissible as Rule 404(b) evidence, for the reasons above.

### D. Evidence of GIAMPIETRO's Support for ISIS and Other Terrorist Groups is Admissible as Evidence of Her Motive and Intent to Support HTS

GIAMPIETRO next contends that evidence that she made statements in support of ISIS, Jabhat al-Nusrah, and other terrorist groups cannot be "substituted for an intent on the part of the defendant to support HTS." (Doc. 143 at 15.) GIAMPIETRO contends, in other words, that evidence that she supported FTO "A" cannot be used to show that she also supported FTO "B." GIAMPIETRO also contends that her statements in support of terrorist groups are not "reasonably near in time" to the charged conduct, and are inadmissible on that basis as well. (*Id.* at 15-16.)

GIAMPIETRO is mistaken. GIAMPIETRO has cited no cases to support the view that a defendant's expressions of support for one terrorist organization are inadmissible as evidence of her motive and intent to support a second terrorist organization. That may be because relevant case law stands for the opposite proposition. *See, e.g.*, *United States v. Kaziu*, 559 F. App'x 32, 34-36 (2d Cir. 2014) (evidence that defendant was inspired by the lectures of radical Islamic cleric Anwar Al-Awlaki to travel to the Middle East and support the FTO al-Shabaab). Nor are the differences among the terrorist groups at issue here as stark as GIAMPIETRO asserts. The government's evidence would show that ISIS, Jabhat al-Nusrah, and HTS all operate in the same region of the world, that HTS is actually an outgrowth of Jabhat al-Nusrah, and that all three groups share as a

19

principal goal the establishment of an Islamic state.

GIAMPIETRO contends that evidence that she supported terrorist groups other than HTS is inadmissible because the situation in Syria changed over time; because her views changed over time as well; and because her evolving views, as a consequence, cannot be considered "reasonably near in time" to the charged offenses. (Doc. 143 at 15.) GIAMPIETRO is again mistaken. It is undoubtedly the case that the situation in Syria changed over time between 2015 and 2018. But that has nothing to do with whether evidence that GIAMPIETRO supported FTOs over time is relevant to establishing her motive and intent in supporting HTS in September and October 2018 by providing Individual A's contact information to UCE-1. It may be that, at trial, GIAMPIETRO will seek to explain *why* she supported ISIS and Jabhat al-Nusrah, why she vacillated in her support over time, and why her support does not help establish her motive and intent in providing UCE-1 with Individual A's contact information. But that is a matter for the jury to decide, not a basis upon which to exclude relevant evidence from their consideration.[11]

### E.    This Evidence is Not Excludable Under Rule 403

GIAMPIETRO also contends that her statements in support of terrorist causes are excludable under Rule 403. (Doc. 143 at 16.) She contends that her "earlier statements regarding terrorism will undoubtedly pose a risk of luring the factfinder into declaring guilt on grounds different from proof specific to the offense charged." (*Id.*) She contends further that "the government's proffered evidence concerning Anwar Al-Awlaki, ISIS, Jihadi John, praise of

---

[11]    GIAMPIETRO also casually argues that introduction of these statements violates her First Amendment rights. (Doc. 143 at 15-16.) But the case she cites does not stand for that proposition. In *Dawson v. Delaware*, the U.S. Supreme Court held that it was error for a trial court to permit the introduction of evidence at sentencing that the defendant belonged to a racist white prison gang, even though that evidence was not relevant to any sentencing issue. 503 U.S. 159, 160 (1992). Here, evidence that GIAMPIETRO supported FTOs goes to the very heart of Count One.

attacks in the United States, pictures of dead bodies and pictures of improvised explosive devices bear little to no relationship to the charged crime and would have serious prejudicial effect." (*Id.*)

GIAMPIETRO is wrong. As an initial matter, evidence may not be excluded under Rule 403, as GIAMPIETRO suggests,[12] merely because it is potentially prejudicial. Evidence may only be excluded "if its probative value is *substantially outweighed* by the danger of *unfair* prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" (emphasis added). In other words, this Court must weigh the probative effect of evidence against the danger that such evidence will unfairly prejudice the defendant, and *only* exclude such evidence when the former is "substantially outweighed" by the latter.

Here, evidence of these statements is highly probative, as it goes directly to GIAMPIETRO's motive and intent (and to other Rule 404(b) purposes) in providing Individual A's contact information to UCE-1. This evidence also demonstrates that GIAMPIETRO publicly supported the causes of the most violent terrorists in recent memory, and that her desire to support terrorist causes was not merely a passing one. And although this evidence is prejudicial to GIAMPIETRO—as indeed most evidence offered against a defendant in a criminal trial is—that prejudice is not unfair, given that this evidence largely consists of her *own statements*. Nor, in any event, is it so unfair that the prejudice substantially outweighs the evidence's high probative value.

