IN THE UNITED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|     Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.: 2:19-cr-00013 |
| | ) | |
| GEORGIANNA A.M. GIAMPIETRO | ) | Chief Judge Waverly D. Crenshaw, Jr. |
|     Defendant. | ) | Magistrate Judge Alistair E. Newbern |

## MOTION TO REVOKE DETENTION ORDER AND RELEASE TO HOME CONFINEMENT

The Defendant, Ms. Georgianna A.M. Giampietro ("Ms. Giampietro"), through counsel, and pursuant to 18 U.S.C. §3145(c), respectfully requests that the Court revoke the detention order entered on August 27, 2019, and release her on bond. At the status conference on June 19, 2020, Ms. Giampietro's trial date was continued for over year and this Court inquired whether she had any risk factors for COVID-19. At that time, she did not. Between July and August, 2020, Ms. Giampietro developed high blood pressure and was monitored and prescribed Zestril, an ACE-inhibitor, for treatment. In September 2020, recent research studies presented at the American Heart Association highlighted the increased risk of serious illness and death in patients with high blood pressure, especially those prescribed ACE-inhibitors.[1] Due to this change in circumstances, combined with a review of the Magistrate Judge's findings for the original detention order, the defendant submits that a combination of home confinement in the custody of her mother, GPS tracking, and restricted and monitored

---

[1] Dennis Thompson, *Blood Pressure Meds Can Affect COVID-19 Care*, HealthDay Reporter and WebMD at https://www.webmd.com/lung/news/20200911/blood-pressure-meds-can-affect-covid-19-care#1 (September 11, 2020). (Exhibit A).

1

internet access will ensure the safety of the community and ensure Ms. Giampietro's appearance in court, as well as protect Ms. Giampietro's own health and safety.

**A. Background of the spread of COVID-19**

Based on new evidence and the fact that the Magistrate's detention order was never appealed, this Court has jurisdiction to revoke the detention order. 18 U.S.C. §3145(c). The District Court's review of a magistrate's decision is *de novo*. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

As of October 27, 2020, in American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died.[2] As of October 27, 2020, there are at least 43.6 million COVID-19 cases worldwide, with 1.1 million deaths due to the virus.[3] Numbers in the U.S. have risen exponentially, catapulting it as the world's leader in COVID-19 cases, with over 8.7 million cases and 225,692 deaths.[4] In Kentucky, where Ms. Giampietro is detained, the Kentucky Health Department Commissioner, Steven Stack, MD, said, "It is not a good time to be out in public. This is the most dangerous it has been in eight months," "The risk of you getting infected in the state of Kentucky has never been higher."[5]

People over the age of sixty and people with certain underlying medical conditions have the worst risk of dying due to the disease. There is no vaccine or cure for COVID-19. The best course, according to public health experts, is to slow and prevent transmission, primarily through

---

[2] Coronavirus Map, The New York Times https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html(updated regularly)
[3] Coronavirus Map, The New York Times, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html?auth=login-email&login=email (updated regularly)
[4] Coronavirus Map, The New York Times https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html(updated regularly)
[5] Fox19 Digital https://www.fox19.com/2020/10/26/watch-live-governor-provides-covid-update-kentucky/

"social distancing" because the coronavirus spreads aggressively, and people can spread it even if they do not feel sick or exhibit any symptoms.[6]

Prisons are fundamentally incapable of implementing these recommendations, and incarcerated people are already dying nationwide as a result. For example, in New York City on Riker's Island, the rate of infection among incarcerated people was over eight times the rate of infection in New York City generally and 45 times higher than the rate from Wuhan, China in March, 2020.[7] Thus, COVID-19 poses a heightened threat within incarceration settings, where inmates live in close quarters, without any capacity to socially distance, and with reduced ability to keep proper hygiene. The nation's jails and detention centers have quickly become petri dishes for the coronavirus.[8]

In response to the rapid spread of the virus in prison facilities, U. S. Attorney General Barr issued a memo to the BOP finding that emergency conditions are "materially affecting" the functioning of the BOP and mandating to use of home confinement at certain BOP facilities.[9] A stimulus bill known as the Cares Act, signed into law, authorized Barr to order such emergency releases. Additionally, Barr released a recent directive to AUSAs across the country to consider the risks of COVID-19 to particular defendants in release decisions. He urged prosecutors to "consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic."[10]

