IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| | ) | No. | 2:19-00013 |
| v. | ) | | |
| | ) | | Chief Judge Crenshaw |
| | ) | | |
| GEORGIANNA A.M. GIAMPIETRO | ) | | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE
DETENTION ORDER AND RELEASE TO HOME CONFINEMENT**

The United States of America, by and through the United States Attorney for the Middle

District of Tennessee, respectfully opposes defendant Georgianna GIAMPIETRO's Motion to

Revoke Detention Order and Release to Home Confinement. (Doc. 151.) On August 14, 2019, a

federal grand jury indicted GIAMPIETRO on one count of Attempting to Provide Material Support

or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B,

in connection with her attempt to provide material support, namely, personnel, to Hay'at Tahir al-

Sham, also known as "HTS," a designated foreign terrorist organization ("FTO"). (Doc. 3.)

At GIAMPIETRO's initial appearance, the government requested that GIAMPIETRO be

held as a danger to the community and as a serious risk of flight. (Doc. 9.) The parties appeared

for a detention hearing before the Honorable Alistair Newbern on August 21, 2019. (Doc. 14.) In

a comprehensive, 11-page written Memorandum Opinion and Order issued on September 24,

2019, Judge Newbern found that the government had shown by clear and convincing evidence that

there is no combination of conditions that could reasonably assure the safety of the community if

GIAMPIETRO were released pending trial, and detained her. (Doc. 26.)

On October 27, 2020—more than 13 months after Judge Newbern issued her Memorandum Opinion and Order—GIAMPIETRO moved for its revocation, on two grounds. First, she contends that Judge Newbern made legal errors. (Doc. 151 at 8-11.) Second, GIAMPIETRO contends that she "developed high blood pressure" between July and August 2020, and that she is now at "increased risk of serious illness and death" from COVID-19. (*Id.* at 1.) These arguments lack merit. Judge Newbern made no errors of law in ordering GIAMPIETRO detained. And GIAMPIETRO's COVID-19 arguments are speculative and baseless.

Furthermore, although this Court reviews GIAMPIETRO's motion de novo, GIAMPIETRO has not asked the Court to hold a hearing to consider her motion. Nor has GIAMPIETRO attached to her motion a transcript of the proceedings before Judge Newbern, so that the Court might review for itself the evidence and testimony that Judge Newbern heard in issuing her ruling. (*See* Doc. 44.) Additionally, in the time since GIAMPIETRO was detained, the grand jury has charged GIAMPIETRO with two counts of Obstruction of Justice. (Doc. 77.) Because GIAMPIETRO has not asked for a hearing on her motion, and because she has provided no valid basis for revoking Judge Newbern's comprehensive detention order or for releasing her on COVID-19 grounds, the government respectfully asks this Court to vacate the November 24, 2020 evidentiary hearing and deny GIAMPIETRO's motion on the record currently before it.

## I.     LEGAL PRINCIPLES GOVERNING REQUESTS FOR DETENTION

GIAMPIETRO seeks review of a detention order under 18 U.S.C. § 3145. In such proceedings, "[r]eview of the Magistrate Judge's decision is de novo, although the district court may conduct its review and base its decision on the evidence presented to the magistrate at the detention hearing." *United States v. Massey*, 2014 WL 3671885, at *1 (M.D. Tenn. July 23, 2014) (Sharp, J.) (internal quotation marks omitted). "De novo review does not require a de novo

- 2 -

evidentiary hearing," and whether to conduct a new hearing or consider new evidence is "left to the district court's sound discretion." *United States v. Lutz*, 207 F. Supp. 2d 1247, 1251 (D. Kan. 2002). While "a strong argument could be made that in order to be entitled to an oral hearing and to present new evidence under § 3145(b), a defendant" must show that the evidence in question "was not known to [her] at the time of the original hearing," *United States v. Shaker*, 665 F. Supp. 698, 704 n.8 (N.D. Ind. 1987), district courts generally have wide latitude to decide whether and how to accept evidence. *See*, *e.g.*, *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990).

As GIAMPIETRO concedes, *see* Doc. 151 at 8-9, there is a rebuttable presumption under 18 U.S.C. § 3142(e)(3) that she should be detained pending trial.[1] The presumption in § 3142(e)(3) places the burden of production on the defendant. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). To overcome that burden, GIAMPIETRO must present at least some evidence that she does not pose a danger to the community or a risk of flight. *Id.* Even if she could satisfy that burden, the presumption favoring detention does not disappear entirely. *Id.* Rather, the presumption, which "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial," remains a factor to be considered by the district court. *Id.* The government retains the burden of persuasion on the ultimate issue of pretrial detention. *Id.*

In determining whether the government has met its burden of persuasion, this Court must consider four factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the

---

[1]     18 U.S.C. § 3142(e)(3)(C) provides that, if the judicial officer finds probable cause to believe that the defendant has committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed," it "shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." Here, a federal grand jury has indicted GIAMPIETRO with an offense listed in 18 U.S.C. § 2332b(g)(5)(B), which carries a maximum term of imprisonment of 20 years. *See* 18 U.S.C. §§ 2332b(g)(5)(B) and 2339B(a)(1); *see also* Doc. 26 at 2. And "[a] grand jury indictment, by itself," of course, "establishes probable cause to believe that a defendant committed the crime with which [s]he is charged." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). A rebuttable presumption of detention therefore applies in this case.

history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). A finding of dangerousness must be supported by clear and convincing evidence. *Id.* § 3142(f)(2)(b); *Stone*, 608 F.3d at 945. A risk of flight finding need only be supported by a preponderance of the evidence, however. *See*, *e.g.*, *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

For the reasons below, these factors weigh in favor of detention in this case.

