IN THE UNITED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:19-cr-00013 |
| | ) | |
| | ) | |
| GEORGIANNA A.M. GIAMPIETRO | ) | Chief Judge Waverly D. Crenshaw, Jr. |
|     Defendant. | ) | |

## REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO REVOKE DETENTION ORDER AND RELEASE TO HOME CONFINEMENT

**A. COVID-19 claim is serious and supported by CDC and recent medical studies**

The government states there is no evidence that Ms. Giampietro's high blood pressure places her in a high risk category for severe illness from COVID-19. However, CDC Guidelines state that adults of any age with hypertension (high blood pressure) might be at an increased risk for severe illness from the virus. In fact, recent medical studies cited by the defendant do show that Ms. Giampietro's condition, and especially her prescribed medication, can lead to more severe illness and even death if the virus is contracted.[1]

The government downplays the potential seriousness of Ms. Giampietro's risk factor while ignoring all of the recent medical evidence. The government correctly notes that no information about the Davies County Detention Center was available to cite in the defendant's request, but the information now proffered by the government concerning the Detention Center supports the emergent need for the defendant's release. Ms. Giampietro is housed in a three-person cell in a unit with 22 other inmates. Doc. 156 at 24. COVID-19 is skyrocketing in Kentucky with record high numbers of cases being reached every day.[2] A second wave of the virus is still expected. By ignoring all of these threats and

---

[1] Dennis Thompson, *Blood Pressure Meds Can Affect COVID-19 Care*, HealthDay Reporter and WebMD at https://www.webmd.com/lung/news/20200911/blood-pressure-meds-can-affect-covid-19-care#1 (September 11, 2020). *See* Doc. 151 - Exhibit A.
[2] Gov. Beshear reports 7.68% positivity rate. WKYT. https://www.wkyt.com/2020/11/10/watch-live-gov-beshear-gives-update-on-covid-19/

1

the risk they may pose to the defendant, the government seems to require that the defendant must contract COVID-19 and suffer severe illness before such risk is not considered "speculative". This is not the purpose of emergency release guidelines issued by A.G. Barr.[3]

## B. Government's aiding theory significantly weakens strength of the evidence

The government in part relies on evidence that the defendant aided a government undercover agent (UCE-1) in UCE-1's "attempted" travel to Syria to join a designated foreign terrorist organization (FTO). Presumably this evidence is offered under the weight of the evidence factor and, alternatively, the danger posed by the defendant factor. The factual background and the relating law, however, undercut the strength of the alleged aid evidence.

Regarding the facts, the alleged aid occurred in a singular Telegram chat wherein the defendant shared the contact information for a person in Syria (Individual A) who could potentially aid UCE-1 and UCE-2 in their attempt to travel to Syria, but whom the defendant believed would dissuade travel. The government omits that within the same discussion, on October 2, 2018, the defendant rescinded the offer and told UCE-1 "[n]a forget it…everything is too suspicious…I don't want to discuss this anymore…I don't want to be involved anymore". The fact that the defendant immediately withdrew the offer of aid and later took steps, as outlined by the government, to distance herself from anything that UCE-1 and 2 may attempt to do strongly mitigates the defendant's risk for further misconduct should she be released to home confinement. Nor does the evidence presented by the government demonstrate a strong case against the defendant under the § 2339B charge of material support. As the Court undoubtedly remembers, the government initially charged the defendant with a violation of § 2339B based on aiding and abetting. That charge was withdrawn in December 2019 and replaced with the current charge. Doc. 77. The reason for the withdrawal is apparent when the aiding theory of guilt

---

[3] Barr Memo, https://context-cdn.washingtonpost.com/notes/prod/default/documents/71181d55-230c-44dd-bfb0-1ace5979b035/note/5a29bea7-fc34-4c84-a544-5b96ffb45384.(April 3, 2020).

is examined. As the defendant previously submitted, an aiding and abetting theory of liability requires a completed crime to have been committed.[4] In this case, no completed crime exists because UCE-1 could not commit the underlying crime of attempted material support. Thus, a theory of culpability for Count One cannot be based on aiding UCE-1 or 2's travel.

Information, like that provided by the defendant, alone does not violate § 2339B absent evidence that the individual was acting under the direction and control of the organization.[5] The government does not offer the type of evidence that would constitute material support, such as an attempted recruitment of UCE-1 by Giampietro to travel, Giampietro's attempted travel, or that Giampietro was acting under the direction and control of an FTO. *See United States v. Hendricks*, 950 F.3d 348, 351 (6th Cir. 2020); *see also United States v. Alebbini*, No. 19-3647, 2020 U.S. App. LEXIS 35069 (6th Cir. Nov. 5, 2020).

C. **Western Union transfers**

The Government also relies on evidence that the defendant sent three financial transfers through Western Union of $150, $200, and $500 between June 14, 2018 and June 25, 2018 to individuals in Turkey. The Government also points to electronic data recovered from the defendant's phone indicating that she viewed fundraising efforts by "@AlSadaqahSyria" for "mujahideen" in Syria around the same time that the transfers were made.

