## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    2:19-cr-00013 |
| v. | ) | |
| | ) | Chief Judge Crenshaw |
| GEORGIANNA A.M. GIAMPIETRO | ) | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S FEBRUARY 15, 2021 MOTION IN LIMINE REGARDING 404(b) EVIDENCE AND SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT (Doc. 169)

The United States of America respectfully opposes defendant Georgianna A.M. GIAMPIETRO's Motion in Limine Regarding 404(b) Evidence and Supplemental Memorandum of Law. (Doc. 169.) The evidence GIAMPIETRO seeks to exclude is intrinsic to the offenses with which she is charged. Additionally, or alternatively, given that GIAMPIETRO's intent in providing UCE-1[1] with Individual A's contact information will be a—if not the—central issue at trial, this evidence is admissible under Federal Rule of Evidence 404(b). The parties have also engaged in extensive litigation on this issue and have framed it for resolution by the Court. The government thus requests that the Court deny GIAMPIETRO's motion without a hearing.

**I.    The Evidence at Issue is Inextricably Intertwined with the Charged Offenses and, Alternatively, is Admissible Under Rule 404(b)**

GIAMPIETRO divides the evidence she seeks to exclude and/or for which she seeks a limiting instruction into five categories. They are (1) GIAMPIETRO's social media posts and messages about "unrelated"[2] terrorist organizations, terrorists, or attacks, including posts with

---

[1]    In this Opposition, references to "OCE-1" are to an online covert employee who began engaging GIAMPIETRO online in approximately 2015. References to "UCE-1" are to an undercover employee who began engaging GIAMPIETRO online in approximately 2017 and later engaged UCE-1 in person. References to "UCE-2" are to an undercover employee who played the role of UCE-1's husband.

[2]    By "unrelated," GIAMPIETRO appears to mean posts referencing FTOs other than HTS.

1

supportive comments about ISIS,[3] "Jihadi John," and the Pulse nightclub shooting; (2) GIAMPIETRO's social media posts related to, or statements made by, "unrelated" terrorist organizations, including posts reflecting statements made by Anwar al-Awlaki[4] and images reflecting solicitations for contributions to the cause of foreign fighters; (3) images GIAMPIETRO maintained on her cell phone depicting battlefield violence and activity, including photographs of foreign fighters urging persons to engage in violent jihad, photographs of dead bodies, and photographs of improvised explosive devices; and (4) evidence that GIAMPIETRO sent money via Western Union to organizations supporting the mujahideen in June 2018. (Doc. 169 at 9-24.) GIAMPIETRO also seeks a limiting instruction with respect to (5) evidence that GIAMPIETRO planned to travel to Syria herself and marry Abu Abdullah, a foreign fighter. (*Id.* at 24-25.)

The government can discern no principled distinction among the first three categories above. And GIAMPIETRO advances the same or similar arguments for exclusion for all three categories. The government thus addresses them collectively below as evidence of GIAMPIETRO's longstanding support for Islamic terror groups. These categories, as well as the other two categories GIAMPIETRO has identified, are inextricably intertwined with the allegations underlying the indictment. Additionally, or alternatively, all of these categories are admissible under Rule 404(b). And the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice, as it must be in order to warrant exclusion.[5]

---

[3]    ISIS has been a designated FTO since May 15, 2014.
[4]    As GIAMPIETRO acknowledges, "Anwar Al-Awlaki is the American cleric who promoted violent resistance to the West as a religious duty and was killed in an airstrike in Yemen on September 30, 2011." (Doc. 169 at 4 n.3.)
[5]    GIAMPIETRO, in light of the Court's rulings on GIAMPIETRO's motions to dismiss Counts Two and Three, appears to have abandoned her argument that this Court should exclude evidence that GIAMPIETRO engaged in various forms of obstructive conduct in connection with this investigation. (*See* Doc. 169 at 4 n.4.)

2

## A.    GIAMPIETRO's Support for Islamic Terror Groups

The government anticipates introducing substantial evidence that GIAMPIETRO maintained a longstanding support for Islamic terror groups. That evidence includes GIAMPIETRO's social media posts in 2015 espousing support for ISIS and for terrorist attacks against the United States; GIAMPIETRO's statements on social media between approximately 2017 and 2018 evincing her knowledge of and support for Islamic terrorists; and GIAMPIETRO's dissemination of radical Islamic teachings via an encrypted social media platform (Telegram) between approximately 2016 and 2018. That evidence also includes GIAMPIETRO's statements to W-1 in support of "Jihadi John" and about the man responsible for the Pulse nightclub shooting; GIAMPIETRO's statements to W-1 regarding GIAMPIETRO's "connections" to persons operating Islamic channels online; GIAMPIETRO's statements to W-2 (a minor) in support of Jabhat al-Nusrah[6] and HTS; and GIAMPIETRO's providing W-2 with a Telegram page associated with Individual A, which W-2 reported was a page that persons could use to send money to the mujahideen. Lastly, that evidence includes GIAMPIETRO's saving photographs of dead bodies on her phone, including photographs of what appear to be victims of foreign fighters and improvised explosive devices; photographs of statements by Anwar Al-Awlaki; and images from organizations encouraging contributions to foreign fighters, including (for example) an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING."[7]

---

[6]    Al-Nusrah Front ("ANF"), also known as Jabhat al-Nusrah, is an affiliate of AQI. ANF has been in Syria since at least 2016. Its goal is to oust the Syrian regime. ANF has been a designated FTO since December 11, 2012.

[7]    As the government noted in its opposition to GIAMPIETRO's previously filed Rule 404(b) motion, *see* Doc. 144 at 4 n.6; Doc. 144-1, the United States unsealed a forfeiture complaint in connection with an investigation into the unlawful use of cryptocurrency to finance terrorism. In that case, the United States seeks the forfeiture of cryptocurrency accounts of foreign "charities" soliciting donations for ANF and HTS, including Al Sadaqah. Among the images from foreign "charities" in that complaint is the image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING," which is also an image recovered from GIAMPIETRO's phone.

