**Expert Witness Report**
Mia Bloom
US v. Georgianna A. M. Giampietro

Your Honor, my name is Mia Bloom and I am professor of Communication and Middle East Studies at Georgia State University in Atlanta, Georgia, where I am also a fellow at the Evidence Based Cyber Security Program in the Andrew Young School of Policy Studies. In addition to being a professor, I am the international security fellow (nonresidential) at the New America Foundation in Washington, DC where my areas of expertise include terrorism and radicalization.

I have a bachelor's degree in History and Middle East Studies (including Islamic studies) from McGill University in Montreal, Canada, a master's degree in Arab Studies from the Edmund Walsh School of Foreign Service at Georgetown University in Washington, DC, and a PhD in Political Science from Columbia University in New York City. My academic training spans comparative politics, the history of the Middle East, religious studies, communications, and international relations. I have also researched and published on the psychology of terrorism and the process of radicalization.

I have worked in academia as a professor since 1999 and taught at several schools around the United States and Canada including Cornell University, McGill University, University of Georgia, Pennsylvania State University, and now at Georgia State University. Over the course of 22 years of teaching, I have been steadily promoted from a visiting professor at Cornell (1999-2001), to an assistant professor at Georgia and Penn State (2004-2010), to an associate professor with tenure (2011-2014), to Full Professor at Georgia State University. There is no academic rank above a Full Professor.

I have taught classes on politics, conflict and war, women's studies, criminology, international relations, Middle East politics, US Foreign Policy, and communication studies, and graduate seminars on ethnic conflict, gender-based violence, and conspiracy theories. I have also worked individually with students on independent studies classes focusing on terrorists' use social media, how terrorist organizations exploit encrypted platforms (like Telegram), and how and why Western women were deliberately targeted for recruitment by Jihadi groups to move (emigrate) to Syria and Iraq beginning in 2013 onwards.

My areas of expertise include the larger study of war and political violence ranging from civil war to rape during war, terrorism, and repressive state tactics. I also have expertise in the areas of gender and violence. I have studied terrorism since 1985, when a bomb was defused in front of me at the central bus station in Tel Aviv. I have devoted my entire academic career to studying all forms of terrorism; comparing how different groups around the world use terrorism and the tactics that terrorist groups employ. I have specialized in suicide terrorism, women and terrorism, and the role of children in terrorist groups since 1999 when I received a MacArthur Fellowship to compare suicide terrorism, rape in war, and child soldiers. This led to my publishing books related to each of these subjects.

1

I completed my first book in 2004 after conducting field research and interviews in Egypt, Sri Lanka, and Israel. I became one of the only scholars exploring the role of women in terrorist movements. This was not an area widely studied (yet) and, beginning in 2005, I started publishing articles on the subject. I focused on how women engaged in terrorist organizations and what kinds of roles and responsibilities they were given depending on the ideology of the group, the location of the conflict, the region, and whether the group permitted women to fight on the front lines or instructed them to merely support the cause online or in other ways. My first publication on the subject was entitled "Mother Daughter Sister Bomber" (2005) and paved the way for more articles, op eds, media interviews, and consulting on this subject until my next book (2011).

In 2009-10 I conducted interviews with women who had been members of terrorist organizations around the world to provide a comparative perspective on how different groups recruited and mobilized women. I interviewed women who been in the Provisional IRA (Irish Republican Army), women who had been in Jihadi groups, and even female former Neo-Nazis. This resulted in my 2011 book *Bombshell: Women and Terrorism*, which was published in several countries and translated to foreign languages.

In the days after 9/11, I was asked to work with the New Jersey Office of Counter Terrorism since there were very few terrorism experts before the attacks in 2001. In my capacity as a consultant, I briefed the state troopers and members of law enforcement about Islamic history and traditions and explained the different types of Jihad. I helped the OCT set up several outreach initiatives to prevent attacks, and an 800 tips line to encourage community members to call (anonymously) with any information. Several plots were disrupted when members of the NJ Muslim community contacted the tips line to report plots against NJ transit or plots against New York City. I also conducted research on the process of radicalization in prison and compared New Jersey with New York and Pennsylvania. The results of my research were implemented by Senator Charles Schumer (New York) and were classified by the Bureau of Prisons.

Beginning in 2007, I began applying for and receiving competitive grants from the US Government to fund my research on terrorism. I was funded by the US Department of Defense and the research arm of the Navy (Office of Naval Research – ONR), to explore a wide range of subjects. These included topics such as online radicalization of men and women, how terrorist groups used social media and encrypted messaging platforms like Telegram, and the impact of de-platforming on the longevity of terrorist organizations. I was tasked over the years with additional projects to explore how terrorist groups recruited, how they funded their activities, and what types of counter messaging worked (and what backfired). These projects included consulting for the CIA, the FBI, and foreign governments such as MI5 and MI6. My research generated a new methodology of "digital ethnography". Digital ethnography is like in person ethnography except that instead of traveling to a country and doing in person interviews, this approach leverages the use of social media to help researchers remotely generate rich, contextual insights into human behaviors and experiences. Using this approach, I was able to monitor what Jihadis and other extremists discussed online and how they moved from online discussions to real world activities. To conduct this research on Telegram (as is required for any university

research) I applied for IRBs (Institutional Review Board) for each project to ensure the research was conducted ethically, safely, and honestly. I pioneered the methodology of using the semi encrypted platform, Telegram, to study terrorist organizations (ISIS and Jabhat al Nusra) and briefed US government agencies about online patterns of behavior and the terrorist strategies to sustain user engagement. In other words, I examined the "addictive properties" of terrorist social media. My project compared and contrasted Telegram across several different languages, and I published the methodology of how to conduct research online monitoring terrorist channels and chatrooms.

By monitoring both the terrorist channels and the chatrooms, my team was able to detect plots in their infancy and prevent a variety of attacks from ever happening. The project successfully prevented an attack against a club in Toronto, Canada, on the anniversary of the Pulse Nightclub attack in Orlando, Florida, and prevented attacks against a shopping mall in Australia, several Kosher bakeries in London, and kidnapping plot or threats against children of leaders, for example, Prince George in the UK and Baron Trump in the US.

