IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 2:19-cr-00013 |
| v. | ) | Chief Judge Crenshaw |
| | ) | |
| GEORGIANNA A.M. GIAMPIETRO | ) | |

## UNITED STATES' MOTION IN LIMINE NO. 2

The United States of America, by and through its attorneys, the Acting United States Attorney for the Middle District of Tennessee and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, hereby files this Motion in Limine No. 2, in which the Government seeks an order to preclude defense counsel from arguing to the jury (including during opening statement), or suggesting through the questioning of witnesses, that the defendant's unlawful conduct is protected by the First Amendment to the United States Constitution, or that the defendant's statements, whether spoken, online, or recorded in any way, may not be considered as evidence of her attempted material support activities because they are protected by the First Amendment.[1] In support thereof, the Government submits the following:

## BACKGROUND[2]

The defendant is an American citizen born in Cookeville, Tennessee. Prior to her arrest, she resided in Sparta, Tennessee. In late 2015, the FBI became aware that the defendant was posting materials supporting ISIS, a radical Islamic terrorist organization long designated by the United States as a Foreign Terrorist Organization ("FTO"), on social media. Because of these

---

[1] During efforts to negotiate agreement concerning jury instructions in this case, the defense sent the Government a proposed instruction addressing "First Amendment Protected Speech," which the Government anticipates will be submitted to the Court as part of the defendant's separately submitted proposed jury instructions.

[2] This is a brief summary of the facts relevant to the Government's Motion in Limine No. 2, and does not include all facts known to the Government or which the Government intends to introduce as evidence at trial.

1

posts, the FBI began investigating whether the defendant may be committing criminal acts related to terrorism, in violation of Chapter 113B of Title 18, United States Code. At the outset of the investigation, an FBI online covert employee ("OCE-1") engaged the defendant online, using a social media platform that permits users to send encrypted messages, photographs, and other files, and communicated with the defendant about various aspects of Islamic teachings and current events. Then, in November 2017, OCE-1 introduced the defendant to an FBI undercover employee ("UCE-1"), posing as a like-minded "sister" who shared the defendant's extremist and radical views related to Islam. Between November 2017 and October 2018, UCE-1 and the defendant engaged in countless electronic communications, via text message and messaging applications, and met in person on at least a few occasions. During their relationship, the defendant often espoused extremist views in support of the Islamic State, expressed her desire to travel to Syria to join her fiancé, a jihadi fighter; explained that every Muslim man's duty is to wage "jihad"[3]; and asserted that women should support their male fighters by fighting alongside them, carrying bodies from the battlefield, and providing food and water to the mujahideen.[4] The defendant also explained that she hoped to die alongside her husband in Syria, in an airstrike, on a Friday during Ramadan while they were praying.

In late September 2018, UCE-1 informed the defendant that her husband, another FBI undercover employee ("UCE-2") had sworn allegiance to Hayat Tahrir al-Sham ("HTS") on their behalf, and that they were preparing, imminently, to travel to Syria to join HTS. The defendant expressed reservations regarding UCE-1 and UCE-2's plans to travel to Syria, suggesting potentially traveling to Afghanistan instead because they were actively fighting in Afghanistan at that time. The defendant also expressed concern that if UCE-1 and UCE-2 were caught, authorities

---

[3] "Jihad" refers to the struggle or fight against the enemies of Islam.
[4] "Mujahideen" is a term which refers to persons who have taken up violent jihad.

might trace them back to her, explaining further, ". . . I need you to unfollow the Telegram[5] channel . . . I need you to delete my name and phone number from your phone and all pictures and text messages." Notwithstanding these reservations, the defendant advised UCE-1 as to how UCE-1 and UCE-2 could travel to Syria without being detected, telling UCE-1 that they should purchase roundtrip airline tickets, rather than one-way tickets; that they should consider traveling to Turkey (prior to entering Syria) by traveling first to Italy, and then from Italy to Turkey; that they should not take their phones with them, and that they should acquire new phones and new phone numbers before they traveled. The defendant also referenced her own plan for traveling to Syria, which included cutting ties with other persons before leaving, explaining that, "[w]hen I was planning my plan was to delete everyone 6 to 8 months before leaving and have no contact with anyone." The defendant also advised that she planned to take her minor son with her to Syria, without the permission of the boy's father. Additionally, after expressing concern about the contacts UCE-1 and UCE-2 were using to travel to Syria and advising that she (the defendant) knew others whom she trusted more, the defendant provided UCE-1 with contact information for @alsadaqahsyria, and told UCE-1 to message @alsadaqahsyria. The clear implication from their communications was that the defendant provided the contact for @alsadaqahsyria to UCE-1 and UCE-2 for assistance in traveling to Syria to join HTS.

