IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>GEORGIANNA A.M. GIAMPIETRO )<br>    Defendant. ) | Case No.: 2:19-cr-00013<br><br>Chief Judge Waverly D. Crenshaw, Jr. |

## DEFENDANT'S *DAUBERT* MOTION TO
## EXCLUDE EXPERT TESTIMONY OF MIA BLOOM

The government seeks to call Mia Bloom to testify as a "women in terrorism" expert. With Dr. Bloom's testimony, the government intends primarily to show that Defendant Georgianna Giampietro fits the profile of a female terrorist that Dr. Bloom has created.

Ms. Giampietro, through counsel, moves to exclude portions of Dr. Bloom's proposed testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*. First, the government has not met its burden of showing that Dr. Bloom's profile is reliable or will assist the jury. Even if her profile satisfied Rule 702, it should still be excluded because its probative value is substantially outweighed by the risk of undue prejudice. Next, Ms. Giampietro moves to exclude Dr. Bloom's proposed testimony that Ms. Giampietro had knowledge of how fake charities finance terrorists because it is improper lay opinion. Lastly, Ms. Giampietro moves to exclude Dr. Bloom's proposed testimony regarding the Islamic concept of *takiya* because it is unreliable, irrelevant, and prejudicial.

## RELEVANT BACKGROUND

### A. Charges Against Ms. Giampietro

Pursuant to the Second Superseding Indictment, the grand jury charged Ms. Giampietro with four counts: (1) attempting to provide material support in the form of personnel and services to Hay'at Tahir al-Sham (HTS) in violation of 18 U.S.C. § 2339A(b)(1); (2) attempting to provide material support in the form of currency to HTS in violation of 18 U.S.C. § 2339B(a)(1); (3) destroying social media accounts and text messages with the intent to obstruct a federal investigation in violation of 18 U.S.C. § 1519; and (4) destroying or altering a record with the intent to impair the record's availability for use in a grand jury investigation in violation of 18 U.S.C. § 1512(c)(1).

### B. Report of Mia Bloom

On May 15, 2021, the government filed its notice of intent to call Mia Bloom as an expert to testify about "women in terrorism, including the activities undertaken by female jihadists and female jihadi supporters." *See* Gov't Notice Re: Expert Witnesses, ECF No. 101. It submitted Dr. Bloom's report on August 18, 2021. Bloom Expert Witness Report, ECF No. 245.1. In her report, Dr. Bloom provides a lengthy description of her experience and knowledge about, among other things, "the role of women in terrorist movements." Bloom at 2. She describes her experience interviewing several female members of terrorist organizations and performing digital ethnography work to monitor what "Jihadis and other extremists discussed online." *Id*. at 2-3. And she describes her work briefing private companies and U.S. government agencies about "online patterns of behavior and the terrorist strategies." *Id*. at 3. Next, Dr. Bloom lists the six main topics of her proposed testimony:

1. Explain the different types of jihad[.]
2. Explain the concept of *takiya* in Islam.

3. Explain how an individual moves from what might be called the radicalization of thought to the radicalization of deed and provide examples of the difference.

4. Present the different types of roles of women had in [various terrorist organizations]; as well as identify the differing recruitment methods to lure women and girls.

5. Address the many uses of social media to radicalize and recruit women for illegal and terrorist acts; and

6. [H]ighlight some of the main clerics who have been most associated with radicalization to violent terrorism . . .

*Id*. at 4. In this motion, Ms. Giampietro objects to Dr. Bloom's testimony as to topics 2 through 6.

***Topic 2: Takiya.*** As to topic 2, Dr. Bloom explains the concept of *takiya* (or *Taqiya*), which, in her words, "might confuse Muslim converts." *Id*. Dr. Bloom states that the *takiya* is the "practice of concealing one's belief and foregoing the regular religious duties if or when an individual perceives danger." *Id*. at 5. Dr. Bloom proposes to testify that this concept permits Muslims engaged in a struggle against the West to use "deception and secrecy involving misleading non-believers, even outright lying." *Id*. Apart from defining the concept, which neither party has raised, Dr. Bloom does not relate her explanation of *takiya* to any of the facts concerning Ms. Giampietro.

