IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 2:19-cr-00013 |
| v. ) | |
| ) | Chief Judge Crenshaw |
| ) | |
| GEORGIANNA A.M. GIAMPIETRO ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE UNDER F.R.E. 802 TO EXCLUDE "INDIVIDUAL A" TELEGRAM CONVERSATION**

The United States of America, by and through Mark H. Wildason, United States Attorney for the Middle District of Tennessee, Assistant United States Attorneys Kathryn Risinger and Philip Wehby, and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, and Trial Attorney Jennifer E. Levy, hereby files this Response Opposing Defendant's Motion in Limine Under F.R.E. 802 to Exclude "Individual A"[1] Telegram Conversation (D.E. 321). Because the communications at issue are not hearsay, they are not excludable from evidence under Federal Rule of Evidence 802. In support thereof, the Government would show the Court the following:

**FACTUAL BACKGROUND**

A. **Overall background of the investigation and the defendant's conduct:**

The defendant is an American citizen born in Cookeville, Tennessee, who resided in Sparta, Tennessee, prior to her arrest. In late 2015, the FBI learned that the defendant was posting materials supportive of ISIS, a radical Islamic terrorist organization long designated by the United States as a Foreign Terrorist Organization ("FTO"), on social media. At the outset of the investigation, an FBI online covert employee ("OCE 1") engaged the defendant online, through

---

[1] The person identified as "Individual A" in the defendant's motion in limine is identified as @Alsadaqahsyria in this response and will be referred to at trial as @Alsadaqahsyria.

Telegram, a messaging application that permits users to send encrypted messages, photographs, and other files, and communicated with the defendant about various aspects of Islamic teachings, including strains of extremist Islamic teachings and beliefs, and current events.

In November 2017, OCE 1 introduced the defendant to an FBI undercover employee ("UCE 1"), posing as a like-minded "sister" who shared the defendant's extremist and radical Islamic views. Between November 2017 and October 2018, UCE 1 and the defendant engaged in countless electronic communications, via text message and encrypted messaging applications, and met in person on four separate occasions: November 28, 2017; February 22, 2018; March 17-18, 2018; and June 25, 2018. During their relationship, the defendant often espoused extremist Islamic views, expressed her desire to travel to Syria to join her fiancé, a jihadi fighter; explained that every Muslim man's duty is to wage "jihad"[2]; and asserted that women should support their male fighters by fighting alongside them, carrying bodies from the battlefield, and providing food and water to the mujahideen.[3] The defendant told UCE 1 that she hoped to die alongside her husband in Syria, in an airstrike, on a Friday during Ramadan while they were praying. The defendant also provided UCE 1 with directions on how to travel to Syria without drawing suspicion from law enforcement authorities, and when UCE 1 met with the defendant in person on February 22, 2018, the defendant confirmed that her fiancé, whom she identified as "Abu Abdullah" ("Abdullah"), had contacts who could obtain false documents to facilitate UCE 1's travel to and entry into Syria.

The defendant also invited UCE 1 to join a private chat group on Telegram with two other "girls" who also wanted to travel to Syria.[4] UCE 1 joined this chat group and communicated at

---

[2] "Jihad" refers to the struggle or fight against the enemies of Islam.
[3] "Mujahideen" is a term which refers to persons who have taken up violent jihad.
[4] Alaa Mohd Abusaad was one of the girls with whom UCE 1 communicated after the defendant invited her to participate in this private chat. On October 29, 2018, Abusaad was originally charged in the Northern District of Alabama, Western Division, in Case No. 7:18-cr-00541, with Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B. Subsequently, on September 13, 2019, Abusaad pled guilty to an Information in Case No. 7:19-cr-00475, charging her with Concealment of Terrorism

length with the defendant and other females about traveling to Syria; the state of affairs in Syria; various radical Islamic teachings; and their shared radical Islamic views.

This investigation revealed the defendant also communicated with numerous other female individuals, some of whom were minors at the time of their communications, as well as with Abdullah about traveling to Syria. The defendant also discussed wanting to marry Abdullah, a jihadi fighter and espoused extremist Islamic views. For example, search warrants executed on various social media accounts relating to the defendant revealed communications during the period of the investigation that the defendant had with Abdullah. In those communications, Abdullah told the defendant that he had posted photographs of fellow fighters who had recently died, including one who had recently conducted a suicide bombing, to his social media account, and that Abdullah had killed a lot of people in villages near Aleppo. The defendant asked Abdullah about traveling to see him in Syria, and inquired as to whether she could get a gun if she traveled with him. Abdullah confirmed that the defendant could get a gun, but that she could pass through checkpoints without being stopped if she were with Abdullah.

