UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | No.   2:19-cr-00013 |
| v. ) | |
| ) | Chief Judge Crenshaw |
| ) | |
| GEORGIANNA A.M. GIAMPIETRO ) | |

### UNITED STATES' OPPOSITION TO DEFENSE MOTION FOR A DAUBERT HEARING PRIOR TO ADMISSION OF TESTIMONY OF CATHERINE SCHRECK

The United States of America, by and through its attorneys, the United States Attorney for the Middle District of Tennessee, and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, hereby files this Response to the defense motion for a *Daubert*[1] hearing relating to the proffered testimony of Catherine Schreck as an expert witness.

### BACKGROUND

In late 2015, the FBI became aware that the defendant was posting on social media materials supporting ISIS, a radical Islamic terrorist organization long designated by the United States as a Foreign Terrorist Organization ("FTO"). The FBI initiated an investigation, during which an FBI online covert employee ("OCE-1") engaged the defendant on social media platforms. After some communication with the defendant on line, in November 2017, OCE-1 introduced the defendant to an FBI undercover employee ("UCE-1"), posing as a like-minded "sister" who shared the defendant's extremist and radical views related to Islam. Between

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

1

November 2017 and October 2018, UCE-1 and the defendant used text messages and messaging applications to engage in countless electronic communications. They also met in person on four occasions, during which they discussed at length their extremist and radical views related to Islam. During their relationship, the defendant often espoused extremist views in support of the Islamic State, expressed her desire to travel to Syria to join her fiancé, a jihadist fighter; explained that every Muslim man's duty is to wage "jihad;" and asserted that women should support their male fighters by fighting alongside them, carrying bodies from the battlefield, and providing food and water to the mujahideen.2

In March 2018, during conversations with the defendant, UCE-1 asked the defendant for a contact to whom the UCE-1 could send money to support the mujahedeen. In response to this inquiry, the defendant provided UCE-1 with contact information for Merciful Hands, advising UCE-1 that Merciful Hands is a "trusted brother." On June 20, 2018, the defendant sent $200 to Merciful Hands. On June 25, 2018, the defendant sent another $500 to Merciful Hands. According to information posted to the Merciful Hands social media platform in 2018, Merciful Hands was seeking donations to support foreign fighters.

Between May and June of 2018, the defendant was in contact with "@MuhamedAA" and inquired how to send money and how much money to send. Evidence collected in the investigation shows that "@MuhamedAA" is the administrator for "@remindersfromSyria," another entity that solicits money for the mujahedeen. On or about June 14, 2018, the defendant sent $150 to "Muhammed Muhammed," associated with international telephone number 905373777140. Evidence links this phone number to "@Alsadaqahsyria," an online handle

---

2 "Mujahideen" is a term which refers to persons who have taken up violent jihad.

operating a Syria-based organization that solicits funds online to aid the mujahedeen in Syria.

In the fall of 2018, after UCE-1 told the defendant that UCE-1 and her husband ("UCE-2") had plans to travel to Syria to join Hayat Tahrir al-Sham ("HTS"), a designated FTO, the defendant expressed concern about the travel plans described by UCE-1. Specifically, the defendant expressed concern about the contacts UCE-1 and her husband were using to travel to Syria. The defendant advised that she knew others whom she trusted more. The defendant then provided UCE-1 with contact information for @Alsadaqahsyria, and told UCE-1 to message @Alsadaqahsyria. An undercover agent portraying himself as UCE-1's husband subsequently made contact with @Alsadaqahsyria online and advised @Alsadaqahsyria that the defendant had provided the contact information. After learning who had provided the contact information, @Alsadaqahsyria proceeded to discuss with the undercover employee the logistics and timing of travel to Syria.

After the conversation between UCE-1's husband and @Alsadaqahsyria, UCE-1 sent a message to the defendant thanking her for providing the contact information and advising that @Alsadaqahsyria could help UCE-1 and her husband get to Syria. The defendant disavowed that she had provided that contact information for travel purposes, stating, "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." The defendant informed UCE-1 that she no longer wished to discuss the matter, stating, "You're going to get me arrested."

