UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) No. 2:19-cr-00013 |
| v. | ) |
| | ) Chief Judge Crenshaw |
| | ) |
| GEORGIANNA A.M. GIAMPIETRO | ) |

### UNITED STATES' OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF MIA BLOOM

The United States of America, by and through its attorneys, the United States Attorney for the Middle District of Tennessee, and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, hereby files this Response to the defendant's *Daubert*[1] motion to exclude the proffered testimony of Dr. Mia Bloom as an expert witness.

### BACKGROUND

Sometime before 2015, the defendant, a resident of Sparta, Tennessee, converted to Islam. Beginning in 2015, she began studying international relations with a focus on the Middle East. The defendant also had various social media accounts where she would post photographs, pictures and comments. These social media posts expressed a clear support for the religious insurgency occurring in Iraq and Syria, as well as against Bashar al-Assad, the President of Syria. The posts included supportive messages for the designated foreign terrorist organizations("FTOs") of Al-Qaeda, ISIS, and Jabhat al-Nusrah.[2] Beginning in 2015, the defendant also joined social media

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).
[2] On May 7, 2014, the Secretary of State designated al-Nusrah Front as a foreign terrorist organization. The notice

1

groups and channels where she and others discussed jihad, the political situation in Iraq and travel to Iraq. She posted supportive comments about "Jihad John," an ISIS fighter who became notorious for beheading captured prisoners, and about the man responsible for the Pulse nightclub shooting in Orlando, Florida. She made posts to a social media platform espousing support for terrorist attacks against the United States. She shared posts of radical Islamic teachings on a Telegram channel, including posting Anwar Al-Awlaki's "44 Ways to Support Jihad." In one of these channels, the defendant was befriended by an online covert employee of the FBI ("OCE-1").

In late 2015, the FBI became aware that the defendant was posting on social media materials supporting ISIS. The FBI initiated an investigation, during which OCE-1 engaged the defendant on social media platforms. In 2016, the defendant continued to post images and articles about the situation in Iraq and Syria while telling OCE-1 about her online relationship with a fighter in Syria whom she had considered traveling to marry. After some communication with the defendant online, in November 2017, OCE-1 introduced the defendant to an FBI undercover employee ("UCE-1"), posing as a like-minded "sister" who shared the defendant's extremist and radical views related to Islam. Between November 2017 and October 2018, UCE-1 and the defendant engaged in countless electronic communications, using text messages and messaging applications, and met in person on a few occasions. During their relationship, the defendant often espoused extremist views in support of the Islamic State, expressed her desire to travel to Syria to join her fiancé, a jihadist fighter; explained that every Muslim man's duty is to wage "jihad;" and asserted that women should support their male fighters by fighting alongside them, carrying bodies

---

of this action was published in the Federal Register on May 15, 2014. A copy of that designation is attached to this Motion as Exhibit A. On May 17, 2018, the Secretary of State officially recognized a number of aliases used by al-Nusrah Front, and the list of aliases included Hayat Tahrir al-Sham.

from the battlefield, and providing food and water to the mujahedeen.

In February 2018, the defendant met with UCE-1 in person and they discussed travel to Syria, the defendant's online romance with Abu Abdullah, Islam, the political situation in Iraq, and hijrah. In 2018, the defendant also created a Telegram group chat that she invited UCE-1 to join. The group chat was used to share articles and messages about the defendant's relationship, the shared interest in the news and politics related to various groups in Iraq and Syria, the defendant's financial situation and Islamic teachings.

In March 2018, during conversations with the defendant, UCE-1 asked the defendant for a contact to whom the UCE could send money to support the mujahedeen. In response to this inquiry, the defendant provided UCE-1 with contact information for Merciful Hands, advising UCE-1 that Merciful Hands is a "trusted brother." On June 20, 2018, the defendant sent $200 to Merciful Hands. On June 25, 2018, the defendant sent another $500 to Merciful Hands. According to information posted to the Merciful Hands social media platform in 2018, Merciful Hands was seeking donations to support foreign fighters.

Between May and June of 2018, the defendant was in contact with "@MuhamedAA" and inquired how to send money and how much money to send. Evidence collected in the investigation shows that "@MuhamedAA" is the administrator for "@remindersfromSyria," an entity that solicits money for the mujahedeen. On or about June 14, 2018, the defendant sent $150 to "Muhammed Muhammed," associated with international telephone number 905373777140. Evidence links this phone number to "@Alsadaqahsyria," an online handle operating a Syria-based organization that solicits funds online to aid the mujahedeen in Syria.

