IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>    Plaintiff, )<br>                      )<br>v.                             )<br>                      )<br>GEORGIANNA A.M. GIAMPIETRO )<br>    Defendant. ) | Case No.: 2:19-cr-00013<br><br>Chief Judge Waverly D. Crenshaw, Jr. |

**DEFENDANT'S REPLY IN SUPPORT OF HER *DAUBERT*
MOTION TO EXCLUDE EXPERT TESTIMONY OF MIA BLOOM**

In this reply, Ms. Giampietro primarily addresses two questions that go to the crux of her *Daubert* motion:

1. Does Mia Bloom's testimony about women who engage in terrorism constitute profile evidence?

2. If Mia Bloom's testimony about women who engage in terrorism is not profile evidence, can it satisfy Federal Rule of Evidence 702, and in particular the "helpfulness" requirement? If so, does it also satisfy the balancing test of Rule 403?

***First Question: Does Mia Bloom's testimony about women who engage in terrorism constitute profile evidence?*** The government claims that it does not (Opp'n 8, 12, 13) but makes no effort to determine the meaning of "profile" or "profile evidence." Courts have described profiles as "a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in specific illegal activity." *United States v. Robinson*, 978 F.2d 1554, 1563 (10th Cir. 1992); *see also United States v. McDonald*, 933 F.2d 1519, 1521 (10th Cir. 1991) ("What is 'profile evidence'? Courts define it in varying terms such as an 'informal compilation of characteristics often displayed by those trafficking in drugs'"). They generally exclude profile evidence because it has *de minimis* probative value, is highly prejudicial, and operates like

1

character evidence by emphasizing the defendant's characteristics to prove guilt.[1] *See United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990).

According to the government, Dr. Bloom's testimony focuses on the following:

- "The research relating to historical cases of specific female terrorists reveal these characteristics, indicators, and activities as explained by Dr. Bloom in her report."

- "Analysis of individual cases demonstrate that there are similarities in background and life experiences that bring female converts to Islam to participate in terrorist activity."

Opp'n 13-14. Like Dr. Bloom, the government uses broad generalizations about female converts:

> Conversions occur "after a difficult life. Many have been victims of abuse or have abused substances and are vulnerable to charismatic religious recruiters offering them a chance to reinvent themselves." D.E. 245-1 at p.10. Converts "usually do not speak Arabic (at the beginning) and cannot challenge any interpretation of the Qur'an or the Hadith that someone spoon feeds them. . . ." *Id.*

*Id.* at 14. In quoting Dr. Bloom's report, the government omits her explanation that "*[m]any of the female converts who became involved in terrorism have a comparable background and profile*, having converted to Islam after a difficult life." Bloom 10 (emphasis added). Dr. Bloom also states that "[w]e have extensive information about the process by which terrorist groups recruit women from analyzing the historical cases of [female terrorists], such as Colleen LaRose" who "*was in many ways a stereotypical female convert to Islam – turned radical jihadi.*" *Id.* at 7-8 (emphasis added). Based on her research, she explains that "[t]here tends to be two different categories of

---

[1] The government cites *United States v. Batiste*, No. 06-20373-CR, 2007 U.S. Dist. LEXIS 102063 (S.D. Fla. Oct. 26, 2007), where the Southern District of Florida permitted expert testimony regarding:

> 1) categories of terrorist suspects, including "radical converts," defined as "disaffected young men who are easily influenced by radical religious rhetoric"; 2) the four-step radicalization process; 3) that the defendants fit into the profile of "radical converts"; 4) that they followed a process of radicalization similar to that of other Islamic extremists and other radical converts. . . .

*Id.* at *9 (cleaned up). While we cannot guess whether the *Batiste* decision would have been different had the defendant objected on the grounds that the expert testimony constituted profile evidence, it requires no guesswork to determine that other courts wholly reject testimony of this sort. *See, e.g., United States v. Baldwin*, 418 F.3d 575, 581 (6th Cir. 2005); *United States v. Wells*, 879 F.3d 900, 923 (9th Cir. 2018).

women that these terrorist groups seek: very young Muslim girls who reside in the West *and women, like LaRose, Ramirez, or the defendant, who are Western converts*." *Id*. at 10 (emphasis added). The government, like Dr. Bloom, repeatedly uses the words "common" and "commonalities," "similarities," "many [female converts]," and "[female] converts usually." And Dr. Bloom connects those similarities directly to Ms. Giampietro. *Id*.

