IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
|     Plaintiff, ) | |
| ) | Case No.: 2:19-cr-00013 |
| v. ) | |
| ) | Chief Judge Waverly D. Crenshaw, Jr. |
| GEORGIANNA A.M. GIAMPIETRO ) | |
|     Defendant. ) | |

## DEFENSE POSITION WITH RESPECT TO SENTENCING

The defendant, Georgianna Giampietro, through undersigned counsel, files the following Objections to the Presentence Investigation Report ("PSR") prepared by the United States Probation Office of the Middle District of Tennessee. Ms. Giampietro objects to the PSR's factual assertions in Paragraphs 12, 14, 16, and 23. Ms. Giampietro further objects to the PSR's legal conclusion in Paragraph 29, 31, and 39 that Ms. Giampietro's offense of conviction is subject to an enhanced guidelines range for promoting a crime of terrorism and obstruction pursuant to U.S.S.G. §§ 3C1.1.

### I.    OBJECTION TO FACTUAL FINDINGS

#### A.  Paragraphs 12 and 14

Ms. Giampietro objects to the implications in Paragraphs 12 and 14 that she gave contact information for two different individuals with connections to Hay'at Tahrir al-Sham ("HTS"), and that she provided contact information before the undercover agent informed her that her husband had joined HTS and they intended imminent travel to Syria. Transcripts of the conversations between the undercover female agent and screen shot of their Telegram conversations are consistent with Ms. Giampietro only sharing the contact information for an Individual A, once, after the female undercover agent revealed she and her husband had sworn allegiance to HTS and

1

expressed their intent to travel to Syria imminently so that the undercover husband could fight on behalf of HTS.

### B. Paragraph 16

Ms. Giampietro objects to the findings of fact in Paragraph 16 that she provided financial support to HTS in June of 2018. Paragraph 16 restates the allegation in the Second Superseding Indictment that Ms. Giampietro provided material support in the form of monetary funds in June of 2018. Ms. Giampietro has consistently denied this allegation, and the government agreed to dismiss the allegation as part of the plea agreement. To the extent the allegation that Ms. Giampietro provided material support in the form of monetary funds to HTS is relevant to sentencing, the allegation must therefore be established by a preponderance of the evidence and ruled on by this Court. *See United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007)("Once the defendant calls the matter to the court's attention, the court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence. Rather, the district court must affirmatively rule on a controverted matter where it could potentially impact the defendant's sentence.") (internal citations and quotations omitted).

The defense's proffered evidence consists of the following exhibits:

/

/

/

/

2

| Exhibit | Description |
|---|---|
| Exhibit A | Wire transfer sent by Ms. Giampietro via Western June 14, 2018, in the amount of $150 to Muhammed Muhammed at a pay agent in Istanbul, Turkey |
| Exhibit B | Wire transfer sent on June 21, 2018, by Ms. Giampietro in the amount of $200 to Omar Ali at a pay agent in Hatay, Turkey |
| Exhibit C | Wire transfer sent on June 26, 2018, by Ms. Giampietro in the amount of $500 to Ahmet Hayek at a pay agent in Hatay, Turkey |
| Exhibit D | Post from Merciful Hands' Facebook and Telegram identify +905378220931 as phone number to use in association with donations |
| Exhibit E | Screen shots taken by Ms. Giampietro of Al-Sadaqah Syria's Telegram account: soliciting donations to buy boots and uniforms for unidentified fighters |
| Exhibit F | Ms. Giampietro's college paper titled "Money in all the Wrong Places: Corruption and Financing Terrorist Organizations" Spring of 2014 |
| Exhibit G | A summary of Ms. Giampietro's statements discouraging support for HTS |
| Exhibit H | Expert report of Dr. Aymenn Jawad Al - Tamimi concerning Hay'at Tahriral-Sham, Al-Sadaqah Syria and Merciful Hands |
| Exhibit I | Expert Report of Dr. Richard Connor of ESI Consulting Report regarding Giampietro |
| Exhibit J | First Supplemental Expert Report of Dr. Aymenn Jawad Al - Tamimi |

1. **June 21 and 26, 2018 transfers**

The presence of a phone number associated with Merciful Hands on the documents associated with the $200 and $500 transfers on June 21 and June 26, 2018, respectively, indicates that the recipients of the funds were associated with Merciful Hands.[1] (Exhibits B and C.)

