IN THE UNITED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA )<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>)<br>GEORGIANNA A.M. GIAMPIETRO )<br>Defendant. ) | | Case No.: 2:19-cr-00013<br><br><br>Chief Judge Waverly D. Crenshaw, Jr. |

**DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE**

The defendant, Ms. Georgianna Giampietro, through undersigned counsel, moves this Court to depart her sentence downward pursuant to U.S.S.G § 5K2.0 (circumstances of a kind not adequately taken into account in the Guidelines) because of the exceptional circumstances of sentencing entrapment employed by the government in its investigation of Ms. Giampietro.

At the end of the government's three-year investigation of Ms. Giampietro, the government chose a designated terrorist organization (HTS), that Ms. Giampietro had repeatedly denounced, to ensure that any conduct it induced by placing its undercover in immediate danger and risk of discovery would result in a terrorism conviction—and would allow for the government to seek the terrorism enhancement. This court should not allow the government to make a mountain out of Ms. Giampietro's online molehill.

I.  FACTUAL BACKGROUND

**1. Government begins three-year undercover investigation**

In August 2015 the Joint Terrorism Task Force asked for an assessment of Ms. Giampietro because her Instagram account contained images that were pro-ISIS. Their stated purpose was to

1

determine Ms. Giampietro's relationship with pending FBI subjects and determine if she posed a risk to national security.

In 2016 the government began a three-year long undercover investigation of Ms. Giampietro.

**2. Ms. Giampietro responds to online undercover's request with legitimate charities**

In 2016, an online covert employee (OCE) asked Ms. Giampietro for ways to send money to Syria (presumably to see if she would send them ways to send money to a terrorist organization). Ms. Giampietro responded to the OCE's requests by sending links to well-regarded charities based in the UK that worked to help the needy, and raised money to build a complex for orphans and widows in Syria with a school, madrassah, education facilities, playground and would provide food.

**3. Government undercover becomes a close friend of Ms. Giampietro**

After the government learned that Ms. Giampietro would not solicit funds for terrorist organizations online, the government's OCE introduced an undercover agent (UCE-1) to Ms. Giampietro. The investigation involved multiple online covert employees, undercover agents, and at least one informant. The undercover introduced to Ms. Giampietro became a very close friend. She was presented as a younger, fellow Muslim convert married to a Muslim man (another undercover, UCE-2) who sought Ms. Giampietro's guidance and friendship.

**4. Ms. Giampietro explains to UCE-1 that her debt religiously bars her from travel**

Ms. Giampietro and UCE-1 talked about Islam, the Syrian conflict, hijrah[1], and Ms. Giampietro's significant student loan debt. Ms. Giampietro discussed her debt with UCE-1 on multiple occasions, explaining why it was a religious barrier to her ever traveling to Syria.

---

[1] Migration from persecution or to a Muslim country.

2

Case 2:19-cr-00013   Document 397   Filed 04/29/22   Page 2 of 12 PageID #: 4497

When the two women met on February 22, 2018, Ms. Giampietro explained that she received a religious ruling from a sheikh in New York who said that it was not permissible for her to just walk away without paying one's debt whether the debt was incurred before or after one became Muslim, she explained he also said it may cause even more harm not to pay the debt off.

5. **UCE-1 begins to challenge Ms. Giampietro's religious belief that she cannot travel without paying her debt**

UCE-1 countered Ms. Giampietro multiple times asking if the sheikh knew Ms. Giampietro's debt was "like Kuffar [of the disbelievers]." Ms. Giampietro explained that according to religious authority she must pay off all of her debt before she dies and only in a scenario that all of the debt was paid would she want to make Hijrah[2].