Nor does GIAMPIETRO's argument that these statements are so "lurid" as to be unfairly prejudicial withstand scrutiny. GIAMPIETRO explains that she intends to argue at that she provided Individual A's contact information to UCE-1 not to facilitate UCE-1's travel to Syria, but "to persuade UCE-1 not to go ahead with her plan to join HTS." (Doc. 143 at 19.) Of course,

---

[12] *See* Doc. 143 at 16 ("Whatever probative value the defendant's prior statements might have is likewise outweighed by its prejudicial value.").

21

the more "lurid" the evidence of her support for terrorist organizations—the more evidence there is, for example, that she had devoted herself to radical Islamic causes—the more probative such evidence is on the issue of her intent, and the more difficult it will be for her to argue that she provided UCE-1 with contact information for Individual A intending to persuade UCE-1 *not* to join HTS. The reason GIAMPIETRO seeks to exclude this evidence, in other words, is the same reason why this evidence is so probative and should not be excluded.

GIAMPIETRO cites *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) in arguing that this "type" of evidence should be excluded under Rule 403. (*See* Doc. 143 at 16.) But *Al-Moayad* did not involve the same "type" of evidence at all. In *Al-Moayad*, the Second Circuit held that the district court's admission of extensive testimony from victims of a Hamas bombing and testimony about an al-Qaeda training camp at the trial of two defendants charged with conspiring to provide material support to Hamas and al-Qaeda was error, because there was no evidence that these matters had any connection to the defendants, because the defendants were not charged with planning or carrying out the bombing, and because it was undisputed that the defendants knew that Hamas engaged in terrorist activity. *See id.* at 159-64. Here, by contrast, the government seeks to introduce GIAMPIETRO's *own statements* about highly salient matters, namely, whether and to what extent GIAMPIETRO supported terrorist causes, a matter which bears directly on her intent.

F.    **GIAMPIETRO May Not Argue at Trial that Her Providing Individual A's Contact Information to UCE-1 is Insufficient as a Matter of Law to Sustain a Conviction under 18 U.S.C. § 2339B**

Remarkably, in what is purportedly a motion in limine to exclude evidence, GIAMPIETRO argues that "voluntarily furnishing Individual A['s contact information] does not constitute a violation of 18 U.S.C. § 2339B(a)(1)(B)," and represents that she "intends to argue [at trial] that . . . the mere furnishing of information to a potential member of a designated foreign terrorist

22

organization is insufficient to constitute providing personnel or services to the organization." (Doc. 143 at 17 n.11, 19.) This argument is meritless.[13] GIAMPIETRO is not charged with the completed crime of providing material support or resources to an FTO. Instead, she is charged with *attempting* to commit that crime, which is also a violation of § 2339B. It is beyond cavil that, if GIAMPIETRO (1) provided Individual A's contact information to UCE-1 and (2) told UCE-1 explicitly that GIAMPIETRO approved of UCE-1's plan to join HTS, and if (3) UCE-1 and UCE-2 had in fact used that information to travel to Syria and join HTS, GIAMPIETRO would have provided material support and resources (in the form of personnel) to HTS by assisting the UCEs in their travel to Syria, and would thus have violated § 2339B. *See United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) ("A person provides 'personnel' to a foreign terrorist organization [under § 2339B] if she makes available one or more persons . . . to work under that organization's 'direction and control.'").[14] It is equally clear that an *attempt* to do these things would also be a violation of § 2339B.[15]

_____

[13]    It is also untimely. Pretrial motions in this case were due on June 5, 2020. (*See* Doc. 89 at 1.) If GIAMPIETRO wanted to argue that "the mere furnishing of information to a potential member of a designated foreign terrorist organization is insufficient to constitute providing personnel or services to the organization"—as in, that the conduct underlying the allegations in Count One is not criminal—she should have filed a motion to dismiss Count One by June 5, 2020. *See* Fed. R. Evid. 12(b)(3)(B)(v). GIAMPIETRO filed no such motion. Instead, she has merely asserted in passing, in a motion to exclude potential 404(b) evidence, that she intends to advance this legal theory before a jury, whose job it is to find facts, not make purely legal judgments. This Court should reject that assertion.

[14]    GIAMPIETRO appears to concede that if she traveled to Syria to join HTS herself, she would be in violation of § 2339B. See Doc. 143 at 13 ("[GIAMPIETRO's] expressed desire to travel to Syria to marry and support an alleged fighter is not protected speech and indeed, had the defendant carried it out, it most likely would have constituted a crime.").