---

[6] Centers for Disease Control and Prevention, How Coronavirus Spreads, https://cutt.ly/CtYRkkC
[7] See LEGAL AID SOCIETY, Analysis of COVID-19 Infection Rate in NYC Jails (last visited April 5, 2020, 3:00 p.m.), available at: https://cutt.ly/RtYTbWd.
[8] 'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars, The New York Times (Mar. 30, 2020) at https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html).
[9] Barr Memo, https://context-cdn.washingtonpost.com/notes/prod/default/documents/71181d55-230c-44dd-bfb0-1ace5979b035/note/5a29bea7-fc34-4c84-a544-5b96ffb45384.(April 3, 2020)
[10] *Id.*

## B. Ms. Giampietro should be released in light of the COVID-19 pandemic and her medical risk factor

The circumstances that existed when Ms. Giampietro was ordered detained have now changed. This pandemic poses a risk to Ms. Giampietro that is greater if she continues to be detained during this public health crisis. Between July and August 2020, Ms. Giampietro was monitored at the Daviess County Detention Center and was then diagnosed with high blood pressure and prescribed Lisinopril (Zestril), an ACE inhibitor.[11] While Ms. Giampietro initially refused medication, she was then administered the medication successfully from July 22, 2020.[12] Ms. Giampietro states that she has seen improvement while taking this medication but still experiences symptoms.[13] It is therefore important Ms. Giampietro continue using this medication. Ms. Giampietro's high blood pressure makes her a higher risk for complications of COVID-19, as listed in the CDC guidelines.[14]

A medical reporter summarizing recent studies presented at the American Heart Association on September 10, 2020, noted that those studies have shown that "high blood pressure is the most common chronic health condition among COVID-19 patients who require hospitalization".[15] Among more than 11,000 people across 22 studies from eight countries, 42% of COVID-19 patients had high blood pressure, the researchers found. The combined results showed that high blood pressure on its

---

[11] *See* Exhibit B, Ms. Giampietro's medical records showing an observed history of high blood pressure between July and August 2020 and her prescribed medication.
[12] *See* Exhibit B at 15.
[13] *See* Exhibit C, a letter from the defendant to counsel about her blood pressure treatment.
[14] Wallace M, Hagan L, Curran KG, et al. COVID-19 in Correctional and Detention Facilities – United States, February-April 2020. MMWR Morb Mortal Wkly Rep 2020:69:587-590. DOI http://dx.doi.org/10.15585/mmwr.mm6919e1external_icon
[15] Dennis Thompson, *Blood Pressure Meds Can Affect COVID-19 Care*, HealthDay Reporter and WebMD at https://www.webmd.com/lung/news/20200911/blood-pressure-meds-can-affect-covid-19-care#1 (September 11, 2020).

4

own was associated with a higher likelihood of death. Overall, having a history of high blood pressure increased a person's risk of kidney injury about fivefold, the Italian study found.

A third study digging deeper into this phenomenon found that common blood pressure medications were associated with an increased risk of death among COVID-19 patients. "The researchers tracked 172 people hospitalized for COVID-19 at the University of Miami/JFK Medical Center in Atlantis, Fla. The investigators found that 33% of people taking either angiotensin-converting enzyme inhibitors (ACE inhibitors) or angiotensin receptor blockers (ARBs) died in the hospital, compared with 13% of people not taking either drug. COVID-19 patients were also more likely to land in the intensive care unit if they were taking one of these blood pressure meds -- 28% of those with a prescription versus 13% not taking either drug."[16]

According to the most recent research, Ms. Giampietro's high blood pressure and her prescribed ACE inhibitor medication may place Ms. Giampietro at a higher risk of illness or death if she were to contract the virus.