## II.   FACTUAL PROFFER OF THE EVIDENCE SUPPORTING THE CHARGES AGAINST GIAMPIETRO

Assuming that the Court determines that an evidentiary hearing is required, the government anticipates proceeding by proffer at the evidentiary hearing in this case. "[C]onducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court." *Stone,* 608 F.3d at 949-50 (citation omitted); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter . . . [has] permitted the Government to proceed by way of proffer.") (citing cases). The government proceeded by proffer before Judge Newbern, who relied upon that proffer in making her detention determination. Judge Newbern noted that the "fact that the information [the government] presented was not subject to meaningful cross-examination lessens it evidentiary weight." (Doc. 26 at 8.) But she noted further that its "weight is bolstered by evidence of GIAMPIETRO's admissions, her social media postings, and images kept on her cell phones . . . ." (*Id.*) As with the memorandum the government filed before Judge Newbern, the government supports its opposition here with evidence of GIAMPIETRO's admissions, social media postings, and images kept on her cell phones and elsewhere, all of which have been provided to GIAMPIETRO in discovery. Furthermore, as GIAMPIETRO's pretrial filings make clear, GIAMPIETRO does not contest that she made the admissions or social media postings at issue, or that she kept the images at issue on her cell phone. Rather, she contends (for

- 4 -

example) that this evidence constitutes protected speech, does not amount to criminal conduct, or should be excluded at trial. The government's proffer thus largely consists of evidence whose existence is not disputed, although its meaning might be.

A. **GIAMPIETRO's Plans to Travel to Syria to aid Foreign Fighters There**

GIAMPIETRO is an American citizen born in Cookeville, Tennessee. Prior to her arrest, she resided in Sparta, Tennessee. In late 2015, the FBI became aware that GIAMPIETRO was posting materials supporting ISIS, a radical Islamic terrorist organization long designated by the United States as an FTO, on social media. Beginning in October 2015, and because of these posts, an online FBI employee ("OCE-1") engaged GIAMPIETRO online. OCE-1 communicated with GIAMPIETRO about various aspects of Islamic teachings and current events for the next three years. OCE-1 later introduced GIAMPIETRO to a second online FBI employee ("UCE-1"). On November 28, 2017, UCE-1 met face-to-face with GIAMPIETRO in Cookeville. During that meeting, which FBI agents surveilled, GIAMPIETRO expressed her desire to travel to Syria.

On February 22, 2018, UCE-1 again met face-to-face with GIAMPIETRO, in a hotel room in Cookeville. During that meeting, which FBI agents also surveilled, GIAMPIETRO again expressed her desire to travel to Syria, where she explained that she intended to join her fiancé, whom she identified as "Abu Abdullah." GIAMPIETRO explained that her fiancé supported numerous "rebel groups" in Syria, and that he was affiliated primarily with "JFS."[2] GIAMPIETRO explained that she believed it to be every Muslim man's duty to wage "jihad,"[3] and that it was the duty of women to support them. GIAMPIETRO explained that women could support these fighters by fighting alongside their husbands, carrying bodies from the battlefield, and providing food and

---

[2]    JFS is an alias for Jabhat al-Nusrah, an affiliate of Al Qaeda in Iraq, whose goal is to oust the Syrian regime.
[3]    "Jihad" refers to the struggle or fight against the enemies of Islam.

water to the mujahideen.[4] GIAMPIETRO also expressed her desire to cook for the "brothers" who were fighting jihad. And GIAMPIETRO explained that she hoped to die alongside her husband in Syria, in an airstrike, on a Friday during Ramadan while she and her husband were praying.

During this conversation, GIAMPIETRO provided UCE-1 with directions on how to travel to Syria without drawing suspicion from law enforcement. UCE-1 asked GIAMPIETRO if Abdullah had contacts who could obtain false documents to facilitate UCE-1's travel to and entry into Syria; GIAMPIETRO replied that she did. GIAMPIETRO also told UCE-1 that she and Abdullah had discussed bringing GIAMPIETRO's son to Syria, and that GIAMPIETRO planned to tell her son's father in the United States that she was only taking her son on a trip to Italy. GIAMPIETRO said further, however, that according to Islamic teachings, she could not travel to Syria until she had repaid her student loans, which were substantial. During the conversation, GIAMPIETRO mentioned that she was in a private chat group on a social media platform with other "girls" who also wanted to travel to Syria, and invited UCE-1 to join, which she did.

The government subsequently obtained federal search warrants for GIAMPIETRO's social media accounts. During a search of those accounts, the government recovered numerous electronic communications between GIAMPIETRO and Abdullah establishing GIAMPIETRO's relationship with Abdullah and GIAMPIETRO's desire to travel to Syria to assist foreign fighters. These communications included, for example, conversations in June 2016 between GIAMPIETRO and Abdullah, during which Abdullah explained that he had posted photographs of fellow fighters who had recently died, including one who had recently conducted a suicide bombing, to his social media account, and that Abdullah had killed a lot of people near Aleppo. These communications also

---

[4]     "Mujahideen" is a term which refers to persons who have taken up violent jihad.

included a conversation on July 10, 2016, during which GIAMPIETRO asked about traveling to see Abdullah in Syria, and inquired whether she could get a gun if she traveled with him.

Additionally, and as described below, FBI agents executing a search warrant at GIAMPIETRO's residence on October 23, 2018 recovered two of GIAMPIETRO's cell phones, specifically, a Samsung S5 and a Samsung S8. Agents later searched both devices. On the Samsung S8, agents recovered photographs of Abdullah, which were stored in an electronic folder entitled "Abu Abdullah." Those photographs depict Abdullah wearing military fatigues and posing with firearms, including what appear to be high-powered rifles. (*See* Exhibit A.) Lastly, the government obtained electronic communications from GIAMPIETRO's social media accounts establishing that GIAMPIETRO had discussed details of her plans to travel to Syria with multiple other persons.