As this Court is aware, the government has previously expressed the intent to bring an additional material support charge, presumably based on these transfers. After more than two years of investigation, however, the government has yet to bring this charge. That, alone, does not prevent the government from submitting the evidence of uncharged conduct but the defendant urges that the Court

---

[4] *See United States v. Hornaday,* 392 F.3d 1306 (11th Cir. 2004)(holding that a defendant cannot aid and abet undercover agent's attempt to commit a crime under 18 U.S.C. 2(a).)
[5] *See* 18 U.S.C. § 2339B(g)(4) incorporating § 2339A definition of material support or resources; *see also United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 401-02 (D. Conn. 2009) (finding that information provided to Al-Qaeda by a U.S. sailor concerning the transit of a Navy battle group was insufficient to constitute a violation under § 2339A.)

should consider it with great skepticism. In its 404(b) submission of uncharged conduct, the government omitted the transactions as potential 404(b) evidence. There is a reason for that. The government's evidence fails to make a connection between any of the individuals to which the defendant sent money and an underlying terrorist organization. Without this connection, the government cannot prove by a preponderance of the evidence that the defendant's transactions were unlawful.

### D. Obstruction

The government also points to the defendant's alleged obstructive conduct [6] as a factor warranting confinement. Obstructive conduct is a factor that may warrant confinement on the basis that the defendant's release poses a significant risk of inhibiting the government's investigation and prosecution of the crime, but there is no *per se* rule that an obstruction charge warrants detention. *See United States v. Demmler*, 523 F. Supp. 2d 677, 681, 683 (S.D. Ohio 2007). In this case, the defendant's conduct after she became aware of the investigation mitigates against any such risk. The defendant only learned of the investigation when she was confronted by FBI agents on October 23, 2018 and interviewed at her home. The lack of obstructive conduct after this interview, during the time she was reasonably aware of the investigation, mitigates against the threat that she would now, two years into the investigation, engage in obstructive conduct.

### E. Possession of photos is not illegal or dangerous

The government argues that twenty-three photos depicting combatants in Syria, war dead, a memorial photo to Anwar Al-Awlaki, and an IED in Syria demonstrate that the defendant is dangerous. Possession of the photos, of course, is not a crime. Nor do they demonstrate dangerousness in a way

---

[6] The government alleges that deletion of social media accounts before the defendant had been confronted by law enforcement was an obstruction of justice.

4

that possession of weapons, explosive materials, military training or the allegation of an actual plot to conduct violence in the United States would warrant detention.[7]

### F. No risk of flight posed by defendant and strict conditions of release are sufficient

The government also argues that the defendant's early stated desire to travel to Syria to marry Abu Abdullah, and her associated research, demonstrate that she poses a significant risk of flight. This argument ignores the fact that Abu Abdullah broke off contact from the defendant in September 2018, as well as the defendant's repeated statements to UCE-1 discouraging any travel to Syria, including discouraging joining HTS or any group.[8] At best, this shows that Giampietro thought about traveling, but unlike other defendants, she did not make the type of plans (buying an airplane ticket, commencing travel etc.) that evidence a true intent and ability. Moreover, the conditions of home confinement mitigate against any risk of travel. GPS monitoring, internet restrictions, and lack of financial ability all ensure the defendant would not be able to travel. Finally, the defendant did not attempt to flee during the pendency of the investigation.

### G. Procedural Issues

The government raises two procedural points. In response to the government's concern of availability of other Court's decisions to release persons charged with a terrorism-related offense, the defense submits the decisions in question in Exhibit B [9]. In response to the governments objection to this Court setting a hearing, the defendant notes whether to conduct a new hearing is "left to the district court's sound discretion" *United States v. Lutz*, 207 F. Supp. 2d 1247, 1251 (D. Kan. 2002). The defendant welcomes the opportunity to further explain the needs for conditions of release and for the court to examine and instruct the defendant particularly concerning home confinement.

---

[7] See *United States v. Meeks,* No. 10-20123, 2011 U.S. Dist. LEXIS 108020 (E.D. Mich. Sept. 22,2011); see also *United States v. Mohammad*, No. 3:15-cr-358, 2017 U.S. Dist. LEXIS 83432 (N.D. Ohio May 31, 2017).
[8] See Exhibit A, summary of statements by the defendant regarding HTS.
[9] *United States v. Al-Arian et. al*. 8:03-CR000077, Doc. 74 - Order Setting Conditions of Release. (M.D. Fla. 2003). (Document under seal). *United States v. Harcevic*, 4:15-cr-00049, Doc. 90 - Order Setting Conditions of Release. March 17, 2015. (N.D. Ca. 2015) (E. Dist. Mo. 2016). *United States v. Muna Osman Jama*, 1:14-CR-230, Doc. 18 – Order setting Conditions of Release. July 25, 2004 (E. Dist. Va. 2004). *United States v. Hinda Osman Dhirane*, 1:14-cr-230, E. Dist. Va., Doc. 26 – Appearance Bond dated July 29, 2014, granted out of the W. Dist. Wash., assigned case #MJ14-311.

Respectfully submitted this 12th day of November, 2020.

By: /s/ Charles Swift  
Charles D. Swift,  
Pro Hac Vice Attorney for Giampietro  
CLCMA  
833 E. Arapaho Rd., Suite 102  
Richardson, TX 75081  
(972) 914-2507

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ Charles Swift  
Charles D. Swift, Pro Hac Vice  
Attorney for Giampietro  
833 E. Arapaho Rd., Suite 102  
Richardson, TX 75081