3

That evidence is intrinsic to Count One, because evidence of GIAMPIETRO's support for Islamic terrorists serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. It also forms an integral part of witness testimony, including the testimony of OCE-1, who observed posts GIAMPIETRO made in support of ISIS. And it completes the story of GIAMPIETRO's attempt to provide material support to HTS in 2018. Indeed, her support in 2015 and 2016 is the *beginning* of the story of her embrace of radical Islamic causes. Evidence of her support for Islamic terrorists helps establish that, years before she provided Individual A's contact information to UCE-1, GIAMPIETRO supported radical Islamic terrorism.[8]

Even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). To prove Count One, the government must show that GIAMPIETRO attempted to provide material support or resources to HTS, knowing that HTS was an FTO.[9] Indeed, GIAMPIETRO's intent in providing UCE-1 with Individual A's contact information will be a—if not the—central issue at trial: GIAMPIETRO has made clear that she plans to argue that her intent in providing Individual A's contact information to UCE-1 was *not* to assist UCE-1 and UCE-2 in traveling to Syria to join HTS.[10] In seeking to explain her reasons for providing Individual A's contact information to UCE-1, GIAMPIETRO puts her intent squarely at issue in this case.

---

[8]     This evidence also helps establish that GIAMPIETRO knew that the social media page associated with Individual A helped fund the mujahideen and was not a "charity" providing support to victims of the Syrian conflict.

[9]     *See* § 2339B(a)(1); *see also United States v. Warsame*, 537 F. Supp. 2d 1005, 1013-14 (D. Minn. 2008); Doc. 169 at 13 ("The mens rea required to violate 18 U.S.C. § 2339B(a)(1) is knowledge about the organization's connection to terrorism and not the specific intent to further the organization's activities.").

[10]     In her previously filed motion to exclude Rule 404(b) evidence, GIAMPIETRO explained that she intended to argue at trial that she provided Individual A's contact information to UCE-1 not to facilitate UCE-1's travel to Syria, but "to persuade UCE-1 not to go ahead with her plan to join HTS." (Doc. 143 at 19.) In her most recent motion, GIAMPIETRO does not state explicitly that she intends to make that argument. She contends more generally that her purpose in providing Individual A's contact information to UCE-1 was not to facilitate UCE-1's travel to Syria to join HTS. (*See* Doc. 169 at 6-9.) Regardless of how she characterizes the issue, however, it is undeniable that her intent in providing Individual A's contact information to UCE-1 will be central to resolving the question of her guilt at trial.

4

Evidence which establishes that GIAMPIETRO actually supported Islamic terrorists for years before providing UCE-1 with Individual A's contact information undoubtedly helps establish that her motive, intent, and knowledge in providing Individual A's contact information to UCE-1 was to assist UCE-1 and UCE-2 in traveling to Syria to join HTS. It also demonstrates that providing that information was part of GIAMPIETRO's preparation or plan, and was neither a mistake nor an accident. GIAMPIETRO's providing Individual A's contact information to UCE-1 was the culmination of her years-long demonstrations of support of radical Islamic terror groups. Placing that act in its full context is critical to understanding GIAMPIETRO's intent in carrying it out.

The government also anticipates that the evidence above will be relevant to the testimony of Dr. Mia Bloom, whom the government has noticed as an expert witness to discuss the role of women in terrorism, including activities undertaken by female jihadists and female jihadi supporters. (*See* Doc. 101.) The government anticipates that Dr. Bloom will explain the radicalization process (with a focus on the radicalization of women), the use of teachings (like those of Anwar al-Awlaki) in the radicalization process, the role of on-line communications and social media platforms (like Telegram) in the radicalization process and in the encouragement of terrorist support activities, the use of charities to fund terrorist activities, and the techniques used to travel undetected and internationally in support of jihadis. This evidence, and Dr. Bloom's testimony, is thus also necessary to place GIAMPIETRO's conduct in this case in its full context.

GIAMPIETRO advances a panoply of arguments seeking exclusion of the evidence above. GIAMPIETRO first contends that the portion of this evidence which predates February 22, 2018 is "extrinsic" because it occurred prior to the date of the offense as alleged in Count One of the Superseding Indictment. (*See* Doc. 169 at 11.) GIAMPIETRO is mistaken. Evidence of conduct occurring prior to the date of an offense as alleged in an indictment is not "extrinsic" merely

5

because it predates the charged time period. Were that the case, evidence of *any* conduct occurring prior to the charged time period would automatically be excludable as extrinsic evidence.

The Sixth Circuit has recognized no such rule. To the contrary, "[t]he Sixth Circuit has recognized that Rule 404(b) "is not implicated" when the prior acts are "part of a continuing pattern of illegal activity" or when they are "inextricably intertwined" with the indicted crime. *United States v. Rios*, 830 F.3d 403, 426 (6th Cir. 2016); *see also United States v. Buchanan*, 213 F.3d 302, 311 (6th Cir. 2000) (remanded for re-sentencing on other grounds) ("evidence that constitutes 'a continuing pattern of illegal activity'" is not considered an "other act," and, therefore, is not governed by Rule 404(b)) (quoting *United States v. Barnes*, 49 F. 3d 1144, 1149 (6th Cir. 1995)). More generally, the Sixth Circuit "has recognized the admissibility of *res gestae*, or background evidence, in circumstances when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (citation omitted). "Proper background evidence has a causal, temporal[,] or spatial connection with the charged offense." *Id.* (citation and internal quotation marks omitted). "Such evidence may include evidence that is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of [a] witness's testimony, or completes the story of the charged offense." *Id.* (citation and internal quotation marks omitted); *see also Barnes*, 49 F.3d at 1149 ("'Intrinsic' acts . . . are those that are part of a single criminal episode."). Thus, evidence which predates the charged time period but which also serves as a "prelude" to the charged offense is intrinsic to that offense. GIAMPIETRO's argument lacks merit.

GIAMPIETRO next contends that evidence that she supported terrorists, disseminated radical Islamic teachings, and saved photographs depicting foreign fighters, dead bodies, improvised explosive devices, statements by radical clerics, and images reflecting solicitations for

contributions to foreign fighters on her phone, constitutes "protected speech," which the government may not use for any purpose at trial. (Doc. 169 at 11-14, 19-22.) GIAMPIETRO is mistaken. It is criminal to provide, or attempt to provide, material support to designated FTOs. The cases are clear that statements in support of such organizations are relevant and admissible as intrinsic evidence of material support charges, as evidence of a defendant's intent in providing material support (or some other Rule 404(b) purpose), or both. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489-90 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012); *see also Haupt v. United States*, 330 U.S. 631, 642 (1947); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 251-52 (1989); *Street v. New York*, 394 U.S. 576, 594 (1969).