Per university regulations, I alerted the authorities to a plot that was being planned on Telegram, and shared screen shots of plots with the relevant intelligence agencies. This is part of the academic "duty to warn" that if someone is planning self-harm or to harm others, it must be reported. My university and research team took great pride when any terrorist plots were disrupted because of our research and vigilance monitoring the channels.

This same methodology of digital ethnography and observing the patterns of communication on the social media platforms allowed me to extend my research to US domestic groups and I examined the George Floyd Protests in May 2020. By using the encrypted platforms, I was able to detect that extremist groups like the proud boys and "boogaloo" groups had infiltrated the protests. One of my articles for *Just Security* was entered into the Congressional Record by Jamie Raskin (Maryland) during the policing hearings in June 2020.

To date, I have published 5 books about violence or terrorism and one book is in production about the role of women in Jihad in several countries including Syria, Iraq, Somalia, and Nigeria; I have also published around 80 articles, book chapters, and policy pieces for non-academic audiences.

As part of my outreach and public facing engagement, I have given over 350 presentations and talks on radicalization and terrorism to universities, US government agencies, and private industry (e.g., Facebook) including 10 talks to World Affairs Councils around the United States, and three talks to the Council on Foreign Relations in Washington DC and New York City. I have briefed the Pentagon four times, the Department of Defense 20 times, the Department of Justice five times, the Department of Homeland Security five times, the Office of the Secretary of Defense, the National Security Council (NSC), FBI, CIA, the United Nations Security Council, and 10 foreign governments in Europe and Oceania about online radicalization and returning women and children from Syria and Iraq. I was one of three academics invited to the White House's Countering Violent

Extremism (CVE) Conference in February 2015 to discuss the subject of women and radicalization, with a focus on Western converts who were recruited to the Syrian/ Iraqi Jihad.

I advise the Global Internet Forum to Counter Terrorism (GIFCT) technical and policy group and the Centre for Research and Evidence on Security Threats (CREST) in the UK. I serve on the advisory committees for the United Nations CTED counter terrorism directorate, the Anti-Defamation League's expert radicalization board, and I am a member of a non-Governmental organization to empower female led civil service organizations around the world called the Women's Alliance for Security Leadership (WASL). I serve as a grant reviewer for the United States Navy, Air Force, Army, the National Science Foundation, the UK and Israeli governments, and the MacArthur Foundation. As part of my academic work, I have reviewed over 400 manuscripts for publication. An abbreviated list of the academic journals and presses are available on my resume.

As a result of being one of the original terrorism scholars predating 9/11, I have been interviewed by the news media an average of 80 times a year for the past fifteen years including television news CNN, BBC, Fox News, MSNBC, print media and magazines. I continue to generate new research and offer my analyses to the American public.

In the following report, I will address the following issues:
1. Explain the different types of jihads; differences between the greater and lesser jihad, and defensive and offensive jihad; I will address the requirements and restrictions of each of these phenomenon;
2. Explain the concept of *takiya* in Islam.
3. Explain how an individual moves from what might be called the radicalization of thought to the radicalization of deed and provide examples of the difference.
4. Present the different types of roles of women had in Jabhat al Nusra/HTS and ISIS; also differentiate between younger women and older women in each of the Syrian/Iraqi foreign terrorist organizations; as well as identify the differing recruitment methods to lure women and girls.
5. Address the many uses of social media to radicalize and recruit women for illegal and terrorist acts; and
6. Finally, I will highlight some of the main clerics who have been most associated with radicalization to violent terrorism, notably the role of Anwar Awlaki, and present how the ideologues related the rights and responsibilities for women (as they might have been framed differently from those of men).

In my expected testimony, I will provide some of the background and context for online radicalization, how women have been the target for terrorist recruitment, why converts might be more easily radicalized than native born Muslims, and why certain specific events are used to motivate people as triggers to participate in violence.

One religious doctrine which might confuse Muslim converts is the concept of *Taqiya*:

*Taqiyah* (or Taqiyyah) is the practice of concealing one's belief and foregoing the regular religious duties if or when an individual perceives danger. The loose translation of the notion is "precautionary dissimulation." In many ways it is a tactic of war – using deception and secrecy involving misleading non-believers, even outright lying. This can include concealing one's allegiance to Islam. This allows Muslims to blend in and even engage in behavior that would appear to the outside observer to be un-Islamic, such as the 9/11 bombers frequenting strip clubs and bars before their terrorist operation. Since extremists consider themselves perennially at war with non-believers (in a defensive jihad), they also believe that they are permitted to lie to anyone who opposes them, or their specific interpretation of the Muslim faith.

Depending on whether someone watches the news (versus getting their news from Facebook) and which news program he or she watches, a person might have certain preconceived notions about Islam. For most Muslims, who constitute a billion people around the world, Islam is understood to be a religion of peace. The word Islam translates as *submission* and is the same root as the word peace, in Arabic *salam*. That is also why Muslims greet each other by saying "Peace be Upon You," or *Salam Aleikum*.

### What is Jihad?

Since 9/11/01 Americans' understanding of Islam has been colored by the events of that date, even though Islam is the most popular and fastest growing religion on the planet; there have been Muslims living in America since 1619. The majority of people brought to this continent as slaves would have been from Muslim countries in Africa. What is most misunderstood in Islam, however, is the concept of jihad which most people mistakenly assume to be "Holy War."

The reason these concepts tend to be misunderstood is that both Jihadi terrorist groups and certain news outlets misrepresent Islam in the same way and distort the concept of jihad. The first thing to understand is there are two jihads in the Islamic faith: the greater Jihad and the lesser jihad. (I will use capital "J" for the Greater Jihad and lower case "j" for the lesser.)

The concept of the two jihads comes from a Hadith (sayings of the Prophet Muhammed: "We are finished with the lesser jihad; **now we are starting the greater jihad** [emphasis added])." [1] Muhammed explained to his followers that fighting against an outside or external enemy was the lesser jihad and that fighting against oneself was the greater Jihad.