UCE-2 subsequently made contact with @alsadaqahsyria online, telling @alsadaqahsyria that UCE-2 had been given @alsadaqahsyria's contact information by "Umm Roses," a social media moniker used by the defendant, and that UCE-2 understood @alsadaqahsyria to be someone who could help brothers and sisters making "Hijrah," meaning emigration to Syria.[6] UCE-2 asked

---

[5] Telegram is an encrypted social media platform.
[6] "Hijrah" is an Islamic term meaning "migration." The term historically refers to the journey undertaken by the Islamic prophet Mohammed from Mecca to Medina. In the extremist context, the term "Hijrah" has been used to describe a foreign fighter's journey from his country of origin to terrorist-held countries abroad.

3

@alsadaqahsyria if @alsadaqahsyria had helped people make Hijrah before, and if it was still possible to do so, to which @alsadaqahsyria replied, "Yes akhi [brother]. You can but safest to wait" to travel to Syria because "there isn't any fighting at the moment," and UCE-2 would primarily be doing "guard duty" "5 or 7 days a month." UCE-2 asked @alsadaqahsyria whether @alsadaqahsyria could get UCE-1 and UCE-2 "across" to Syria, if UCE-1 and UCE-2 made it to Turkey. In response, @alsadaqahsyria replied that he could, but explained that he had talked to "another brother," who said that it was difficult to cross into Syria at present, and that UCE-1 and UCE-2 should wait and cross later.

The contact provided by the defendant, @alsadaqahsyria, also gave UCE-2 information about how to travel to Turkey undetected. Recognizing that this travel would appear to be suspicious, @alsadaqahsyria explained that UCE-2 should have a good cover story and should take steps to make it look like UCE-1 and UCE-2's travel was legitimate. The advice given by @alsadaqahsyria included, "Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like your [sic] an aid worker. Then you have a good defence." When UCE-2 asked @alsadaqahsyria why he needed a "good defense," and whether @alsadaqahsyria was referring to being questioned by Turkish authorities, @alsadaqahsyria replied, "Yea. Also if you get stopped you have evidence to support your story."

UCE-1 sent a message to the defendant, thanking her for providing UCE-1 with @alsadaqahsyria's contact information, and advised that @alsadaqahsyria could help UCE-1 get to Syria. The defendant then claimed that she had not provided @alsadaqahsyria's contact information for travel purposes, stating, "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." The defendant also informed UCE-1 that she no longer wished to discuss the matter,

4

stating, "You're going to get me arrested." The defendant then deleted the Telegram account from which she had been communicating with UCE-1 after the conversation.

## SECOND SUPERSEDING INDICTMENT

Counts One and Two charge the defendant with Attempted Material Support of a Foreign Terrorist Organization ("FTO"), specifically Hayat Tahrir al-Sham ("HTS"), in violation of 18 U.S.C. § 2339B, attempting to provide material support and resources to that terrorist organization.[7] (D.E. 255.) In order to find the defendant guilty of those offenses, the Government must prove the following elements beyond a reasonable doubt:

First, that the defendant knowingly provided material support or resources to a foreign terrorist organization.

Second, that the defendant knew that the organization was a designated terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism.

Third, that one of the jurisdictional requirements, is satisfied. One of the jurisdictional requirements is that the defendant is a national of the United States.