***Topics 3-6: The Profile of a Female Terrorist.*** Topics 3 through 6 all generally relate to women engaged in terrorism and online recruiting. According to Dr. Bloom, women constitute "around 30% of most terrorist organizations and comprise around 1/3 of the suicide bombers." Bloom at 7. Beginning on page 7 of the report, Dr. Bloom describes what she considers the common characteristics of women recruited into terrorist organizations, including:

- "Muslim converts tend to join jihadist groups at a disproportionate rate — around three to four times higher than the rate of people born and raised as Muslims." (*Id*. at 8)

- "Al Qaeda recruiters were very interested in female converts willing to carry out a terrorist and especially martyrdom operation. Jihadi leaders favor Western women." (*Id*. at 9)

3

- "There tends to be two different categories of women that these terrorist groups seek: very young Muslim girls who reside in the West and women, . . . the defendant, who are Western converts." (*Id*. at 10)

- "Terrorist groups seek out converts because they find them easy to radicalize and because many converts are ignorant of the rules and regulations governing the Muslim faith. Converts can be easily duped and convinced to engage in violence even if it violates the core teachings of the religion." (*Id*. at 8)

- "They usually do not speak Arabic (at the beginning) and cannot challenge any interpretation of the Qur'an or the Hadith that someone spoon-feeds them." "[S]ome converts do not even speak to an actual Muslim in real life until they are recruited for terrorist activities." (*Id*. at 10)

- "Many of the female converts who became involved in terrorism have a comparable background and profile, having converted to Islam after a difficult life." (*Id*.)

- "Women who become radicalized online tend to spend as much as eight or nine hours a day on their computers." (*Id*. at 9)

Dr. Bloom also outlines interviews she conducted with women who were lured into the world of terrorism online. *Id*. at 2, 7. Dr. Bloom presents the case studies of three women, Colleen LaRose from Pennsylvania, Muriel Degauque from Belgium, and a third named Jaimie Ramirez—all three participated in and/or were convicted of supporting Islamic terrorism. *Id*. at 7-11. Dr. Bloom goes into especially great detail about LaRose's background, characteristics, and radicalization:

- "LaRose was in many ways a stereotypical female convert to Islam -- turned radical jihadi." (Bloom at 8)

- "Colleen (Fatima) LaRose gave herself the name "Jihad Jane" and was arrested for plotting to kill a cartoonist named Lars Vilks in March 2010." (*Id*. at 7)

- "After a decade of abuse, as well as a history of narcotics and alcohol usage, LaRose converted to Islam." (*Id*. at 8)

- "[C]ar[ing] for her elderly mother, LaRose became fascinated by the Arab world. She found herself spending hours online and researching about the region and conversion to Islam." (*Id*.)

4

- "LaRose was self-taught about the Islamic faith, spending hours online, and visiting Muslim websites." She "converted to Islam via instant messenger on Facebook." (*Id.*) "LaRose researched the religion on her own, and never visited a mosque." (*Id.* at 9)

- "[S]he started raising money and awareness online for the plight of Muslims in the Middle East and especially the plight of the Palestinians." (*Id.*)

- "The exposure to graphic and violent images and the prodding by her online community of brothers emphasized that she needed to 'do something.'" "In social media, she said she would be willing to die a martyr for the cause." "Not long after seeing these images, she was on a plane to Ireland to coordinate with her Handler." (*Id.*)

What stands out in Dr. Bloom's recounting of the LaRose case are the seeming similarities between LaRose and Ms. Giampietro. Both LaRose and Ms. Giampietro are Caucasian women. Both are Western converts. Both cared for elderly family members. Both left abusive marriages. And both had a history of drug abuse.

Dr. Bloom also describes "specific indicators and activities" of persons that she believes might move from radical views to joining a terrorist organization:

- "Another issue that moves radicalized individuals to engage in real world action is the extent to which they perceive that there are benefits of martyrdom. For people who engage in jihadi terrorism, they perceive the mortal life to be less valuable and less beneficial than the afterlife and the promise of heaven (janna) they will experience after their martyrdom." (*Id.* at 13)

- "The individual doesn't have to check off one box at a time." "Some people might skip a step or might acquire the ideology of the group after they join and not necessarily before." (*Id.*)

- "we can detect radicalization is by seeing which religious authorities are the ones cited, followed, being consulted, or disseminated by the individual" (*Id.* at 13-14)

- "From the perspective of most counter terrorism experts, 'If you were to look at people who had committed acts of terrorism or had been arrested and you took a poll, you'd find that the majority of them had some kind of exposure to Awlaki.'" (*Id.* at 16 n.9) (internal citation omitted)

- "The most common of the radical preachers are: . . . [Anwar Awlaki, Sayyid Qutb, and Ibn Taymiyyah]." (*Id.* at 14). Ms. Giampietro cites to among others: Anwar Awlaki and Ibn Taymiyyah (*Id.* at 14-15)

5

Based on her interviews and academic research, Dr. Bloom has created a profile of the typical woman who becomes radicalized online and supports terrorism—a female terrorist profile. But she fails to demonstrate that her female terrorist profile is based on reliable methods. Further, neither the government nor Dr. Bloom discusses whether and how often law enforcement actually utilizes her profile in terrorism investigations. While this may be an interesting tool for academics, social media companies, and even various government agencies, Dr. Bloom's profile should not be presented as expert evidence to a jury tasked with determining whether the *defendant*—not a profile—committed the charged crimes.