Further, evidence collected from the defendant's Samsung S8 cellular telephone includes photographs of Abdullah, which were stored in an electronic folder on the device entitled "Abu Abdullah." Those photographs depict Abdullah wearing military fatigues and posing with various firearms, including what appear to be high-powered rifles. The electronic folder also contained videos of nearby bombings or the aftermath of bombings.

---

Financing, in violation of Title 18, United States Code, Sections 2339C(c)(2)(A) and 2, and is currently awaiting sentencing. Once Abusaad is sentenced in Case No. 7:19-cr-00475, the Government will recommend dismissing Case No. 7:18-cr-00541.

3

B.  **The defendant's communications with UCE 1 leading up to the communications at issue:**

In late September 2018, UCE 1 informed the defendant that her "husband," another FBI undercover employee, had sworn allegiance to Hayat Tahrir al-Sham ("HTS") on their behalf and that they were preparing, imminently, to travel to Syria to join HTS. Over the course of the next few days, the defendant and UCE 1 engaged in extensive communications about UCE 1 and her husband's travel plans and the contacts they were using to assist them with their travels for this purpose.[5]

During these communications, the defendant repeatedly expressed concerns regarding UCE 1 and her husband's plans to travel to Syria via London and the overseas contacts they were intending to use for assistance in getting into Syria, whom the defendant found to be very suspicious. For example, the defendant made statements to UCE 1, expressing her doubts, such as: "He needs to be careful"; "Be careful"; "This is scaring me"; "Many people in London get caught"; "And many pretend to be muslims and turn them in"; "That's why I'm asking"; and "I just think everything is very aheeb . . . Ajeeb."[6] The defendant also expressed concern that if UCE 1 and her husband were caught, authorities might trace them back to her, explaining further, "I fear for our safety"; "I need you to unfollow the telegram channel inshaAllah bc there are other sisters on there too"; "I need you to delete my name and number from your phone and all pictures and text messages"; "I hope you understand why."

Notwithstanding these reservations, the defendant advised UCE 1 as to how UCE 1 and her husband could travel to Syria without being detected, telling UCE 1 that they should purchase

---

[5] The defendant's motion in limine failed to adequately describe the full scope of the defendant's communications with UCE 1, thus taking certain statements out of context; mis-portraying the undercover agent's actions in an overbearing and coercing manner; and downplaying the defendant's intent in providing UCE 1 with @Alsadaqahsyria's contact information.
[6] The English translation of the word "Ajeeb" is "strange."

4

roundtrip airline tickets, rather than one-way tickets; that they should consider traveling to Turkey (prior to entering Syria) by traveling first to Italy, and then from Italy to Turkey; that they should not take their phones with them, and that they should acquire new phones and new phone numbers before they traveled. For example, the defendant made statements, such as: "And do not take your phone and same for him"; "You all need new phones and new numbers"; "And the both of you need to contact no one!" The defendant also referenced her own plan for traveling to Syria, which included cutting ties with other persons before leaving, explaining that, "[w]hen I was planning my plan was to delete everyone 6 to 8 months before leaving and have no contact with anyone"; "Bc one wrong move."

On or about September 30, 2018, the defendant informed UCE 1 that the defendant had spoken with one of her contacts who claimed that there was presently no jihad in Syria. The defendant asked UCE 1, "Have you thought about Afghanistan? They're still fighting there."[7] Because of the defendant's concerns for her own safety and that of UCE 1 and her husband, the defendant herself offered to reach out to one of her contacts, whom she claimed was very "trusted" and who could better assist UCE 1 and her husband. Then, on or about October 2, 2018, the defendant provided UCE 1 with the contact @Alsadaqahsyria and directed UCE 1's husband to message @Alsadaqahsyria: "Have your husband message this account . . . @Alsadaqahsyria . . . I was told to give him this." When UCE 1 asked if that was the person who could assist her and her husband in getting to Syria, the defendant responded, "Just message him." UCE 1 told the defendant that UCE 1's husband would want to know why he should contact @Alsadaqahsyria.