On August 14, 2019, the defendant was charged in a single count indictment with violating 18 U.S.C. § 2339B for attempting to provide material support in the form of personnel and resources to HTS. (D.E. 3) On December 18, 2019, a superseding indictment was returned against the defendant, adding two counts of obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(1)

and 1519. (D.E. 77)  On August 23, 2021, a Second Superseding Indictment was returned against the defendant, adding a second violation of 18 U.S.C. § 2339B for her attempt to provide material support to HTS in the form of currency, based upon three money transfers she made in June 2018, intending that the money be used to support extremist fighters affiliated with HTS. (D.E. 256)

As a result of the filing of the Second Superseding Indictment, the government filed a motion to amend its expert witness notice on November 5, 2021.[3] (D.E. 316)  Ms. Schreck's proposed expert testimony will be directly related to the newly filed charge of attempting to provide material support to HTS through money transfers made to specific "charitable" entities.

## ARGUMENT

The Supreme Court has stated that under Federal Rule of Evidence 702, the district court acts as a gatekeeper to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Tamraz v. Lincoln Elec. Co*., 620 F.2d 665, 668 (6th Cir. 2010).  The district court's task is specifically to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  Rule 702 "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and 'other specialized'

---

[3] The government takes issue with the defendant's implication on page 3 of her motion that the government has somehow violated the Court's April 16, 2021, order in failing to submit an expert report from Ms. Schreck discussing the issues summarized in the amended expert witness notice.  The order itself, setting various pretrial deadlines, is premised on the rescheduling of trial to September 14, 2021.  The necessity to offer Ms. Schreck's expert testimony did not arise until after the filing of the Second Superseding Indictment on August 23, 2021, which contains a new charge of attempting to provide material support to an FTO through money transfers made to so-called charities that were affiliated with HTS in 2018.  Insofar as the new charge was not part of the prosecution in April 2021, and insofar as the trial date in this case was continued to January 31, 2022, triggering new scheduling deadlines, the government respectfully submits that the submission of an expert report from Ms. Schreck later this month will not be untimely.  Indeed, the Court's revised scheduling order related to trial deadlines allows for the filing of expert reports on December 27, 2021.

knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Supreme Court in *Kumho* further explained that district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. When a district court is evaluating the reliability of non-scientific expert testimony, it may forgo factors enumerated in *Daubert* and focus on the reliability of the expert's personal knowledge or experience. *Thomas v. City of Chattanooga*, 398 F.3d 426, 431-32 (6th Cir. 2005). In any event, the expert "must explain how that experience leads to the conclusion reached … and how that experience is reliably applied to the facts." *Id.* at 432 (quoting Fed. R. Evid. 702 Adv. Comm. Note); *see generally United States v. Frazier*, 442 F. Supp. 3d 1012 (M.D. Tenn. 2020) (Crenshaw, C.J.). "Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility." *Commins v. Genie Industries, Inc.*, Civil Action No. 3:16-CV-00608-GNS-RSE, 2020 WL 1189937 at *3 (W.D. Ky March 11, 2020) (quoting *In re E.I. Dupont de Nemours & Co. C-8 Personal Injury Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015); *United States v. Bonds*, 12 F.3d 540, 565 (6th Cir. 1993) (noting that *Daubert* establishes "a 'flexible' and more lenient test that favors admission."). This Circuit has long recognized that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008). The district court's decision to admit proposed expert testimony is normally upheld unless there is an abuse of discretion. *See United States v. Collins*, 799 F.3d 554, 572 (6th Cir. 2015); *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012).

The defendant objects to several aspects of Ms. Schreck's expert testimony as proposed in the government's expert notice, without reviewing her expert report, which will be filed later this month. Moreover, the defendant requests a *Daubert* hearing based on these objections. The government submits that the objections are premature and the court should defer its decision on

5

both these objections and the need to hold a *Daubert* hearing until after Ms. Schreck's expert report is submitted.