In the fall of 2018, after UCE-1 told the defendant that UCE-1 and her husband ("UCE-2") had plans to travel to Syria to join Hayat Tahrir al-Sham ("HTS"), a designated FTO, the defendant

expressed concern about the travel plans described by UCE-1. Specifically, the defendant expressed concern about the contacts UCE-1 and her husband were using to travel to Syria. The defendant advised that she knew others whom she trusted more. The defendant told UCE-1 that she would ask an online friend in Syria about UCE-1 and UCE-2's travel plans. In a private chat @Alsadaqahsyria told the defendant that there was no fighting in Syria for the UCEs to join, that they were not required to swear allegiance to HTS, and discouraged them from traveling if they did not already have jobs there. The defendant shared this information with UCE-1 and told her that the plans to travel seemed like a bad idea based on what @Alsadaqahsyria had told her. In response to a request from UCE-1 for @Alsadaqahsyria's contact information, the defendant provided UCE-1 with contact information for @alsadaqahsyria, and told UCE-1 to message @alsadaqahsyria. UCE-1's husband[3] subsequently made contact with @alsadaqahsyria online and advised @alsadaqahsyria that the defendant provided the contact information. After learning who had provided the contact information, @alsadaqahsyria proceeded to discuss with the undercover employee the logistics and timing of travel to Syria.

After the conversation between UCE-1's husband and @alsadaqahsyria, UCE-1 sent a message to the defendant thanking her for providing the contact information and advising that @alsadaqahsyria could help UCE-1 get to Syria. The defendant disavowed that she had provided that contact information for travel purposes, stating, "He wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." The defendant informed UCE-1 that she no longer wished to discuss the matter, stating, "You're going to get me arrested."

---

[3] The FBI witness who communicated online with @alsadaqahsyria was a third undercover employee who was different from the undercover employee who met the defendant in person during the investigation.

4

On August 14, 2019, the defendant was charged in a single count Indictment with violating 18 U.S.C. § 2339B for attempting to provide material support in the form of personnel and resources to HTS. (D.E. 3)  On December 18, 2019, a Superseding Indictment was returned against the defendant, adding two counts of obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(1) and 1519. (D.E. 77)   On August 23, 2021, a Second Superseding Indictment was returned against the defendant, adding a second violation of 18 U.S.C. § 2339B for her attempt to provide material support to HTS in the form of currency, based upon three money transfers she made in June 2018, intending that the money be used to support extremist fighters affiliated with HTS. (D.E. 256)

On May 15, 2020, the government filed its notice regarding expert witnesses, identifying Dr. Mia Bloom as a proposed expert to discuss the role of women in terrorism, the activities undertaken by female jihadists and female jihadi supporters, the radicalization process, the ideology in Islamic literature and teachings often used in radicalization efforts, the meaning of certain terminology used in this context, the role of online communications and social media platforms in the radicalization process, the use of charities to fund terrorist activities and the techniques used to travel undetected to support jihadis.  (D.E. 101)   The government filed a copy of Dr. Bloom's curriculum vitae along with the expert notice.   On August 18, 2021, the government submitted Dr. Bloom's expert report.  (D.E. 245-1)   On November 24, 2021, the defendant filed her *Daubert* motion to exclude Dr. Bloom's expert testimony.

## ARGUMENT

The defendant has requested that the Court conduct a hearing pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to establish the scope and admissibility of expert testimony that the government intends to offer at trial relating to issues of the participation of women in terrorism.  At the same time, the defendant has sought wholesale

5

exclusion of such testimony as proffered by the government's expert witness, Dr. Mia Bloom. The government contends that a *Daubert* hearing is unnecessary to conclude that the proposed testimony is both relevant and reliable.