Despite this language, the government claims that Ms. Giampietro "entirely mischaracterizes Dr. Bloom's testimony as 'profile' evidence. . ."[2] Opp'n 8. This conclusory statement mimics that made by the government in *United States v. Wells*, 879 F.3d 900 (9th Cir. 2018). There, the district court admitted expert testimony regarding what the government described on appeal as the "personality and psychological characteristics of those who commit [workplace violence]" as well as the "pattern [the expert] saw through his research and studies" "of those who perpetrated such crimes." Answering Brief for the United States at 86, ECF No. 58, *United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) (No. 14-30146, 15-30036). The government argued that the expert's testimony was not profile evidence because "[h]e did not 'profile' any specific perpetrator." *Id*. It claimed that the expert "was careful not to profile [the defendant]. Nor did he suggest that any one profile could describe those who commit targeted intended violence." *Id*. at 92. Any finally, it claimed that the expert's "analysis of statistics, study and research described the different characteristics, personalities, and action of those who commit such crimes. It was the jury's role and its role alone to determine if any of the various characteristics fit [the defendant]." *Id*. at 93-94.

---

[2] The government goes on to suggest that Dr. Bloom's testimony is not profile evidence *because* she is qualified and her methods are is reliable. Opp'n 8. But neither lack of expert qualifications nor unreliability is the issue that necessitates exclusion of profile evidence. Courts often consider profiles to be reliable investigative tools; but their purported reliability does not make them admissible in a criminal trial. *Simpson*, 910 F.2d at 157.

3

The court of appeals disagreed with the government, holding that the expert's testimony was inadmissible profile evidence. *Wells*, 879 F.3d at 918-20 (excluding the expert's testimony because its probative value could be "found only in its ability to answer the impermissible question of whether, based on his character profile, [the defendant] acted in accordance therewith"). This Court should exclude Dr. Bloom's testimony because despite the government's denial, it too constitutes inadmissible profile evidence. To borrow an idiomatic phrase, if it looks like a duck, swims like a duck, and quacks like a duck, then it probably *is* a duck.

***Second Question: If Dr. Bloom's testimony does not constitute profile evidence, does it satisfy the requirements of Rules 702 and 403?*** If the Court agrees with the government and concludes that Dr. Bloom's testimony is not profile evidence, the analysis changes but the outcome should not. Expert testimony is inadmissible under Federal Rule of Evidence 702 if it is not sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. FED. R. EVID. 702; *see also* FED. R. EVID. 401 (defining relevant evidence as "having the tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"). In other words, Rule 702 requires expert testimony to be both helpful and relevant.

In the government's words, Dr. Bloom's testimony focuses on the similarities in the background, life experiences, and activities of female converts who engage in terrorism. Opp'n 13-14. The Court must ask whether this testimony meets Rule 702's helpfulness requirement. Specifically, if the testimony about various similarities of female terrorists provides "*no general patterns, no reliable profiles, and no way to explain every kind of terrorism*," as Dr. Bloom and the government say, then how does it help the jury determine whether this defendant attempted to

4

provide material support to a terrorist organization in this case?³ Opp'n 13 n.8. The simple answer: it does not.

Further, there is no dispute that beginning in 2015, Ms. Giampietro used social media to consume and share materials relating to foreign terrorist organizations (FTOs). Nor is there a dispute that she had conversations with UCE-1 about FTOs, Islamic teachings, and her desire to travel to Syria. Indeed, the government identifies myriad evidence on these points that it seeks to offer as proof that Ms. Giampietro—a Western female convert—became radicalized online. Opp'n 2-4 (referencing Ms. Giampietro's conversations, posts, and research).⁴ Thus, while expert testimony regarding HTS's background and history would likely be admissible under Rule 702,⁵ the jury does not need expert testimony about how Western female converts can become radicalized online. As a result, Dr. Bloom's testimony fails the helpfulness test of Rule 702.

Next, even if an expert's testimony meets Rule 702's requirements, courts may still employ their discretion to exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. The government downplays the significance of the Rule 403 balancing test, barely addressing the risk of prejudice at all. Opp'n

---

³ Because Dr. Bloom's testimony would not assist the trier of fact, this Court need not decide whether she is qualified or whether her methods are reliable. Nevertheless, despite her years of research and published methodology, Dr. Bloom—like other terrorism researchers—cannot say with any level of certainty what type of individual may become radicalized or support an FTO. Opp'n 13 n.8 (quoting Bloom). *See State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993) ("[B]ecause no consensus exists on the reliability of a psychological profile to determine abuse, expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place."). Thus, even if her list of common characteristics and activities is a useful investigative tool, it does not belong in court before a jury.