---

[1] Defense expert Dr. Al-Tamimi interviewed the director of Merciful Hands. The director indicated that he did not have a memory of the transfers. His lack of memory concerning two donations three years after

3

For a transfer to Merciful Hands to constitute a material support of HTS, the evidence must show Ms. Giampietro knew Merciful Hands would transfer the funds to HTS, or was aware that Merciful Hands performed its work under the direction and control of HTS. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 23-25 (2010). The only evidence suggesting that Merciful Hands, in turn, provided funds to HTS is a statement on Merciful Hands' Telegram channel that the charity solicited donations in order to help the "mujahideen, muhajireen, orphans and widows", and a statement by Merciful Hands indicating that it had worked in conjunction with the Abu Hamad foundation. (Exhibit H - Jawad Initial Expert Report at 7 - 8, and Exhibit J - Jawad First Supplemental Expert Report at 1;) (*See also* Exhibit D – Posts from Merciful Hands).

"Mujahideen" in the context of Merciful Hands refers to "those who wage jihad' (*i.e.* Islamic holy war/struggle)", is generic, and does not in itself promise support for HTS in the form of currency or goods, as multiple groups of affiliated and unaffiliated persons offered armed resistance in Northeast Syria. (Exhibit H - Jawad Initial Expert Report at 7.) Accordingly, it is not possible to deduce from Merciful Hands' stated support of mujahideen, the affiliation of the militants purportedly supported by Merciful Hands. (Exhibit H - Jawad Initial Expert Report at 8). The animosity of the director of Merciful Hands in 2018 towards HTS, however, makes it unlikely that the Mujahedeen referred to were HTS. (Exhibit H - Jawad Initial Expert Report at 8.)

Likewise, Merciful Hands' statement on Facebook, that it was working with the Abu Hamad Foundation and Sadaqah Al Khair, does not establish that Merciful Hands' activities were performed under the direction and control of HTS. Little is known concerning Sadaqah Al Khair (Exhibit J - Jawad Supplemental Expert Report at 2), and consequently there is no evidence linking

---

the fact, however, is understakable given the passage of time and volume of donations for even a small charity.

Sadaqah Al Khair to HTS. The Abu Hamad Foundation, however, has been linked to HTS through its support of Malhama Tactical, which provided training to HTS insurgents among others. (Exhibit J - Jawad Supplemental Expert Report at 2 – 3.) Additionally, at least one individual confirmed Abu Hamad's direct support of HTS. (Exhibit J - Jawad Supplemental Expert Report at 3.) That same individual, however, denied that the Abu Ahmed Foundation worked with Merciful Hands to support Malhama Tactical and HTS. The director of Merciful Hands explained that the relationship with the Abu Hamad Foundation was a donor/donee relationship in which Abu Hamad provided one or two monetary donations to support Merciful Hands' charity work. This relationship was independent of HTS, and as such did not constitute material support.

**2. June 14, 2018 transfer**

Unlike the June 21 and 26, 2018 transfers, there is no telephone number associated with the transfer on June 14, 2018. (Exhibit A.) The transfer was to Istanbul - far from the Turkey's Syrian border – and not the Hatay province which adjoins the Syrian border. Accordingly, there is nothing to suggest that the transfer was to a person associated with Merciful Hands. There is evidence to suggest that Ms. Giampietro was interested in another group purporting to support combatants - Al-Sadaqah Syria. Ms. Giampietro took screenshots of Al-Sadaqah Syria's Telegram solicitation for funds to buy boots and uniforms for fighters on June 15, 2018 (*after* June 14). (Exhibit E.) Ms. Giampietro's screenshots raise the possibility that the June 14, 2018, transfer was to an individual associated with Al-Sadaqah Syria. Undercutting that possibility is the timing of the screen shots, the absence of evidence that Al-Sadaqah Syria had assets in Istanbul, and the fact that Al-Sadaqah Syria exclusively sought donations in the form of bit-coin. The screen shots taken after the transfer again undercut the proposition that they show research on the part of Ms. Giampietro. Al-Sadaqah Syria was a charity operated in Northwest Syria and there is no evidence that it had the necessary