6. **Ms. Giampietro was uncomfortable with UCE-1 asking how to send money to Syria and asking how to travel to Syria**

On April 23, 2018, Ms. Giampietro reached back out to the OCE (who had introduced UCE-1 to Ms. Giampietro) to ask about UCE-1. Ms. Giampietro was concerned and wanted to know how well OCE knew UCE-. Ms. Giampietro told OCE that UCE-1 and UCE-2 had driven to meet another sister and had asked that woman if she knew how to send money to Syria. Ms. Giampietro also told OCE that UCE-1 kept asking her about how to get into Syria. Ms. Giampietro said she was scared and that it was hard to trust people. OCE reassured Ms. Giampietro that she thought UCE-1 was probably harmless but only God knows and that she hoped God would remove fear from Ms. Giampietro's heart and that God would protect her.

7. **Government used fraudulent "sheikh" to alter meaning of religious texts in attempt to convince Ms. Giampietro she did not have to pay her debts and could travel**

After Ms. Giampietro explained her religious belief, based on Islamic scriptures, that she

---

[2] Migration to a Muslim country.

could not travel until she paid off all of her debt, the government tried to convince Ms. Giampietro that she did not have to pay off that debt.

The FBI used an informant to impersonate a religious leader (sheikh) to advise Ms. Giampietro on her religion. The informant was introduced as a Saudi-trained sheikh that could answer her questions. Through UCE-1, the FBI's fraudulent sheikh told Ms. Giampietro that she did not have to pay her debt in order to travel, and sent her religious scripture (through UCE-1) that tried to convince her that her debt did not need to paid. Ms. Giampietro countered the fake sheikh's deliberately false interpretation of religious authority with an accurate religious interpretation, and concluded that it meant she could not travel until her debt was paid. Ms. Giampietro refuted all of the FBI's false interpretations of religious scripture. When UCE-1 finally acknowledged this, UCE-1 said Ms. Giampietro could travel after she paid her debt. Ms. Giampietro responded, "if I live that long".

8. **From late 2016 until her arrest in October 2018 Ms. Giampietro denounced HTS and advised that no one should travel or join any groups because of Islamic scripture regarding times of disunity**

*See* Exhibit A, Examples of Defendant's Statements Criticizing HTS and Advising Against Fighting or Joining Any Groups.

9. **Ms. Giampietro's online Syrian boyfriend breaks up with her, she moves on and secures professional employment as a clinical social worker**

In August 2018, Ms. Giampietro's online Syrian boyfriend, Abu Abdullah, broke up with her. Ms. Giampietro secured a third job and was working as a clinical social worker, supporting her mother, and daughter.

### 10. September 23, 2018, UCE-1 tells Ms. Giampietro UCE-1 and UCE-2 have joined HTS and will travel to Syria, Ms. Giampietro is worried and tries to dissuade

On September 23, 2018, UCE-1 surprised Ms. Giampietro with an announcement that she was traveling to Syria with UCE-2 to join HTS. This had not been discussed between the two, the last time the topic of Hijrah was discussed was several months prior. In the interim Ms. Giampietro had been advising that no one should join any groups. *See* Exhibit A.

Ms. Giampietro responded with concern for UCE-1's safety. She was fearful they would be caught and cautioned UCE-1 that Islamic scripture advised that in times of infighting and disunity (like that in Syria) that Muslims should stay in their homes and not join any groups. She told UCE-1 that HTS was no good. UCE-1 responded that they were still going and created doubt around the contacts her and UCE-2 were using for travel.

Ms. Giampietro, concerned for her friend, said she would give UCE-1 someone to talk to and then privately reached out to Individual A. Ms. Giampietro told Individual A (individual familiar with the situation on the ground in Syria) about UCE-1's plans and he told Ms. Giampietro that there was no fighting, no reason for the undercovers to go to Syria, and no need to swear allegiance to HTS. Ms. Giampietro relayed this information to UCE-1 to dissuade her from traveling.

### 11. Ms. Giampietro gives Individual A's contact information to UCE-1, then immediately withdraws it

On October 2, 2018, Ms. Giampietro gives the Telegram name for Individual A, "@AlSadaqahSyria" to UCE-1 saying "Have your husband message this account, I was told to give him this."