[15]    GIAMPIETRO, without further explanation, cites to *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362 (D. Conn. 2009) in support of the argument she plans to advance at trial on this point. But *Abu-Jihaad* does not aid GIAMPIETRO. In that case, the government charged Hassan Abu-Jihaad with disclosing national defense information, in violation of 18 U.S.C. § 793(d), and with providing material support to terrorists, in violation of 18 U.S.C. §§ 2339A and 2. *Id.* at 364. At trial, the government offered proof that, in 2001, while Abu-Jihaad was serving as a U.S. Navy Signalman aboard a U.S. destroyer, he disclosed classified information regarding the movement of U.S. warships to persons in London who were associated with an organization that supported violent Islamic jihad. *Id.* As its theory of the case on the material-support count, the government argued that Abu-Jihaad's disclosure of classified information to the persons in London amounted to an effort to provide *himself* as personnel to a terrorist organization. *Id.* at 396-402. Following a detailed consideration of the definition of "personnel" under the statute, the

Thus, the jury in this case will be called upon to determine whether, in providing Individual A's contact information to UCE-1, and offering other guidance to UCE-1 pertaining to UCE-1 and UCE-2's efforts to travel to Syria to join HTS, GIAMPIETRO attempted to provide material support or resources to HTS, and thus violated § 2339B. That is a fact question for the jury, and the jury alone, to resolve. GIAMPIETRO may argue at trial that she never provided UCE-1 with Individual A's contact information, or that her intent in providing UCE-1 with Individual A's contact information was not criminal and instead served some other purpose (such as dissuading UCE-1 from traveling abroad), even if those arguments are at odds with what the government believes the evidence will show at trial. But what GIAMPIETRO may not do is argue to the jury that GIAMPIETRO's providing Individual A's contact information to UCE-1, regardless of her motive in doing so, *was not criminal*. Permitting GIAMPIETRO to do so would usurp the fact-finding role of the jury and amount to error under the law.[16]

---

*Abu-Jihaad* Court was not willing to affirm the conviction under § 2339A under this theory.

The facts in *Abu-Jihaad* are not like those in the instant case at all. Here, GIAMPIETRO is charged with attempting to provide material support under § 2339B, not § 2339A. Section 2339A prohibits persons from providing material support or resources (including personnel) "knowing or intending that they are to be used in preparation for, or in carrying out," certain enumerated acts. To secure a conviction under § 2339A, the government must therefore prove more than just that a defendant provided material support or resources; the government must also prove that a defendant did so for a particular purpose enumerated in the statute. Section 2339B, by contrast, prohibits persons from providing material support or resources (including personnel) to designated FTOs, irrespective of whether such material support or resources are to be used for any particular purpose. If the support is provided to a designated FTO, the violation of § 2339B is established. The definition of material support contained in the statute is also quite broad, encompassing the provision of personnel, including oneself, expert advice or assistance, false documentation and transportation. By the terms of § 2339B, the government is not required to prove that a defendant provided material support to an FTO for any specific illegal purpose.

[16] GIAMPIETRO also contends that the government should not be permitted to introduce the evidence described in its Notice to preempt a potential entrapment defense because she "does not intend to offer a defense of entrapment or seek such an instruction." (*See* Doc. 143 at 19.) The government is aware, however, of communications between GIAMPIETRO's counsel and an expert witness for the government which suggest that GIAMPIETRO has, at a minimum, contemplated advancing such a defense. Thus, if GIAMPIETRO does ultimately pursue an entrapment defense or seek an instruction on entrapment, the government reserves the right to seek the introduction of this evidence to preempt that defense. The government also maintains, as outlined in its Notice, *see* Doc. 102 at 10, that the government ought to be permitted to introduce this evidence in any event to address questions a jury might reasonably have about why the investigation here lasted as long as it did.

24

### III. Conclusion

WHEREFORE, the government respectfully requests that the Court deny defendant Georgianna A.M. GIAMPIETRO's Motion in Limine Regarding 404(b) Evidence and Memorandum of Law in Support (Doc. 143) and permit the government to introduce the evidence above as intrinsic evidence, Rule 404(b) evidence, or both.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney
Middle District of Tennessee

By: _____*s/Ben Schrader*_____
BEN SCHRADER
Assistant U.S. Attorney

By: _____*s/Philip Wehby*_____
PHILIP WEHBY
Assistant U.S. Attorney

By: _____*s/Jennifer Levy*_____
JENNIFER LEVY
Trial Attorney, Counterterrorism Section
U.S. Department of Justice

Dated:      August 17, 2020

### CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2020 I electronically filed one copy of the government's Reply to Defendant's Response to Notice Regarding 404(b) Evidence via the CM/ECF electronic filing system, which will send a Notice of Electronic Filing to counsel for defendant.

_____*s/Ben Schrader*_____
BEN SCHRADER
Assistant U.S. Attorney

25