Courts across the country have been releasing pretrial detainees with pre-existing conditions to protecting them from the worst outcomes of the COVID-19 virus. This includes cases where there is a presumption of detention, and cases based on violent charges. See *United States v. Stephens,* 2020 WL 1295155, F. Supp. 3d (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"). Notably, the court in *Unites States v. Stephens* ordered the defendant released in part based on COVID-19 pandemic, even though there were no reported cases in the facility where he was held. "Although there is not yet a known outbreak among the jail and prison populations, inmates may

---

[16] *Id.*

5

Case 2:19-cr-00013 Document 151 Filed 10/27/20 Page 5 of 14 PageID #: 1978

be at a heightened risk of contracting COVID-19 should an outbreak develop." 2020 WL 1295155, at 2 (S.D.N.Y. Mar. 19, 2020). [17]

In an order granting a preliminary injunction in *Faour Abdallah Fraihat, et al. v U.S. Immigration and Customs Enforcement, et al.,* the government was ordered to make determinations for detainees with risk factors. The court noted the particular threat of asymptomatic carriers within crowded incarceration facilities. No. 5:19-cv-1546 (C.D. Cal. Apr. 20, 2020), Doc. No. 132. Many people infected with COVID-19 are asymptomatic, but still contagious.[18] Coupled with the long incubation period (an average of five days before showing any symptoms), "these two factors result in a lot of people who are infected and spreading the virus without knowing it." *Id*. This problem is exponentially challenging in prison settings, where large numbers of inmates are in close quarters, some unwittingly shedding the virus.

Attorney General Barr cautioned prosecutors and urged for the detention of defendants who presented a true danger, such as "violent gang members and child predators."[19] However, aside from these legitimate threats to public safety, Barr urged prosecutors to make efforts to "safeguard the health and safety of those remanded to our custody."[20] Thus, there is precedent for this Court to rely on to release Ms. Giampietro. Ms. Giampietro is at risk of suffering

---

[17] *See also United States v. Davis*, Case 1:19-cr-00292-JDB (D.C. Cir. Apr. 6, 2020) (granting pretrial release after having previously denied bail in a presumption drug conspiracy case, in light of 28-year-old defendant's acute bronchitis); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *See United States v. Roman*, No. 19 Cr. 116 (KMW), 2020 U.S. Dist. LEXIS 53956 (S.D.N.Y. Mar. 27, 2020) (granting bail pending sentencing because defendant's age, existing preconditions including hypertension and two unruptured brain aneurysms heightened his risk for complications if contracted with Coronavirus); *United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting bail application to a defendant with a progressive lung disease given "the unique confluence of serious health issues and other risk factors facing this defendant, . . . which place him at a substantially heightened risk of dangerous complications should he contract COVID-19").

[18] Jillian Mock, *Asymptomatic Carriers are Fueling the COVID-19 Pandemic*, Discover Magazine at https://www.discovermagazine.com/health/asymptomatic-carriers-are-fueling-the-covid-19-pandemic-heres-why-you-dont (March 26, 2020).

[19] *Ibid*. Barr Memo, fn. 9.

[20] *Id*.

complications, or even death, if she contracts the coronavirus due to her high blood pressure and her ACE-inhibitor medication.

### C. Error in the Magistrate's decision and analysis of the factors for pretrial release demonstrate that Ms. Giampietro should be granted bail

#### 1. Legal Standards

As grounds for their Motion, the defense respectfully submits that there are conditions under which Ms. Giampietro could be released which would secure her future court appearances and which would not jeopardize the community's safety, nor the safety of any other person.

In order to obtain a detention order, the government must demonstrate either: (1) by clear and convincing evidence that no conditions other than detention will reasonably assure the safety of any other person and the community, 18 U.S.C.S. § 3142(f)(2); or (2) by a preponderance of the evidence that detention is necessary to reasonably assure the appearance of the defendant at future court proceedings. 18 U.S.C. §3142(f). Under 18 U.S.C. §3l42(g), in determining whether there are conditions of release that would "reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court must consider, "the nature and circumstances of the offense charged", "the weight of the evidence against the person", "the history and characteristics of the person including the person's character, physical and mental condition, family ties, ... financial resources, length of residence in the community, community ties, past conduct, criminal history, and record concerning appearance at court proceedings" and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. §3142(g).

7

## 2. Rebuttable Presumption

Generally, a defendant has a presumptive right to release. However, in cases where "there is probable cause to believe that the defendant has committed an offense identified as a federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(B), for which a maximum term of imprisonment of ten years or more is prescribed, there is a rebuttable presumption that "'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.'" *See* 18 U.S.C. § 3142(e)(3).