### B.  GIAMPIETRO Provides UCE-1 with Contact Information for Individual A, for the Purpose of Aiding UCE-1 and UCE-2's Travel to Syria

GIAMPIETRO also provided UCE-1 and UCE-2 (UCE-1's fictitious husband) with contact information for a Middle East-based individual to facilitate their travel to Syria to join HTS, a designated FTO. In late September 2018, UCE-1 informed GIAMPIETRO that UCE-2 had sworn allegiance to HTS on their behalf, and that they were preparing, imminently, to travel to Syria to join HTS. GIAMPIETRO expressed reservations regarding UCE-1 and UCE-2's plans, along with concerns that authorities might trace those plans back to GIAMPIETRO. GIAMPIETRO explained further, ". . . I need you to unfollow the Telegram[5] channel . . . I need you to delete my name and phone number from your phone and all pictures and text messages."

Notwithstanding these reservations, GIAMPIETRO provided UCE-1 with specific advice as to how UCE-1 and UCE-2 could travel to Syria without being detected. GIAMPIETRO explained that UCE-1 and UCE-2 should not take their phones with them, and that they should

---

[5]     Telegram is an encrypted social media platform.

- 7 -

acquire new phones and new phone numbers before they traveled. GIAMPIETRO referenced her own plan for traveling to Syria, which included cutting ties with other persons before leaving, explaining that, "[w]hen I was planning my plan was to delete everyone 6 to 8 months before leaving and have no contact with anyone." GIAMPIETRO explained that UCE-1 and UCE-2 should purchase roundtrip airline tickets, rather than one-way tickets, and that they should consider traveling to Turkey (prior to entering Syria) by traveling first to Italy, and then travel from Italy to Turkey. In an online chat on September 30, 2018, GIAMPIETRO informed UCE-1 that GIAMPIETRO had spoken with one of her contacts, who claimed that there was presently no jihad in Syria, and asked UCE-1, "Have you thought about Afghanistan? They're still fighting there."

GIAMPIETRO also asked UCE-1 about the overseas contact UCE-1 claimed UCE-1 was using to assist UCE-1 and UCE-2's travel. GIAMPIETRO offered to reach out to one of GIAMPIETRO's contacts instead, whom GIAMPIETRO claimed could better assist UCE-1. On October 2, 2018, GIAMPIETRO provided UCE-1 with contact information for Individual A, and told UCE-1 to message Individual A.[6] Although GIAMPIETRO did not explicitly tell UCE-1 that Individual A could assist UCE-1 and UCE-2 in traveling to Syria, the clear implication from their communications was that UCE-1 and UCE-2 should contact Individual A for that purpose.[7]

FBI investigators obtained open source information about Individual A, which established Individual A's connection to FTOs. Individual A is the operator of a Telegram channel bearing username @Alsadaqahsyria, which went live on May 18, 2018, and which raises funds for fighters in Syria using cryptocurrencies. Although the channel purports be an "independent charity organization," the channel also claims to provide "the mujahideen in Syria with weapons, financial

[6]     When agents executed the warrant at GIAMPIETRO's residence, they recovered a journal that belonged to GIAMPIETRO. That journal contained a handwritten note listing contact information for Individual A.

[7]     The government recognizes that GIAMPIETRO intends to argue at trial that she provided UCE-1 with contact information for Individual A in order to convince UCE-1 and UCE-2 *not* to travel to Syria.

aid[,] and other projects relating to the jihad." Photographs and memes posted to this channel between May and June 2018 depict (for example) masked men wearing military fatigues, and make explicit requests for donations to benefit foreign fighters.[8] (*See* Exhibit B.)

On October 4, 2018, after receiving Individual A's contact information from GIAMPIETRO, UCE-2 made contact with Individual A online. UCE-2 told Individual A that UCE-2 had been given Individual A's contact information by "Umm Roses," a social media moniker used by GIAMPIETRO, and that UCE-2 understood Individual A to be someone who could help brothers and sisters making "Hijrah," meaning emigration to Syria.[9] UCE-2 asked Individual A if Individual A had helped people make Hijrah before, and if it was still possible to do so. Individual A replied, "Yes akhi [brother]. You can but safest to wait" to travel to Syria, explaining that "there isn't any fighting at the moment," and that UCE-2 would primarily be doing "guard duty" "5 or 7 days a month." UCE-2 asked Individual A further whether Individual A could get UCE-1 and UCE-2 "across" to Syria, if UCE-1 and UCE-2 made it to Turkey. Individual A replied that he could, but explained that he had talked to "another brother," who said that it was difficult to cross into Syria at present, and that UCE-1 and UCE-2 should wait and cross later.

Individual A also provided UCE-2 with information about how to travel to Turkey undetected. Individual A explained that UCE-2 should have a good cover story, and should take steps to make it look like UCE-1 and UCE-2's travel was legitimate, including, "Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like your [sic] an aid worker. Then you have a good defence." When UCE-2 asked Individual A why he needed a "good

---

[8]        Several of these images bear a stamp ("Provided by MEMRI JTTM") reflecting that they were obtained via open source means by the MEMRI Cyber & Jihad Lab.

[9]        "Hijrah" is an Islamic term meaning "migration." The term historically refers to the journey undertaken by the Islamic prophet Mohammed from Mecca to Medina. In the extremist context, the term "Hijrah" has been used to describe a foreign fighter's journey from his country of origin to terrorist-held countries abroad.

defense," and whether Individual A was referring to being questioned by Turkish authorities, Individual A replied, "Yea. Also if you get stopped you have evidence to support your story."

In a conversation with GIAMPIETRO on October 4, 2018, UCE-1 thanked GIAMPIETRO for providing UCE-1 with Individual A's contact information, and explained that Individual A could help UCE-1 get to Syria. GIAMPIETRO then claimed that she had not provided Individual A's contact information for travel purposes, stating, "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." GIAMPIETRO also informed UCE-1 that she no longer wished to discuss the matter, stating, "You're going to get me arrested." GIAMPIETRO deleted her Telegram account after the conversation. And on October 7, 2018, notwithstanding GIAMPIETRO's claim to UCE-1 that she had "no clue" who Individual A was, GIAMPIETRO messaged a member of GIAMPIETRO's chat group, stating, "So her husband messaged this brother I know."