GIAMPIETRO cites *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) for the proposition that this evidence constitutes "political thought" which, standing alone, cannot be criminalized. (*See* Doc. 169 at 12.) Although § 2339B does not criminalize mere "political thought," that proposition has no bearing on GIAMPIETRO's case. GIAMPIETRO's crime stems from an *act* she took—providing Individual A's contact information to UCE-1 to facilitate UCE-1 and UCE-2's travel to Syria to join HTS—not "political thought" or other protected speech activities. As the case law makes clear, there is no bar to using statements GIAMPIETRO made as evidence of the criminal act she is alleged to have undertaken here. GIAMPIETRO's citation to *Humanitarian Law Project* is therefore inapposite.[11]

---

[11]     The Supreme Court noted in *Humanitarian Law Project* that §2339B criminalizes the provision of material support in the form of speech in a narrow category of cases where the speech is "to, under the direction of, or in

GIAMPIETRO attempts to distinguish *United States v. Springer*, 753 F. App'x 821 (11th Cir. 2018), a case the government cited in its Notice Regarding 404(b) Evidence (Doc. 102) in support of the proposition that the evidence above is inextricably intertwined with the charged offenses. GIAMPIETRO contends that the evidence in *Springer*—the defendant's statements of support for ISIS—were properly admitted because the defendant had been charged with threatening to murder a judge, and because the government had to show that the threats were "true threats" and not mere hyperbole to meet the elements of the offense. (*See* Doc. 169 at 12-14.) Under GIAMPIETRO's logic, the statements in *Springer* were admissible because the defendant had been charged with a crime that was, at its heart, one involving allegedly criminal speech, and were therefore relevant to determining whether the threat was truly criminal. GIAMPIETRO thus contends that because the violation of § 2339B alleged in Count One cannot prohibit the exercise of "protected speech," statements she made in support of terrorists are inadmissible.

GIAMPIETRO is mistaken. She cites no authority for the proposition that a defendant's statements in support of terrorists are inadmissible for any purpose in a criminal trial on the grounds that such statements constitute "protected speech." To the contrary, the First Amendment emphatically does *not* prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Nor do the cases distinguish, as GIAMPIETRO imagines, between the use of speech where the charge is based on a defendant's utterances, as opposed to his actions.

Furthermore, although GIAMPIETRO seeks to distinguish *Springer*, she makes no effort to distinguish *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1988), a case the government cited for the same proposition. Nor does GIAMPIETRO make any meaningful attempt to distinguish

coordination with foreign groups that the speaker knows to be terrorist organizations." 561 U.S. at 26. That is relevant where a defendant (for example) is the spokesperson for an FTO. GIAMPIETRO's case does not fall in that category.

8

*United States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014), *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013), or *United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010), other cases which the government cited in its Notice. Instead, GIAMPIETRO complains generally that "the statements in those cases were either intrinsic to the offense, or probative of the intent to support the charged organization." (Doc. 169 at 14-15.) To the extent GIAMPIETRO complains that the government has failed to explain the 404(b) rationale underlying this evidence, this complaint falls flat, given the government's articulation of justifications for the admissibility of each category of evidence above. And to the extent she complains about the case citations the government has offered, that complaint falls flat as well, given that she has failed to offer a meaningful explanation as to why the rationale in those cases would not also apply to the admission of the evidence at issue here.

GIAMPIETRO next contends that evidence that she made statements in support of ISIS, Jabhat al-Nusrah, and other terrorist groups cannot be "substituted for an intent on the part of the defendant to support HTS." (Doc. 169 at 15.) GIAMPIETRO contends, in other words, that evidence that she supported FTO "A" cannot be used to show that she also supported FTO "B." GIAMPIETRO also contends that her statements in support of terrorist groups are not "reasonably near in time" to the charged conduct, and are inadmissible on that basis as well. (*Id.* at 15-16.)

Once again, GIAMPIETRO has cited no cases to support her contention. That may be because relevant case law stands for the opposite proposition. *See*, *e.g.*, *Kaziu*, 559 F. App'x at 34-36 (evidence that defendant was inspired by the lectures of radical Islamic cleric Anwar Al-Awlaki to travel to the Middle East and support the FTO al-Shabaab). Nor are the differences among the terrorist groups at issue here as stark as GIAMPIETRO asserts. The government's evidence would show—and GIAMPIETRO would be hard-pressed to disagree—that ISIS, Jabhat al-Nusrah, and HTS all operate in the same region of the world, that HTS is actually an outgrowth of Jabhat al-

9

Nusrah, and that all three groups share as a principal goal the establishment of an Islamic state.

GIAMPIETRO also contends that evidence that she supported terrorist groups other than HTS is inadmissible because the situation in Syria changed over time; because her views changed over time; and because her evolving views, as a consequence, cannot be considered "reasonably near in time" to the charged offenses. (Doc. 169 at 15-16.) GIAMPIETRO misses the mark. The changing situation in Syria between 2015 and 2018 has nothing to do with whether evidence that she supported FTOs over time is relevant to establishing her motive and intent in supporting HTS in September and October 2018 by providing Individual A's contact information to UCE-1. It may be that, at trial, GIAMPIETRO will seek to explain *why* she supported ISIS and Jabhat al-Nusrah, why she vacillated in her support over time, and why her support does not help establish her motive and intent in providing UCE-1 with Individual A's contact information. But that is a matter for the jury to decide, not a basis upon which to exclude relevant evidence from their consideration.

GIAMPIETRO next contends that her statements in support of terrorist causes are excludable under Rule 403. (Doc. 169 at 16-17.) She contends that her "earlier statements regarding terrorism will undoubtedly pose a risk of luring the factfinder into declaring guilt on grounds different from proof specific to the offense charged." (*Id.* at 17.) She contends further that "the government's proffered evidence concerning Anwar Al-Awlaki, ISIS, Jihadi John, or praise of attacks in the United States, bear little to no relationship to the charged crime and would have serious prejudicial effect." (*Id.*) GIAMPIETRO is incorrect. Evidence may only be excluded under Rule 403 "if its probative value is *substantially outweighed* by the danger of *unfair* prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" (emphasis added). In other words, this Court must weigh the probative effect of evidence against the danger that such evidence will unfairly prejudice the defendant, and *only*

10

exclude such evidence when the former is "substantially outweighed" by the latter.