Following from Muhammed's Hadith, the greater Jihad is the struggle within the individual to resist temptation, to pray five times a day as required, to give alms (charity) to the poor, to fast during the month of Ramadan, to avoid alcohol, drugs (even nicotine is forbidden by the most devout Muslims) and maintain the strict dietary restrictions which prohibit eating many delicious foods. The lesser jihad is what most people think of when they hear the term and it is associated with the obligation for Muslims to defend the

---

[1] https://www.washingtonpost.com/news/global-opinions/wp/2017/07/08/jihad-is-not-a-dirty-word/

community of the faithful (what they call the Ummah) and the lands under Muslim control.

Secondly, making matters more confusing, this lesser jihad makes the distinction between offensive and defensive categories. The "offensive jihad" corresponds to periods of history when the areas under Islamic rule (called the House of Islam or *Dar al Islam*) were expanding, for example during the 7th century until the 13th century as Islam emerged from the Arabian Peninsula (currently what we call Saudi Arabia) to convert most of the Middle East, North Africa, Southern Europe, and even reached cities in medieval France and Austria.

"Defensive jihad" is when the House of Islam is under siege or being attacked by the enemy. The enemy is sometimes called the House of War (*Dar al Harb*). In this scenario, instead of Islam expanding, the territory is contracting, and Muslims are losing ground and losing lands they previously held. The reason for the distinction is not just semantics. If Islam is under attack, many of the rules and regulations about who is obligated to participate in jihad change. It also changes the nature of the obligation from a general support of jihad to being an individual obligation incumbent upon every single member of the community being personally responsible to engage and participate – including women and children.

For example, Islam ordinarily requires a child to get the permission from his or her parents, a wife to get permission from her husband, or a debtor to get permission from the person to whom they owe money, *prior* to participating in the lesser jihad because if they are killed, they would be unable to repay their debt. However, during a *defensive* jihad, these rules no longer apply; children do not need parental permission, the wife doesn't need her husband's consent, and there is no requirement to get a debtor's permission to participate in the war.

This became salient because during the "jihad" in Iraq and Syria (2012-2020), not only did women not need the permission of their husbands to participate in jihad, but they were permitted to travel without a chaperone – something that is customarily an iron clad rule that limits women's mobility in Muslim traditional societies (for example, Afghanistan or Saudi Arabia). There were numerous instances where women and girls traveled to Syria and Iraq without a male guardian.

There is a debate about the nature of the jihad in Syria and Iraq, whether it is understood to be defensive (Muslims attacked by foreign enemies like Russia, or Muslims they consider to be heretics like President Assad, or Turkey) or whether it was offensive, as groups affiliated with Al Qaeda or ISIS were expanding their control of territory across Syria and Iraq while at the same time, other militant organizations around the world began to pledge allegiance to the Syrian and Iraqi jihadi groups and expended their influences over South Asia or parts of Africa.

For some observers, it might have appeared to be an expansion as the jihadi group gained momentum and footholds in Africa, South Asia, and even in China. Another view is that it is a defensive Jihad if Muslims are reclaiming areas that once were under Muslim rule.

Case 2:19-cr-00013   Document 245-1   Filed 08/18/21   Page 6 of 19 PageID #: 3154

This would include all of the Middle East, North Africa, Southern Europe, and even Spain, which jihadis call "al Andalusia". However, neither of the two Jihadi groups (ISIS or HTS) deployed women on the front lines, as the Prophet Muhammad had in the 7th century. So, there is genuine confusion as to whether they were fighting offensively or defensively and no agreement across all the participants regarding the qualities of the offensive versus the defensive (lesser) jihad. Because if the jihad had been truly defensive in nature, then women and children would have been expected to fight -- just like men on the front lines in all the available roles. Instead, women had extremely limited roles, mostly as wives and mothers. Women in the al Qaeda linked group HTS provided support, and they would pull bodies from the battlefield (for proper burial) and procure weapons, mobile phones, cash, foreign passports, and anything they could get from the dead bodies of the enemy soldiers. While women did not fight in the traditional sense, in both groups the women were pivotal in online recruiting, fund raising, and disseminating propaganda.

### Women and Terrorism

Women's roles in terrorism have a long history that predate the war in Syria by over 100 years. The first person tried in a court of law for terrorism offenses was a woman named Vera Zasulich. Zasulich stood trial in Russia in the 19th century. She had attempted to assassinate the mayor of St. Petersburg as part of an anarchist group named People's Will ("Narodnya Volya"). For the past fifty years, women have participated in terrorist groups at all levels, from fund raising, to recruitment, to being suicide bombers. Women in Syria and Lebanon were among the first female suicide bombers (back in March 1985) for a left-wing group called the Syrian Social Nationalist Party (SSNP). Women still constitute till this day around 30% of most terrorist organizations and comprise around 1/3 of the suicide bombers except in certain conflicts like Nigeria where the women are 53% of the total of the jihadi group Boko Haram. Boko Haram was made famous in April 2014 when they kidnapped 270 schoolgirls in Chibok and became the subject of a social media campaign #bringbackourgirls, led by the first lady, Michelle Obama, Dwayne "the Rock" Johnson, and Mala Yusufzai.

Al Qaeda in Iraq was the first of the Al Qaeda connected organizations to deploy a female suicide bomber. The group recruited a blonde Belgian convert named Muriel Degauque to blow up American soldiers in Iraq in 2005. Degauque died in the blast.

We have extensive information about the process by which terrorist groups recruit women from analyzing the historical cases of Muriel Degauque and other female terrorists, such as Colleen LaRose from Pennsylvania. Colleen (Fatima) LaRose gave herself the name "Jihad Jane" and was arrested for plotting to kill a cartoonist named Lars Vilks in March 2010. LaRose turned herself in and she was not a suicide bomber (like Degauque). Since she survived the plot, she has been interviewed extensively, and was the subject of an Irish documentary by RTE. In her media interviews and the documentary, she provided extensive details about her process of involvement, specifically how she was recruited by Al Qaeda, and what she did as a female Jihadi in the organization. A third woman, Jaimie Ramirez was also arrested as part of the plot against Vilks and had provided copious information about the process of radicalization and the shift from being radicalized online to engaging in violent or illegal acts in real life.