The defense may argue that the defendant's communications and postings related to events in Syria and elsewhere were mere advocacy, expression, and association protected by the First Amendment, and do not constitute the offense of material support. The Government has not alleged that the defendant's communications and postings constitute material support. The defendant is not charged with violating 18 U.S.C. § 2339B on the basis of her postings or conversations. The defendant is charged with attempting to provide material support for her conduct in the following ways:

---

[7] The defendant is also charged in Count Three with the Destruction and/or Alteration of Records in a Federal Investigation, in violation of Title 18, United States Code, Section 1519; and in Count Four with Altering, Destructing, Mutilating, or Concealing a Record or Document, or Attempting to do so, in violation of Title 18, United States Code, Section 1512(c)(1).

5

The Government will offer evidence that the defendant was in contact with "@MuhamedAA" between May 2018 and June 2018 and inquired how to send money and how much money to send. Evidence will be offered that shows "@MuhamedAA" is the administrator for "@remindersfromSyria," an entity that solicits money for the Mujahedeen.

The Government will also present evidence that the defendant sent $150 to "Muhammed Muhammed" on or about June 14, 2018, associated with international telephone number 905373777140. Evidence will link this phone number to "@Alsadaqahsyria," an online handle operating a Syria-based organization that solicits funds online to aid the Mujahedeen in Syria.

The Government will also present evidence that in March 2018, the defendant engaged in conversations with an FBI Undercover Employee ("UCE") who was posing as a like-minded sister, meaning a female individual who was supportive of radical ideologies in the Islamic faith. When the UCE asked the defendant for a contact to whom the UCE could send money to support the Mujahedeen, the defendant provided UCE with contact information for Merciful Hands, advising UCE that the individual behind Merciful Hands is a "trusted brother." Subsequently, in two separate financial transactions: on June 20, 2018, and June 25, 2018, the defendant sent $200 and $500, respectively, to Merciful Hands. According to information posted to the Merciful Hands social media platform, Merciful Hands was seeking donations to support foreign fighters during the time that the defendant provided its information to UCE and during the time that the defendant contributed money.

Finally, the Government will offer evidence that in the fall of 2018, the defendant attempted to provide material support and resources to an FTO when she advised UCE-1 and her husband on how to travel to Syria undetected and assisted them in safely traveling to Syria to join

6

HTS by providing them with the contact information for a trusted brother, "@alsadaqahsyria" who could assist UCE-1 and her husband with their travel.[8]

## ARGUMENT

A district court has a duty to exclude evidence or argument concerning a legally insufficient defense. *See, e.g., United States v. Bailey,* 444 U.S. 394, 414 (1980) ("It is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses."). The defendant in this case cannot invoke the First Amendment as a defense to the attempted material support charge against her, and any argument to that effect should be precluded.

The First Amendment protects pure speech but does not protect criminal acts. The First Amendment does not provide a cloak for active terrorist support, whatever the purported religious or political excuse for that conduct. In upholding Title 18, United States Code, Section 2339B against a First Amendment challenge, the Supreme Court determined that this statute does not impinge upon an individual's First Amendment right to freedom of association. *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). The *Holder* Court concluded that Section 2339B "does not criminalize mere membership in a designated foreign terrorist organization, but rather, it prohibits providing material support to such a group." *Id.* at 18. The Court reasoned that "a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause." *Id.* at 24. The Court went on to note that "some designated foreign terrorist organizations use social and political

---

[8] Material related to each of the above-described events was previously provided in discovery. Further, contrary to any defense speculation, the Government has never characterized the defendant's conduct as "expert advice and assistance."

7

components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." *Id.* at 30.

Thus, First Amendment challenges to Title 18, United States Code, Section 2339B have proved unsuccessful in numerous courts. *See United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most zealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching."); *see also Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) ("[T]he law is well established that there is no constitutional right to fund terrorism."); *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244-45 (D.C. Cir. 2003); *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1026 (7th Cir. 2002) ("Under Section 2339B . . . [defendant] may, with impunity, become [a member] of Hamas [an FTO], praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas. Section 2339B prohibits only the provision of material support (as that term is defined) to a terrorist organization. There is no constitutional right to provide weapons and explosives to terrorists. . . ."); *see generally United States v. Taleb-Jedi*, 566 F. Supp.2d 157, 174-177 (E.D.N.Y. 2008). As a district court observed in rejecting a First Amendment challenge in the context of a terrorism prosecution:

> There is . . . a clear line between First Amendment protected activity and criminal conduct for which there is no constitutional protection. . . . The First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form, including services as a combatant. Those who choose to furnish such material support to terrorists cannot hide or shield their conduct behind the First Amendment.