*Topic 6: Terrorist Financing.* In a portion of topic 6, Dr. Bloom references and quotes from a school research paper Ms. Giampietro allegedly prepared about terrorist financing. Bloom at 16. Dr. Bloom opines, "It is clear that the defendant, Ms. Giampietro, was aware of the many ways in which terrorist groups could illegally finance their activities." *Id*. She further concludes, "Given that the defendant had previously researched the many ways that fake charities funded terrorist operations, it is unlikely that she would have not known that Al Sadakah had a long history of being specifically identified as one of those charitable fronts for a terrorist group." *Id*. at 17. This proposed testimony is lay opinion.

**ARGUMENT**

I.  **Profile Evidence is Inadmissible with Limited Exceptions that Do Not Apply to this Case.**

Dr. Bloom's proposed testimony fails to satisfy the requirements set forth in *Daubert* because the government fails to demonstrate that it is reliable or will assist the jury as required by Rule 702. The Court, however, need not reach the Rule 702 analysis because criminal profiling evidence is itself inadmissible as substantive evidence of guilt with few exceptions that do not apply in this case.

6

"[A] profile is simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." *United States v. Robinson*, 978 F.2d 1554, 1563 (10th Cir. 1992); *see also Florida v. Royer*, 460 U.S. 491, 493 (1983) (defining "drug courier profile" as "an abstract of characteristics found to be typical of persons transporting illegal drugs"). As this Circuit recognized in *United States v. Baldwin*, courts have long condemned the use of profiling evidence as substantive evidence of guilt. 418 F.3d 575, 581 (6th Cir. 2005) (citing *United States v. Long*, 328 F.3d 655, 666 (D.C. Cir. 2003)); *see also United States v. Wells*, 879 F.3d 900, 921 (9th Cir. 2018) ("[T]estimony of criminal profiles is highly undesirable as substantive evidence because it is of low probativity and inherently prejudicial."); *United States v. Hernandez-Cuartas*, 717 F.2d 552, 555 (11th Cir. 1983) (explaining that although drug courier profiles are "valuable in helping drug agents to identify potential drug couriers, we denounce the use of this type of evidence as substantive evidence of a defendant's innocence or guilt"); *State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993) ("Th[e] 'special aura' of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert.").

Courts generally find profiling evidence admissible only "to demonstrate why the defendant was stopped for investigation, to rebut inferences raised by the defendant's testimony, or to show *modus operandi*." *Baldwin*, 418 F.3d at 581; *United States v. Lui*, 941 F.2d 844 (9th Cir. 1991) (noting that profile evidence may be admitted for limited purposes, such as to show how an arrest occurred). Courts scrutinize, however, whether the government's asserted purpose is the true purpose and whether the true purpose is proper. *See United States v. Quigley*, 890 F.2d 1019, 1023-24 (8th Cir. 1989) ("This point by point examination of profile characteristics with

specific reference to defendant constitutes use of the profile not as background to explain or justify an investigative stop, but as substantive evidence that defendant fits the profile and, therefore, must have intended to distribute the cocaine in his possession."). In *Baldwin*, the government charged the defendant with wire fraud and conspiracy for faking his own kidnapping. 418 F.3d at 577. At trial, the judge permitted the government to introduce an FBI agent's testimony regarding the defendant's "personality profile," which the government argued was "to show why the agent focused on the defendant as a suspect rather than victim and to explain why the agent interviewed the defendant in the manner he did." *Id*. at 581 (cleaned up). The Sixth Circuit rejected the government's offered purpose, finding that neither the interview technique nor the agent's view of the defendant as a suspect or victim was at issue, and it further concluded that the profile had nothing to do with the *modus operandi* of the crime. *Id*. Instead, the Court explained, the profile served as impermissible character evidence and the trial court erred in admitting it. *Id*. (holding that the trial court's error was harmless because the defendant confessed to committing the crime).