---

[7] This important fact – that the defendant offered an alternative location to which UCE 1 and her husband could travel in order to support the extremist Islamic agenda and join the Mujahideen – is one that the defendant fails to mention in her motion in limine, presumably because it undercuts the defendant's theory that the defendant was unsupportive of UCE 1 and her husband's efforts, as well as any entrapment defense she intends to raise whereby she will likely allege that the Government acted in a heavy-handed manner; that the defendant was not pre-disposed to commit the crime with which she is charged; and that it is only due to the Government's undue and coercive pressure that the defendant finally passed the contact information for @Alsadaqahsyria to UCE 1.

The defendant, who was wary of spies and had been guarded in her communications throughout this investigation, stated things like: "If you have someone to help you then forget it . . . Khaloss[8] . . . Very suspicious"; "Na forget it . . . Everything is too suspicious"; "And I don't want to discuss this anymore"; "I don't want to be involved anymore"; "I don't like suspicious ppl"; and "Let's not speak about this anymore." Although the defendant never told UCE 1 explicitly that @Alsadaqahsyria could assist UCE 1 and her husband in traveling to Syria, the clear implication was that they should contact @Alsadaqahsyria for that purpose. The defendant's intent is borne out in the subsequent conversations, which are discussed in more detail below.

C. **Specific communications at issue:**

An online covert FBI employee portraying himself online as UCE 1's husband (hereinafter referred to as "OCE 2") subsequently made contact with @Alsadaqahsyria online, telling @Alsadaqahsyria that he had been given @Alsadaqahsyria's contact information by "Umm Roses," a social media moniker used by the defendant, and that OCE 2 understood @Alsadaqahsyria to be someone who could help brothers and sisters making "Hijrah" to Syria.[9] OCE 2 asked @Alsadaqahsyria if @Alsadaqahsyria had helped people make Hijrah before, and if it was still possible to do so, to which @Alsadaqahsyria replied, "Yes akhi [brother]. You can but safest to wait" to travel to Syria because "there isn't any fighting at the moment," and OCE 2 would primarily be doing "guard duty" "5 or 7 days a month." OCE 2 asked @Alsadaqahsyria whether @Alsadaqahsyria could get him and UCE 1 "across" to Syria if they made it to Turkey. In response, @Alsadaqahsyria replied that he could, but explained that he had talked to "another

---

[8] In this context, "Khaloss" means "I'm done."
[9] "Hijrah" is an Islamic term meaning "migration." The term historically refers to the journey undertaken by the Islamic prophet Mohammed from Mecca to Medina. In the extremist context, the term "Hijrah" has been used to describe a foreign fighter's journey from his country of origin to terrorist-held countries abroad.

brother," who said that it was difficult to cross into Syria at present, and that they should wait and cross later.

However, @Alsadaqahsyria, the contact provided by the defendant, also gave OCE 2 information about how to travel to Turkey undetected, which was also consistent with advice the defendant herself provided to UCE 1 regarding how to travel and join HTS. Recognizing that this travel would appear to be suspicious, @Alsadaqahsyria explained that OCE 2 should have a good cover story and should take steps to make it look like he and UCE 1's travel was legitimate. The advice given by @Alsadaqahsyria included, "Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like your [sic] an aid worker. Then you have a good defence." When OCE 2 asked @Alsadaqahsyria why he needed a "good defense," and whether @Alsadaqahsyria was referring to being questioned by Turkish authorities, @Alsadaqahsyria replied, "Yea. Also if you get stopped you have evidence to support your story."

Subsequent to these communications between @Alsadaqahsyria and OCE 2, UCE 1 sent a message to the defendant, thanking her for providing @Alsadaqahsyria's contact information and advising that @Alsadaqahsyria could help UCE 1 and her husband get to Syria. Following this message from UCE 1, the defendant immediately changed course, and out of the blue, falsely claimed that she had not provided @Alsadaqahsyria's contact information for travel purposes, stating, "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." The defendant also informed UCE 1 that she no longer wished to discuss the matter, stating, "You're going to get me arrested." The defendant then deleted the Telegram account from which she had been communicating with UCE 1.