To the extent that the defendant attempts to challenge Ms. Schreck's credentials and experience, the government notes that Ms. Schreck has over ten years of combined educational and employment experience related to her proposed areas of testimony in this case, namely open-source intelligence, data collection, documentation, and interpretation of terrorist communications, with a focus on al-Qaeda in Syria and the Middle East. In college, her degree, awarded in 2010, was in international affairs with a specialization in security studies. She studied extremist Islam, with a focus on al-Qaeda as part of her undergraduate program. When she lived in Jordan in 2009, she immersed in the culture and worked with a research center on interfaith issues and dealt with Islamic extremism in that country. For her first Masters degree, awarded in 2014, Ms. Schreck concentrated her studies on the Iraq War as well as security issues in the region. She was the only student in her class who spoke Arabic. Her dissertation for her second Masters degree, awarded in 2017, related to historic Syrian conflicts and required extensive research in Arabic and French primary source materials. Thus, by the time she joined SITE Intelligence Group in 2018, Ms. Schreck was well versed in jihadist activities and the numerous organizations operating in the Middle East and their online and social media infrastructure. Her work at SITE Intelligence has included tracking, studying, and analyzing jihadi online networks, which serve as the key conduit for terrorist planning, recruitment, and financing. She has produced hundreds of reports, briefings, and investigations for law enforcement, criminal justice, intelligence and analyst communities in North America, Europe, Asia, and the Middle East. Further, shortly after joining SITE, she was promoted to oversee several teams based on her deep understanding and experience of terrorist networks. In 2018, she began leading SITE's Terrorism and Finance department, overseeing all

6

Case 2:19-cr-00013   Document 360   Filed 12/30/21   Page 6 of 12 PageID #: 4278

monitoring and analysis of content from various extremist and terrorist actors related to online terrorist financing and fundraising, including transaction methods (cryptocurrency, crowdfunding, money transfer, etc) and online promotional techniques (illegitimate charities, coded language, etc).

Ms. Schreck's background clearly demonstrates that she is qualified to testify as an expert based upon her knowledge, skill, experience, training and education. *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). As the Circuit has noted, "[t]he issue … is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). In this case, Ms. Schreck's qualifications provide a strong foundation for testimony concerning the online activities of entities such as The Merciful Hands and Alsadaqah and their relationship to foreign terrorist organizations.

The defendant implies that the case against her is a terrorism financing case, and therefore, questions Ms. Schreck's qualifications in forensic financial accounting or other aspects of terrorism financing. (D.E. 323 at pp. 4-5) The focus of the prosecution, however, is on the defendant's transmission of funds to entities operating on the Internet. Ms. Schreck's proposed expert testimony relates directly to how such entities operate on the Internet to solicit funds and other support for foreign fighters affiliated with FTOs. Her testimony will describe and explain what information is available on certain social media sites that would be seen by people seeking to contribute to these entities.

The defendant then attempts to challenge the methodology supporting Ms. Schreck's proposed expert testimony, without yet knowing what that methodology is, by impugning the

7

integrity of the Executive Director and founder of SITE Intelligence.[4] (D.E. at pp. 5-6) SITE Intelligence Group has provided almost 100 government entities, both domestic and international, with verified, actionable intelligence and analysis relating to designated FTOs and other violent extremist groups for more than 20 years. SITE Intelligence collects, tracks, and applies open-source intelligence to monitor and understand terrorist behavior and activities. SITE Intelligence information and support involves identification of raw data as well as providing analysis to a variety of governmental entities, including criminal justice entities, law enforcement, counterterrorism units, defense forces and institutions, intelligence agencies, secret/protective services, fusion centers, embassies, border patrol/immigration entities and crisis centers. The timely, verified raw data and analysis is fully vetted by the government agencies that are among its clients. SITE Intelligence also supports a broad range of private sector clients, including tech and social media companies, banks and financial institutions, multinational oil and gas corporations, transportation and aviation entities, defense and security contractors, and Fortune 500 companies seeking corporate threat intelligence. In addition, SITE Intelligence provides its information to think tanks, policy institutions, humanitarian organization,s and academic institutions. Despite this well-established, broad-based support to governmental and non-governmental entities, the defendant attempts to malign the reliability of the work of SITE Intelligence Group's personnel[5] and the company's products by citing two cases in which Rita