> Rule 702 of the Federal Rules of Evidence states:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has stated that under Federal Rule of Evidence 702, the district court acts as a gatekeeper to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 589; *Tamraz v. Lincoln Elec. Co.*, 620 F.2d 665, 668 (6th Cir. 2010). The district court's task is specifically to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Rule 702 "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Supreme Court in *Kumho* further explained that district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. When a district court is evaluating the reliability of non-scientific expert testimony, it may forgo factors enumerated in *Daubert* and focus on the reliability of the expert's personal knowledge or experience. *Thomas v. City of Chattanooga*, 398 F.3d 426, 431-32 (6th Cir. 2005). "Even when an expert has never previously been qualified, 'it is the *quality*' of the expert's qualifications that a district court must

6

focus on." *United States v. Young*, 916 F.3d 368, 380-81 (4th Cir.)(quoting *United States v. Garcia*, 752 F.3d 382, 391 (4th Cir. 2014); no abuse of discretion in accepting expert's social sciences-based methodology), *cert. denied,* 140 S. Ct. 113 (2019). Social science testimony is valid when an expert with sufficient credentials identifies the methodology used as one generally accepted in the social sciences. Once accepted social science method is a comparative method, focusing on primary sources, then comparing conclusions against secondary sources and "events on the ground." *NAACP, Inc. v. City of Myrtle Beach,* 504 F. Supp.3d 513 (D.S.C. 2020)(quoting *United States v. Young,* 916 F.3d 368, 380 (4th Cir. 2019). An expert's background, extensive academic credentials, the fact that the United States government uses the expert for training in these areas and the expert's prior work as an expert in other contexts can sufficient qualify the witness as an expert. 916 F.3d at 380. In any event, the expert "must explain how that experience leads to the conclusion reached … and how that experience is reliably applied to the facts." *Id.* at 432 (quoting Fed. R. Evid. 702 Adv. Comm. Note); *see generally United States v. Frazier*, 442 F. Supp. 3d 1012 (M.D. Tenn. 2020) (Crenshaw, C.J.). In determining the relevance of expert testimony, the court must make a "common sense inquiry" into whether the "untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locasio*, 6 F.3d 924, 936 (2d Cir. 1993) (quotations omitted); *see also United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). "Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility." *Commins v. Genie Industries, Inc.*, Civil Action No. 3:16-CV-00608-GNS-RSE, 2020WL 1189937 at *3 (W.D. Ky March 11, 2020) (quoting *In re E.I. Dupont de Nemours & Co. C-8 Personal Injury Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015)); *United States v. Bonds*, 12 F.3d 540, 565 (6th

7

Cir. 1993) (noting that *Daubert* establishes "a 'flexible' and more lenient test that favors admission.").[4] This Circuit has long recognized that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008). The district court's decision to admit proposed expert testimony is normally upheld unless there is an abuse of discretion. *See United States v. Collins*, 799 F.3d 554, 572 (6th Cir. 2015); *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012).

The defendant first entirely mischaracterizes Dr. Bloom's testimony as "profile" evidence, and then challenges almost all of the proffered testimony based on this mischaracterization, claiming that the testimony is unreliable and will not assist the trier of fact. The government submits that Dr. Bloom's background, qualifications, and experience for more than 30 years establish her as a pre-eminent expert in the study of the role and activities of women in terrorism, including the radicalization process used to enlist women into terrorist groups and terrorist activity, a field where there are few credible experts. Her research is not only reliable for purposes of providing testimony in this case; it is relied upon by other academics and government entities in the United States and abroad.[5] Her testimony would clearly assist the trier of fact in determining

---

[4] *See also United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir.), *cert. denied*, 521 U.S. 1127 (1997), where this Circuit observed,

> [I]f [the *Daubert* framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded. Such a result truly would turn *Daubert*, a case intended to relax that [sic] admissibility requirements for expert scientific evidence, on its head.

[5] *See, e.g.,* Thomas, J. and Bond, K., "Women's Participation in Violent Political Organizations," a groundbreaking quantitative study and one of the first cross-national evaluation of the issue, published on line on 07 August 2015 by Cambridge University Press, retrievable at https://www.cambridge.org/core/journals/american-political-science-review/article/abs/womens-participation-in-violent-political-organizations/FD35CCB2555B2B3AA023D2A77F894370; Thomas, J., "Wolf in Sheep's Clothing: Assessing the Effect of Gender Norms on the Lethality of Female Suicide Terrorism," retrievable at http://www.janakathomas.com/uploads/2/7/1/6/27169143/thomas_lethality_female_suicide_bombers-accepted_final.pdf.