⁴ Much of this evidence is the subject of Ms. Giampietro's Motion in Limine Regarding 404(b) Evidence, Doc. 169.

⁵ Ms. Giampietro agrees that courts routinely permit expert testimony about background. Hence, Ms. Giampietro did not object to Dr. Bloom's Topic 1, namely "explain[ing] the different types of jihad." But unlike in the majority of cases cited by the government, Dr. Bloom does not propose to testify about the history or background of the foreign terrorist organization that the government charged Ms. Giampietro with supporting—Hayat Tahrir al-Sham (HTS). *See* Opp'n 9 (citing *Sines v. Kessler*, Case no. 3:17-cv-0072, 2021 WL 1431296 at *6 (W.D.Va. April 14, 2021)). In fact, she provides almost no background information about HTS itself. Bloom at 13, 18.

17-18.[6] But Dr. Bloom's testimony is more than simple context and background; it goes beyond a discussion of the radicalization or recruitment process in general. Dr. Bloom expressly connects women like LaRose—"the stereotypical female convert to Islam–turned radical jihadi."—to Ms. Giampietro. The probative value of this testimony is nominal in relation to the acute risk that the jury will convict Ms. Giampietro simply because she fits the description (or profile) of a female terrorist as described by Dr. Bloom.

*Two additional issues requiring a response.* First, the government argues that Dr. Bloom should be permitted to testify about the concept of *takiya* because "[i]t could explain why the defendant behaved one way in public and another way with her online associates and friends, such as UCE-1." Opp'n 11-12. The way Ms. Giampietro "presented herself to her mother and in her community" is not an issue in this case and Dr. Bloom's opinion on this topic is wholly speculative. In the end, Dr. Bloom's testimony about *takiya* serves no purpose other than to suggest that Islam encourages lying and that Ms. Giampietro is a liar.

Second, the government claims that Dr. Bloom's testimony about "recruiting practices of designated foreign terrorist organizations, as they relate to women, can assist the jury in deciding whether the defendant attempted to provide material support in the form of personnel." Opp'n 17. But Dr. Bloom's testimony does not support or advance this conclusion; rather, she discusses at length how an FTO might recruit a Western female convert like Ms. Giampietro. *See, e.g.,* Bloom at 4, 7, 10 ("Jihadi groups have been very adept at using the Internet, and social media, to recruit women [like the defendant] from the West."). Thus, to the extent the government seeks to argue that Ms. Giampietro is *herself* an FTO recruiter, Dr. Bloom's testimony about FTO recruitment of

---

[6] The government also makes the unsupported claim that "Dr. Bloom's testimony cannot be considered unfairly prejudicial if based, in part, upon the defendant's own statements and actions." Opp'n 18. This is not the test for determining prejudice. Indeed, one of the reasons that evidence of a defendant's own prior bad acts is limited or excluded under Rule 404(b) is the danger of unfair prejudice.

6

Case 2:19-cr-00013   Document 374   Filed 01/07/22   Page 6 of 7 PageID #: 4374

Western female converts would not assist the jury in determining that issue. And when viewing the evidence in this case, it is also apparent that her testimony on this topic is not "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[7] *United States v. Leblanc*, 45 F. App'x 393, 400 (6th Cir. 2002). Instead it would confuse and mislead the jury.

Dr. Bloom's testimony is inadmissible profile evidence, will not assist the jury to determine issues in this case, and carries a substantial risk of undue prejudice and jury confusion. Accordingly, Ms. Giampietro requests that the Court grant her Motion and issue an order and opinion excluding the testimony of Mia Bloom.

Respectfully submitted this 7th day of January, 2022,

By: /s/ *Charles Swift*
Charles D. Swift,
*Pro Hac* Attorney for Giampietro
CLCMA
100 N. Central Expy, Suite 1010
Richardson, TX 75080
(972) 914-2507

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of January, 2022, I electronically filed the foregoing **Defendant's Reply in Support of Her Daubert Motion to Exclude Expert Testimony of Mia Bloom** with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ *Charles Swift*
Charles D. Swift, Pro Hac
Attorney for Giampietro

---

[7] As the government knows, at no point in Ms. Giampietro's interactions with the UCE-1 did she propose that she or the UCEs travel to Syria to fight. Instead, the evidence (cited by the government) shows that UCE-1 informed Ms. Giampietro that she and her husband intended to travel to Syria and Ms. Giampietro took steps to discourage them from doing so.