5

assets in Istanbul to receive the transfer. (Exhibit H - Jawad Initial Expert Report, at 8.) Finally, unlike Merciful Hands, Al-Sadaqah Syria solicited funds exclusively in bitcoin, so transfer by Western Union would be contrary to their customary practices. The affiliation of the recipient of the June 14 transfer is, at most, speculative.

### 3. Ms. Giampietro lacked predisposition to use a charity as a cover for providing support to HTS

The evidence does not support the allegation that Ms. Giampietro was seeking to surreptitiously fund HTS through Merciful Hands and/or Al-Sadaqah Syria. To learn more about Ms. Giampietro's intent to fund terrorism through charities, the Court requested a copy of her Spring 2014 college paper concerning terrorist financing. (Exhibit F – Ms. Giampietro's college paper, Spring 2014.) The paper is a review of literature concerning terrorism financing; the relevant portion discusses literature concerning Hamas's use of charitable activities to drive fundraising and win hearts and minds. (Exhibit F - Giampietro paper at 5.) What can be gleaned from the paper is that Ms. Giampietro was aware that terrorist organizations have used sympathetic charitable activities to drive their fundraising. Ms. Giampietro's general knowledge of the potential for a charitable activity to mask terrorism financing fails to corroborate the theory that her donations to Merciful Hands were intended to benefit HTS. Ms. Giampietro's contemporaneous statements were critical of HTS, due to HTS's belligerent activities against other Muslim groups. (Exhibit H - Jawad Initial Expert Report at 10: *see also* a summary of Ms. Giampietro's statement regarding HTS – Exhibit G.) The statements were made to persons she considered trusted friends and supporter,s making it unlikely she was feigning her lack of support for HTS. Ms. Giampietro's hostility towards HTS, coupled with her knowledge that charitable activities could be a front for a terrorist organization, actually makes it more likely that Ms. Giampietro would be careful to select charities that were *not* connected to HTS.

6

### C. Paragraph 23

Ms. Giampietro objects to the suggestion in Paragraph 23 that she destroyed evidence after the commission of the offense of conviction, as misleading. Paragraph 23 states "Agents also found messages on the defendant's cellphones that indicated she was deleting messages and applications due to her possible pending Indictment." While correct in some respects, the statement is misleading because it lacks the appropriate temporal and factual contexts. The alleged period of the offense of conviction was from September 23, 2018 to October 23, 2018.

Prior to and during the alleged criminal conduct, Ms. Giampietro used the Secret Chat feature on Telegram to communicate with others, including the undercover and persons in Syria. Secret Chats are features of Telegram that permit the parties to communicate without a permanent record of the conversations being stored on their phones. (Exhibit I - Expert Report of Richard Connor at 3.) The parties to a Secret Chat must agree to use the feature before engaging in a Secret Chat. (Exhibit I - Expert Report of Richard Connor at 3.) It is unclear whether the alleged deletion of messages by Ms. Giampietro refers to the use of the Secret Chat feature during the charged period and the document allegedly deleted during Ms. Giampietro's use of the Secret Chat feature. During the period of the charged conduct, Ms. Giampietro logged out of the Telegram account she had used with the undercover, and created a new account. Unless Ms. Giampietro scheduled a deletion of her prior account, logging out of a prior account and creating a new account would not remove the Telegram data that had been saved on her phone. The allegation that Ms. Giampietro removed an application would not necessarily result in the destruction of data and is insufficient to conclude the same. (Exhibit I - Expert Report of Richard Connor at 3, paragraph c.) Finally, Ms. Giampietro was advised to delete information on her devices by doing a factory reset on them. There is no evidence that Ms. Giampietro followed the advice, as the Forensic images of her

7

devices does not suggest that they had been wiped or reset. (Exhibit I - Expert Report of Richard Connor at 3, paragraph c).