**UCE-1** responded: "...ok is this the person that can help us get over??? Or who is this?"

Ms. Giampietro: Just message him

**UCE-1**: Hes go to want to know why he should do this...I wont know what to tell him.

5

Like for what purpose you know."

**Ms. Giampietro:** If you have someone to help you then forget it. Khaloss [translates: finished]. Very suspicious.

**UCE-1**: We do have someone what will this person serve as that's all...I mean if hes someone you trust to help us get over then I can go to [UCE-2] with that...

**Ms. Giampietro:** Na forget it. Everything is too suspicious.

UCE-2 contacted Individual A who advised that the undercovers would need a job before going there, that there was no fighting. After UCE-1 told Ms. Giampietro that she is leaving, Ms. Giampietro panicked, cut contact with UCE-1 and became suspicious of her.

## II. GROUNDS FOR DOWNWARD DEPARTURE OR VARIANCE

"[I]t is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." (*See* U.S.S.G. Chapter One, Part A) (Quoting Congress and the Sentencing Commission from the Sentencing Reform Act). Departures perform an important role and permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing. Departures also help maintain "sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B); Background Note, § 5K2.0.

### A. Departure Based On Circumstances of Kind Not Adequately Considered by Guidelines (U.S.S.G. § 5K2.0)

U.S.S.G. § 5K2.0(a)(1)(A) states that the Court may depart from the applicable guidelines range if, "the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance… of a kind or to a degree not adequately taken into consideration by the

6

Sentencing Commission in formulating the guidelines that, in order to advance the objectives, set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.

U.S.S.G § 5K2.0(2)(A) provides for downward departure based on specific identified circumstances of a kind not adequately taken into consideration in the guidelines stating, "If any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart may be warranted."

U.S.S.G. § 5K2.0(2)(B) further provides for downward departure in the exceptional case where a circumstance that was not identified by the Commission in the Guidelines is relevant to determining the appropriate sentence.

### a. Sentencing Entrapment as an "unidentified circumstance" not adequately considered under § 5K2.0(2)), instead of as a constitutional ground

Courts have attempted to find ways to account and control for government manipulation or entrapment in sentencing by considering sentencing fairness on constitutional grounds. A defendant may be eligible for a downward departure or variance for sentencing entrapment where he "can show he was predisposed to commit a minor or lesser offense, but was entrapped to commit a greater offense, subject to greater punishment . . ." *United States v. Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015) (citing *United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009)).

The First, Ninth, Tenth, Eighth, Seventh, and Eleventh Circuits have all recognized sentencing entrapment as a defense.[3] The Sixth Circuit has not yet recognized sentencing entrapment

---

[3] See *United States v. Jaca-Nazario,* 521 F.3d 50, 57 (1st Cir. 2008); *United States v. Boykin*, 785 F.3d 1352, 1362 (9th Cir. 2015) (considering "whether legitimate reasons existed for the investigation or whether it was solely intended to increase [the defendant's] sentence"); *United States v. Beltran,* 571 F.3d 1013, 1017-18 (10th Cir. 2009) (explaining that these doctrines are based on "a due process principle allowing a court to modify a sentence if, considering the

7

Case 2:19-cr-00013   Document 397   Filed 04/29/22   Page 7 of 12 PageID #: 4502

as a constitutional ground for downward departure. *United States v. Flowers*, 712 F. App'x 492, 504 (6th Cir. 2017) citing *Hammadi*, 737 F.3d at 1048 (6th Cir. 2013) (noting that under the facts of the case, it "need not decide whether to adopt or reject these doctrines"). Regardless, the circumstances of sentencing entrapment are the type of "unidentified circumstance" not adequately taken into account by the Guidelines that may warrant downward departure under U.S.S.G. § 5K2.0(2)(B) instead. *See supra* at paragraph II, A.