At the detention hearing on August 21, 2019, Ms. Giampietro was charged with aiding and abetting an attempt to provide material support under 18 U.S.C. §2339(B)(a)(1). The government has since issued a Superseding Indictment charging Ms. Giampietro with a single count of 18 U.S.C. §2339(B)(a)(1) and 18 U.S.C. § 2 (attempting to provide material support to a terrorist organization), a single count of 18 U.S.C. 1519 (altering or destroying records or documents) and a single count of 18 U.S.C. 1512(c)(1) (altering or destroying records or documents). The Superseding Indictment alleges that Ms. Giampietro attempted to provide material support to a Foreign Terrorist Organization, Hayat Tahrir al-Sham (hereinafter "HTS"), in the form of personnel and services and that she attempted to obstruct justice by altering or destroying records or documents related to a federal investigation and an official proceeding.

Both indictments charge Ms. Giampietro with crimes that carry a rebuttable presumption of detention. At the Magistrate's detention hearing, Ms. Giampietro offered the testimony of three witnesses: Lori Chaney, a co-worker; Dana Looper, her family law attorney; and Maria Williams, her mother. The Magistrate Judge found that the testimony of the three witnesses provided evidence "sufficient to rebut the presumption of detention that Giampietro would not

8

present a danger or a risk of flight if released pending trial" and that the defendant's personal characteristics favored release. (Doc. 26 at 4). The Magistrate nevertheless held that detention was warranted, finding that the strength of the evidence against Ms. Giampietro and the nature and seriousness of the danger to the community favored her detention. The Magistrate found that the evidence proffered by the government met the standard of "clear and convincing evidence" that no combination of conditions could reasonably assure the safety of the community if Ms. Giampietro was released pending trial. (Doc. 26 at 11).

The Magistrate found sufficient evidence to rebut the presumption of detention. The Magistrate erred, however, in determining the factors set out in 18 U.S.C. §3l42(g). There are in fact conditions of release that would effectively mitigate the Court's concern about the nature and seriousness of the alleged offenses, any danger Ms. Giampietro would pose to the community, and any risk of flight.

### 3. Weight of the Evidence

The Magistrate's reliance on the strength of the evidence was erroneous as a matter of law. The return of the indictment conclusively determines the existence of probable cause. *See United States v. Sheikh*, 994 F. Supp. 2d 736, 739 (E.D.N.C. 2014) ("It has long been settled by the Supreme Court that a grand jury indictment conclusively determines the existence of-probable cause." (citations omitted)). However, "[t]his factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010) citing *Hazime*, 762 F.2d at 37 (noting that the weight of evidence against the person "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community"). "[T]he weight of the evidence is the *least important* of the various factors" to be considered by the Court

in determining whether conditions exist which will reasonably assure the appearance of Ms. Giampietro. *Motamedi*, 767 F.2d at 1408 (emphasis added). The weight of the evidence is the least important factor because Ms. Giampietro is presumed innocent. See 18 U.S.C. § 3142(j). Moreover, even "evidence of the commission of a serious crime and the fact of a potentially long sentence" alone is insufficient "to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988). Accordingly, the weight of the evidence does not require Ms. Giampietro be detained pending trial.

In his decision, the Magistrate Judge detailed the evidence proffered by the government in their Detention Memorandum (Doc. No. 13), including evidence related to Western Union transfers made by Ms. Giampietro in June of 2018, to Turkey and Egypt. (Doc. No. 26). This was legal error as Ms. Giampietro was not charged with this conduct, and in the government's Superseding Indictment - no charges were brought which related to these transactions. The Court is limited to the defendant's charged offense, not hypothetical offenses**.**

**4. Nature and seriousness of the offense charged, and dangerousness of the defendant**

Ms. Giampietro concedes that the primary charged offense, attempting to provide material support to a foreign terrorist organization, weighs against finding that any conditions, absent detention, ensure the safety of the public and her presence for trial. *See United States v. Sheikh*, 994 F. Supp. 2d 736, 740 (E.D.N.C. 2014).

However, indictment on a crime of terrorism does not dictate detention in all cases. *See USA v. Harcevic*, 4:15-cr-00049, E. Dist. Mo.; *see also United States v. Al-Arian, M. Dist. Fla.,* 8:03-cr-77*; see also United States v. Muna Osman Jama*, 1:14-cr-230, E. Dist. Va., Doc. 18 – Order setting Conditions of Release dated July 25, 2004; and *United States v. Hinda Osman Dhirane*, 1:14-cr-230, E. Dist. Va., Doc. 26 – Appearance Bond dated July 29, 2014, granted out

10

of the W. Dist. Wash., assigned case #MJ14-311. Defendants in all of these terrorism-related offense cases were charged with terrorism-related crimes and were granted home detention with certain conditions of release.