### C.     GIAMPIETRO's Admissions

GIAMPIETRO made numerous admissions during her recorded interview with agents when they executed the warrant at her residence on October 23, 2018. GIAMPIETRO admitted, for example, that she had said that she wanted to travel to Syria to marry Abdullah, to pull bodies off the battlefield, and to die in an airstrike on Ramadan; that she knew that the United States recognizes HTS as a terrorist group; that she communicated with UCE-1 regarding UCE-1 and UCE-2's plans to travel to Syria; that she had conveyed to others her plan to smuggle herself into Syria; that she used code words online; and that she used self-destruct timers in her texts because she did not want others to know what she was communicating about.[10] GIAMPIETRO also

---

[10]     GIAMPIETRO also claimed during her interview that she was interested in performing charity work, and in engaging in counseling services overseas, although those claims are belied by GIAMPIETRO's online communications with UCE-1 and other online activity. GIAMPIETRO also claimed to have reported to foreign law

acknowledged that she had deleted social media accounts that she had been using to communicate with other persons in her chat group after becoming aware of federal investigations, including an investigation involving a person in Alabama who has since pled guilty to material support charges.

### D. Western Union Transfers

As GIAMPIETRO notes in her motion, *see* Doc. 151 at 10, the government made reference at her detention hearing to Western Union money transfers GIAMPIETRO appeared to have made to groups supporting terrorist activities. The government later developed proof that GIAMPIETRO sent $150, $200, and $500 via Western Union to organizations supporting the mujahideen on June 14, June 20, and June 25, 2018, respectively. Specifically, the government recovered a set of screenshots saved to GIAMPIETRO's Samsung S8 depicting a transfer of $150 from "Georgianna Giampietro" to "Muhammed Muhammed" in Turkey on June 14, 2018. Agents subpoenaed Western Union for transactions involving GIAMPIETRO, as well as transactions involving a payee named "Muhammed Muhammed." Western Union returns reflected that a Georgianna GIAMPIETRO with GIAMPIETRO's date of birth, residing at 327 Imperial Drive in Sparta, sent $150 to Muhammed Muhammed on June 14, 2018. Agents also recovered a screenshot saved to the S8 on June 15, 2018, which depicts the Telegram channel name "Al Sadaqah"; a photo of men holding a pair of boots, with the caption, "Al Sadaqah providing brand new military boots to front line mujahideen/Anonymous donation methods available"; and the handle @alsadaqahsyria.

Agents also recovered a screenshot saved to the S8 on June 20, 2018, depicting a Western Union transfer of $200 from a redacted name to "Omar Ali" at the number "+90 537 822 0931." During a recorded meeting between GIAMPIETRO and UCE-1 on March 17, 2018, UCE-1 told GIAMPIETRO that UCE-2 was interested in "helping some of the mujahideen." GIAMPIETRO

---

enforcement services the names of persons she believed to be supporting terrorist groups, but the government has so far uncovered no information to substantiate those claims.

told UCE-1 that if UCE-2 was on Telegram, GIAMPIETRO could "give him some brothers" whose Telegram channel GIAMPIETRO followed. GIAMPIETRO told UCE-1 further that these brothers were "over there" and were "trustworthy." The next day, GIAMPIETRO sent UCE-1 a message on Telegram providing UCE-1 with contact information for one of the "trusted brothers" whom she referenced above. Specifically, GIAMPIETRO sent UCE-1 a forwarded message from "Al-Maqalaat," describing the needs of the "mujahideen," including their household needs. GIAMPIETRO sent UCE-1 the number "+90 537 822 0931" accompanied by the message "I use to know this brother the owner of this channel from FB/He's trustworthy." Agents also recovered a screenshot saved to GIAMPIETRO's phone on June 25, 2018, depicting a transfer of $500 from an unknown sender to "Ahmet Hayek" at "+90 537 822 0931." Agents subpoenaed Western Union for transactions involving GIAMPIETRO, as well as transactions involving payees named "Omar Ali" and "Ahmet Hayek" (among others). Western Union returns reflected that a Georgianna GIAMPIETRO with GIAMPIETRO's date of birth, residing at 327 Imperial Drive, sent $200 to Omar Ali on June 20, 2018 and $500 to Ahmet Hayek on June 25, 2018. (*See* Exhibit C.)

### E. Backchannel Communication with Individual B

Additionally, in the time since the initial detention hearing, the government recovered a damning October 2018 Telegram exchange between GIAMPIETRO and an associate of Individual A's (whom the government refers to as "Individual B") who operated the "Syria Care Turkey" Telegram channel. The government was not yet aware of this exchange at the time of the initial detention hearing, and so did not rely on it or present it to Judge Newbern in seeking detention. That exchange is lengthy; the government attached it in full to its opposition to GIAMPIETRO's motion to exclude 404(b) evidence. (*See* Doc. 144-4.) As the government explained there, *see* Doc.

- 12 -

144 at 12-15, the exchange provides key insights into GIAMPIETRO's motive for providing Individual A's contact information to UCE-1 and into her consciousness of guilt.

To summarize: during an online conversation between UCE-2 and Individual A on October 10, 2018, UCE-2 sent Individual A the following message:

> Asalaam aleikum wr wb. ive made it to London and am deleting this telegram account. im waiting on my wife but ill contact you once im in turkey from a new telegram. ill have same name 'Yusuf'. jazakAllah khair for your help akhi. inshAllah we will speak soon.