Here, evidence of these statements is highly probative, as it goes directly to GIAMPIETRO's motive and intent (and to other Rule 404(b) purposes) in providing Individual A's contact information to UCE-1. This evidence also demonstrates that GIAMPIETRO publicly supported the causes of the most violent terrorists in recent memory, and that her desire to support terrorist causes was a continuing effort. Although this evidence is prejudicial to GIAMPIETRO— as indeed most evidence offered against a defendant in a criminal trial is—that prejudice is not unfair, given that this evidence largely consists of her *own statements*. Nor, in any event, is it so unfair that the prejudice substantially outweighs the evidence's high probative value.

Nor does GIAMPIETRO's argument that these statements are so "lurid" as to be unfairly prejudicial withstand scrutiny. The more evidence there is that she devoted herself to radical Islamic causes, and that she did so for an extended period of time prior to providing Individual A's contact information to UCE-1, the more probative such evidence is of her intent, and the more difficult it will be for her to argue that she provided this information for some purpose other than to facilitate UCE-1's travel to Syria to join HTS. The reason GIAMPIETRO seeks to exclude this evidence is thus the same reason why this evidence is so probative and should not be excluded.

GIAMPIETRO cites *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) to argue that this "type" of evidence should be excluded under Rule 403. (*See* Doc. 169 at 17.) But *Al-Moayad* did not involve the same "type" of evidence at all. In *Al-Moayad*, the Second Circuit held that the district court's admission of extensive testimony from victims of a Hamas bombing and testimony about an al-Qaeda training camp at the trial of two defendants charged with conspiring to provide material support to Hamas and al-Qaeda was error, because these matters had no connection to the defendants, because the defendants were not charged with planning or carrying out the bombing,

11

and because it was undisputed that the defendants knew that Hamas engaged in terrorist activity. *See id.* at 159-64. Here, by contrast, the government seeks to introduce GIAMPIETRO's *own statements*, concerning whether and to what extent GIAMPIETRO supported terrorist causes, a matter bearing directly on her intent in committing the charged offense.

GIAMPIETRO next contends that the government should not be permitted to introduce this evidence to rebut potential defenses. As the government explained in its Notice Regarding 404(b) Evidence, *see* Doc. 102 at 9-10, the government has a good-faith basis to believe that GIAMPIETRO's defense will include arguments that her online activity involving terrorist organizations related to research she was conducting into the Syrian conflict; that she advocated for the establishment of a religious state, but opposed ISIS and other terrorist organizations as "false" versions of that state; that she planned to travel to Syria to marry "Abu Abdullah," but abandoned that idea because of student loan debt she had accrued; and that the government went to great lengths to convince her to aid UCE-1 and UCE-2 in their effort to travel to Syria to join HTS, eventually persuading her to provide them with the name of an overseas contact who could facilitate their travel into Syria. It will therefore be incumbent on the government to introduce the evidence described above to demonstrate that the "research" GIAMPIETRO was conducting into the Syrian conflict motivated her desire to aid the overseas travel of UCE-1 and UCE-2, and that she was deeply familiar with the antagonists in the Syrian conflict; that she at one time supported ISIS; that she abandoned her interest in traveling to Syria to marry "Abu Abdullah" at one time not because of her debt but because "Abu Abdullah" stopped communicating with GIAMPIETRO; and that the government's investigation into GIAMPIETRO's online activities lasted as long as it did because she continued to engage in suspicious conduct over a period of years before attempting to facilitate the travel of UCE-1 and UCE-2 to join HTS in September and October 2018.

12

The Rules of Evidence permit the government to introduce evidence for these purposes. *See, e.g.*, *United States v. Young*, 916 F.3d 368, 374-75, 378-79 (4th Cir. 2019) (evidence that defendant maintained extremist paraphernalia, including white supremacist and Nazi paraphernalia, in his home relevant and admissible to show defendant's predisposition to support the Islamic State of Iraq and the Levant); *United States v. Mohamud*, 843 F.3d 420, 423-24, 432-35 (9th Cir. 2016) (evidence that defendant had written articles for *Jihad Recollections* praising terrorists a year before planning to carry out a bombing relevant and admissible to show defendant's predisposition to commit that bombing); *United States v. Kadir*, 718 F.3d 115, 123-24 (2d Cir. 2013) (photos of defendant charged with conspiracy to commit acts of terrorism posing with machine guns admissible to rebut defendant's claim that he was merely engaged in "peaceful fundraising for a future mosque"); *United States v. Hammond*, 381 F.3d 316, 342-44 (4th Cir. 2004) (en banc) (videotapes found in defendant's apartment depicting violence and anti-American sentiment relevant and admissible as evidence of defendant's knowledge of FTO's unlawful activities and his motive in raising funds for the FTO, and also tended to rebut defendant's claim that he sympathized only with the organization's humanitarian goals), *overruled on other grounds*, 543 U.S. 1097 (2005); *see also Brooks v. Caterpillar Global Mining America, LLC*, No. 4:14CV-00022-JHM, 2017 WL 3401476, at *7 (W.D. Ky. Aug. 8, 2017) (citing cases) ("Federal courts have repeatedly held that in a criminal case, the government may offer evidence in its case-in-chief in anticipation of an expected defense."). This same evidence is also unlikely to be excludable under Rule 403. *See United States v. El-Mezain*, 664 F.3d 467, 509 (5th Cir. 2011) ("Evidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial.").

GIAMPIETRO "represents to the Court that she does not intend to offer a defense of entrapment or seek such an instruction," *see* Doc. 169 at 18-19, and contends that the government

13

should not be permitted to introduce the evidence above. The government is aware of communications between GIAMPIETRO's counsel and an expert witness for the government which suggest that GIAMPIETRO has contemplated advancing an entrapment defense. Even if GIAMPIETRO does not overtly advance such a defense, however, the jury may reasonably question why the government's investigation—into a subject living in a quiet rural community in Tennessee, whose criminal conduct occurred almost entirely online—lasted as long as it did. The government should be permitted to introduce this evidence preemptively to answer such questions.