Degauque's suicide bombing and LaRose and Ramirez's arrests highlight not just the role of women in terrorism, but the role of female converts in terrorist attacks. There are thousands of female converts in Europe and North America, many of whom converted to marry Muslim men. There have been several suicide bombers (and many preempted attackers) who were female converts. On June 2, 2006, a woman known only as Sonja B, a German convert to Islam, was arrested before she could carry out a terrorist attack in Iraq. When her husband in Morocco was arrested along with sixteen of his co-conspirators, Mohamed Reha, a leading Moroccan terrorist with Al Qaeda's North African affiliate, the Moroccan Islamic Combat Group (GICM) claimed that al Qaeda could mobilize dozens of female bombers on a moment's notice. He claimed, "the [female] partners [wives] of several terrorists detained in Belgium [are] ready to carry out suicide attacks."

We have long observed that Muslim converts tend to join jihadist groups at a disproportionate rate — around three to four times higher than the rate of people born and raised as Muslims. Few people, converts included, ever turn to violence, but there have been enough jihadi terrorists who were converts that make it useful to explore the connection.

Terrorist groups seek out converts because they find them easy to radicalize and because many converts are ignorant of the rules and regulations governing the Muslim faith. Converts can be easily duped and convinced to engage in violence even if it violates the core teachings of the religion. Converts or even people with limited knowledge of Islam (for example someone born Muslim but raised without the religion) can be convinced that the Qur'an and the Prophet Muhammad endorse violence against civilians.

LaRose was in many ways a stereotypical female convert to Islam -- turned radical jihadi. After a decade of abuse, as well as a history of narcotics and alcohol usage, LaRose converted to Islam. LaRose had been the victim of incest, rape and had lived on the streets when she ran away from home at age 13 and worked as a prostitute. Beginning at the age of 7 or 8 she and her sister, Pam (then 11), were raped by their biological father, Richard LaRose, who would appear at their door at night with a bottle of lotion, the signal that sexual abuse would begin. The rapes started when Colleen was in the second grade and continued until she ran away at 13. By age 15 or 16 she married one of her johns who was twice her age. She became pregnant and suffered a miscarriage that left her unable to have children. The couple divorced and she married again suffering through a second abusive marriage, followed by many years of substance abuse and a failed suicide attempt in 2005.

LaRose's radicalization began a few months after an anonymous sexual encounter with a "Middle Eastern guy" she met in Amsterdam on vacation with her then live-in boyfriend Kurt. Returning to the US to care for her elderly mother, LaRose became fascinated by the Arab world. She found herself spending hours online and researching about the region and conversion to Islam. While chatting with a Saudi man online, LaRose typed in the word *Shahada* and converted to Islam via instant messenger on Facebook. LaRose was self-taught about the Islamic faith, spending hours online, and visiting Muslim websites

8

like the dating site, Muslima.com to meet other Muslims. Women who become radicalized online tend to spend as much as eight or nine hours a day on their computers. The online life takes over their real-world interactions such that they are online more than they are present.

LaRose researched the religion on her own, and never visited a mosque. She had recited the *Shahada*, the statement of the faith to accept Allah as the one true God and the Prophet Mohammad as his messenger three times. By converting, LaRose exchanged a life of alcohol, crack cocaine and crystal meth for a higher power: Islam and Allah (God).

As soon as she converted, she started raising money and awareness online for the plight of Muslims in the Middle East and especially the plight of the Palestinians. According to interviews, she considered participating in Jihad as a way "to become somebody."[2] In the RTE documentary "Jihad Jane" she told the filmmaker Ciaran Cassidy explicitly "I was nobody but now because I'm a terrorist, I am somebody!"

LaRose became devoted to the (Muslim) men she met online and blindly followed their instructions. To other reporters she articulated that, "I loved my brothers … when they would tell me stuff, I would listen to them, no matter what … I also was … lost."[3] In one interview, she explained the connection between online radicalization and the process that resulted in her plot to kill. In LaRose's case, the target was Lars Vilks, a Swedish cartoonist who had insulted Muslims and the Prophet Mohammad by sketching Muhammad's face onto the head of a dog. The exposure to graphic and violent images and the prodding by her online community of brothers emphasized that she needed to "do something." In social media, she said she would be willing to die a martyr for the cause.

> "I was watching videos on YouTube. The thing that had an effect on me was the brutality I was seeing against Muslims. I would get upset. The blood and the bodies and the children. The day that I was watching the bombing [of] Palestinians, you could hear the children screaming and crying and all the women and the brothers. At the same time I was watching this on the internet, outside my window I could hear kids playing and laughing in the streets. And I was thinking to myself, nobody knows what's going on."

Not long after seeing these images, she was on a plane to Ireland to coordinate with her handler, an Algerian Jihadist named Ali Charaf Dahmache who went by the code name "theblackflag" and her co-conspirator, an American teenager named Mohammed Hassan Khalid.

Al Qaeda recruiters were very interested in female converts willing to carry out a terrorist and especially martyrdom operation. Jihadi leaders favor Western women because they assume that the women will be able to pass through security checkpoints more easily and

[2] https://www.reuters.com/article/us-usa-jihadjane/special-report-from-abuse-to-a-chat-room-a-martyr-is-made-janes-jihad-idUSBRE8B60GP20121207
[3] https://www.reuters.com/article/us-usa-jihadjane/special-report-from-abuse-to-a-chat-room-a-martyr-is-made-janes-jihad-idUSBRE8B60GP20121207

are less likely to be searched. They believe that a convert's (blonde) hair, white skin, and U.S. passport (in the case of LaRose, her Texas twang), allow them to get closer to the target they're trying to kill. Besides their Western appearance and passports, the other primary reason why Muslim converts are recruited is that they can be manipulated by radicalized individuals or fiery clerics pushing a false narrative about the sanction of killing civilians in the name of Islam.