*United States v. Lindh*, 212 F. Supp.2d 541, 579 (E.D. Va. 2002); *accord United States v. Nagi*, 254 F.Supp.2d 548, 558-559 (W.D.N.Y 2017). Moreover, a defendant who encourages others to

8

join a foreign terrorist organization by traveling to join the fight or commit acts on behalf of the FTO elsewhere, using an internet-based application to spread information about the organization and its leaders, can be prosecuted for attempting to provide material support to an FTO. *See United States v. Rahim*, No. 19-11341, 2021 WL 2065902 (N.D. Tex. May 21, 2021) (per curiam).

The defendant should not be allowed to wrap herself in the cloak of the First Amendment and invite the jury to acquit her to vindicate perceived rights to free speech or religion, notwithstanding evidence of her guilt of material support conduct. *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1363 (11th Cir. 1994) ("If the court determines that the defendant's proffered evidence is irrelevant or otherwise inadmissible, it should issue a ruling *in limine* precluding the introduction of that information at trial.").

Nor should the defendant be permitted to confuse the jury by arguing that the First Amendment somehow prevents the jury from considering her statements or beliefs as evidence of her guilt on the charge of Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B. *See, e.g., United States v. Sattar*, 314 F, Supp. 2d 279, 301 (S.D.N.Y. 2005), *aff'd*, 590 F.3d 593 (2d Cir. 2009). In this case, the Government submits that the defendant's online statements to UCE-1, as well as to others through her Telegram channel and in other one-on-one conversations, may be considered in establishing her *mens rea* in connection with the charged offenses. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). The defendant's statements in this case will be used as evidence that she knew that HTS was a designated Foreign Terrorist Organization that was involved in terrorist activity; that she intended to travel to Syria to join her fiancé, a jihadi fighter, to assist him and other fighters who espouse extremist viewpoints; that she intended to help UCE-1 and UCE-2 travel to Syria to join HTS; and that she sent funds to support

9

Case 2:19-cr-00013   Document 319   Filed 11/24/21   Page 9 of 12 PageID #: 3441

the jihadi fighters and encouraged UCE-1 to do so as well. Such use of speech evidence is legally permissible and directly relevant to establishing *mens rea* for the charges of Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B. As one district court recently observed, "it is the combination of speech evincing intent and subsequent action on [the] defendant's part … that form the basis of the charge against [her]." *United States v. Augustine*, 18 CR 393 (SJ)(RML), 2020 WL 8188844 (E.D.N.Y. Sept. 8, 2020).

Based on the discussions between the parties related to jury instructions and what could or could not be agreed upon, the Government expects the defendant to request a jury instruction addressing "First Amendment Protected Speech." As stated above, no such instruction is warranted in this case and the Court should decline to provide such an instruction to the jury in this case. Accordingly, this Court should preclude defense counsel from arguing to the jury (including during opening statement), or suggesting through the questioning of witnesses, that the defendant's unlawful conduct is protected by the First Amendment to the United States Constitution, or that the defendant's statements, whether spoken, online, or recorded in any way, may not be considered as evidence of her attempted material support activities because they are protected by the First Amendment

## **CONCLUSION**

Based on the foregoing, this Court should grant the Government's Motion in Limine No. 2 and preclude the defendant from arguing that her statements may not be considered as evidence of her attempted material support activities because they are protected by the First Amendment.

Respectfully Submitted,

MARK H. WILDASIN
Acting United States Attorney
Middle District of Tennessee

By: /s/ *Kathryn Risinger*
KATHRYN RISINGER
PHIL WEHBY
Assistant United States Attorneys
110 9th Avenue South
Nashville, Tennessee 37203
Phone: (615) 736-5151

/s/ *Jennifer E. Levy*
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Ste. 7600
Washington, D.C. 20530
(202) 514-1092

## CERTIFICATE OF SERVICE

      I hereby certify that on November 24, 2021, I electronically filed one copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to counsel for the defendant in this case.

/s/ *Kathryn D. Risinger*
KATHRYN D. RISINGER
Deputy Criminal Chief