Similarly, in *United States v. Wells*, the Ninth Circuit held that the district court erred in permitting the government's expert to use criminal profile testimony as substantive evidence of the defendant's guilt. 879 F.3d at 914. At trial, the government had offered the expert to testify regarding the common characteristics and "typical pattern" of individuals who commit workplace homicide. *Id*. The expert did not testify about the defendant's characteristics personally, as the government used other lay testimony to show that the defendant "fit" the expert's profile. *Id*. The court of appeals concluded that the expert's profile was inadmissible because "[t]he probative value of [the expert's] testimony is found only in its ability to answer the impermissible question of whether, based on his character profile, [the defendant] acted in accordance therewith on the [day of the alleged crime]." *Id*. at 923 (citing as an example *Haakanson v. State*, 760 P.2d 1030,

8

1036 (Alaska Ct. App. 1988) ("We hold that the prosecution may not introduce a profile to show that the defendant is more likely to have committed an offense because the defendant fits within that profile. To admit this testimony at the beginning of trial was clearly erroneous.")).

It is apparent from Dr. Bloom's report that the government does not seek to offer the female terrorist profile for a proper purpose. Her profile is not being used to explain why the government was investigating Ms. Giampietro nor is it offered to show *modus operandi* in this case.[1] Instead, the government improperly seeks to demonstrate that Ms. Giampietro's characteristics and actions are in conformance with Dr. Bloom's female terrorist profile. Ms. Giampietro requests that this Court exclude the profile evidence under Sixth Circuit law.

## II. Dr. Bloom's Female Terrorist Profile Fails to Satisfy Rule 702.

Dr. Bloom's proposed testimony set forth in topics 3 through 6 of her report fails to satisfy Rule 702. Under *Daubert v. Merrell Dow Pharmaceuticals*, a district court judge's gatekeeping obligation ensures that only reliable and relevant expert testimony is presented to jurors. 509 U.S. 579, 597 (1993). As this Circuit has explained, *Daubert* directs courts to perform a two-step inquiry: first, "determine whether the expert's testimony reflects 'scientific knowledge," including whether the expert's methods are reliable; and second, determine whether the "proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact." *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000). Dr. Bloom's proposed testimony fails both prongs.

---

[1] The government likely could not use Dr. Bloom's profile to explain its investigation unless it could also show that actually used her profile when investigating Ms. Giampietro *in this case*—not after the fact for trial purposes. Moreover, unless the government demonstrates that Dr. Bloom's female terrorist profile is widely accepted by law enforcement, it is unclear how the government could properly offer the profile for any other purpose, including *modus operandi*.

9

## A. The government has not met its burden to demonstrate that Dr. Bloom's profile is reliable.

The first prong of the court's gatekeeper obligation is to determine whether the expert's proposed testimony is reliable. Neither the government nor Dr. Bloom demonstrates the reliability of her method of profiling females who support or engage in terrorist acts. To determine reliability, *Daubert* provided several non-exhaustive factors for courts to consider, including: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance." 509 U.S. at 593-94 ("[P]roposed [expert] testimony must be supported by appropriate validation."); *see also Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (considering these same factors even when the proffered expert testimony is not scientific). Courts may also conclude that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Sixth Circuit provides further guidance by outlining a number of "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Red flags include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177). Courts may also detect a red flag where an expert's testimony was prepared solely for litigation. *Id.* (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)).

Although drug courier profiles are inadmissible as substantive evidence, they are generally not challenged as unreliable; indeed, courts note that they are often useful investigative tools widely used by law enforcement. *See, e.g., United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990). The same does not apply to all profiles. For example, state courts often reject profiles in

10

murder, sexual assault, and child abuse cases as unreliable. *See, e.g.*, *Ballard*, 855 S.W.2d at 562 ("[B]ecause no consensus exists on the reliability of a psychological profile to determine abuse, expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place.") (citing TENN. R. EVID. 702); *State v. Person*, 20 Conn. App. 115, 564 A.2d 626 (Conn. App. Ct. 1989) (trial court did not err in prohibiting defendant from establishing, through testimony of a psychiatrist and psychologist, that he did not fit the profile of a pedophile, because of insufficient reliability); *State v. Fortin*, 162 N.J. 517, 745 A.2d 509 (N.J. 2000) (in capital murder case, holding that expert in analysis of *modus operandi* and ritualistic crimes could not testify that two unique crimes were committed by same person using "linkage analysis" profiling evidence because not sufficiently reliable). Few courts have considered expert profiles in the context of terrorism cases. The Southern District of New York in *Cromitie v. United States* concluded that "[t]o the extent [the defendant's] preferred expert would have testified that he did not 'fit the terrorist profile,' such testimony would probably have been excluded." 2017 U.S. Dist. LEXIS 59122, *26 (Apr. 7, 2017) (denying a habeas petition for ineffective assistance based on failure to procure terrorism expert) (citing *Lui*, 941 F.2d at 847 as authority for rejecting expert profile evidence); *see also United States v. Shafi*, 2018 U.S. Dist. LEXIS 109484, *12, 2018 WL 3159769 (N.D. Cal. June 28, 2018) (noting that terrorism evidence must "not veer into profiling"); *but see United States v. Mohamud*, 2013 U.S. Dist. LEXIS 1239, *16, 2013 WL 71806 (D. Or. Jan 4, 2013) (permitting competing experts to opine on terrorism profiles but excluding label of "homegrown terrorist" or "contemporary violent extremist"). Dr. Bloom's female terrorist profile is "not reliable enough to 'substantially assist' a jury" to determine the issues in this case. *See Ballard*, 855 S.W.2d at 562.