7

Notwithstanding the defendant's claim to UCE 1 that she had "no clue" who @Alsadaqahsyria was, the defendant messaged OCE 1 and began asking a lot of questions about UCE 1 because OCE 1 had introduced UCE 1 to the defendant. During these communications, which occurred over multiple days, the defendant asked how well OCE 1 knew UCE 1; suggested UCE 1 was a "spy"; and questioned whether UCE 1 and her husband really traveled to London. The defendant told OCE 1 that UCE 1 asked too many questions; was caught telling lies; and voluntarily advised she was going to make "hijrah." The defendant told OCE 1, "I want to block her. But she has my real number"; "Like she makes me nervous"; "And if I block her what will happen to me"; "I'm worried about her being tapped. Like when we spoke face to face"; and "I don't trust them at all."

Additionally, around the same time as her communications with OCE 1, the defendant messaged with an individual identified as Syria Care Turkey. Based on their communications, it was clear that Syria Care Turkey also knew @Alsadaqahsyria and was aware of @Alsadaqahsyria's communications with UCE 1's husband. The defendant made similar statements to Syria Care Turkey, eventually saying, "Nothing wrong if they're actually real and truthful. But me and some sisters had our doubts for awhile about them. Like how they always asked bait questions. So we all decided to block her. Even the sister that introduced us to this sister is ajeeb [strange] too. I don't know I completely came off social media hard to trust anyone . . . I don't know I just don't want to go to jail for 30 yrs and leave my son in the hand of the Kuffar. Bc they could say she helped us she gave us the contacts."

D.      **Investigation into @Alsadaqahsyria:**

FBI investigators obtained open source information about @Alsadaqahsyria, which established @Alsadaqahsyria's connection to foreign terrorist organizations. For example,

8

@Alsadaqahsyria was active on a Telegram channel that raised funds for fighters in Syria using Bitcoin and other cryptocurrencies. Although the channel purports be an "independent charity organization," the channel also claims to provide "the mujahideen in Syria with weapons, financial aid[,] and other projects relating to the jihad." Photographs and memes posted to this Telegram urged people to donate to the group, making clear that the donations were intended to support foreign fighters. For example:

- On May 18, 2018, the channel posted a photograph depicting two masked men wearing military fatigues and carrying assault rifles in a mountainous area, and holding a sign which contains the words "Ribat Project," bearing the emblem of @Alsadaqahsyria's "foundation," and providing the group's Bitcoin address. The text on the photograph reads, "Delivering food and supplies to the front lines in Syria."

- On May 25, 2018, the channel shared a poster explaining that @Alsadaqahsyria was providing a Ramadan "iftar" "to help our beloved mujahideen defending the front line." The poster includes a table outlining the extent to which particular donations would benefit fighters, estimating, for example that "$6,000 would benefit 100 fighters for 30 days," and that the price of a military uniform was $50.

- On June 1, 2018, the channel posted a photograph depicting six packaged military uniforms, each topped by another picture bearing @Alsadaqahsyria's emblem, a call for donations, and @Alsadaqahsyria's Bitcoin account number. The text on the photograph reads further, "providing brand new military suits [uniforms] to mujahideen."

- On June 1, 2018, the channel posted a photograph depicting seven mujahideen fighters wearing military fatigues, with their faces digitally blurred, and with each fighter holding uniform packages like those described above. The text on the photograph reads, "Providing brand new military suits to mujahideen."

Further, @Alsadaqahsyria changed his contact email address in June 2018 from an encrypted email service to an email service situated on the "dark web," which offers anonymity to its users.

Looking at this investigation as a whole, including her numerous communications with others regarding her support of the extremeist Islamic agenda; her desire to marry a foreign fighter; her desire to travel to Syria to support the male fighters by fighting alongside them, carrying bodies

9

from the battlefield, and providing food and water to the mujahideen; her desire to die alongside her husband in Syria, in an airstrike, on a Friday during Ramadan while they were praying; the extremist propaganda posted on the defendant's various social media platforms; the various statements she made to UCE 1 during their private online chats, as well as their in-person meetings; and the entirety of her communications with UCE 1 during September and October 2018, one could reasonably presume, as UCE 1 did, that the defendant provided the contact for @Alsadaqahsyria to UCE 1 and her husband, intending that UCE 1 and her husband reach out to @Alsadaqahsyria for assistance in safely traveling to Syria to join HTS, without detection from law enforcement, knowing that @Alsadaqahsyria could and would provide such assistance.