---

[4] Rita Katz has testified before Congress and in terrorism trials. She has briefed officials at The White House and the Departments of Justice, Treasury, and Homeland Security. She has provided counterterrorism training to military leadership, intelligence analysts and law enforcement agents from numerous government agencies in the United States and overseas. She has led workshops for non-governmental agencies and academic audiences, and has supported policy makers and government institutions worldwide in their efforts to counter terrorism and prevent violent extremism. Ms. Katz has been profiled in The New Yorker and 60 Minutes, and her articles have been published in The Washington Post, Time, The Daily Beast, VICE, and other outlets. For her unique contributions to FBI counterterrorism investigations, Ms. Katz received special recognition from FBI Director Robert Mueller.

[5] Given Ms. Schreck's background and experience summarized above, the defendant's assumption that her

8

Katz, was sued. Both of those cases were dismissed.[6]

The defendant attempts to assert that "even if Ms. Schreck is qualified as an expert and her methodology is sufficiently reliable to permit her testimony, her testimony is not helpful to the jury." (D.E. at p. 6). The defendant then purports to present "the relevant legal framework," mischaracterizing the government's theory of prosecution and the basis for the defendant's culpability. The defendant conflates several different concepts to arrive at this "relevant legal framework." First, the defendant is charged with attempting to provide material support to an FTO, by transmitting funds to entities that had an affiliation with HTS. Contrary to the defendant's assertion, the government need not prove that those entities transferred the funds to HTS. The key consideration is what the defendant believed or intended when she transmitted

---

experience "was gained exclusively at SITE under Ms. Katz's direction" (D.E. at p. 6) is incorrect.

[6] Notably, in *Unus v. Kane*, the Fourth Circuit unanimously affirmed the district court's dismissal of the substantive bases for the lawsuit against all defendants. The plaintiffs did not even appeal dismissal of the substantive – Bivens claims against Ms. Katz. In particular, Ms. Katz was alleged to have provided information to the FBI agent that was used to develop a search warrant affidavit, which the plaintiffs claimed included factual misrepresentations. The Fourth Circuit affirmed the district court's ruling that the plaintiffs "failed to sufficiently identify any factual misrepresentations in the Affidavit, and therefore, … failed to identify how Katz has caused any injury." 565 F.3d 103, 126 (4th Cir. 2009). Since the court found that there were no factual misrepresentations in the affidavit, the claims failed against Ms. Katz as well. The Fourth Circuit determined that probable cause existed to support the Affidavit, and the FBI agent was entitled to qualified immunity on the substantive *Bivens* claim alleged against him.

In *Mar-Jac Poultry, Inc. v. Katz, et al.*, 773 F.Supp. 2d 103 (D.D.C. 2011), the court granted the joint motion of the defendants for summary judgment, dismissing claims of defamation, libel, and slander, ending an eight year battle in court. The case was based on a *60 Minutes* news report describing Ms. Katz's efforts to uncover people and entities that provided financial support to Islamic extremists from within the United States after September 11, 2001. According to the broadcast, the government relied upon Ms. Katz's findings, in part, to execute search warrants at the plaintiff's offices in furtherance of an investigation into terrorist financing. The plaintiff sued the defendants for defamation, based on the content of the *60 Minutes* interview of Ms. Katz, claiming that the defendants had implied that the company was engaged in money laundering activities. The court concluded that the statements made by Ms. Katz concerning money flowing through the plaintiff corporation to terrorists were "at best --- speculation and surmise," observations about matters which Ms. Katz made clear she was still investigating. *Id.* at 121, 123. The court also noted that the broadcast "touched upon a topic of significant public concern, as it discussed one woman's efforts to reveal alleged use of U.S. monies to support terrorist groups, a topic of continuing public anxiety." *Id.* at 120. All claims against Ms. Katz and CBS were dismissed as a matter of law because the statements included in the broadcast were protected by the First Amendment. *Id.* at 123-24. The court held that the program was not defamatory.