significant issues in this case. Numerous courts in this Circuit and others have allowed similar expert testimony to assist the trier of fact in understanding "the background or the history, structure, leaders or operations of an unfamiliar organization or subculture, as that information often can further situate the communications and other relevant evidence into context." *Sines v. Kessler,* Case no. 3:17-cv-0072, 2021 WL 1431296 at *6 (W.D.Va. April 14, 2021)(expert testimony of sociologists studying white supremacy strategies permitted). "Such expert testimony is regularly admitted because it is often not only helpful but necessary for jurors to have an informed understanding of language." *Id.* at *4; *see also Rios*, 830 F.3d at 413-14 ("gang expert" testimony concerning the structure, organization and rules permitted); *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (citing cases) (expert testimony concerning the inner workings of organized crime families permitted), *cert. denied*, 539 U.S. 926 (2003); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (expert testimony concerning the activities and structure of international terrorist organizations permitted); *United States v. Puckett*, Crim. No. 07-766WJ, 2008 WL 11359123 (D.N.M. Aug. 11, 2008)(expert testimony concerning the activities of a domestic terrorist group, the meaning of its documentation and its terms permitted); *United States v. Abu-Jihad*, 553 F.Supp.2d 121 (D. Conn. 2008)(expert testimony concerning the history, structure and goals of a foreign terrorist organization, the recruitment of Muslim fighters, mujahideen activities in specific countries and the role of a mujahideen propaganda website in reaching mujahideen permitted); *United States v. Batiste*, No. 06-20373-CR, 2007 WL 5303052 (S.D. Fla. Oct. 26, 2007)(expert testimony concerning "radical converts" to terrorism and the radicalization process permitted); *United States v. Abdi*, 498 F.Supp. 2d 1048 (S.D. Ohio 2007)(expert testimony concerning the inner workings of world terrorist groups permitted). In terrorism cases, education and professional experience have been found sufficient to qualify an

expert to provide background information and expert testimony. *See, e.g., United States v. Kassir*, No. S2 03 CR 356 (JFK), 2009 WL 910767 at *6 (S.D.N.Y. April 2, 2009)(citing cases).

The defendant's challenge to Dr. Bloom is particularly surprising to the government, insofar as defense counsel attempted to engage Dr. Bloom as the defense expert in this case as far back as May 8, 2020. In a lengthy email message to Dr. Bloom, defense counsel explained that he contacted her at the recommendation of Simon Cottee, an author and lecturer who has written extensively on terrorism and the motivation of terrorists. According to the email, defense counsel advised Dr. Bloom that "Simon Cottee suggested that you could potentially be the ideal expert witness for a case I am doing in the Middle District of Tennessee, US v. Giampietro, which involves allegations of material support to Hay'at Tahrir (HTS) by a female revert." In this email, defense counsel stated that he was looking for expert testimony on the following topics:

1) Who the organizations are in the Giampietro's [sic] online discussion;

2) Where Giampietro's expressed opinions fall within the religious tenants underlying the different groups in Syria and their female supporters;

3) Describe the documented travel from the west to Syria by couples/families and what had been reported by 2018 on the subject, and

4) Describe the recruitment process of women and families.

Dr. Bloom responded to defense counsel the same day, stating that she would not be able to help him because she was already advising the government about this case. Dr. Bloom did provide defense counsel with the names and contact information for four other people who work on the issue of women's involvement in violent extremism.[6] The defense has not noticed any of these

---
[6] Dr. Bloom advised government counsel of the outreach by defense counsel, and government counsel then contacted defense counsel by email within a few days, informing defense counsel that Dr. Bloom had so advised the government

10

other people as proposed expert witnesses.

**Dr. Bloom's Proffered Testimony Fully Satisfies The Requirements of Rule 702.**

Dr. Bloom's proffered testimony is reliable, based upon her education and extensive professional experience. As part of that experience, she has conducted numerous interviews of women in preparation for her first book, published in 2005, as well as for her second book, published in 2011. The vast majority of her publications are peer reviewed, including every book and article published by university presses listed on her resume. She has a Google scholar page that reflects a score of over 4700 academic citations, in which her work relating to women in terrorism has been cited by other academic scholars. Moreover, in 2005-2006, Dr. Bloom conducted studies for intelligence agencies in the United States and abroad about how funds are transmitted to terrorist groups. She has advised other experts about the sources of terrorist funding, and has compared jihadi financing efforts to those used by the Tamil Tigers, a distinct terrorist organization.