## II. OBJECTIONS TO PSR SENTENCING GUIDELINES

**A. Paragraphs 29 and 39 (Terrorism Enhancement)**.

U.S.S.G. §3A1.4 provides for a 12-level increase in the offense level, and automatic placement in criminal history category VI, if a defendant's "offense is a felony that involved or was intended to promote a federal crime of terrorism." Per Application Note 1, a "federal crime of terrorism" is given the same definition as used in 18 U.S.C. §2332b(g)(5). 18 U.S.C. §2332b(g)(5) provides a two-pronged definition for a "federal crime of terrorism." The first prong is that the underlying offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). The second prong is that the underlying offense was a violation of any one of a list of enumerated statutes found in 18 U.S.C. § 2332b(g)(5)(B). *See United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010), citing 18 U.S.C. § 2332b(g)(5)(A); *cf. United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001); *United States v. Starks*, 309 F.3d 1017, 1026 (7th Cir. 2002); *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008).

Ms. Giampietro's underlying offense under 18 USC § 2339C is an enumerated offense in § 2332b(g)(5)(B), satisfying the second prong. What is at issue is the first prong of § 2332b(g)(5)(A), whether the underlying offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

The first prong of § 2332b(g)(5)(A) imposes a specific intent requirement. *See United States v. Stewart,* 590 F.3d 93, 138 (2d Cir. 2009) ("[C]omission of a federal crime of terrorism . . . incorporates a specific intent requirement.") (quoting *United States v. Chandia I,* 514 F.3d 365,376

8

(4th Cir. 2008)*; see also United States v. Hassan*, 742 F.3d 104, 148-49 (4th Cir. 2014); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014); *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014).

The Second Circuit explained in *Awan* that the intent requirement "does not require proof of a defendant's particular motive," which is "concerned with the rationale for an actor's particular conduct." *Awan,* 607 F.3d at 317. Rather, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *Id.* The focus is not "on the defendant, but on his 'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." *Id.* In short, § 2332b(g)(5) "is better understood as imposing a requirement that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* (quoting *Stewart*, 590 F.3d at 138).

In determining the first prong, the burden is on the government to show by a preponderance of the evidence that Ms. Giampietro's concealment of material support was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. *See United States v. Johnson,* 227 F.3d 807, 813 (7th Cir. 2000) ("During sentencing, the Government must prove the facts underlying the base offense or an enhancement by a preponderance of the evidence. A conviction material of a terrorist organization conviction does not in and of itself constitute the specific intent for the terrorism enhancement, and requires finding of facts by the Court with respect to whether the material support was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. *Chandia*, 514 F.3d at 376 (4th Cir. 2008).

9

In support of the first prong, the PSR suggests two factual findings: First, that Ms. Giampietro "made multiple financial donations, via Western Union, to support terrorist groups." Second, "she attempted to provide additional support to foreign terrorist organizations by connecting two undercover FBI agents, whom she believed wanted to commit jihad, with individuals who would be able to assist their travel into Syria without suspicion." PSR at 29. Neither proposed finding, however, is sufficient to conclude that Ms. Giampietro's offense of conviction was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

**1. Alleged Monetary Support Terrorist Groups**

The first finding, that Ms. Giampietro made multiple financial donations via Western Union to support terrorist groups, is not supported by the evidence. *Infra*, Factual Objections at Paragraph 16. Further, even if the court determines that the preponderance of the evidence supports a finding that Ms. Giampietro provided financial support to HTS in June, 2018 the finding is insufficient to establish the application of § 3A1.4(a) to Ms. Giampietro. The text of the terrorism enhancement explicitly requires that the underlying offense be calculated to influence, affect or retaliate against government conduct. 18 U.S.C. § 2332b(g)(5)(A). Here, the alleged support in June 2018 is distinct from the underlying offense of conviction (concealing support for the undercover agents' travel to Syria in order to provide themselves as personnel to support HTS, in violation of 18 USC § 2339C(c) in September). Accordingly, relying on the alleged June 2018 material support to find that the underlying offense conviction, concealment of material support in September 2018, was calculated to influence, affect, or retaliate against government conduct contravenes the plain language of § 2332b(g)(5)(A).