### III. ANALYSIS

**A. The government's attempted sentencing entrapment to secure the terrorism enhancement is an unidentified circumstance not adequately considered by the guidelines as provided for in § 5K2.0(2)**

First, Ms. Giampietro has plead guilty to concealing the provision of financial resources to a terrorist organization by providing contact information to UCE-1 that could be used to donate money to HTS as an alternative to the undercovers traveling to join HTS because she feared for the undercover's safety and for both of their possible detection by law enforcement. This is insufficient to support application of the terrorism enhancement which requires additional proof of a specific intent to influence the conduct of a government, or retaliate against a government. *United States v. Amer Sinan Alhaggagi*, 978 F.3d 693, 694 (9th Cir. 2020); *see* Doc. 396 Defendant's Objections to the PSR at 8 and Doc. 390, Plea Agreement Factual Basis at 3-6. Ms. Giampietro's argument for downward departure in her sentence should be considered separately from the inapplicability of the terrorism enhancement. If this Court applies the terrorism

---

totality of the circumstances, 'the government's conduct is so shocking, outrageous and intolerable that it offends 'the universal sense of justice'"); *Martin,* 583 F.3d at 1073 (accepting sentencing entrapment); *United States v. Turner,* 569 F.3d 637, 641 (7th Cir.2009).

enhancement, Ms. Giampietro seeks a downward departure because of the exceptional circumstances of government sentencing entrapment pursuant to U.S.S.G. § 5K2.0(2)(B).

"Sentencing entrapment" applies, for example, when a government agent induces an individual to deal in a larger quantity or different type of drug than he is otherwise predisposed to deal, and the result is a high sentence for the offense. *United States v. Sed,* 601 F.3d 224, 230 (3d Cir. 2010), citing *United States v. Martin*, 583 F.3d 1068, 1073 (8th Cir. 2009).

For such drug offenses, the Sentencing Guidelines themselves recognize the danger of vesting too much discretion in the Government to solicit and then charge certain quantities of drugs, and in certain instances they empower judges to compensate for law enforcement overreach. *See United States v. Stavig*, 80 F.3d 1241, 1245-46 (8th Cir. 1996); *see* U.S.S.G. § 2D1.1, App. n. 17 allows the court to depart downward when government agents set a below market price, allowing the defendant to purchase a significantly larger quantity of drugs. U.S.S.G. § 2D1.1, App. n. 12 provides that when a defendant is not capable of producing the negotiated quantity of drugs, the court must exclude from its sentencing calculation the amount that the defendant is unable to produce. Application Note 12 also applies to cases involving reverse-sting operations when undercover government agents sell drugs to a defendant.

There is no similar Guideline that provides for a downward departure specifically for government overreach and entrapment in terrorism-related cases. In Ms. Giampietro's case, the government inducement combined with Ms. Giampietro's lack of predisposition instead result in the type of unidentified circumstance warranting downward departure under § 5K2.0 (unidentified circumstance not considered by the Guidelines warranting departure).

9

### a. Ms. Giampietro was not predisposed to supporting HTS and the government both selected HTS as a group UCE-1 would join and induced Ms. Giampietro's provision of Individual A's contact information

Ms. Giampietro told UCE-1 that she did not like HTS, HTS was infighting with other groups and were oppressors, and that HTS was causing fitna (disunity). She had told UCE-1, as well as OCE years prior, about Islamic scripture which said that during times of infighting one should not join any groups and stay in their homes. *See* Exhibit A. Ms. Giampietro was thus not predisposed to supporting HTS. In 2016, Ms. Giampietro had also been approached by the government's OCE asking for ways to send money to Syria, Ms. Giampietro only provided her with mainstream charities-- she never provided or tried to provide anyone ways to conceal terrorist financing. Ms. Giampietro was not predisposed to concealing terrorist financing. Ms. Giampietro was also not predisposed to traveling to join any group. This was proven when the government's outrageous use of an imposter religious sheikh to attempt to convince Ms. Giampietro she could travel with deliberately false interpretations of Islamic scripture failed. Still, the government was determined.