The allegation of the crimes of material support of terrorism and obstruction of justice are mitigated here by the circumstances of the alleged crimes. Ms. Giampietro is alleged to have assisted undercover agents in an attempt to provide material support to a foreign terrorist organization by sharing social media contact information of an individual to facilitate their travel to Syria. The government submitted that Ms. Giampietro shared this information to assist the undercover agents in traveling to Syria to join HTS, although Ms. Giampietro clarified to the undercovers that this was not her intention. Similarly, both obstruction of justice charges relate to past conduct of the defendant asking the undercover agents to delete her contact information, as well as her use of the Telegram application's auto-destruct feature. There were no victims of these alleged crimes, the alleged conduct did not involve any violence, and all of the alleged conduct took place online.

The Magistrate considered the danger posed by Ms. Giampietro potentially returning to online communications regarding travel to Syria as serious enough to find that no conditions could mitigate that risk. But conditions limiting, prohibiting and/or monitoring Ms. Giampietro's internet use would erase the risk of Ms. Giampietro returning to any online communications or activity.

The Magistrate also stated concern for Ms. Giampietro's previously stated desire to travel to Syria. Ms. Giampietro is from Sparta, Tennessee, and has close ties to her family and community there. She has always lived in Tennessee and prior to her arrest, lived with her mother. Ms. Giampietro has significant student debt and not only did she not take any substantial steps towards travel, she lacks any ability to travel. Ms. Giampietro does not possess any documents nor the

11

financial resources that would permit her to engage in international travel. Had Ms. Giampietro wanted to flee, she had many opportunities before she was indicted when she was aware of the government's investigation and of their intention to indict her following their reverse proffer. The court could also impose several conditions of release to mitigate this risk, including imposing GPS monitoring, confinement within her home, and placing Ms. Giampietro in the custody of her mother[21].

### 5. Personal History and Characteristics

The Magistrate was correct in finding that Ms. Giampietro's personal characteristics weigh in favor of release. Ms. Giampietro does not have any prior criminal record, nor does she have even the slightest history of violence. She has lived with her mother for 10 years, attended college and majored in Sociology. She also received a Master's Degree. Ms. Giampietro has maintained stable and enriching employment, most recently as a social worker, and has strong professional references. (Doc. No. 26 at 9). She enjoys strong familial support and ties to her community in Tennessee. Ms. Giampietro has two children that she cares for. It would be unreasonable to assume that a woman, who would not leave her family even after discussing a desire to travel and while she knew she was under investigation and facing indictment, would attempt to flee now.

**D. Conclusion**

The heightened risk of medical complications due to her new diagnosis of high blood pressure and the particular risks associated with her prescribed medication should Ms. Giampietro contract COVID while in custody, informs a decision that Ms. Giampietro should be released pending trial in September, 2021. Ms. Giampietro consents to any combination of conditions of

---

[21] *See* Exhibit D, a declaration from Ms. Maria Williams, the defendant's mother, who states she is willing to be the custodian of Ms. Giampietro, consents to any monitoring or restriction of internet use and access, and ensures the Court that she would be a vigilant custodian.

release and respectfully proposes that home confinement in the custody of her mother, GPS tracking, and internet restriction or monitoring could be put in place as conditions of her release. Apart from the serious nature of the allegations, which in and of themselves are not conclusive, the remaining factors support finding the conditions proposed by the defense are sufficient to protect the public and ensure Ms. Giampietro's presence for trial.

Respectfully submitted this 27th day of October, 2020.

By: /s/ *Charles Swift*<br>
Charles D. Swift,<br>
Pro Hac Attorney for Giampietro<br>
CLCMA<br>
833 E. Arapaho Rd., Suite 102<br>
Richardson, TX 75081<br>
(972) 914-2507

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of October, 2020, I electronically filed the foregoing Motion to Revoke Detention Order with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ *Charles Swift*
Charles D. Swift
Pro Hac Attorney for Giampietro
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