In the October 2018 Telegram exchange between GIAMPIETRO and Individual B described above, Individual B sent GIAMPIETRO a verbatim copy of the message UCE-2 sent to Individual A on October 10, 2018, with the accompanying message, "The brother [Individual A] sent this message." (*See* Doc. 144-4 at 31.) In other words, (1) GIAMPIETRO told UCE-1 to have UCE-2 contact Individual A; (2) UCE-2 contacted Individual A seeking assistance in traveling to Syria; and (3) UCE-2 again contacted Individual A and sent the message above on October 10, 2018, after UCE-2 arrived in London. Individual A then (4) sent the message above to Individual B, who relayed the message to GIAMPIETRO in a conversation on October 10, 2018. As that exchange makes quite plain, *see* Doc. 144 at 12-15, GIAMPIETRO, as of October 2018, (1) still wished to travel to Syria, and was "working hard to get there"; (2) still adhered to the teachings of radical Islamic clerics like Anwar al-Awlaki; and (3) was taking steps to destroy evidence and intended to obstruct any investigation into her providing UCE-1 with Individual A's contact information.

## III.   THIS COURT SHOULD DETAIN THE DEFENDANT AS A DANGER TO THE COMMUNITY AND AS A SERIOUS FLIGHT RISK

This Court should apply the § 3142 presumption in this case and detain GIAMPIETRO pending trial, as Judge Newbern did. Moreover, and as outlined below, even if the Court were to find that GIAMPIETRO has overcome the presumption, the government has met its burden of

- 13 -

showing clear and convincing evidence that GIAMPIETRO should be detained pending trial to ensure the safety of the community. The government has also met its burden of showing by a preponderance of the evidence that GIAMPIETRO poses a serious risk of flight.

### A.     The Nature and Circumstances of the Offense

The nature and circumstances of the offense in this case militate strongly in favor of detention. GIAMPIETRO has been charged with attempting to provide material support to a designated FTO. Congress has deemed this offense one which carries a rebuttable presumption of detention, meaning that pretrial detention for such defendants ought to be the norm. That is not surprising, given that in cases like GIAMPIETRO's a grand jury has found probable cause to believe that the defendant has attempted to provide an FTO with material support. "The allegation of such a crime weighs heavily against [a] defendant," because "[i]t is not a common violent crime, but rather terror that rips civilization's fabric." *United States v. Sheikh*, 994 F. Supp. 2d 736, 740 (E.D. N.C. 2014) (citation omitted). The grand jury has also found probable cause to believe that GIAMPIETRO sought to obstruct law enforcement efforts in connection with these activities.

The allegations underlying this case are extremely serious. They portray a defendant with a longstanding sympathy toward foreign terrorist organizations; a manifest desire to aid those organizations, including by providing them with personnel and by sending hundreds of dollars to aid the mujahideen; a clear interest in traveling abroad to provide aid to those organizations; and a pattern of destroying evidence, attempting to destroy evidence, or directing others to destroy evidence of criminal conduct.[11] This factor thus weighs in favor of detention.

---

[11]     In considering the nature and circumstances of the offense, the Court should also weigh the possible penalty GIAMPIETRO faces upon conviction. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). Here, GIAMPIETRO faces a maximum term of imprisonment of 20 years on each count of the indictment. This time period represents a substantial penalty, which would serve as powerful motivation for GIAMPIETRO to flee the jurisdiction were she to be released. *See* Doc. 13-3, Detention Order, *United States v. Abusaad*, No. 7:18-cr-541-LSC-TMP, at 12 (N.D. Ala. December 19, 2018) (prospect of an effective guidelines sentence of 20 years of imprisonment for a defendant charged with attempting to provide material support "create[d] a strong incentive for the defendant to flee").

- 14 -

**B.** **The Weight of Evidence Against the Defendant**[12]

The weight of the evidence of GIAMPIETRO's dangerousness is strong. A grand jury has found probable cause to believe that GIAMPIETRO attempted to provide personnel to an FTO. GIAMPIETRO also has a lengthy track record of supporting and promoting terrorist activity online. She also has a history of concealing that conduct from law enforcement, including by directing others to conceal such conduct. These facts all weigh in favor of detention.

**1.** **GIAMPIETRO Promoted Violence Online**

GIAMPIETRO made numerous posts and/or comments online evincing support for violent extremism. Those posts included a post on September 16, 2015, claiming "IS [Islamic State] are the ones fighting for us." GIAMPIETRO also made posts and/or comments on social media platforms espousing violence towards the United States, including a post on September 21, 2015, stating, "subhanallah [praise be to Allah] america can burn loool"; a post on September 12, 2016, stating, "there is no ceasefire all lies .. may AllÄ☐h (subhanu wa ta'ala) destroy the US, Russia, Assad and his regime ameen thumma ameen."; and a post on July 13, 2017, stating, "We don't need America to accept us we only need AllÄ☐h . ï·»The US are terrorists killing innocent Muslims daily." GIAMPIETRO also posted numerous images espousing support for terrorist attacks against the United States online in 2015. Those images included a photograph of a headless Statue of Liberty waving an ISIS flag and captioned, "One of my favorite pictures that keeps getting deleted," a photograph of a jihadi fighter pointing a gun at the reader with the words, "Rivers of Blood Await America," a photograph of the U.S. Capitol engulfed in flames and triumphant ISIS supporters waving ISIS flags, and other extreme images. (*See* Exhibit D.)

---

[12]     "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948 (citation omitted).

- 15 -

## 2. GIAMPIETRO Kept Violent Images on Her Cell Phones

In addition to posting online content demonstrating support for terrorist activity, GIAMPIETRO kept content on her cell phones evincing support for terrorist causes. For example, GIAMPIETRO kept photographs of images of foreign fighters and accompanying phrases urging persons to engage in violent jihad, *see* Exhibit E. GIAMPIETRO kept photographs of dead bodies, including what appear to be photographs of victims of foreign fighters, as well as a photograph depicting a foreign fighter with his boot on a victim, holding up his index finger in a symbol which means "There is only one God and his name is Allah," a symbol commonly used by ISIS, *see* Exhibit F. GIAMPIETRO kept photographs of what appear to be improvised explosive devices, *see* Exhibit G. GIAMPIETRO kept photographs of statements by Anwar al-Awlaki, a radical Islamic cleric who has preached that Muslims have a religious duty to kill Americans, *see* Exhibit H. And GIAMPIETRO kept images related to organizations espousing contributions to the cause of foreign fighters, including an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING," *see* Exhibit I. All of these materials are further evidence of GIAMPIETRO's continuing commitment to, and support for, violent terrorist activity.