GIAMPIETRO also explains, in what is purportedly a motion in limine to exclude evidence, that she "intends to argue [at trial] that the mere furnishing of information (Individual A's contact information) to a potential member of a designated [FTO] is insufficient to constitute providing personnel or services to the organization." (Doc. 169 at 18.) This argument is meritless and inappropriate.[12] GIAMPIETRO is not charged with the completed crime of providing material support or resources to an FTO. Instead, she is charged with *attempting* to commit that crime, which is also a violation of § 2339B. It is beyond cavil that, if GIAMPIETRO (1) provided Individual A's contact information to UCE-1 and (2) told UCE-1 that GIAMPIETRO approved of UCE-1's plan to join HTS, and if (3) UCE-1 and UCE-2 had in fact used that information to travel to Syria and join HTS, GIAMPIETRO would have provided material support (in the form of personnel) to HTS by assisting the UCEs in their travel to Syria. That is a clear violation of § 2339B. *See United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) ("A person provides

---

[12]    This argument is also untimely. Pretrial motions in this case were due on June 5, 2020. (*See* Doc. 89 at 1.) If GIAMPIETRO wanted to argue that "the mere furnishing of information to a potential member of a designated foreign terrorist organization is insufficient to constitute providing personnel or services to the organization"—as in, that the conduct underlying the allegations in Count One is not criminal—she should have filed a motion to dismiss Count One by June 5, 2020. *See* Fed. R. Evid. 12(b)(3)(B)(v). GIAMPIETRO filed no such motion. Instead, she has merely asserted in passing, in a motion to exclude potential 404(b) evidence, that she intends to advance this legal theory before a jury, whose job it is to find facts, not make purely legal judgments. This Court should reject this argument.

14

'personnel' to a foreign terrorist organization [under § 2339B] if she makes available one or more persons . . . to work under that organization's 'direction and control.'").[13]  It is equally clear under the statute that an *attempt* to do these things would also be a violation of § 2339B.

The jury in this case will be called upon to determine whether, in providing Individual A's contact information to UCE-1, and offering other guidance to UCE-1 pertaining to UCE-1 and UCE-2's efforts to travel to Syria to join HTS, GIAMPIETRO attempted to provide material support or resources to HTS, and thus violated § 2339B. That is a fact question for the jury, and the jury alone, to resolve. GIAMPIETRO may argue at trial that she never provided UCE-1 with Individual A's contact information, or that her intent in providing UCE-1 with Individual A's contact information was not criminal and instead served some other purpose (such as dissuading UCE-1 from traveling abroad). But what GIAMPIETRO may not do is argue to the jury that GIAMPIETRO's providing Individual A's contact information to UCE-1, regardless of her motive in doing so, *was not criminal*. Permitting GIAMPIETRO to do so would usurp the fact-finding role of the jury and amount to error under the law. GIAMPIETRO's argument for excluding the evidence under Rule 404(b), Rule 403, or both, on this rationale should therefore be rejected.

## B. <u>Western Union Money Transfers</u>

As the government outlined in its opposition to GIAMPIETRO's motion to revoke the magistrate judge's bond order, *see* Doc. 156 at 11-12, and as GIAMPIETRO notes in her motion, the government has developed proof that GIAMPIETRO sent $150, $200, and $500 via Western Union to organizations supporting the mujahideen on June 14, June 20, and June 25, 2018,

---

[13]        GIAMPIETRO concedes that if she traveled to Syria to join HTS herself, she would have violated § 2339B. *See* Doc. 169 at 24-25 ("[GIAMPIETRO's] expressed desire to travel to Syria to marry and support an alleged fighter is not protected speech and indeed, had [the defendant] carried it out, most likely would have constituted a crime.").

15

respectively.[14] Specifically, the government recovered screenshots saved to GIAMPIETRO's phone depicting a transfer of $150 from "Georgianna Giampietro" to "Muhammed Muhammed" in Turkey on June 14, 2018. Western Union subpoena returns reflected that a Georgianna GIAMPIETRO with GIAMPIETRO's date of birth, residing at 327 Imperial Drive in Sparta, sent $150 to Muhammed Muhammed on June 14, 2018. Agents also recovered a screenshot saved to her phone on June 15, 2018, which depicts the Telegram channel name "Al Sadaqah"; a photo of men holding a pair of boots, with the caption, "Al Sadaqah providing brand new military boots to front line mujahideen/Anonymous donation methods available"; and the handle @alsadaqahsyria. The handle "@alsadaqahsyria" is the contact information for Individual A that GIAMPIETRO passed to UCE-1 to facilitate UCE-1 and UCE-2's travel to Syria to join HTS.

Agents also recovered a screenshot saved to her phone on June 20, 2018, depicting a Western Union transfer of $200 from a redacted name to "Omar Ali" at the number "+90 537 822 0931." During a recorded meeting between GIAMPIETRO and UCE-1 on March 17, 2018, UCE-1 told GIAMPIETRO that UCE-2 was interested in "helping some of the mujahideen." GIAMPIETRO told UCE-1 that if UCE-2 was on Telegram, GIAMPIETRO could "give him some brothers" whose Telegram channel GIAMPIETRO followed. GIAMPIETRO told UCE-1 that

---

[14] GIAMPIETRO contends that the government has "not given notice of, but has previously indicated its intention to introduce," this evidence (*see* Doc. 169 at 23). The government deems this evidence intrinsic to Count One, and is therefore under no obligation to give special "notice" to the defense of the government's intent to use this evidence at trial. *See Churn*, 800 F.3d at 779 ("*Res gestae* evidence does not implicate Federal Rule of Evidence 404(b), which generally bars evidence of past acts to prove character, . . . with some exceptions."); *see also* Fed. R. Evid. 404(b), Advisory Committee note, 1991 Amendments (addition of a pre-trial notice requirement in criminal cases "does not extend to evidence of acts which are 'intrinsic' to the charged offense"). Regardless, the government referenced this evidence at GIAMPIETRO's detention hearing in August 2019 and has provided documentary and other evidence underlying these money transfers to GIAMPIETRO in discovery. GIAMPIETRO has also argued that this evidence should be excluded at trial under Rule 404(b), Rule 403 (or both). There is no basis to exclude this evidence on grounds (for example) that the government failed to provide timely notice to GIAMPIETRO of the government's intent to introduce this evidence at trial, particularly given that GIAMPIETRO has plainly suffered no prejudice as a result of any claimed late disclosure.