Many of the female converts who became involved in terrorism have a comparable background and profile, having converted to Islam after a difficult life. Many have been the victims of abuse or have abused substances and are vulnerable to charismatic religious recruiters offering them a chance to reinvent themselves. Because the convert is often a blank slate, she (or he) can be duped to believe almost anything. Converts are malleable. They usually do not speak Arabic (at the beginning) and cannot challenge any interpretation of the Qur'an or the Hadith that someone spoon feeds them. They are unable to debate the finer points of Islamic philosophy or dispute the jihadi's interpretation of the enemy. LaRose never attended mosque. She never met a preacher or a cleric and only went by her own research about Islam or what other people told her. Depending on how small a town they are from, some converts do not even speak to an actual Muslim in real life until they are recruited for terrorist activities.

LaRose was released from prison in 2018 after serving 8 years. We can glean significant patterns of behavior and the processes of involvement in terrorism from the individual case studies of Colleen LaRose who was the first Caucasian woman to be prosecuted for jihadi terrorism offenses, and other women like Jaimie Ramirez who have been preempted prior to an attack or arrested for their involvement in a conspiracy to commit a terrorist attack. We have also determined why converts are vulnerable to radical messages, and how online recruiters manipulate this vulnerability and lack of firsthand religious knowledge for their nefarious ends.

Jihadi groups have been very adept at using the Internet, and social media, to recruit women from the West. There tends to be two different categories of women that these terrorist groups seek: very young Muslim girls who reside in the West and women, like LaRose, Ramirez, or the defendant, who are Western converts. The tactics employed to recruit the women mirror those tactics that pedophiles use in online "grooming." The recruiters know that most young girls and women will be suspicious of men online, and so they use women to recruit other women. Jihadi groups in Syria leveraged the presence of foreign women such that French women recruited French girls, British emigrants recruited young girls from the UK (like the ones who disappeared from Bethnal Green Academy in 2015) and Americans recruited other American girls. The reasons for this are clear, part of the process of online grooming requires that the target can relate to the recruiter. British females would be familiar with the same celebrities, television shows, even snack foods. An American girl would not have the same frames of reference. This is relevant because the group chats by the defendant demonstrate many of the same tried and true tactics used by Jihadi recruiters to foster an environment of confidence -- to make a recruiter likeable, relatable, and trustworthy.

The recruiter showers the target with attention. The moment someone is asking questions on a forum or appears to be receptive, they are bombarded with texts, friendship requests on Facebook, hundreds of followers on twitter (many of which are likely bots or sock puppet accounts) but the overall reaction is often positive so that the target feels appreciated and popular. This works with women of all ages but is especially successful with millennials.

Finally, by examining previous cases, we have discovered how and why untrained converts make amateurish mistakes that a professional terrorist would not make. Individuals who are radicalized online lack the same professional training that terrorists receive in a training camp for example in Libya or Afghanistan. Like "lone actors," untrained extremists engage in boasting, reveal specific details of the plot to friends or family, or make rookie mistakes such as neglecting to use VPNs or using their actual name instead of an alias in financial transactions. In the case of Colleen LaRose and Jamie Ramirez, they made many mistakes which resulted in their arrest. As the conspiracy to kill Vilks unfolded, LaRose and her co-conspirators botched virtually every assignment given to them by their handlers. LaRose eventually contacted the FBI while Ramirez was arrested in Ireland after 6 months of Gardaí surveillance. These kinds of amateurish mistakes are usually how the terrorist plots are discovered and prevented.

### *Online Radicalization*

Research has shown that exposure to radical material might be the first step in radicalization but it is certainly not the only reason why people join a terrorist group and commit illegal acts. Exposure to radical materials alone does not guarantee someone will become a terrorist. We must understand that some people consume and even post radical materials without ever engaging in any illegal or terrorist activities. According to psychologist and expert on radicalization, Dr. Sophia Moskalenko, only a very small percentage of people ever move from radical views to radical action.[4]

Some of the early theories of radicalization centered on the idea of a "conveyor belt" (alternatively, "stairway") model of radicalization (e.g., Fathali Moghaddam, 2005; Mitch Silber & Bhatt, 2005; John Horgan, 2005). These models presented radicalization as a gradual progression from political neutrality, to activism, to radicalism, to violence. In this model of behavior, ideology played a central role transforming the individual into a terrorist. These early theories of radicalization implied a kind of inevitable process what some might call path dependency that eliminated individual agency. Once on the path of radicalization -- violent acts become assumed or inevitable. However, despite its appeal, the idea of gradual and predictable radicalization driven by ideology didn't find empirical support. As more data on terrorists became available, we learned that radicalization was NOT linear. Many people became terrorists without first being political activists, effectively skipping the linear stages and reaching the apogee of radicalization and violence. There were however certain indicators (discussed below) where someone was moving from radical thought to planning radical action or deeds.

---

[4] https://www.universiteitleiden.nl/binaries/content/assets/customsites/perspectives-on-terrorism/2021/issue-2/moskalenko--mccauley-.pdf

There are also specific preachers and religious sources of authority who have been associated with radicalization by encouraging violence among their followers. Many have created manifestos that provide specific step by step instructions how to carry out acts of terrorism. In addition to giving detailed instructions (how to build a bomb? Or the Best ways to kill someone with a knife) there are also specific incidents that generate a reaction to move the radicalized individual from outrage and anger to acting on their grievances. For LaRose for example, it was watching videos of Palestinian children suffering.

During the Syrian civil war, there were several events that were impactful and used to recruit Muslims from around the region and converts from around the world to join the jihad in the years 2013-2019. There are specific indicators and activities that belie when the individual is moving from radicalization of thought to show they have moved to radicalization of the deed and are ready to do more than just post as a digital warrior.