The defense is unaware of any court that has evaluated Dr. Bloom's methods of creating her female terrorist profile or deemed them reliable. The government has not demonstrated that her profile is reliable in this case. Nor has it shown that her female terrorist profile is generally accepted—particularly for use by law enforcement investigating terrorism cases. *See Daubert*, 509 U.S. at 593-94.

Dr. Bloom's research and proposed testimony is based largely on qualitative studies with few subjects and anecdotal evidence. *See Newell Rubbermaid, Inc.*, 676 F.3d at 527 (noting the "red flag" of anecdotal evidence, failure to consider other causes, and extrapolation of data). In her report, she cites case studies and interviews with three women who she suggests have characteristics and activities similar to Ms. Giampietro. Bloom at 7. This makes sense given that terrorist acts are extremely rare: "less than one person in ten million per year in the Western world for the recent wave of violence . . ." Mitja Saroc, *Making sense of political violence: an interview with Marc Sageman*, 31 SMALL WARS & INSURGENCIES No. 3, 670-73 (2020) (discussing the "low base rate of terrorism" and "unacceptable numbers of false positives"). Indeed, Dr. Bloom admits that "only a very small percentage" of individuals consuming radical online content ever engage in terrorist acts. Bloom at 11 (citing Sophia Moskalenko & Clark McCauley, *QAnon: Radical Opinion versus Radical Action*, 15 PERSPS. ON TERRORISM, no. 2, Apr. 2021, at 144) (noting that that "fewer than 100 U.S. Muslims [] were found to be associated with terrorism between 2016 and 2018")). Despite this admission, she uses anecdotal evidence and a limited number of cases to make sweeping conclusions and generalizations that, if applied, would result in an unacceptably high number of false positives. Ultimately, Dr. Bloom's research suffers from "limited external validity" and "limited generalizability" due to the very small number of "Western" female terrorists, the countless variables affecting an individual's decision to support terrorism, and the

low base rate of terrorism.[2] *United States v. Langan*, 263 F.3d 613, 622 (6th Cir. 2001) (affirming exclusion of expert whose theory fails to meet the requisite reliability standards based on its limitations); *see also* Mark P. Denbeaux & D. Michael Risinger, Kumho Tire *and Expert Reliability: How the Question You Ask Gives the Answer You Get*, 34 SETON HALL L. REV. 15, 39 (2003) ("'External validity' considers the question, 'How far are we justified in taking the data, assuming them to be accurate in their own terms, and in drawing implications or conclusions in other context either very closely related . . . or much further away?'").

Dr. Bloom's proposed testimony is also unreliable because it relies on research with reliability problems of its own, namely the study by Dr. Moskalenko. *See Ellipsis, Inc. v. Color Works, Inc.*, 428 F. Supp. 2d 752, 761 (W.D. Tenn. 2006) (excluding an expert in part because his report was predicated on unreliable methodology and data). Dr. Moskalenko's study appears to exaggerate facts and data: its estimate that 75,000 U.S. Muslims have "radical opinions" was based on an internet poll comprised of subjectively-worded questions and involved only 211 participants.[3] Moskalenko, *QAnon*, 15 PERSPS. ON TERRORISM at 144. The study also misrepresents the data about the number of U.S. Muslims involved in terrorism over a three year period. *Id*.

---

[2] "Generalizability" is defined as "is the degree to which the results of a research study reflect what the results would be "in the real world," . . . . In other words, research results are generalizable when the findings are true generally speaking in most contexts with most people most of the time." *Generalizability*, THE SAGE ENCYCLOPEDIA OF EDUCATIONAL RESEARCH, MEASUREMENT, & EVALUATION (Bruce B. Frey ed. 2018).