## SECOND SUPERSEDING INDICTMENT

Count One charges the defendant with Attempting to Provide Material Support (Personnel and Services) to a Foreign Terrorist Organization ("FTO"), specifically Hayat Tahrir al-Sham, in violation of Title 18, United States Code, Section 2339B.[10] (D.E. 255.) For the defendant to be convicted on Count One, the Government must prove the following: 1) that the defendant knowingly attempted to provide material support or resources to a foreign terrorist organization, specifically Hayat Tahrir al-Sham; 2) that the defendant knew that Hayat Tahrir al-Sham was a designated foreign terrorist organization or had engaged in or was engaging in terrorist activity or terrorism; 3) that the defendant is a national of the United States; and 4) that the defendant did some act as a substantial step in an effort to provide material support to Hayat Tahrir al-Sham. *See* 18 U.S.C. § 2339B. *See also United States v. Khweis*, Crim. No. 1-16-CR-00143-LO (E.D. VA

---

[10] The defendant is also charged in Count Two with Attempting to Provide Material Support (Currency) to HTS, in violation of Title 18, United States Code, Section 2339B; in Count Three with the Destruction and/or Alteration of Records in a Federal Investigation, in violation of Title 18, United States Code, Section 1519; and in Count Four with Altering, Destructing, Mutilating, or Concealing a Record or Document, or Attempting to do so, in violation of Title 18, United States Code, Section 1512(c)(1). However, the defendant's motion attempts to exclude evidence directly related to Count One of the Second Superseding Indictment. Therefore, the Government's response is tailored to addressing why such evidence is admissible at trial in support of Count One.

2017) (Doc.165); *United States v. Moalin*, Case 3:10-cr-04246-JM (S.D. Cal. 2013) (Doc. 301); *United States v. Amina Ali*, Case 0:10-cr-00187-MJD-FLN (D. Minn. 2011) (Doc. 153).

## LEGAL ANALYSIS

At trial, the Government expects to introduce the communications between UCE 1's husband and @Alsadaqahsyria, which took place in early October 2018, in its case-in-chief as evidence that proves the defendant is guilty of Count One of the Second Superseding Indictment. Such communications are admissible because they are not hearsay and do not fall under Federal Rule of Evidence 801(c) because they are not being offered for the truth of the matter asserted. Rather, such communications are admissible and relevant as evidence regarding the defendant's state of mind, intent, and knowledge because the defendant passed the contact for "@Alsadaqahsyria" to UCE 1 for the purpose of assisting UCE 1 and her husband with traveling to Syria for the purpose of joining HTS, a designated foreign terrorist organization. *See*, *e.g.*, *United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998). Accordingly, this Court should deny the defendant's motion to exclude such communications on this basis.

**A.    Hearsay Generally:**

Out-of-court statements offered for the truth of the matter are considered hearsay and are generally inadmissible at trial under the Federal Rules of Evidence unless an exception applies. FED. R. EVID. 801(c), 802 (2021). Exceptions to the general rule against hearsay generally fall within Federal Rules of Evidence 803, 804, and 807. Importantly, testimony regarding out-of-court statements is not hearsay when such statements are not being offered to prove the truth of the matter asserted. *Id*. at 801(c)(2). For example, the rule against hearsay does not apply to statements offered merely to show that they were made, such as suggestions, orders, or questions because such utterances do not assert facts subject to verification. *United States v. Gibson*, 675 F.2d 825,

11

833-34 (6th Cir. 1982). *See also United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996) (holding questions generally are not hearsay because they cannot reasonably be construed to be an intended assertion and the fact that a question may convey a message does not make the question hearsay); *United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994) ("Instructions to an individual to do something are not hearsay.") (internal quotations omitted); *United States v. Miriana*, 422 F.2d 150, 153 (6th Cir. 1970) (questions and statements made by IRS agents during their conferences with the defendant were admissible because they were admitted simply to show the utterances were made in order to put the defendant's statements in perspective). Or, where "the statement is offered as circumstantial evidence of [a defendant's] state of mind, it does not fall within the definition given by Rule 801(c); because it was not offered to prove the truth of the matter asserted." *Salameh*, 152 F.3d at 112 (quoting *United States v. Detrich,* 865 F.2d 17, 21 (2d Cir.1988). *See also Roberts v. Azize*, 767 F. App'x 196, 199 (2d Cir. 2019) (finding out-of-court statements introduced to establish a declarant's state of mind or knowledge are not hearsay) (citation omitted); *United States v. Dupree*, 706 F.3d 131, 136-38 (2d Cir. 2013).