9

funds to The Merciful Hands and Alsadaqah. The online information shared by these entities is highly relevant to inform those who view the forums and send money as to the purposes for the solicitation of funds. The transmission of funds to such entities with a stated connection to FTOs is sufficient to establish an attempt to violate the law, whether or not the funds actually reach an FTO. Secondly, the basis for the defendant's criminal culpability under Count Two of the Second Superseding Indictment is the providing of currency. This type of material support does not require that these entities act at the direction and control of an FTO. *See* 18 U.S.C. § 2339B(h).[7]

Given the nature of the charges pending against the defendant, the proposed expert testimony of Catherine Schreck is clearly relevant to the issues in this case and would assist the jury to understand the evidence or to determine a fact in issue. *See United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000). Ms. Schreck's testimony would help the jury in determining how terrorist groups operate on social media on the Internet; online connections among entities such as The Merciful Hands and Alsadaqah, and groups in Syria that support mujahedeen fighting for FTOs such as HTS; how entities such as The Merciful Hands and Alsadaqah instructed potential

---

[7] The defendant's citation to *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) misses the main point of the opinion. As Chief Justice Roberts explained, Congress enacted a limiting definition in 18 U.S.C. § 2339B(h) when providing material support constitutes "personnel," requiring concerted activity with someone connected to an FTO. *Id.* at 23. Assuming a connection between The Merciful Hands and FTOs such as HTS, or between Alsadaqahsyria and FTOs such as HTS, funds obtained through online solicitations are not deemed segregated from such organizations under the law. Chief Justice Roberts noted, "[w]hen it enacted § 2339B in 1996, Congress made specific findings regarding the serious threat posed by international terrorism…'[F]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct.'" *Id.* at 29 (emphasis included). Chief Justice Roberts further explained, "'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks." *Id.* at 30. Specifically, Chief Justice Roberts quoted with approval an affidavit from the government, stating, "Money is fungible, and '[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put.' . . . But 'there is reason to believe that foreign terrorist organizations do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations.' . . . Thus, '[f]unds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives.'" *Id.* at 31.

donors to send money without being detected and why they would do so; and the various beneficiaries promoted by these entities. Ms. Schreck's testimony would also aid the jury in explaining the significance of the references on The Merciful Hands online accounts to The Abu Ahmed Foundation. All of these aspects of Ms. Schreck's proposed testimony would provide context for members of the jury who are not expected to be familiar with the activities of The Merciful Hands and Alsadaqah on the Internet. Without knowing about the nature of these entities and their relationship to foreign fighters and FTOs, a layperson most likely will not have the requisite background to recognize what information the defendant would have been aware of as she reviewed the online presence of The Merciful Hands and Alsadaqah and sent money to both of those entities. With the benefit of Ms. Schreck's testimony relating to the activities of entities such as The Merciful Hands and Alsadaqah on the Internet and their connections to foreign terrorist organizations operating in Syria, the jury will be better able to determine whether the defendant sent funds to The Merciful Hands and Alsadaqah knowing and intending that this money support the activities of HTS.

## CONCLUSION

Wherefore, for the foregoing reasons, the government submits that the defendant's objections to the proffered expert testimony of Catherine Schreck should be denied without a hearing. Alternatively, the government requests that the Court defer consideration of the defendant's objections and defer a decision concerning whether a *Daubert* hearing should be held until Ms. Schreck's expert report is filed in this case.

11

Respectfully Submitted,

MARK H. WILDASIN
United States Attorney
Middle District of Tennessee

By: /s/ *Kathryn Risinger*
KATHRYN RISINGER
PHIL WEHBY
Assistant United States Attorneys
110 9th Avenue South
Nashville, Tennessee 37203
Phone: (615) 736-5151

/s/ *Jennifer E. Levy*
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Suite 7600
Washington, D.C. 20530
(202) 514-1092

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2021, a true and correct copy of the foregoing document was filed electronically via CM/ECF, which will automatically provide service to Charles Swift and Peter Strianse, counsel for the defendant.

/s/ *Kathryn Risinger*
KATHRYN RISINGER
Deputy Criminal Chief – Organized Crime