**The Defendant's Challenges to Dr. Bloom's Proffered Testimony are Meritless.**

### Dr. Bloom's Proffered Testimony is Reliable

The defendant challenges five of the six topics that Dr. Bloom is expected to discuss during her expert testimony in this case. While she does not take issue with Dr. Bloom's explanation of the different types of jihad, the defendant criticizes Dr. Bloom's anticipated discussion of the concept of *takiya* as irrelevant and unrelated to any of the facts concerning the defendant. The government submits that the concept of *takiya* is relevant and important for the jury to understand if evidence is offered concerning how the defendant presented herself to her mother and in her

---

of the outreach. Government counsel also told defense counsel in that message that the government intended to file a notice identifying Dr. Bloom as a proposed expert witness for the prosecution in this case.

11

community, in terms of her appearance or her religious observance. It could explain why the defendant behaved one way in public and another way with her online associates and friends, such as UCE-1. Dr. Bloom is not expected to offer an opinion as to whether the defendant was practicing *takiya*; Dr. Bloom will simply explain it as an Islamic concept for the jury and how it relates to jihad. As her expert report states,

> The loose translation of the notion is 'precautionary dissimulation.' In many ways it is a tactic of war – using deception and secrecy involving misleading non-believers, even outright lying. This can include concealing one's allegiance to Islam. This allows Muslims to blend in and even engage in behavior that would appear to the outside observer to be un-Islamic, such as the 9/11 bombers frequenting strip clubs and bars before their terrorist operation. Since extremists consider themselves perennially at war with non-believers (in a defensive jihad), they also believe that they are permitted to lie to anyone who opposes them, or their specific interpretation of the Muslim faith.

D.E. 245-1 at p. 50. The proffered testimony about this Islamic concept leaves to the jury the significance of the defendant's behavior, insofar as it was not consistent in public and in private.[7]

The defendant then mischaracterizes the remaining four topics of expert testimony described by Dr. Bloom in her report as creating a "profile." The defendant baldly asserts that the characteristics described by Dr. Bloom, collected through research conducted by many other professionals, were created by her. (D.E. 325 at p. 3: "Dr. Bloom describes what *she* considers the common characteristics of women recruited into terrorist organizations…"; D.E. 325 at p. 5: "Dr. Bloom also describes 'specific indicators and activities of persons that *she* believes might move from radical views to joining a terrorist organization.'")(emphasis added). In fact, these are

---

[7] The defendant also challenges this testimony concerning the meaning of *takiya* as having been prepared solely for trial, citing a products liability case. D.E. 325 at p.18. This criticism is meritless, since the expert reports of all proffered witnesses, defense as well as the government, describe opinions prepared for trial in this case. Dr. Bloom's proffered testimony on the meaning of this concept is derived from her study of Islamic literature and her experience researching the conduct of women affiliated with terrorist groups who prepare to undertake terrorist activity.

12

characteristics, indicators, and activities stated in the research, not characteristics, indicators and activities developed by Dr. Bloom. The research relating to historical cases of specific female terrorists reveal these characteristics, indicators, and activities as explained by Dr. Bloom in her expert report. *See* D.E. 245-1 at pp.7-11. The information from the case studies described by Dr. Bloom came from published accounts of media interviews with them. These accounts were all published before the defendant's activities became the subject of law enforcement investigation. The accounts describe examples of how the radicalization process occurs. Insofar as failed terrorists are the only ones available to determine how they became involved in this activity, data concerning their background and path to radicalization is the process model for researchers to use. This is an accepted methodology for the study of radicalization.

While the defendant repeatedly insists that Dr. Bloom "has created a … female terrorist profile," this assertion is totally false. Dr. Bloom has never created profiles, does not believe in profiles and her expert report does not present a profile.[8] Dr. Bloom has interviewed women who joined a variety of terrorist organizations in different locations around the world during her decades of work in the field, and as a result of that research, has never proposed any single prototype for a female terrorist or the radicalization process. In her work, she has studied different terrorist and radical groups and has seen commonalities among different groups. She has used well acknowledged methodology identified as "most dissimilar case selection," generalizing over decades the common processes of involvement of women she has studied. Thus, the research

---

[8] As far back as May 2007, Dr. Bloom has written, "The most important issues to make clear are that there are no general patterns, no reliable profiles, and no way to explain every kind of terrorism." M. Bloom, <u>Women as Victims and Victimizers</u>, Foreign Policy Agenda, U.S. Department of State, Volume 12, Number 5 (May 2007) (Chapter 4 of publication entitled "Countering the Terrorist Mentality"), http://usinfo.state.gov/pub/ejournalusa.html, reprinted at https://www.hsdl.org/?view&did=473930.