10

## 2. Attempted Material Support Though the Provision of an Individual That Could Assist the Undercovers to Travel Without Suspicion

Likewise, the second proposed finding, that Ms. Giampietro attempted to provide support to foreign terrorist organizations by connecting two undercover FBI agents whom she believed wanted to commit jihad with individuals who would be able to assist their travel into Syria without suspicion, is insufficient to conclude that Ms. Giampietro's underlying offense of conviction for concealment in violation of § 2339C, was calculated to influence, affect, or retaliate against government conduct. Again, the factual finding is based on conduct other than the underlying offense of conviction charged in Count One of the Second Superseding Indictment. The proposed finding of fact is more closely related but nevertheless insufficient to conclude that Ms. Giampietro's attempted concealment was calculated to influence, affect, or retaliate against government conduct. Ms. Giampietro's knowledge of the undercovers' intent to join HTS in order to participate in jihad does not establish that her underlying offense was calculated to influence, affect, or retaliate against government conduct. This is because Ms. Giampietro's intent in concealing the material support was calculated to prevent the undercovers' discovery and capture, thereby protecting herself from discovery.

To make this finding, the court need look no further than the Ms. Giampietro's discussion with the undercover female agent. In February of 2018, Ms. Giampietro forwarded the undercover articles supporting the claim that HTS was fighting other Muslims, and told the undercover that Abdullah[2] is not fighting because it is a time of fitna (disunity). In March 2018, Ms. Giampietro shared an Arabic post regarding HTS activities, and expressed the opinion that HTS was an oppressor. In response to the undercover agents' questions of whether there was a call for unity

---

[2] Abdullah was Ms. Giampietro's online love interest in Syria at the time.

11

against Assad, Ms. Giampietro expressed the opinion that no one was fighting Assad. Later in March, Ms. Giampietro expressed the opinion that the leader of HTS was taking the group in the wrong direction and that members of ISIS, an organization she denounced beginning in 2016, were infiltrating HTS.

Most importantly, after the undercover told Ms. Giampietro in September of 2018 that her husband swore allegiance to HTS so he could go to Syria to fight jihad, Ms. Giampietro avers that HTS was bad. Ms. Giampietro again tried to dissuade the undercover from going to Syria by telling her there was no jihad. When those efforts failed, Ms. Giampietro then expressed concern over the undercovers' contacts in London, telling her that there are too many informants in London. It is in this context that Ms. Giampietro first offered that she might have an alternative contact and offered to reach out to them. Several days later, Ms. Giampietro told the undercover that her contact indicated that there was no fighting, and again attempted to dissuade the undercover from going to Syria. The undercover next contacted Ms. Giampietro to tell her that her husband was going to depart in the next few days, and to ask her advice regarding buying gift cards. At this point, Ms. Giampietro gave the undercover the Telegram contact information for Individual A. When the undercover sought to question Ms. Giampietro further about the contact, Ms. Giampietro told the undercover not to contact Individual A and that she did not want to be involved.

The above evidence supports the following factual conclusions: first, that at the time of the concealment, Ms. Giampietro did not personally support HTS or fighting jihad in Syria. Second, a primary reason that Ms. Giampietro opposed HTS was her belief that HTS was fighting other Muslim insurgent groups rather than the Syrian government forces of Assad. Third, Ms. Giampietro was concerned that the undercover agents' plan for travel to Syria posed a substantial

12

risk of discovery by law enforcement and risk of arrest. Fourth, Ms. Giampietro was concerned that if the undercover agents were caught, she would be implicated and likewise get into trouble.

These factual conclusions support a determination that it is at least equally possible Ms. Giampietro's crime was calculated to protect herself from the consequences of the undercovers' discovery and arrest, rather than to influence, affect, or retaliate against government.