Despite Ms. Giampietro's clear negative views on HTS and the Syrian conflict in 2018, the government decided that UCE-1 would "join" HTS and travel to Syria to fight—and pressure Ms. Giampietro for help. UCE-1 was a young, white female, and fellow Muslim convert. Ms. Giampietro became close friends with her and was very worried for her safety. She told UCE-1 not to go, that HTS was a bad group, that she worried UCE-1 would get caught, that she worried UCE-1's contacts were not trustworthy and that UCE-1 was in danger. *See* Exhibit B, Messages between Ms. Giampietro and UCE-1 after UCE-1 revealed she would travel to join HTS. Any reading of these messages reveals Ms. Giampietro's interest during this conversation was *not* to help support HTS, but to convince the undercover not to go and if she could not convince her, to

10

give her some other way to contribute without putting herself in danger and without possibly exposing Ms. Giampietro to law enforcement either. Ms. Giampietro immediately withdrew the contact she had reluctantly provided, telling UCE-1, "Na forget about it" and "I don't want to discuss this anymore, you're going to get me arrested."

> b. *The government's intentional use of HTS in inducing Ms. Giampietro's conduct should not be rewarded with an extreme sentence*

As in drug cases like *Stavig* or *Martin*, the government induced Ms. Giampietro into providing contact information for donating to HTS. The government picked the organization that UCE-1 allegedly joined and was going to travel to support. They did not pick the Free Syrian Army (FSA), they did not pick Ahrar Al-Sham, or some rebel group that had not been designated. The government intentionally chose a designated foreign terrorist organization, HTS, even though Ms. Giampietro had denounced them repeatedly. That critical decision is what criminalized Ms. Giampietro's conduct at all and it is what the government hopes will also secure them the terrorism enhancement. The government's decision to force an offense involving HTS, specifically, turned Ms. Giampietro from a pro-jihad, keyboard political and religious internet forum user, into a convicted supporter of a terrorist organization she despised.

Ms. Giampietro's sentence should reflect her own predisposition and the extent of her culpability. *See United States v. Parrilla*, 114 F.3d 124, 127 (9th Cir. 1997). The government created the conditions in this case over the course of three years and made sure that whatever conduct occurred, they could tie it to HTS. This would ensure a terrorism conviction and would allow them to argue for the terrorism enhancement. The terrorism enhancement would increase the guidelines range for this offense from 30-37 months to 188-235 months (capped at 120 months). The problem with such a drastic and dramatic increase in sentence based on one or two critical facts is that the government will always be tempted to create and induce offenses that

11

qualify for them. This Court should refuse to apply the terrorism enhancement because it does not legally apply, but in the alternative, this Court should depart or vary downward because of the exceptional government overreach and inducement in this case.

**Conclusion**

For the reasons set forth above, Ms. Giampietro respectfully request that this Court vary or depart downward any sentence to account and control for the government's efforts to manipulate the sentence in this case by overreaching beyond Ms. Giampietro's predisposition and ensuring all conduct would be tied to HTS, a designated terrorist organization Ms. Giampietro disliked.

Respectfully submitted this 29th day of April 2022,

By: /s/ <i>Charles Swift</i><br>
Charles D. Swift,<br>
Pro Hac Attorney for Giampietro<br>
CLCMA<br>
100 N. Central Expy, Suite 1010<br>
Richardson, TX 75080<br>
(972) 914-2507

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of April, 2022, I electronically filed the foregoing Defendant's Motion for Downward Departure with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ <i>Charles Swift</i><br>
Charles D. Swift, Pro Hac<br>
Attorney for Giampietro<br>
100 N. Central Expy, Suite 1010<br>
Richardson, TX 75080