## 3. GIAMPIETRO Encouraged Others to Conceal Their Online Conduct

GIAMPIETRO also encouraged other persons to engage in counter-surveillance methods online to prevent law enforcement from detecting GIAMPIETRO's online activity related to her support of foreign terrorist causes, along with the online activity of others. Such activity serves as evidence that GIAMPIETRO may seek to thwart the government's investigation while on pretrial release by, for example, destroying evidence or encouraging other persons to destroy evidence or engage in other obstructive conduct related to the investigation. In sum, and for all of the reasons

above, the evidence of GIAMPIETRO's dangerousness is strong. This factor thus weighs in favor of detention.

### C.   The History and Characteristics of the Defendant

The third factor in the detention analysis, the history and characteristics of the defendant, likely weighs in GIAMPIETRO's favor.[13] Under 18 U.S.C. § 3142(g)(3)(A), the history and characteristics of a person which the Court should consider include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."

Here, the government offers no opinion on GIAMPIETRO's character or her physical and mental condition, or on how those factors affect detention. Nor does the government have any information regarding GIAMPIETRO's history of drug or alcohol abuse, other than GIAMPIETRO's admission, reflected in a Facebook chat recovered pursuant to the execution of a federal search warrant, that she had overdosed on methamphetamine in high school. GIAMPIETRO does have family ties in middle Tennessee, although GIAMPIETRO undertook much of the criminal activity underlying the indictment in her home in Sparta without the knowledge of her mother, with whom she lived and now proffers as a third-party custodian. Until her arrest in this case, GIAMPIETRO was employed as a social worker, although she is no longer so employed, and the government has serious concerns about GIAMPIETRO's continued role as an emotional resource for at-risk minors. GIAMPIETRO also has very limited financial resources, given her substantial student debt. Lastly, the government notes that GIAMPIETRO has no criminal history, and thus no record concerning appearance at court proceedings.

---

[13]   Judge Newbern held that this factor "weighs slightly against detention." (Doc. 26 at 9.)

**D.    The Nature and Seriousness of the Danger to Any Person or the Community**

For reasons already cited, including the seriousness of the criminal conduct underlying the indictment, as well as GIAMPIETRO's record of destroying evidence, and encouraging others to destroy evidence, GIAMPIETRO poses a serious danger to the community. This factor thus weighs in favor of detention as well. *See Sheikh*, 994 F. Supp. 2d at 741 (defendant's online posts in support of violent causes, coupled with his attempt to travel abroad, constituted evidence of his danger to the community); *see also* Doc. 13-3, Detention Order, *Abusaad*, at 13-14, 14 n.8 (defendant's "willingness and religious zeal for supporting Islamic terrorist organizations, coupled with her operational experience in doing so," create a danger to "national and international order").

**E.    GIAMPIETRO'S Arguments for Revocation of Judge Newbern's Detention Order Lack Merit**

GIAMPIETRO contends that Judge Newbern made three legal errors in ordering her detained. First, she contends that Judge Newbern should not have considered the government's representations regarding the Western Union money transfers the government referenced at GIAMPIETRO's detention hearing because GIAMPIETRO was "not charged with this conduct," and because the Court was "limited to the defendant's charged offense, not hypothetical offenses," in making its detention determination. (Doc. 151 at 10.) Second, GIAMPIETRO argues that her conduct in this case "did not involve any violence," involved "no victims," and took place online, and is thus less serious than Judge Newbern or the government has characterized it. (*Id.* at 11.) Third, GIAMPIETRO points to several cases in which persons charged with terrorism offenses were released pending trial, and contends that "indictment on a crime of terrorism does not dictate detention in all cases." (*Id.*) GIAMPIETRO also contends that the Court could fashion conditions of release that would ensure the safety of the community. (*Id.* at 11-13.)

- 18 -

GIAMPIETRO is mistaken. As an initial matter, it is settled that the Court is not restricted only to considering evidence of crimes for which a defendant has been indicted when determining whether the defendant poses a danger to the community or a risk of flight. *See*, *e.g.*, *United States v. Watson*, 475 F. App'x 598, 599 (6th Cir. 2012) (defendant charged with gun and drug offenses detained in part based on evidence of his "possible involvement in a potentially fatal shooting of a third party"). Were that the law, the government could only present, and the Court could only consider, evidence of a defendant's dangerousness if the defendant were facing charges in connection with that evidence. GIAMPIETRO offers no legal support for this dubious assertion.

Furthermore, evidence of these Western Union money transfers is neither "hypothetical" nor extrinsic to the charged conduct. The superseding indictment alleges that, beginning on or about February 22, 2018, and continuing until on or about October 23, 2018, GIAMPIETRO attempted to provide material support to HTS. Evidence that GIAMPIETRO sent money in June 2018 to organizations soliciting funds for the mujahideen is intrinsic to that offense, in that it serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. This money-transfer evidence, in other words, is evidence of the offense with which GIAMPIETRO is charged, such that even if the government were limited to presenting evidence of charged conduct to establish dangerousness, the government could do so here.

GIAMPIETRO's attempt to minimize her conduct is also misplaced. It is true that GIAMPIETRO did not engage in per se violent conduct, and that most of the conduct at issue occurred online. But a federal grand jury has found probable cause to believe that GIAMPIETRO attempted to facilitate the overseas travel of two persons who wished to join an FTO, and that she also obstructed justice. As Judge Newbern explained, the government's evidence, including "GIAMPIETRO's admissions, her social media postings, and images kept on her cell phones,"

reflect that GIAMPIETRO maintained "radical views aligned with the support of terrorism against the United States," *see* Doc. 26 at 8. This must weigh heavily against her in the detention analysis.