16

these brothers were "over there" and were "trustworthy." The next day, GIAMPIETRO sent UCE-1 a Telegram message providing UCE-1 with contact information for one of the "trusted brothers," identified as "Al-Maqalaat," who described the needs of the "mujahideen." GIAMPIETRO sent UCE-1 the number "+90 537 822 0931" accompanied by the message "I use to know this brother the owner of this channel from FB/He's trustworthy." Agents recovered a screenshot saved to GIAMPIETRO's phone on June 25, 2018, depicting a transfer of $500 from an unknown sender to "Ahmet Hayek" at "+90 537 822 0931." Western Union subpoena returns reflected that a Georgianna GIAMPIETRO with GIAMPIETRO's date of birth, residing at 327 Imperial Drive, sent $200 to Omar Ali on June 20, 2018 and $500 to Ahmet Hayek on June 25, 2018.

This evidence is intrinsic to Count One, because evidence of GIAMPIETRO's willingness to send financial support to the mujahideen serves as a prelude to, and is directly probative of, her attempt to provide material support to HTS in 2018. It also completes the story of her attempt to provide material support to HTS in 2018: her financial support for foreign fighters in Syria helps establish that, in the months leading up to her providing Individual A's contact information to UCE-1, and within the time period alleged in Count One, she supported Islamic terror groups, including a group whose contact information she passed to UCE-1 to facilitate UCE-1 and UCE-2's travel to Syria to join HTS. This evidence also helps establish that she knew that the social media page associated with Individual A helped fund the mujahideen and was not a "charity" supporting victims of the Syrian conflict.

Even if this evidence were not intrinsic to Count One, it is admissible under Rule 404(b). To prove Count One, the government must show that GIAMPIETRO attempted to provide material support or resources to HTS, knowing that HTS was an FTO. Evidence establishing that she provided financial support to the mujahideen in the months before she gave Individual A's contact

17

information to UCE-1 helps establish that her motive, intent, and knowledge in providing that information was to assist UCE-1 and UCE-2 in traveling to Syria to join HTS, and that providing that information was part of her preparation or plan, and was neither a mistake nor an accident.

GIAMPIETRO contends that permitting the government to introduce this evidence "would constitute an improper amendment of the indictment" and amount to a "violation of the defendant's Fifth Amendment right to a grand jury." (*See* Doc. 169 at 23-24.) She also contends that it would "mislead the jury" and "create the potential for a trial within a trial." (*See id.*) She is mistaken. Improper amendments to an indictment occur when a prosecutor or court alters the charging terms of an indictment such that the defendant faces charges at trial other than those for which she was indicted by the grand jury. *See United States v. Combs*, 369 F.3d 925, 935-36 (6th Cir. 2004). Permitting the government to use evidence of these money transfers—evidence that GIAMPIETRO provided financial support to the mujahideen in the months leading up to her provision of Individual A's contact information to UCE-1, within the dates of the offense alleged in Count One—does not subject GIAMPIETRO to a trial on charges other than those for which she was indicted. Nor would the use of this evidence "mislead" the jury, given that a key component of the jury's deliberations will be to ascertain the intent underlying her conduct. GIAMPIETRO has also offered no authority holding otherwise. Her arguments thus fall flat.

### C.    Abu Abdullah and GIAMPIETRO's Interest in Traveling to Syria

Lastly, the government anticipates introducing evidence at trial that GIAMPIETRO communicated with a foreign fighter in Syria named "Abu Abdullah" between 2016 and 2018, and that she expressed to numerous individuals her desire to travel to Syria to marry him.[15] The

---

[15]    GIAMPIETRO discussed her desire to travel to Syria and marry "Abu Abdullah" in online communications with OCE-1, in online communications with UCE-1, and with others (including W-2) between approximately 2016

government also anticipates introducing evidence that GIAMPIETRO kept photographs on her phone of "Abu Abdullah" wearing military fatigues and posing with various firearms, as well as photographs of other foreign fighters accompanied by phrases urging violent jihad.

This evidence is intrinsic to Count One, because GIAMPIETRO's desire to travel to Syria, marry a foreign fighter, and support foreign fighters serves as a prelude to, and is directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. This evidence forms an integral part of witness testimony. And it completes the story of GIAMPIETRO's attempt to provide material support to HTS in 2018, in that it demonstrates that GIAMPIETRO maintained a longstanding interest in traveling to Syria herself to marry and support a foreign fighter.

Even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). This evidence helps establish GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1 to facilitate UCE-1 and UCE-2's travel to Syria to join HTS. It also establishes that providing that information was part of GIAMPIETRO's preparation or plan, and that providing that information was neither a mistake nor an accident.

The government also anticipates introducing evidence at trial that GIAMPIETRO expressed a desire, during a face-to-face meeting with UCE-1 on November 28, 2017, to travel to Syria; that GIAMPIETRO informed W-2 that she intended to take her son with her to Syria; that she explained to others how to travel to Syria for jihad; and that she set up a GoFundMe page in 2017 so that others could help pay down her substantial student loans, and which would enable her to travel to Syria. This evidence is intrinsic to Count One, because GIAMPIETRO's desire to travel to Syria, the measures she took to pay down her loans, and her instructions to others about how to

_____

and 2018. GIAMPIETRO also made statements to W-1 expressing her desire to marry "Abu Abdullah" because he was a fighter and because GIAMPIETRO wanted to support him in his efforts.

prepare for departing the United States and ultimately traveling to Syria, serve as a prelude to, and are directly probative of, GIAMPIETRO's attempt to provide material support to HTS in 2018. They also form an integral part of the testimony of OCE-1, UCE-1, and W-2, all of whom discussed these topics with GIAMPIETRO. And they complete the story of GIAMPIETRO's attempt to provide material support to HTS, which culminated in 2018. This evidence helps establish that, in the years before she provided Individual A's contact information to UCE-1, GIAMPIETRO was planning to travel to Syria herself and was also encouraging others to travel to Syria for jihad.