Terrorist organizations use these specific events to produce outrage and anger to incite a reaction from Muslims living in Western countries. The chemical gas attack by Bashar al Assad against civilians in Ghouta was perhaps the most significant event leveraged by Jihadi groups to motivate people to come to the region and help fight against the Assad regime.  In brief, in 2013 the Syrian dictator, Bashar al-Assad, gassed innocent civilians using chemical weapons, he deliberately bombed hospitals and schools to kill children, and made thousands of Syrians disappear who were summarily executed. Worse still, Assad tasked professional photographers to document his human rights abuses.

### Events at Ghouta

Syrian President Assad is an autocratic dictator who responds to any popular uprising against him with unrestrained violence and terror. In September 2013 Assad used chemical weapons to attack civilians in the city of Ghouta. Within hours of the attack, dozens of videos were uploaded to social media of visibly sick adults and children but who showed no signs of injury. In some of the most graphic footage, dozens of dead bodies, including the bodies of babies and small children, were laid out in rows on the floors of medical clinics and mosques, and even lined the streets. The victims' symptoms appeared consistent with exposure to a nerve agent; these symptoms included shortness of breath, disorientation, runny noses, eye irritation, nausea, vomiting, and eventually the loss of consciousness and death.

A British based human rights organization, the Syrian Observatory for Human Rights group (SOHR) estimated the attack caused 502 deaths. The UN's Violations Documentation Centre (VDC) estimated the number was closer to 588, including 135 women and 108 children. Finally, the US government determined that the attack resulted in 1,429 people killed, including 426 children.[5] The Organization for the Prohibition of Chemical Weapons ascertained that the Syrian government had used sarin gas to kill the men, women, and children. A CBS 60 Minutes investigation that aired many years later

---

[5] https://www.bbc.com/news/world-middle-east-23927399

(in 2021) confirmed the US count of more than 1,400 men, women and children killed and that it was Sarin gas.[6]

The White House (at the time) assessed "with high confidence" that the Syrian government was responsible for the massacre. President Assad denied any responsibility and was supported by Russian President Vladimir Putin -- who called the American conclusions "utter nonsense." Russian officials went so far to suggest that anti-government rebels (like HTS or ISIS) were the ones responsible and were trying to provoke an international military intervention in Syria with their attack.

The Sarin chemical attack at Ghouta was a stain on the Obama administration's middle east foreign policy and elicited a very negative reaction within American Muslim communities. President Barack Obama had proclaimed that if any country in the region used chemical or biological weapons this illegal act would cross some imaginary line in the sand. Despite the U.S. verified conclusions about Assad's guilt, there was no intervention after Ghouta. The failure to act was used by jihadi groups to recruit people horrified by the attack. This is why Ghouta plays such a looming role in discussions about the grievances that move the individual from radical thought to violent action.

Another issue that moves radicalized individuals to engage in real world action is the extent to which they perceive that there are benefits of martyrdom. For people who engage in jihadi terrorism, they perceive the mortal life to be less valuable and less beneficial than the afterlife and the promise of heaven (janna) they will experience after their martyrdom.

When trying to understand the process of being involved in terrorism, it is important to emphasize that there isn't always a slow or gradual way of becoming involved. The process is not necessarily linear or straight forward and it can be complicated. The individual doesn't have to check off one box at a time, and the existing analogies to conveyer belts, escalators, or stairs do not always match the real work experiences of people radicalized into terrorism. Some people might skip a step or might acquire the ideology of the group *after* they join and not necessarily before.

We cannot discount the role of individual agency and there are many examples of people engaged in a plot who changed their minds at the last minute. So, it is more accurate to say that there are preconditions that are observable in the vast majority of people who move from radicalization of thought to radicalization of deed. Also, there tends to be a considerable amount of information leakage; people divulge elements of the plots to friends' family and coworkers in as much as 72% of the time. This is particularly the case with people who are not formally trained, people who are "lone actor" or "mass casualty shooters," and those people who are self-radicalized and who lack the experience, acumen, and spy craft that professional terrorists learn. Therefore, amateurs make rookie mistakes and why they are so often caught.

One of the ways in which we can detect radicalization is by seeing which religious authorities are the ones cited, followed, being consulted, or disseminated by the

---

[6] https://www.cbsnews.com/news/bashar-al-assad-syria-evidence-war-crimes-60-minutes-2021-07-11/

individual. Since the vast majority of Muslim religious authorities are NOT violent, the minority of scholars who advocate for violence is fairly limited to a handful of known clerics.

In advance of preparing for this case, I was provided with a selection of Telegram chats in which the defendant, Giampietro was identified as a participant. Where relevant, I indicate that the quote is from a Giampietro Telegram chat. The Telegram chats examined as part of the evidence in this case included scholars and theologians specifically cited. These citations underscore the degree of intense indoctrination and radicalization of Ms. Giampetro.

The Islamic authorities cited in posts, direct messages or in the Telegram chats I reviewed include the ideologues who are most often associated with radicalization, and were the same ones frequented by individuals who have perpetrated violence in the United States and abroad. These are the ideologues who amplify the role of the lesser jihad and the benefits and rewards of martyrdom over the greater Jihad to be a good and pious person.

The most common of the radical preachers are:

Anwar Awlaki: "Running away from jihad will not save you from death, you can die as a coward or you can die as a martyr." (Cited in Giampietro Telegram chats)

Sayyid Qutb, and his book, *Milestones*. Qutb argues that Muslims who do not follow the same ideology become worse than the non-Muslims because they should know better. For Qutb, these Muslims become legitimate targets.

Among the leading Jihadi theologians that formulated the basis for the Jihadi ideology was Ibn Taymiyyah, a 13th century scholar who discussed how to attack the enemy during the Mongol Invasions. The Mongols at this time would have converted to Islam yet Ibn Taymiyyah found them to be fake Muslims and thus legitimate targets for attack.