[3] *See* Moskalenko, *QAnon*, PERSPS. ON TERRORISM at 144 n.11 (citing Sophia Moskalenko & Clark McCauley, *U.S. Muslim Barometer Survey. Results of 28 January-17 February 2016 Internet Poll of 211 U.S. Muslims: Opinions about Discrimination at Home and about ISIS and the War in Syria*, NAT. CONSORTIUM FOR THE STUDY OF TERRORISM & RESPONSES TO TERRORISM (May 2017), https://www.researchgate.net/publication/317370905_Results_of_28_October-8_November_2016_Internet_Poll_of_216_US_Muslims_Opinions_about_ISIS_ and_the_War_in_Syria_about_the_2016_US_presidential_election_and_about_the_Syrian_refugee_crisis). The authors purportedly found 3% of the 211 respondents "agreed that jihad is a personal moral obligation." This, the study concluded, constituted "radical opinion." The study took the 3% of respondents and applied it to 2.15 million U.S. Muslims to come to its 75,000 estimate.

(citing Charles Kurzman, *Muslim-American Involvement with Violent Extremism, 2001-2018*, DUKE UNIV. SANFORD SCH. OF PUB. POL'Y, TRIANGLE CTR. ON TERRORISM & HOMELAND SEC. (Jan. 22, 2019) (estimating that there were only "three possible incidents of Islamic terrorism in 2018" and noting that the number of incidents has been declining since 2015)).

The government has the burden to show that Dr. Bloom should be permitted to testify despite these red flags. Accordingly, at a minimum, the Court should hold a *Daubert* hearing to scrutinize her methodology. *Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 974 (M.D. Tenn. 2002) ("After considering the record and the testimony rendered at the *Daubert* hearing, the Court finds that [the proposed expert's] theories are not based on sufficient facts and data, and that his testimony will therefore not assist the jury in making a factual determination."), *aff'd* 89 F. App'x 927 (6th Cir. 2003).

### B. Dr. Bloom's profile will not assist the trier of fact.

The second prong of the Court's gatekeeper obligation is to determine whether the expert's proposed testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. Dr. Bloom's female terrorist profile will not. Rule 702(a) requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." In addition to Rule 401's relevance requirement, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. In proffering Dr. Bloom's testimony, the government seeks to demonstrate first that there are typical characteristics and background common to women who radicalize and support terrorist organizations. Dr. Bloom provides that profile in her report:

- "Many of the female converts who became involved in terrorism have a comparable background and profile, having converted to Islam after a difficult life. Many have been the victims of abuse or have abused substances and are vulnerable to charismatic religious

14

- recruiters offering them a chance to reinvent themselves. Because the convert is often a blank slate, she (or he) can be duped to believe almost anything."

- "We can glean significant patterns of behavior and the processes of involvement in terrorism from the individual case studies of Colleen LaRose who was the first Caucasian woman to be prosecuted for jihadi terrorism offenses."

*See, e.g.*, Bloom at 10. Next, the government seeks to show that Ms. Giampietro meets the profile, thereby making it more likely that she radicalized and supported terrorism in this case. Dr. Bloom provides that connection between the profile and Ms. Giampietro:

- "There tends to be two different categories of women that these terrorist groups seek: very young Muslim girls who reside in the West and women, like LaRose, Ramirez, *or the defendant*, who are Western converts."

- "The recruiters know that most young girls and women will be suspicious of men online, and so they use women to recruit other women. . . .The reasons for this are clear, part of the process of online grooming requires that the target can relate to the recruiter. British females would be familiar with the same celebrities, television shows, even snack foods. An American girl would not have the same frames of reference. This is relevant because the group chats *by the defendant* demonstrate many of the same tried and true tactics used by Jihadi recruiters to foster an environment of confidence -- to make a recruiter likeable, relatable, and trustworthy."

*See, e.g., id*. (emphasis added). In *United States v. Simpson*, the government argued that drug courier testimony was probative to show that the defendant "me[t] the drug courier profile," which "tends to show that he is a courier . . . [and] might have had a motive for carrying a gun." 910 F.2d at 157. The Fourth Circuit explained that although a drug courier profile is a "powerful investigative tool," "proof that a person fits the profile, unsupported by evidence of drug trafficking, proves nothing." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 9 (1989)). It held that the district court abused its discretion in permitting drug courier profile testimony because its "*de minimis* relevance was substantially outweighed by the highly prejudicial impact . . ." *Id.*; *see also Wells*, 879 F.3d at 920 ("Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity.") (quoting *Lui*, 941 F.2d at 847); *United States v. Gutierrez-Farias*, 294 F.3d 657, 663

15

(5th Cir. 2002) (concluding that "expert" profile evidence did not assist the jury to understand evidence in the case but instead just provided the jury with a "simple generalization").