B. **OCE's communications with "@Alsadaqahsyria" are offered as relevant, admissible evidence of the defendant's knowledge and intent to commit the crime as alleged in Count One of the Second Superseding Indictment:**

As stated above, the Government intends to introduce OCE 2's communications with @Alsadaqahsyria as evidence of the defendant's state of mind, intent, and knowledge, showing that when she passed the contact information for @Alsadaqahsyria to UCE 1, she did so 1) knowing that UCE 1 and her husband intended to travel to Syria to join HTS, a designated foreign terrorist organization; 2) because the defendant did not trust UCE 1 and her husband's contacts and was concerned that if they used their own contacts and followed their own plans, they would be caught by law enforcement; 3) if they were caught by law enforcement, they might lead authorities to the defendant and her support of extremist fighters in Syria; and 4) because the

12

defendant trusted her contact and believed @Alsadaqahsyria could ensure UCE 1 and her husband's safe passage into Syria for the purpose of joining HTS. If, as is the case here, "'the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'" *Dupree*, 706 F.3d at 136 (quoting FED. R. EVID. 801(c) advisory committee's note).

    Here, the defendant and UCE 1 engaged in extensive communications over the course of multiple days regarding UCE 1 and her husband's plan to travel to Syria to join HTS. Considering the totality of the evidence gathered during this investigation, it is clear, and the defendant's communications make clear, that she was *not* trying to dissuade UCE 1 and her husband from traveling to Syria to join HTS because she (the defendant) disagrees with the extremist Islamic agenda or because she (the defendant) is not supportive of Mujahideen fighting on behalf of and in furtherance of foreign terrorist organizations and their principles and beliefs. Instead, her communications repeatedly and consistently reiterated that the defendant was concerned for UCE 1's safety, her husband's safety, and the defendant's own safety if UCE 1 and her husband used their contacts and followed their original plans to travel through London to Syria for the purpose of joining HTS. As a result, and as a means of self-preservation, the defendant provided UCE 1 with @Alsadaqahsyria's contact information with the intent to assist UCE 1 and her husband into safely traveling to Syria while avoiding law enforcement detection. OCE 2's communications with @Alsadaqahsyria provide evidence of the defendant's intent and constitute admissible, relevant evidence of that intent. Statements offered as circumstantial evidence of a defendant's state of mind are not offered to prove the truth of the matter asserted, and therefore, do not fall within he statements proscribed by the rule against hearsay. *See Salameh*, 152 F.3d at 112; *Detrich*, 865 F.2d at 21.

In *Salameh*, the defendants were charged with and convicted of various crimes relating to their participation in the plot to bomb the World Trade Center. *Id*. at 108. During the arrest of one of the defendants, the police seized various terrorist materials espousing the desireability of attacking enemies of Islam and describing how to produce and use explosives as proof of the defendant's state of mind. The Second Circuit rejected another defendant's claim that the admission of the terrorist materials violated Federal Rule of Evidence 801(d)(2)(E) (co-conspirator statements), finding that the government had introduced the materials as evidence to prove the state of mind of those who harbored these materials. *Id*. at 112 ("As proof of defendants' state of mind, Ajaj's terrorist materials were not hearsay under Rule 801(c), and their failure to come within Rule 801(d)(2)(E) is of no consequence.").

Here, @Alsadaqahsyria's out-of-court statements are being admitted into evidence not to prove truth of anything asserted therein, but simply to prove that the statements were made so as to establish that the defendant intended to provide material support to a designated foreign terrorist organization by assististing UCE 1 and her husband in their travels to Syria to join HTS. *Id*. *See also Anderson v. United States*, 417 U.S. 211, 219-221 (1974) (holding that out-of-court statements consisting of election contest testimony, where admitted into evidence not to prove truth of anything asserted therein but simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false, were not hearsay); *Azize*, 767 F. App'x at 199 ("[O]ut-of-court statements introduced to establish a declarant's state of mind or knowledge are not hearsay.") (citations omitted); *United States v. Mehana*, 735 F.3d 32, 58-59 (1st Cir. 2013); *Atlantic–Pacific Const. Co., Inc. v. NLRB,* 52 F.3d 260, 263 (9th Cir.1995) ("An out of court statement may be admitted as circumstantial evidence of the declarant's state of mind...."); *See also United States v. Leake*, 642 F.2d 715, 720 (4th Cir.