13

Case 2:19-cr-00013   Document 361   Filed 12/30/21   Page 13 of 19 PageID #: 4297

described by Dr. Bloom reflects certain similarities in the background and life experiences of a number of women recruited into terrorist groups and activities, backgrounds and experiences that terrorist groups exploit to enhance recruitment efforts. In Dr. Bloom's expert report, she clearly states that by examining and analyzing previous cases of women involved in terrorist activity, extensive information has been obtained "about the process by which terrorist groups recruit women." D.E. 245-1 at p.7. Analysis of individual cases demonstrate that there are similarities in background and life experiences that bring female converts to Islam to participate in terrorist activity. Conversions occur "after a difficult life. Many have been victims of abuse or have abused substances and are vulnerable to charismatic religious recruiters offering them a chance to reinvent themselves." D.E. 245-1 at p.10. Converts "usually do not speak Arabic (at the beginning) and cannot challenge any interpretation of the Qur'an or the Hadith that someone spoon feeds them. They are unable to debate the finer points of Islamic philosophy or dispute the jihadi's interpretation of the enemy. . . Depending on how small a town they are from, some converts do not even speak to an actual Muslim in real life until they are recruited for terrorist activities." *Id.*

Since Dr. Bloom's proffered testimony in no way reflects a reliance on profiling women or presenting a profile of a female terrorist for the factfinder to consider, none of the caselaw relied upon by the defendant relating to "profiling evidence" is relevant to the Court's consideration of Dr. Bloom as an expert witness.

The defendant criticizes Dr. Bloom's research and proposed testimony as "based largely on qualitative studies with few subjects and anecdotal evidence." D.E. 325 at p.12. In the study of women in terrorism, there is not a large amount of data-driven research available. The studies that exist are quantitative research articles, and the authors of those articles cite Dr. Bloom's

14

research in support of those studies. *See* footnote 4, *supra*. The defendant's implication that Dr. Bloom relies on "a limited number of cases to make sweeping conclusions and generalizations," *id.*, ignores the fact that Dr. Bloom has, in fact, studied the activities of women in several countries who operated in various terrorist groups for decades, authoring books and articles describing these women beginning in 2006. Dr. Bloom's work in the field has been based on conducting research into a diverse array of women affiliated with radical and terrorist groups operating in Europe, Southeast Asia, and the Middle East. The conclusions she describes in her expert report reflect not only the three case studies she describes in the report, but also incorporates her decades of research and analysis developed as a result of her outreach to women who were involved in terrorist activities in other countries.

While the defendant attempts to undermine the reliability of Dr. Bloom's research based on a criticism of a cited study of Sophia Moskalenko and Clark McCauley (D.E. 325 at pp.13-14), it is clear that the defendant has not read the study itself, but rather, relies exclusively upon a secondary source that not only mischaracterizes the basis for the study but also fails to include any discussion of the methodology used by the authors.

This study was commissioned by a DHSNC-START research grant. Test reliability was established by administering a survey in seven separate waves over the course of five years. Measurements on radicalization items and scales were obtained in each of the seven waves, allowing the researchers to compare values on radicalization items and scales across waves. As a result, "test-retest" reliability was ascertained 21 separate times as the waves were compared with one another. The values obtained in the different waves were highly correlated with one another, demonstrating high "test-retest" reliability. Inter-rater reliability was established by including in the survey questions about radicalization that other researchers used in the population

15

of U.S. Muslims, including questions that had been used by PEW and Gallup researchers. Moskalenko and McCauley observed a high correlation between their data and the data from Pew and Gallup research in each of the seven survey waves. Internal consistency reliability was established by calculating Cronbach's Alpha for the Radicalism Intentions Scale in each of the seven waves of the survey, resulting in a high Alpha score demonstrating that items on the scale were highly inter-correlating and indicating their reliability.