### 3. *United States v. Amer Sinan Alhaggagi*

The Ninth Circuit's recent decision in *United States v. Amer Sinan Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), supports the conclusion that Ms. Giampietro's underlying offense of conviction does not warrant enhancement under § 3A1.4(a). The facts in the *Giampietro* case related to the terrorism enhancement are largely analogous to those in *Alhaggagi*. Like the present case, *Alhaggagi* contained two separate courses of potential conviction. The first was an undercover operation that commenced after the FBI discovered that the defendant expressed a desire to conduct a terrorist attack, in an ISIS chat group. The operation placed an undercover officer with the defendant, who expressed a willingness to aid the defendant in conducting the attack. Together, the undercover and the defendant scouted locations and discussed possible means of conducting an attack. The defendant, however, abandoned the plan after the undercover showed him mock explosives that could be used to conduct the attack. *Id*. at 694-95.

The second course of conduct was discovered after the defendant's arrest. During a search of the defendant's electronic devices, the FBI discovered that the defendant, at the request of an individual he believed to be an ISIS member, had created Twitter and Gmail accounts for ISIS use. The defendant maintained that he opened the account to curry favor with certain users to assist him in his trolling and in his retaliation against other chat group members. *Id.* at 696-97. The

13

defendant was charged with, and plead guilty to, one count of material support of terrorism to a designated foreign terrorist organization under 18 U.S.C. § 2339B(a)(1), based on the second course of conduct.[3]  *Id.* at 697.

At sentencing, the District Court found that because Alhaggagi knew he was providing support to ISIS sympathizers and he knew that ISIS was a terrorist organization which, as matter of course, sought to influence government conduct, his conduct was calculated to influence or affect government conduct by intimidation or coercion and/or retaliation against government action.  On appeal, the Ninth Circuit found that the District Court's reasoning was abuse of discretion, finding that the District Court's logic was only true in the broadest sense because any support given to a terrorist organization ultimately goes to the benefit the organization's terrorist purpose. This reasoning, however, missed the mark in the context of the terrorism enhancement because it failed to properly differentiate between the intent required to sustain a material support conviction pursuant to 18 U.S.C. § 2339B(a)(1), and the intent required to trigger the terrorism enhancement pursuant to U.S.S.G. § 3A1.4.  *Id* at 701.

The Probation Officer's reliance on Ms. Giampietro's knowledge, that undercovers purportedly intended to provide themselves to HTS in order to support jihad, is similarly mistaken. Ms. Giampietro can, and did, intend her attempted concealment for a different reason than those represented by the undercovers namely—self-protection.

The Ninth Circuit also rejected the government's argument on appeal that Alhaggagi's uncharged plans to conduct a terrorist attack in the San Francisco Bay area provide an alternative

---

[3] The defendant also plead guilty to one count of possessing device-making equipment in violation of 18 U.S.C. § 1029(a)(4); one count of using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2); and one count of aggravated identity theft.

14

basis for enhancement of his offense. The Court reasoned that distinguishing where the underlying offense conduct constituted violent acts of terrorism, the specific intent is easy to identify, either from the statements of the defendant or the nature of the offense. It then follows that had a terrorist attack plot been the underlying offense of conviction, the Court would have had little trouble finding that the enhancement applied. The Ninth Circuit nevertheless rejected the government's argument out of hand, holding as argued here that "the text of the terrorism enhancement, explicitly requires the underlying offense—the offense that violates one of the enumerated crimes in the second prong—be calculated to influence or affect government conduct." *Id.* at 700 n.6. Put another way, the focus in determining whether the enhancement applies is not on the defendant's intent generally, but on the defendant's specific intent for the underlying offense of conviction.

Probation's proposed use of the allegation that Ms. Giampietro separately provided funds to HTS in June of 2018, to establish the specific intent for the crime of conviction, is no different than the argument rejected in *Alhaggagi*. The only difference is that, unlike *Alhaggagi*, here the factual conclusion is speculative rather than supported by clear and convincing evidence. But even if this Court disagrees, Ms. Giampietro respectfully requests that this Court reject this proposed factual basis as a matter of law, in accordance with the plain language of the statute and universal interpretation of the intent requirement associated with 18 U.S.C. § 2332b(g)(5)(A).