GIAMPIETRO's argument that defendants charged with terrorism offenses have, on occasion, been afforded pretrial release also falls flat. GIAMPIETRO cites four cases—*Harcevic*, *Al-Arian*, *Jama*, and *Dhirane*—as examples of defendants who "were charged with terrorism-related crimes and were granted home detention with certain conditions of release." (Doc. 151 at 10-11.) GIAMPIETRO has provided no Westlaw or Lexis citations for these cases, however, making it difficult for the government (and the Court) to identify the cases she is relying on, much less the specific rulings in these cases, which purportedly stand for the proposition GIAMPIETRO asserts they stand for here. Furthermore, to the extent these rulings are unavailable on Westlaw or Lexis, as it appears most (if not all) are, GIAMPIETRO has not complied with Middle District of Tennessee Local Rule 7.01(d)(5), which requires her to append these filings as exhibits to her motion. This Court has the discretion to reject GIAMPIETRO's argument on these grounds alone.

The government has nevertheless endeavored to seek out some information about the cases GIAMPIETRO cites, and can make the following representations:

- The defendant in *Harcevic* was charged in St. Louis, but arrested in California. He was released on a $1 million bond in California. When he returned to St. Louis, the prosecutors there sought unsuccessfully to detain him.

- The defendant in *Al-Arian* was one of eight defendants charged with a variety of offenses. Of those who were apprehended,[14] all but two—who were among the least culpable defendants in that case—were detained.

- *Jama* and *Dhirane* involved defendants who raised money to send to Al Shabaab, an FTO. The government did not seek detention, although the government did seek GPS monitoring, a passport surrender, and a third-party custodian.

---

[14] Several defendants remain fugitives.

It is difficult, without more, to draw conclusions about the detention determination in these cases. But it remains true that the government seeks detention here; that Judge Newbern ordered GIAMPIETRO detained; that GIAMPIETRO has been charged with additional offenses since her initial detention hearing; and that the government developed additional material-support evidence, including evidence that GIAMPIETRO sent funds to the mujahideen in June 2018.

Lastly, as Judge Newbern explained, there are no conditions of release which could ensure the safety of the community. GIAMPIETRO's mother, Maria Williams, testified at GIAMPIETRO's detention hearing. As Judge Newbern explained, Ms. Williams "did not have knowledge of GIAMPIETRO's online activities," even though GIAMPIETRO lived with her when she is alleged to have committed the offenses in the indictment. (Doc. 26 at 9.) As Judge Newbern also explained, the testimony of Ms. Williams and other witnesses "demonstrate[] that GIAMPIETRO has been able to conceal her online activities completely from her friends and family." (*Id.*) GIAMPIETRO will almost certainly be able to circumvent whatever restrictions this Court seeks to place on her Internet access were she to be released, and could again engage in criminal conduct online.

## IV.  GIAMPIETRO's SPECULATIVE COVID-19 CLAIM DOES NOT SUPPORT PRETRIAL RELEASE

GIAMPIETRO contends that she should be released pending trial in light of the COVID-19 pandemic and her alleged medical risk factor of hypertension that will, she claims, likely subject her to serious illness if she were to contract the virus. (Doc. 151.) GIAMPIETRO's assertions are largely speculative. GIAMPIETRO has not established a compelling basis for her pretrial release pending trial, particularly in the face of the danger she poses to the public, given the conduct underlying the allegations in this case. Furthermore, a review of records from the Daviess County Detention Center, where GIAMPIETRO is housed, lends no meaningful support to her position.

GIAMPIETRO, who is 35 years old, does not suffer from any identified serious illness or long-term health condition. Based on her current circumstances, she also does not appear to fall within a high-risk group of people who are at increased risk to develop severe illness from exposure to the COVID-19 virus. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. At most, GIAMPIETRO may suffer from a mild form of high blood pressure, based on an extrapolation from her medical records, which set out elevated blood pressure readings from July 2020 and the issuance of certain prescribed medication. (*See* Exhibit J.) As of September 24, 2020, GIAMPIETRO had a blood pressure reading of 125/69. (*Id.*) No more recent blood pressure readings are in the medical records proffered by GIAMPIETRO or provided to the government by the detention facility. Nor is there a documented formal diagnosis of hypertension.

The Centers for Disease Control and Prevention ("CDC") recognize that those with serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, and *pulmonary hypertension* have an elevated risk of serious illness from contracting COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. But the CDC recognizes those with regular hypertension or high blood pressure as only having a *possible* increased risk of severe illness from contracting COVID-19. *Id.*[15] With regard to hypertension, the critical CDC risk factor is "pulmonary hypertension," classified as a type of "serious heart condition." Pulmonary hypertension is "a type of high blood pressure that affects the arteries in your lungs and the right side of your heart." *See*

---

[15]     The CDC amended its guidance to include hypertension on its list of factors that *might* present an increased risk of serious illness from COVID-19. *See id.* The CDC notes, however, that current data is "limited" about the impact of this and other conditions and "whether they increase the risk for severe illness from COVID-19." *Id.*; *see also United States v. Carter*, 2020 WL 4194014, at *2 (S.D. Ga. July 21, 2020) (observing in a compassionate release case, "[A]t this point, the Court cannot conclude that the 'might' category qualifies an illness as sufficiently serious to warrant compassionate release in and of itself.").

https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697. It is not the same as simple high blood pressure, known as "regular hypertension" or "systemic hypertension," and appears to be the condition the defendant is alleging.[16]