Even if this evidence were not intrinsic to Count One, it is nevertheless admissible under Rule 404(b). Evidence that GIAMPIETRO wanted to travel to Syria, that she took steps enabling her travel to Syria, and that she told others how to travel to Syria for jihad, helps establish why she would provide Individual A's contact information to UCE-1. It also helps explain how she would know what information and guidance to provide to UCE-1 in order to travel to Syria undetected. It thus helps establish GIAMPIETRO's motive, intent, and knowledge in providing Individual A's contact information to UCE-1. It also demonstrates that providing this information to UCE-1 was part of GIAMPIETRO's preparation or plan, and was neither a mistake nor an accident.

GIAMPIETRO does not request the exclusion of any of this evidence. (*See* Doc. 169 at 24-25.) Instead, GIAMPIETRO requests that the Court issue a limiting instruction informing the jury that the evidence may only be considered for the limited purpose of "showing [the defendant's] knowledge about travel to Syria." (*Id.* at 25.) GIAMPIETRO argues that her "intent to travel is not intrinsically part of the charged conduct," and is "being offered to show that [her] desire to travel to Syria caused her to support the undercovers' desire to travel [to] Syria." (*Id.*)[16]

---

[16]     GIAMPIETRO does not argue that this evidence must be excluded under Rule 403.

GIAMPIETRO's arguments lack merit. She contends that because the government has not charged her with providing material support to HTS in the form of herself, and because the government's theory is that she attempted to provide material support to HTS by facilitating the travel of *others* to Syria to join HTS, evidence that bears on her personal desire to travel to Syria to join HTS is extrinsic to the charged offense and is therefore either inadmissible or admissible subject to a limiting instruction. But she has offered no legal support for that assertion. Nor is there support for that assertion in light of the facts of this case. GIAMPIETRO supported terrorist causes over a period of several years. During that time, she engaged in a chat group with other female jihadi sympathizers, who also expressed an interest in traveling to Syria to support foreign fighters. After UCE-1 informed GIAMPIETRO that UCE-1 was traveling to Syria, GIAMPIETRO suggested ways for UCE-1 to alter her travel plans in ways that conformed with plans GIAMPIETRO had made to travel abroad. There can be no doubt either that such evidence is inextricably intertwined with GIAMPIETRO's attempt to assist UCE-1 and UCE-2 in traveling to Syria to join HTS, or is, at an absolute minimum, admissible as evidence of GIAMPIETRO's motive and intent in attempting to assist UCE-1 and UCE-2. GIAMPIETRO's request for a limiting instruction thus lacks merit and should be rejected.

## II.   **GIAMPIETRO Has Failed to Provide the Court with the Full Context for Her Conduct and Statements in This Case**

GIAMPIETRO posits that "[t]he Court must decide whether to admit or exclude Defendant's statements outside the charged period, and the photographs from her cellphone, against the backdrop of the charged offenses." (Doc. 169 at 6.) In the government's opposition to GIAMPIETRO's previously filed motion to exclude 404(b) evidence, the government noted that GIAMPIETRO had provided the Court with an incomplete account of communications involving

21

GIAMPIETRO, UCE-1, and Individual A between September 23, 2018 and October 4, 2018. (*See* Doc. 144 at 11-15.) The government noted that although GIAMPIETRO had explained in her summary that, on September 23, 2018, UCE-1 informed GIAMPIETRO that UCE-2 had sworn allegiance to HTS, and that UCE-1 and UCE-2 intended to travel to Syria to join HTS, GIAMPIETRO failed to advise the Court fully of her own statements and conduct.[17]

In her most recent motion, GIAMPIETRO provided a more complete summary of the conduct underlying the charges in this case, which now includes some (but not all) of the information she previously omitted. (*See* Doc. 169 at 6-9.) But she has again omitted any reference to a damning Telegram exchange between GIAMPIETRO and an associate of Individual A's (whom the government refers to as "Individual B") who operated "SyriaCareTurkey," another Telegram channel soliciting funds for the mujahideen.[18] That exchange, which took place between October 5 and October 18, 2018, was filed as an attachment to the government's opposition to

---

[17] GIAMPIETRO failed to state that she took steps to conceal this conversation and UCE-1's conduct by asking UCE-1 to "unfollow" her Telegram channel and by instructing UCE-1 to delete GIAMPIETRO's name, number, and any photos or text messages of GIAMPIETRO from UCE-1's phone. GIAMPIETRO did not state that GIAMPIETRO informed UCE-1, "[o]nly contact me when you arrive there [Syria] in'sha'Allah." GIAMPIETRO did not state that she advised UCE-1 that UCE-2 to pack and bring supplies in a way that was not "obvious" because "they look at that stuff" and because their luggage "will be searched." GIAMPIETRO did not advise the Court that she told UCE-1 and UCE-2 that they "should of [sic] asked me before you all planned," and further informed UCE-1 that GIAMPIETRO's "plan [for when GIAMPIETRO traveled to Syria] was to delete everyone 6 to 8 months before leaving and have no contact with anyone." (*Id.* at 11-12; Doc. 143 at 8.) Similarly, in GIAMPIETRO's previously filed motion, GIAMPIETRO explained that she informed UCE-1 on September 30, 2018 that GIAMPIETRO had communicated with Individual A, and that Individual A had informed GIAMPIETRO that "there was no fighting in Syria for the UCEs to join"; that the UCEs "were not required to swear allegiance to HTS"; and that Individual A would "discourage[]them from traveling if they did not have jobs there already." (Doc. 144 at 12; Doc. 143 at 8.) But GIAMPIETRO omitted that she, after informing UCE-1 that there was "no work" in Syria, asked UCE-1, "Have you thought about Afghanistan? They're still fighting there." (*See* Doc. 144 at 12; Doc. 144-3 at 60-87; Doc. 143 at 8.)

The government attached as Exhibits B, C, and D to its previously filed opposition several lengthy chat conversations, given that GIAMPIETRO referenced those conversations in her motion, and so that the Court can review them itself if necessary.

[18] The government has referenced this Telegram exchange in its opposition to GIAMPIETRO's previously filed motion to exclude Rule 404(b) evidence and in its opposition to GIAMPIETRO's motion to revoke the magistrate judge's detention order. (*See* Doc. 144 at 12-15; Doc. 156 at 12-13.) GIAMPIETRO has made no reference at all to this Telegram exchange in anything she has filed with the Court.

22

GIAMPIETRO's previously filed Rule 404(b) motion. (*See* Doc. 144-4.) The exchange provides key insights into GIAMPIETRO's motivations for providing Individual A's contact information to UCE-1, and into GIAMPIETRO's consciousness of guilt when she became concerned that law enforcement might learn of her conduct.

In an online conversation between UCE-2 and Individual A on October 10, 2018, UCE-2 sent Individual A the following message:

> Asalaam aleikum wr wb. ive made it to London and am deleting this telegram account. im waiting on my wife but ill contact you once im in turkey from a new telegram. ill have same name 'Yusuf'. jazakAllah khair for your help akhi. inshAllah we will speak soon.

(*See* Doc. 144-5 at 1-2.) In the October 5-18, 2018 Telegram exchange between GIAMPIETRO and Individual B, Individual B sent GIAMPIETRO a verbatim copy of the message UCE-2 sent to Individual A on October 10, 2018, with the accompanying message, "The brother [Individual A] sent this message." (*See* Doc. 144-4 at 31.) This evidence completes the chronology of events establishing Count One of the indictment: (1) GIAMPIETRO told UCE-1 to have UCE-2 contact Individual A; (2) UCE-2 contacted Individual A seeking assistance in traveling to Syria; and (3) UCE-2 again contacted Individual A and sent the message above on October 10, 2018, after UCE-2 arrived in London. Individual A then (4) sent the message above to Individual B, who relayed the message to GIAMPIETRO in a conversation on October 10, 2018.

During the October 5-18, 2018 Telegram exchange with Individual B, GIAMPIETRO made numerous inculpatory admissions about her conduct vis-à-vis UCE-1 and UCE-2:

- When Individual B told GIAMPIETRO that Individual A "was willing to help" UCE-1 and UCE-2 and "gave simple advice," GIAMPIETRO informed Individual B, "He needs not to bc if they are spies I will be arrested," and "Let me know if your friend [Individual A] is helping him since supposedly leaving tonight so I can break my phone loooool and get a new one."

23

- When Individual B told GIAMPIETRO to "factory reset" her cell phone in order to ensure that messages related to GIAMPIETRO's conversations with UCE-1 were deleted and not retrievable by law enforcement, GIAMPIETRO replied, "There's nothing on my device," "I don't have her number I deleted everything," and "So I can say someone used my number," meaning that GIAMPIETRO could say that someone else used her number to communicate with UCE-1.

- When Individual B sent the message above to GIAMPIETRO, GIAMPIETRO replied, "WOW"; "Please don't get me in trouble"; "I need him [Individual A] not to help him [UCE-2] in'sha'Allah"; "[o]ne small mess up and I get 30 years"; "I can hear it now 'she gave us the information'"; and, "Is your friend helping him?/I need to know/If so I'm destroying my phone and not getting one for months."

- When Individual B asked GIAMPIETRO, "What's wrong with them coming anyway" and "I thought you wanted them to come in no?" GIAMPIETRO replied, "Nothing wrong if they're actually real and truthful."

- When Individual B told GIAMPIETRO, "Inshallah they get in safely," GIAMPIETRO replied, "In'sha'allah/I really want them to be honest. Bc I was going to send her money to get me a house there/Sigh/This is my dream: house by a river and caves, open fields, a garden, and a horse loooool/I know in the north west of S they have that/Abu showed me/Sigh/I miss him."

- When Individual B told GIAMPIETRO that her "friends" UCE-1 and UCE-2 were "weird," GIAMPIETRO advised Individual B that her "other friend just went Madkhali on me" and that her friend told GIAMPIETRO "not to listen to anwar [Anwar al-Awlaki] and qutb etc. etc.," but that GIAMPIETRO had rejected that advice.

- When Individual B lamented that there were many people in the West who "loved 'jojo'" (meaning ISIS) but did not act on their support, GIAMPIETRO replied, "I mean right now tbh there's no real group to support." Individual B replied, "Except tell everyone on Twitter lol/Support jihad and Islam/That's it," GIAMPIETRO replied, "Yes I call them keyboard Warriors/I cannot wait to move there in'sha'Allah/Wallahi I'm working hard to get there in'sha'Allah."

(*See* Exhibit 144-4.)[19] As this exchange demonstrates, as of October 2018, GIAMPIETRO (1) still

---

[19]     Additionally, when Individual B and GIAMPIETRO were discussing the possibility of GIAMPIETRO moving to Syria, GIAMPIETRO informed Individual B, "A close sister [the subject of an FBI investigation in Alabama] just messaged me/Saying there's an investigation on her/The same sister who gave that sister (yosuf wife) information of that brother to make H." Individual B told GIAMPIETRO, "Listen please just reset factory reset your phone"; GIAMPIETRO replied, "Okay I will in'sha'Allah."

wished to travel to Syria, and was "working hard to get there"; (2) still adhered to the teachings of radical Islamic clerics; and (3) was taking steps to destroy evidence and intended to obstruct any investigation into her providing UCE-1 with Individual A's contact information. GIAMPIETRO's omission of this exchange in her summary of relevant evidence at the heart of this case seriously undercuts her arguments for exclusion.

III.   **Conclusion**

WHEREFORE, the government respectfully requests that the Court deny defendant Georgianna A.M. GIAMPIETRO's Motion in Limine Regarding 404(b) Evidence and Supplemental Memorandum of Law. (Doc. 169) and permit the government to introduce the evidence above as intrinsic evidence, Rule 404(b) evidence, or both.

<div style="margin-left: 40%;">

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney
Middle District of Tennessee

By:     *s/Ben Schrader*
BEN SCHRADER
Assistant U.S. Attorney

By:     *s/Philip Wehby*
PHILIP WEHBY
Assistant U.S. Attorney

By:     *s/Jennifer Levy*
JENNIFER LEVY
Trial Attorney, Counterterrorism Section
U.S. Department of Justice

</div>

Dated:     March 1, 2021

25

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2021 I electronically filed one copy of the government's Reply to Defendant's Response to Notice Regarding 404(b) Evidence via the CM/ECF electronic filing system, which will send a Notice of Electronic Filing to counsel for defendant.

_s/Ben Schrader_____
BEN SCHRADER
Assistant U.S. Attorney