The Telegram chats I reviewed included the following quotations from 13th century Jihadi theologian Ibn Taymiyyah several times:

- o "To kill me is to make me a martyr." (Cited in Giampietro Telegram chats)

- o "Jihad is an obligation taking them from humiliation and degradation to honor and dignity and away from defeat to victory." (Cited in Giampietro Telegram chats)

- o "Think not of those who are slain as dead; Nay they are living with their Lord they have provision." (Cited in Giampietro Telegram chats)

- o "The souls of the martyrs reside in the bodies of green birds that perch on chandeliers suspended from the throne and fly about in Paradise wherever they please." (Cited in Giampietro Telegram chats)

- o "All people go to death on the path of life except the Mujahid, He goes to life on the path of death." (Cited in Giampietro Telegram chats)

Ms. Giampietro also cited Abu Hurayrah, known by his full name, Abd al-Rahman ibn Sakhr al-Dausi (he lived from 603 – 681 AD). Hurayrah was a companion of the Prophet Muhammad and the most quoted narrator of Muhammed's sayings that constitute the bulk of the Hadith. This quote posted by Ms. Giampietro celebrates martyrdom: "1/3 will be killed, and they will be the best martyrs in Allah's sight" (cited in Giampietro Telegram chats)

### *The Essential Influence of Anwar al Awlaki*

Anwar al Awlaki was an American born Muslim cleric. Awlaki had been a preacher at a mosque in Falls Church, Virginia. After the 9/11 attacks, he had encouraged "interfaith dialogue," and been invited to the Pentagon. However, the FBI began to suspect Awlaki, who had been in touch with several of the September 11th hijackers. Awlaki was repeatedly interviewed by the FBI and placed under constant surveillance.

In 2002, Awlaki left the United States for the United Kingdom claiming that his near constant surveillance created a "climate of fear [and] intimidation."[7] In London it appears that Awlaki started to become radicalized which was made more intense after he left London for Yemen. Once he arrived in Yemen, United States authorities pressured the Yemeni government to detain him. Awlaki was imprisoned without trial for 18 months.

After his release from Yemeni custody, Awlaki engaged with hundreds of thousands of followers online. He wrote and lectured about Muslims' individual obligation to carry out violent jihad. He authored pamphlets and posted videos to YouTube and other social media platforms that encouraged his followers to engage in acts of violence. Awlaki had considerable personal magnetism and attracted many Muslims living in Western countries in part because he spoke English without any accent, he was tall and formidable, and filled mosques to capacity whenever he lectured. Awlaki was considered to offer a cool version of the jihad for a younger audience. He was considerably more charismatic than the actual leader of al Qaeda, Ayman al Zawahiri.

In online videos, and in an English-language magazine called Inspire, he became an unforgiving critic of US policies and, in some instances, an apologist for attacks against Americans. In 2009, a Nigerian, Umar Farouk Abdulmutallab, tried to detonate plastic explosives on a Christmas Day flight from Amsterdam to Detroit.[8]

After the failed attempt by the "underwear bomber" to detonate a device on a US bound Delta flight from Amsterdam, US authorities determined that Anwar al Awlaki posed a "clear and present danger" and an imminent threat to the country. Early in 2010, the media began to report that Awlaki had been added to "kill lists" maintained by the CIA and JSOC – the US military's Joint Special Operations Command. In the fall of 2010,

---

[7] https://www.theguardian.com/us-news/2016/nov/15/targeted-killing-secrecy-drone-memos-excerpt
[8] https://www.theguardian.com/us-news/2016/nov/15/targeted-killing-secrecy-drone-memos-excerpt

Justice Department lawyers argued to a federal judge that the Constitution permitted the government to kill suspected terrorists without judicial process. This was the first time that the US government had called for the extra judicial killing of an American citizen without justifying their actions to a court. In a subsequent ruling, the judge wrote that the Awlaki case was "unique and extraordinary." Awlaki was killed by US forces (in a drone strike) in 2011.

Despite his death over a decade ago, Awlaki's legacy continues to inspire Muslim extremists to engage in terrorism in the US and around the world. His lectures and fiery sermons are disseminated on several ISIS platforms -- despite the fact that Awlaki was an Al Qaeda affiliated leader for the group's Yemen branch, Al Qaeda in the Arabian Peninsula (AQAP), demonstrating that many of these groups vacillate between coordination and competition all the time.

In 2016 the bombing suspect arrested in New York City, Ahmad Rahami, carried a handwritten journal that praised of Awlaki. The federal criminal complaint filed in Manhattan argued that Rahami's journal referenced terrorist leaders' instructions that, "If travel is infeasible [sic], attack nonbelievers where they live."

From the perspective of most counter terrorism experts, "If you were to look at people who had committed acts of terrorism or had been arrested and you took a poll, you'd find that the majority of them had some kind of exposure to Awlaki."[9]

Terrorist Financing

Regarding Terrorist Financing, it is clear that the defendant, Ms. Giampietro, was aware of the many ways in which terrorist groups could illegally finance their activities. As part of my preparation of testimony, I was given access to her research paper for Professor Morris entitled "Money in all the wrong places: Corruption and Financing Terrorist Organizations."

In her research paper for Professor Morris, Ms. Giempietro analyses the mechanisms of using charities, outside donors and state sponsorship "willfully, knowingly, and intentionally was providing direct support for terrorist groups". The defendant observed that many unregulated charities in foreign countries "provide a major source of illicit funds to international terrorist networks." The research paper devotes an entire section to illegal groups and militant networks using charities as a front for terrorist financing.

To quote **directly** from Ms. Giampietro's research paper:

"Terrorist organizations for the longest [time] have exploited charities. Winer (2008) states that these charities provide "social services such as education, health care, religious instruction as mechanisms to generate support for their causes and to propagate

[9] https://www.nbcnews.com/news/us-news/anwar-al-awlaki-radical-cleric-inspiring-terror-beyond-grave-n651296

extremist ideologies" (p. 115). Terrorist groups use charities to attract a significant number of donors to "increase public support, to discourage government action against them, and to operate in areas of conflict where terrorists otherwise would have no cover" (Winer, 2008, p. 115). For example, Hamas is a major fund-raising organization. They market to Muslims around the world for the cause of the Palestinians. "Over decades, Hamas has established networks of highly visible mosques, schools, and relief organizations that are widely seen by many Palestinians as providing services more effectively than the Palestinian Authority" (Winer, 2008, p. 115). The Unites [sic] States needs to complete work that has been focused on these corrupt charities for the purpose of financing these terrorist networks...Terrorist groups corrupt charity organizations by using these donations for their personal gain and to finance their attacks. Looking at state sponsors, Shapiro & Siegal (2007) gives an example of the Sudanese government. Al Qaeda's businesses located in Sudan during 1993 generated enough money "to support thousands of followers, run military training camps, and provide large kickbacks to the Sudanese government" (p. 405)."

The *Wall Street Journal* profiled terrorist groups that were soliciting digital currency and identified the "jihadist groups like al Sadaqah, which came under scrutiny from U.S. officials. In January, Rep. Ted Budd (R., N.C.) introduced a bill to establish a financial-technology task force to combat terrorists' use of cryptocurrency. Trump's Treasury Secretary Steven Mnuchin told the Senate Banking Committee that the agency is also planning to investigate."[10]

The *Wall Street Journal* article explains that al Sadaqah (Sedakah) was identified as a front to raise money for jihadi groups in Syria and noted that the organization did little to hide its relationship with militants. The article explains, "al Sadaqah posted a video on Telegram showing a new roof and shorn-up walls and ramparts. The place where the brothers eat and sleep is in much better condition than before," a balaclava-clad man says on a video tour of the facility. In another report, researchers noted that the al-Sadaqah Organisation, "which describes itself as a charity, conducted a crowdfunding campaign across al-Qaeda-linked social media channels and Telegram" was a suspicious campaign."[11]

Given that the defendant had previously researched the many ways that fake charities funded terrorist operations, it is unlikely that she would have not known that Al Sadakah had a long history of being specifically identified as one of those charitable fronts for a terrorist group.

### *Explaining social media and the semi encrypted platforms*

Most people associate online radicalization with platforms such as Facebook, Twitter, and YouTube. While Jihadi groups initially used those platforms, these tech companies came under pressure to eliminate terrorist content from their platforms.

---

[10] https://www.wsj.com/articles/jihadists-see-a-funding-boon-in-bitcoin-1519131601
[11] https://www.itstime.it/w/suspicious-crowdfunding-campaigns-in-bitcoin-and-their-exploitation-of-exchange-services-by-daniele-maria-barone/

Beginning in 2015, the major social media platforms (especially the ones based in the United States) like Twitter, YouTube, and Facebook were pressured to monitor and delete the accounts of a variety foreign terrorist groups operating on their platforms. Facebook even created dedicated divisions whose primary task was to seek out terrorist content and remove it from their platform using artificial intelligence, algorithms, and teams of researchers that would search for specific terms or hashtags. These efforts targeted the range of Jihadi Islamic fundamentalist groups that were operating in Syria like HTS. The continued relevance of semi-encrypted platforms remains crucial because as ISIS lost territorial control over parts of Iraq and Syria, those areas came under Kurdish, Iraqi, or Syria Defense Forces' (SDF) rule, and in parts of Syria like Idlib (or Idleb) there was an upsurge in HTS activity.

Beginning in 2016, Twitter began actively suspending the accounts of individuals who violated their terms of service (TOS) for promoting violence. While targeted against international Jihadi terrorist groups, the new rules were applied broadly to accounts in the US of various extremist organizations (for example, Milo Yiannopolis, Roger Stone, the American Nazi Party, Paul Nehlen, Gavin McInnes, Laura Loomer, Richard Spencer, David Duke).

As a result of getting kicked off these platforms (the term used is "de-platformed") many Jihadi groups turned instead to encrypted platforms like Telegram that were not subject to US law and on which they found safe harbor. Telegram was the last hold out in terms of prioritizing secrecy and privacy. Telegram remained the Jihadi platform for disseminating propaganda and recruiting new members until May 2020 when the platform finally banned accounts that disseminated Jihadi propaganda.

Telegram is a cross-platform messaging service, which allows users to view materials such as news reports, videos, photos, and other documents without having to exit the platform and regardless of the size of message content. It also allows users to send chats, self-destructing messages (which disappear once they are read). It is an ideal platform for secret communications because there is no copy saved to the cloud of messages that are self-destructed. The Telegram platform includes channels that are unidirectional, where a central administrator (termed admins) disseminate material with which members cannot interact. Telegram also has a multi-directional chat function, allowing individual members to interact with one another, comment on content, and share new materials they post. Jihadi supporters regularly post material from semiofficial channels and chat rooms and circulate "Breaking News" announcements from official sources like HTS and the official ISIS channels (named *Nashir*, *Amaq*, and *Dabiq*,)[12] that functioned as a kind of news agencies. Some of the chat rooms provide membership lists, allowing users to view other members, identify who is online at a given moment and identify the group's admins who have the power to add or remove individuals from the group.

---

[12] https://www.bbc.com/news/world-middle-east-50545816 *Nashir, Amaq and Dabiq* publish short news reports, using text and video, on the mobile app Telegram. These reports take on the trappings of Jihadi journalism, with "Breaking News" headings and reports from the battlefield.

Secret chats are protected by end-to-end encryption. How this works is that every user is given a unique digital key when they send out a message. To access that, the receiver has to have a key that matches the sender's exactly, so that messages from any one user can only be read by the intended recipient. This makes it almost impossible for middlemen such as police or intelligence agencies to access the flow of information between the sender and receiver (Rebecca Tan, *Vox*, 2017).

The founder of Telegram, Pavel Durov was pressured to allow US government access to the platform by providing a "back door" for intelligence agencies to access the encrypted messages on their platform. However, Durov refused to share confidential data with the Russian or any other government. This is because privacy isn't just one of Telegram's features -- it was Telegram's brand.

Durov only consented after years of pressure to de-platform the ISIS content on Telegram. Accounts that followed jihadi content were suspended and ISIS and other groups like HTS decreased their social media footprint with every iteration of de-platforming until the beginning of the covid-19 pandemic.

Respectfully submitted by Dr. Mia Bloom