In this case, the government must prove that Ms. Giampietro committed the offenses with which *she* is charged, namely attempting to support terrorism and obstructing justice. That Ms. Giampietro shares characteristics (such as her nationality, race, or history of abuse) with other women who may have been radicalized online or who supported terrorism makes it no more or less probable that she committed the charged offenses herself. *See United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) (finding that "guilt may not be inferred from the conduct of unrelated persons"). Dr. Bloom's profile will not assist the jury to understand the evidence or determine a fact in issue. It will instead confuse the jury and distract from the evidence about Ms. Giampietro in this case.

### III. The Probative Value of Dr. Bloom's Female Terrorist Profile is Substantially Outweighed by the Risk of Unfairly Prejudicing Ms. Giampietro.

Even if this Court concludes that Dr. Bloom's female terrorist profile has any probative value at all, Ms. Giampietro requests that it still exclude the profile because it is unduly prejudicial. FED. R. EVID. 403. The Fifth Circuit in *United States v. Williams* noted that while courts have "wide latitude" to determine whether evidence is more probative than prejudicial, "in our view the probative value of a drug courier profile is so low in relation to its prejudicial effect that its admission is error." 957 F.2d 1238, 1242 (5th Cir. 1992) (rejecting the government's claim that the profile was offered as background evidence). Similarly, in the Eastern District of Kentucky, the court prohibited an agent from discussing whether the defendant's clinic displayed any of the usual characteristics of a "pill mill" because "'there is a particularly acute risk the jury will convict [the defendant] simply because the defendant fits the profile' of a pill mill doctor." *United States v. Arny*, 137 F. Supp. 3d 981, 997 (E.D. Ky. 2015) (quoting *Quigley*, 890 F.2d at 1023-24); *see*

16

*also United States v. Zakhari*, No. 3:19-cr-208-RGJ, 2021 U.S. Dist. LEXIS 172024, *24 (W.D. Ky. Sept. 10, 2021) ("The Court agrees [with the Sixth Circuit in *Baldwin*] that use of profile evidence would be inappropriate and thus [the detective] will not be permitted to offer profile evidence or testify that [the defendant's] actions fit a particular profile.").

There is likewise an acute risk here that the jury will convict Ms. Giampietro because she "fits" into an expert's female terrorist profile. The proposed testimony about LaRose is particularly prejudicial as it spotlights the characteristics and experiences that LaRose and Ms. Giampeitro have in common and downplays the reality that millions of other individuals who engage in no illegal or terrorist conduct have those same characteristics and experiences. Finally, the government's attempt to inject Ms. Giampietro's religious beliefs and immutable traits into "trial as evidence of criminal behavior is self-evidently improper and prejudicial." *See Cruz*, 981 F.2d at 664 (finding that the "[i]njection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudical for reasons that need no elaboration here."). Even if the government could satisfy Rule 702 or overcome the overwhelming rejection of profile evidence, Ms. Giampietro requests that this Court still exclude Dr. Bloom's female terrorist profile under Rule 403.

### IV. Dr. Bloom's Remaining Proposed Testimony Also Fails to Satisfy Rule 702.

#### A. Dr. Bloom's proposed testimony that Ms. Giampietro had knowledge regarding how fake charities finance terrorism is not based on "scientific knowledge."

This Court should preclude Dr. Bloom from testifying about whether Ms. Giampietro was aware that terrorist organizations use fake charities for financing because the proposed testimony is lay opinion. In her discussion of topic 6, Dr. Bloom opines that based on her reading of a Wall Street Journal article and her review of Ms. Giampietro's school research paper, "it is unlikely that [Ms. Giampietro] would have not known that Al Sadakah had a long history of being specifically

17

identified as one of those charitable fronts for a terrorist group." Bloom at 17. Her opinion is not based on scientific, technical, or other specialized knowledge; it is based on her personal observations and perceptions derived from reviewing Ms. Giampietro's research paper in this case. *See* FED. R. EVID. 702. This is precisely the kind of testimony that moves from expert to improper lay opinion and usurps the role of the jury. *United States v. Freeman*, 730 F.3d 590, 596 (6th Cir. 2013). Accordingly, Ms. Giampietro requests that the Court exclude this proposed testimony.

### B. Dr. Bloom's explanation of the Islamic concept of *takiya* was created solely for this trial, will not aid the trier of fact, and risks unduly prejudicing Ms. Giampietro.

Dr. Bloom should be precluded from testifying about the Islamic concept of *takiya* because her proposed testimony is not reliable, it will not help the trier of fact, and it risks causing undue confusion and prejudice to Ms. Giampietro. The Sixth Circuit has described expert testimony prepared solely for litigation as a "red flag" in the Rule 702 reliability analysis. *Newell Rubbermaid, Inc.*, 676 F.3d at 527. The defense can locate no research or publications indicating that Dr. Bloom has expertise in or has previously stated an opinion on this very obscure subject. It appears that instead her opinion about *takiya* was prepared solely for trial—about this particular defendant. *Id.* The government has not met its burden to demonstrate that her testimony about *takiya* is reliable.

Next, Dr. Bloom's testimony about *takiya* is irrelevant and will not assist the jury. As defined by Dr. Bloom, *takiya* "is the practice of concealing one's belief and foregoing the regular religious duties if or when an individual perceives danger." Bloom at 5. But *takiya* is not at issue in this case. Dr. Bloom does not cite to any occasion on which Ms. Giampietro endorsed the concept, discussed the concept, or somehow participated in lying or deception pursuant to the concept of *takiya*. Similarly, this proposed testimony constitutes—or risks being perceived as—an opinion regarding Ms. Giampietro's mental state or credibility, which experts are not permitted to

18

give. FED. R. EVID. 704(b); *see also Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999) (holding that experts may not testify regarding the credibility of witnesses). As a result, Dr. Bloom's testimony is irrelevant and will not aid the trier of fact to understand the evidence or determine a fact in issue.

Last, the proposed testimony would confuse the jury and prejudice Ms. Giampietro. Dr. Bloom states in her report:

> In many ways [*takiya*] is a tactic of war – using deception and secrecy involving misleading non-believers, even outright lying. . . . Since extremists consider themselves perennially at war with non-believers (in a defensive jihad), they also believe that they are permitted to lie to anyone who opposes them, or their specific interpretation of the Muslim faith.

Bloom at 5. Dr. Bloom's proposed testimony suggests to the factfinder that Ms. Giampietro has a compelling reason to lie—whether to non-believers, the government, or perhaps the jury—based on her religious beliefs. The testimony plays into and elevates misinformation spread about *takiya* by anti-Muslim activists and politicians.[4] Along with no discernable probative value, there is a significant risk that testimony about this concept will prejudice Ms. Giampietro. Accordingly, Ms. Giampietro requests that this Court prohibit Dr. Bloom or any expert from testifying about the concept of *takiya*.

## CONCLUSION

In a case involving controversial allegations of supporting terrorism, it is absolutely critical that the Court as gatekeeper only permit the jury to hear reliable, relevant, and helpful expert

---

[4] *See* Ishmael N. Daro, *"Taqiyya": How An Obscure Islamic Concept Because An Obsession Of Anti-Muslim Activists*, BUZZFEED NEWS (Apr. 12, 2018), https://www.buzzfeednews.com/article/ishmaeldaro/taqiyya-explained (identifying use of *takiya* by anti-Muslim activists, politicians, and media); *see also* Omar Suleiman and Nazir Khan, *Playing the Taqiyya Card: Evading Intelligent Debate by Calling all Muslims Liars*, YAQEEN INST. FOR ISLAMIC RSCH. (Apr. 28, 2017), https://app.yaqeen.io/read/paper/playing-the-taqiyya-card-evading-intelligent-debate-by-calling-all-muslims-liars#ftn6 (discussing meaning of *takiya* and comparing misinformation about the concept to anti-Semitic stereotypes of Jews as untrustworthy).

19

testimony. Dr. Bloom's proposed testimony, including her female terrorist profile, fails to satisfy these requirements and will undoubtedly prejudice Ms. Giampietro at trial while providing little-no probative value. Ms. Giampietro requests a *Daubert* hearing so that the Court may fully assess the reliability of Dr. Bloom's methods and the helpfulness of her testimony.

Respectfully submitted this 24th day of November, 2021,

By: /s/ *Charles Swift*
Charles D. Swift,
*Pro Hac* Attorney for Giampietro
CLCMA
100 N. Central Expy, Suite 1010
Richardson, TX 75080
(972) 914-2507

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of November, 2021, I electronically filed the foregoing Motion for a *Daubert* Hearing Prior to Admission of Testimony of Mia Bloom with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ *Charles Swift*
Charles D. Swift, *Pro Hac*
Attorney for Giampietro
100 N. Central Expy, Suite 1010
Richardson, TX 75080