1981) (reversible error to exclude as hearsay conversation in which defendant was told use of certain funds, since statement was not offered to prove actual use of funds but only that defendant "believed that the funds were being used in a legitimate fashion"); *United States v. Thurman*, 915 F. Supp. 2d 836, 862 (W.D. Ky. 2013) ("[I]f an out-of-court statement is offered merely to establish the recipient's belief or state of mind as a result of the utterance, then the extrajudicial statement is not hearsay under Rule 801.") (citations omitted); *Arista Records LLC v. Lime Group LLC,* 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011) ("Out-of-court statements are not hearsay if offered to show the context within which parties were acting, or to show a party's motive or intent for behavior.").

During his communications with OCE 2, @Alsadaqahsyria told OCE, "There isn't any fighting at the moment. So you will be doing not much. Mainly [sic] guard duty. 5 or 7 days a month. The rest you at home unless you have other skills." When OCE 2 specifically asked if @Alsadaqahsyria could assist getting OCE 2 and his wife into Syria if they were able to make it to Turkey, @Alsadaqahsyria replied, "Yes I can. Inshallah . . . Look. It's important you have a cover story. Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like you are an aid worker." When OCE 2 inquired if that was necessary in case he and his wife get asked by Turkish authorities about their activities, @Alsadaqahsyria said, "[Y]ea. Also if you get stopped. You have a evidence to support your story." Clearly, in the context of these communications, "hijrah" was being used to describe a foreign fighter's journey from his country of origin to terrorist-held countries abroad. It is of no consequence whether @Alsadaqahsyria's statements regarding the current fighting climate in Syria, the type of tasks OCE 2 would be doing upon making "hijrah" and joining the fight, and how to safely travel into Syria for these purposes were actually true. Instead, these statements are being offered solely to close the loop and prove the defendant's true intent in passing @Alsadaqahsyria's contact to UCE 1 – to assist UCE 1 and

15

her husband in joining HTS – despite the defendant's subsequent statements to the contrary. [11] "Testimony is not hearsay if it is offered only to show the context within which parties had been acting, or to show a party's motive or intent for behavior." 5 Weinstein's Federal Evidence § 801.11 (2021). Such is the case here and the defendant's Motion in Limine Under F.R.E. 802 to Exclude "Individual A" Telegram Conversation should be denied in its entirety.

## CONCLUSION

Based on the above, the Government requests that this Court enter an order denying the defendant's Motion in Limine Under F.R.E. 802 to Exclude "Individual A" Telegram Conversation, thus allowing the Government to introduce those communications during it's case-in-chief as evidence of the defendant's intent to provide material support to a designated foreign terrorist organization.

---

[11] Arguably, @Alsadaqahsyria's out-of-court statements made during this conversation are also admissible for the truth of the matter asserted as statements of @Alsadaqahsyria's then-existing mental, emotional, or physical condition pursuant to Federal Rule of Evidence 803(3). For a statement to qualify under this exception to the hearsay rule, the following three requirements would have to be satisfied: 1) the statement must be contemporaneous with the mental state sought to be proven; 2) there must not be any suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his thoughts; and 3) the declarant's state of mind must be relevant to an issue in the case. In the context of this conversation, @Alsadaqahsyria's statements are indicative of his motive and intent to assist UCE 1 and her husband into safely making "hijrah" to Syria to join the fight. Because @Alsadaqahsyria's contact information was passed to UCE 1 by the defendant, @Alsadaqahsyria's intent is relevant to the defendant's intent and true motives in passing along the contact information.

Respectfully Submitted,

MARK H. WILDASIN
United States Attorney
Middle District of Tennessee

By: /s/ *Kathryn Risinger*
KATHRYN RISINGER
PHIL WEHBY
Assistant United States Attorneys
110 9th Avenue South
Nashville, Tennessee 37203
Phone: (615) 736-5151

/s/ *Jennifer E. Levy*
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Suite 7600
Washington, D.C. 20530
(202) 514-1092

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2021, a true and correct copy of the foregoing document was filed electronically via CM/ECF, which will automatically provide service to Charles Swift and Peter Strianse, counsel for the defendant.

/s/ *Kathryn Risinger*
KATHRYN RISINGER
Deputy Criminal Chief – Organized Crime