The sample of the population of U.S. Muslims involved in the study was selected by a reputable surveying firm. A sample size of about 280 people in each of the seven waves of the survey were chosen by the surveying firm, representing diversity in age, gender, income, education level, marital status, geographic location and racial and ethnic origins. More details about the methodology employed in this study can be provided to the Court and counsel, but it is clear from the information described above that this was a study conducted in strict conformity with psychological research protocols and the extrapolated results are reliable.

### **Dr. Bloom's Proffered Testimony Will Assist the Trier of Fact**

This case charges the defendant with attempting to assist others to travel to Syria to join a designated foreign terrorist organization; attempting to send money to entities that are affiliated with designated foreign terrorist organizations; and obstructing justice by attempting to hide her involvement in these activities. A prosecution such as this is not within the ordinary experience of an average citizen, nor can the jury be expected to fully understand the context for the defendant's charged activities without the benefit of expert testimony.[9] Dr. Bloom's testimony

---

[9] Contrary to the defendant's assertion that the government is "attempt[ing] to inject Ms. Giampietro's religious beliefs and immutable traits into 'trial as evidence of criminal behavior,'" D.E. 325 at p.17, the government must prove that the defendant attempted to provide material support to a designated foreign terrorist organization, and in so doing, is entitled to present evidence to the jury explaining how the defendant's conduct, not her beliefs or any

16

rests upon experience and knowledge that the jury does not have. Her testimony will aid the jury in understanding the motivations and modus operandi for recruiting women into supporting foreign terrorist organizations. Dr. Bloom can provide context for the defendant's collection of certain Islamic literature and her quotation of the philosophy of particular clerics, theologians and scholars in her social media communications. Dr. Bloom's anticipated testimony will assist the jury in determining whether the defendant "knowingly" attempted to provide material support to a designated foreign terrorist organization. Her discussion of the recruiting practices of designated foreign terrorist organizations, as they relate to women, can assist the jury in deciding whether the defendant attempted to provide material support in the form of personnel. Dr. Bloom's testimony concerning the terrorist recruitment of women, including how the terrorist organizations disseminate information to potential recruits, is also an important subject for the jury to understand. In fact, the categories of testimony that defense counsel sought from Dr. Bloom in May 2020 (*see* p. 10, *supra*) are the very areas of concern that the jury will be asked to consider, and that consideration will be aided by permitting the testimony of Dr. Bloom.

### Dr. Bloom's Proffered Testimony Is Not Unfairly Prejudicial

Dr. Bloom's proffered testimony provides the jury with context as they are called upon to understand and evaluate the defendant's conduct. Her testimony concerning the radicalization process is general in nature, and her experience in studying women who have been radicalized and who have become involved in terrorist activity provides helpful background for the jury to consider in assessing the facts in this case. Insofar as Dr. Bloom can offer an opinion about the radicalization of the defendant based upon the writings of certain Islamic theologians and scholars,

---

"immutable traits," violated federal law.

these theologians and scholars were identified as a result of Dr. Bloom's review of a selection of Telegram chats in which the defendant was a participant and whom she cited. Insofar as Dr. Bloom can offer an opinion about whether the defendant knowingly attempted to provide material support by sending funds to certain entities online, Dr. Bloom was also provided a copy of a research paper written by the defendant relating to fundraising activities of terrorist organizations. Dr. Bloom's testimony cannot be considered unfairly prejudicial if based, in part, upon the defendant's own statements and actions.

## CONCLUSION

Wherefore, for the foregoing reasons, the government submits that the defendant's objections to the proffered expert testimony of Dr. Mia Bloom should be denied without a hearing.

Respectfully Submitted,

MARK H. WILDASIN
United States Attorney
Middle District of Tennessee

By: /s/ *Kathryn Risinger*
KATHRYN RISINGER
PHIL WEHBY
Assistant United States Attorneys
110 9th Avenue South
Nashville, Tennessee 37203
Phone: (615) 736-5151

/s/ *Jennifer E. Levy*
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Suite 7600
Washington, D.C. 20530
(202) 514-1092

## CERTIFICATE OF SERVICE

      I hereby certify that on December 30, 2021, a true and correct copy of the foregoing document was filed electronically via CM/ECF, which will automatically provide service to Charles Swift and Peter Strianse, counsel for the defendant.

                                                  /s/ *Kathryn Risinger*
                                                  KATHRYN RISINGER
                                                  Deputy Criminal Chief – Organized Crime