### B. Paragraph 31 (Obstruction Enhancement)

Ms. Giampietro objects to Probation's obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1.

In applying the obstruction enhancement to the offense of conviction, the PSR relies on Application Note 4(D), of § 3C1.1, which provides that "if the defendant destroyed or concealed or directed or procured another person to destroy or conceal evidence that is material to an official

15

investigation or judicial proceeding, an enhancement for obstruction of justice is applicable." The PSR finds that facts support application based on the defendant's alleged admission that she deleted social media accounts that she used to communicate with others in a chat group, even after she became aware of federal investigations. Agents also found messages on the defendant's cellphones that indicated she was deleting messages and applications due to her possible pending Indictment. These factual allegations mirror the conduct charged in Counts 2 and 4 of the Second Superseding Indictment. Ms. Giampietro disputes that she deleted any materials with knowledge of ongoing investigation of her conduct, or of any potential indictment.

That dispute is largely mooted, however, because the Probation Officer relies on the incorrect Application Note in determining the Base level for the offense. Probation asserts, and Ms. Giampietro agrees, that the base level for her offense of conviction is the § 2X3.1 (Accessory After the Fact) guideline. PSR at Paragraph 27. Because the Base offense is § 2X3.1, Application Note 7 - Inapplicability of Adjustment in Certain Circumstances - to § 3C1.1, applies instead of Application Note 4.

Application Note 7 states "If the defendant is convicted of an offense covered by ... §2X3.1 (Accessory After the Fact)..., this adjustment is not to be applied to the offense level for that offense *except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself* (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense)." (emphasis added).

Ms. Giampietro's crime of conviction charged in the Superseding Information alleges that the offense conduct occurred between September 23 and October 23, 2018. These dates constitute the duration of the obstruction conduct for the purpose of Application Note 7.

16

Case 2:19-cr-00013   Document 396   Filed 04/29/22   Page 16 of 18 PageID #: 4439

Applying Application Note 7 to the factual allegations in Paragraphs 22, 23, and 31 does not establish a basis for any "significant further obstruction" after the period of Ms. Giampietro's offense of conviction which warrants application of the § 3C1.1 enhancement. Ms. Giampietro's use of social media with a self - destruct feature, deletions of her social media account, and telling the undercover to delete her name from her phone to cut ties with the undercover, occurred either before the offense of conviction, or were part of the concealment element of her offense and thus cannot be considered for the purpose of the § 3C1.1 enhancement. Subsequent to the charged period, Ms. Giampietro did not engage in any significant further obstructive conduct, as she did not perform factory resets or deletions on her phone after the conversations regarding "@AlSadaqah". Because there is no evidence that "significant" further obstructive conduct occurred after the offense of conviction, the 3C1.1 enhancement cannot apply.

### III. Ms. Giampietro's GUIDELINES CALCULATION

| Guideline | Guideline # | Levels |
| --- | --- | --- |
| Base Offense Level | 2X3.1, 2M5.3(a) | 26 + 2 -6 = 22 |
| Acceptance of Responsibility | 3E1.1(a) | -2 |
| Acceptance of Responsibility | 3E1.1(b) | -1 |
| Criminal History | I | |
| | | |
| Total Offense Level | | 19 |

| Guidelines Range | | 30-37 months |
| --- | --- | --- |

### CONCLUSION

Defense respectfully requests an Evidentiary Hearing with respect to the application of both U.S.S.G. §3A1.4 – the terrorism enhancement, and U.S.S.G. § 3C1.1 – the obstruction enhancement.

Respectfully submitted this 29th day of April, 2022,

By: /s/ *Charles Swift*
Charles D. Swift
*Pro Hac* Attorney for Giampietro
100 N. Central Expy, Suite 1010
Richardson, TX 75080
(972) 914-2507

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of April, 2022, I electronically filed the foregoing **DEFENSE POSITION WITH RESPECT TO SENTENCING** with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ *Charles Swift*
Charles D. Swift
Pro Hac Attorney for Giampietro