In her motion, GIAMPIETRO generally reports that she suffers from high blood pressure, or hypertension, diagnosed sometime in July 2020, which she contends makes her susceptible to severe illness if she contracts COVID-19. But there is no evidence that GIAMPIETRO's cited condition places her in a high risk category for severe illness from COVID-19. Specifically, there is no indication in her medical records of pulmonary hypertension or any other sort of severe, debilitating, or life-threatening form of high blood pressure. At most, GIAMPIETRO's documented blood pressure readings reflect only a common form of hypertension, which is typically identified as essential or primary hypertension. Notably, the medical records do not even reflect a formal diagnosis of this condition, although the government presumes GIAMPIETRO may have exhibited some form of it based upon counsel's representations. (*See* Exhibit J.)[17] GIAMPIETRO has failed to show that her alleged hypertension qualifies as "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." (*See id.*) By all indications from the records presented, GIAMPIETRO's cited condition is being effectively managed with medication, a fact

---

[16]     *See* https://phassociation.org/patients/aboutph/ (last visited November 5, 2020) ("Pulmonary hypertension (PH), is a complex and often misunderstood disease. The term PH means high blood pressure in the lungs. In 'regular' hypertension (also known as high blood pressure or 'systemic['] hypertension) the pressure in the arteries throughout the body is higher than it should be. This can be measured with a blood pressure cuff. In PH, the blood vessels specifically in the lungs are affected. They can become stiff, damaged or narrow, and the right side of the heart must work harder to pump blood through."); https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/pulmonary-hypertension-high-blood-pressure-in-the-heart-to-lung-system ("Unlike systemic blood pressure, which represents the force of your blood moving through the blood vessels in your body, pulmonary blood pressure reflects the pressure the heart exerts to pump blood from the heart through the arteries of the lungs. In other words, it focuses on the pressure of the blood flow in your lungs."); https://www.webmd.com/lung/pulmonary-arterial-hypertension ("Having pulmonary arterial hypertension (PAH) means that you have high blood pressure in the arteries that go from your heart to your lungs. It's different from having regular high blood pressure.").
[17]     *See* https://medlineplus.gov/highbloodpressure.html ("Primary, or essential, high blood pressure is the most common type of high blood pressure.").

which she essentially acknowledges in her filing.[18] (*Id.*) There is no indication in her medical records or otherwise that she suffers from pulmonary hypertension, the critical CDC risk factor. GIAMPIETRO's health concerns, while understandable, do not provide a basis for relief. Indeed, GIAMPIETRO is at no greater risk of serious illness from COVID-19 than any other person.

GIAMPIETRO also expresses concern about her particular susceptibility to COVID while incarcerated because of general issues that have been experienced in some prisons. GIAMPIETRO can point to no issues, however, relating to cases in her current housing facility, and provides no indication of any personal exposure to the virus at this facility. In consultation with the Marshals Service, the government represents that GIAMPIETRO is housed in a three-person cell within a unit containing approximately 22 women inmates. The Marshals further advise that there are presently no identified positive cases of COVID-19 among inmates at the facility. That facility also is taking basic safety measures to lower the risk of introducing the virus into the facility, including the quarantining of new arriving inmates, the isolation of inmates upon their return from in-person court appearances, the prohibition of contact visits with family members, the distribution of masks, the provision of ready access to hand sanitizer when outside one's cell, and the daily access of inmates to cleaning carts. What is clear is that the detention facility is taking appropriate precautions to protect the health and safety of its inmates and to mitigate the spread of the virus. There is no indication that GIAMPIETRO is at substantially greater risk of exposure to the virus

---

[18]     GIAMPIETRO, citing a web article in support, contends that her use of an Ace inhibitor like Zestril, which is apparently being prescribed to her, puts her at an increased risk for severe illness from COVID. (Doc. 151 at 4.) However, the article itself, entitled "Blood Pressure Meds Can Affect COVID-19 Care," states in part that "it's not very likely these blood pressure medications in themselves are harmful to COVID-19 patients," but rather "'are markers     of     the     underlying     disease     for     which     they     were     prescribed.'" https://www.webmd.com/lung/news/20200911/blood-pressure-meds-can-affect-covid-19-care#1. According to the article, people with high blood pressure who contract COVID-19 should consult their doctor about their medication. Common sense would dictate this approach, and there is no reason to believe that GIAMPIETRO's medication cannot be addressed by medical personnel at her facility. The mere fact that the defendant is taking blood pressure medication, however, bears little relevance in the current circumstances as to whether the defendant should be released.

- 24 -

than any other person, as a result of the facility's protective measures. Moreover, seeking release based on the potential exposure to the virus is not a sufficient basis for release and, taken to its logical extreme, would support the release of all detainees during this public health crisis.

In sum, GIAMPIETRO simply does not present facts that would support the assertion that she is suffering from a serious health condition that would make her particularly susceptible to contracting the virus, or that she is otherwise at great risk of harm if she were to remain incarcerated under the present circumstances. The medical records proffered by GIAMPIETRO, along with those obtained by the government, provide no support for her position. Additionally, GIAMPIETRO has failed to establish that the Daviess County Detention Center is not equipped to provide her with all appropriate medical care to treat her reported condition or that she has been deprived of any necessary treatment. GIAMPIETRO's concern is largely general in nature and not associated with an immediate or serious threat to her health and safety. Her fear of contracting COVID-19, in conjunction with her cited medical condition, does not provide a basis for release.

## V.     **CONCLUSION**

For the foregoing reasons, and any reasons which may be set forth at a hearing, the government requests that the Court deny GIAMPIETRO's Motion to Revoke Detention Order and Release to Home Confinement (Doc. 151) and order GIAMPIETRO detained pending trial.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney

By:     s/ *Ben Schrader*
BEN SCHRADER
Assistant United States Attorney

By:     s/ *Philip Wehby*
PHILIP WEHBY
Assistant United States Attorney

- 25 -

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 6, 2020, I sent a copy of the foregoing via the Court's electronic filing system to Charles Swift, Esq. and Peter Strianse, Esq., counsel for the defendant.

*s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney
