IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 2:19-cr-00013 |
| | ) | |
| v. | ) | Chief Judge Crenshaw |
| | ) | |
| GEORGIANNA A.M. GIAMPIETRO | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S POSITION
WITH RESPECT TO SENTENCING**

The United States of America, by and through its attorneys, the United States Attorney for the Middle District of Tennessee and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, hereby submits its Response in opposition to Defendant's Position With Respect to Sentencing. (D.E. 396.)[1]

I.    Introduction

In her filing, the defendant challenges certain factual information regarding her conduct in this case and in the process attempts to minimize, deflect, and explain away certain acts she committed.  Contrarily, the government submits that the Presentence Investigation Report ("PSR") as written provides an accurate summary of the defendant's conduct in this extensive investigation that resulted in the charges in this case.  In her position filing, the defendant objects to the inclusion of certain facts that formed the basis for the investigation and charges against her.  The defendant also proffers evidence and arguments in her filing to the Court in support of

---

[1]    The defendant has filed a separate Motion for Downward Departure (D.E. 397), which was not the subject of the Court's most recent Order (D.E. 394) and will require independent consideration after the Guidelines are determined.  As it is not yet ripe for consideration, the government submits that it intends to respond to this motion, along with its Sentencing Memorandum, closer to the date the Court sets for sentencing in this case and its corresponding filing deadlines.

an alternative interpretation of her criminal culpability.[2]  Insofar as the defendant goes beyond mere objection to statements in the PSR and floods the Court with additional information for inclusion in the PSR, the government respectfully submits additional evidence herein in response to the defendant's alternative position to ensure the fullness and accuracy of the record.  While the government is not advocating for the Court to conduct a mini-trial of this case at this point in the proceedings, it is appropriate and necessary here for the government to provide the Court with the proper context of the evidence and the circumstances which gave rise to this prosecution, and in the process frame the lens from which this Court should largely view the defendant's claims.

The government submits that defendant's concealment activities in September and October 2018, to which she pleaded guilty, were the culmination of years of research, study, and involvement with individuals affiliated with or supportive of, the activities of designated foreign terrorist organizations.  The PSR properly incorporates the factual basis for the offense conduct in this case, including a description of other relevant evidence obtained through the investigation of the defendant's activities. The Court is entitled to consider the nature and scope of the defendant's conduct, reflecting her longstanding commitment to assist foreign terrorist organizations, as part of the sentencing calculation for the offense of concealing the provision of material support to a foreign terrorist organization.  The Supreme Court has long recognized that sentencing courts have broad discretion to consider various kinds of information.  *United States v. Watts*, 519 U.S. 148, 151 (1997).  Title 18, United States Code, Section 3661 codifies this longstanding principle, stating

> "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the

---

[2]      The defendant could have presented his alternative position to the Probation Office in the preparation of the PSR, but apparently did not do so.

United States may receive and consider for the purpose of imposing an appropriate sentence."

The Supreme Court has reasoned that there is a difference in admissibility of evidence to be considered by a sentencing court, as opposed to evidence presented during the trial of the defendant. The nature of a sentencing proceeding justifies a broader presentation of evidence beyond the issue of guilt for a specific offense:

> "In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. Rules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial."

*Williams v. New York*, 337 U.S. 241, 247 (1949) (footnote omitted). Thus, sentencing courts have traditionally and constitutionally "considered a defendant's past behavior, even if no conviction resulted from that behavior." *Nichols v. United States*, 511 U.S. 738, 747 (1994); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573 n. 19 (1996) ("A sentencing judge may even consider past criminal behavior which did not result in a conviction."); *United States v. Brika*, 487 F.3d 450, 458-59 (6th Cir. 2007). The Sentencing Guidelines do not alter this aspect of a sentencing court's discretion, but rather, reflect the policy established in 18 U.S.C. § 3661, stating:

> "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without

limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."

U.S.S.G. § 1B1.4.  Thus, the defendant's attempt to narrow the Court's consideration of her conduct that provides important context for her offense of conviction must necessarily fail.

## II.   Defendant's Objections to Factual Findings in the PSR – Paragraphs 12, 14, 16

The defendant claims that Paragraphs 12 and 14 imply that the defendant gave contact information for two different individuals with connections to the designated foreign terrorist organization, Hay'at Tahrir al-Sham ("HTS").   Based on a plain reading of the PSR text, the government does not agree that such an implication exists in the drafting of paragraphs 12 and 14.  The government confirms that the defendant shared with the undercover employee of the Federal Bureau of Investigation ("UCE 1") contact information for a single point of contact that she reasonably knew to have connections to HTS, a contact known to her as Individual A.  The defendant was clearly aware that Individual A had such connections to HTS because she had communicated with him at his Telegram channel, @alsadaqahsyria, a channel where the defendant knew funds were raised for the mujahideen in Syria, including HTS.[3]  On October 7,

---

[3]     Open-source information about this Telegram channel established that while it purported to be an "independent charity organization," it also advertised its purpose as providing "the mujahideen in Syria with weapons, financial aid[.] and other projects relating to the jihad."  This channel encouraged donations for fighters in Syria to be sent using cryptocurrencies.  Photographs and memes posted on the channel between May and June of 2018 showed masked men wearing military fatigues with text seeking requests for donations to benefit foreign fighters.  On May 25, 2018, the channel shared a poster stating that Al-Sadaqah is providing a Ramadan iftar "for mujahideen stationed in the frontline in Syria."   A table depicted on that poster estimates that $6,000 would benefit 100 fighters for 30 days; $1,800 would benefit 30 fighters for 30 days; $600 would benefit one fighter for 30 days; and $2 would benefit one fighter for one day.   The poster gives the price of a pair of combat boots as $50 and the price of a military uniform as $50, and informs donors that the donation is a valid form of zakat ("alms-giving").  On June 1, 2018, the channel posted a photo showing six packaged military uniforms, each topped by a picture bearing Al-Sadaqah's emblem, a call for donations, and the Al-Sadaqah Bitcoin account number.   The text on the photo reads: "providing brand new military suits [uniforms] to mujahideen."  Screenshots recovered from the defendant's Google Cloud account

4

2018, the defendant communicated with another witness concerning UCE-1's outreach to @alsadaqahsyria, stating, "So her husband messaged this brother I know." Exh. 1  In executing a search of the defendant's home on October 23, 2018, the FBI found a handwritten notation of Individual A's contact information, @alsadaqahsyria, in the defendant's journal.  *See* Exh.2. The investigation revealed that the defendant also sent messages to an individual identified as Syria Care Turkey.  Based on their communications, it was clear that Syria Care Turkey knew @alsadaqahsyria and was aware of @alsadaqahsyria's communications with UCE 1's husband. The defendant stated to Syria Care Turkey, "Nothing wrong if they're actually real and truthful. But me and some sisters had our doubts for awhile about them.  Like how they always asked bait questions.  So we all decided to block her.  Even the sister that introduced us to this sister is ajeeb [strange] too.  I don't know I completely came off social media hard to trust anyone . . . I don't know I just don't want to go to jail for 30 yrs and leave my son in the hand of the Kuffar. Bc they could say she helped us she gave us the contacts."

The defendant next objects to the statements made in paragraph 16.  According to the defendant, these statements are "findings of fact … that she provided financial support to HTS in June of 2018."  The defendant then uses this mischaracterization of the PSR text to justify presentation of ten exhibits and extensive argument to assert that she did not provide financial support to HTS. (*See* D.E. 396, at 2-6.)  The exhibits include not only the actual wire transfers

---

and cell phones, dated June 2018 demonstrate that the defendant knew that @alsadaqahsyria supported the mujahideen in Syria.  The first screenshot, from the Google Cloud account, is of a post from @alsadaqahsyria's Telegram Channel, describing the purpose of the organization as "providing brand new military boots to front line mujahideen," and indicated that "Anonymous donation methods [are] available."  The second screenshot, from one of the defendant's cell phones, is a contact card for @alsadaqahsyria, which describes his organization as "An idepentant [sic] charity [sic] organization supporting the Mujhideen in Syria."  The FBI found other images such as those on the Al-Sadaqah Telegram Channel, on the defendant's cellphone, along with many images and communications in support of the activities of more than one designated foreign terrorist organization.

made by the defendant, but also her terrorist financing research paper and reports of defense experts. The fallacy in her position, however, is her reliance upon untested, undocumented and essentially speculative assertions by one defense expert that her contributions did not support designated foreign terrorist organizations. In response to the defendant's reliance on that expert's undocumented assertions, the government submits the analytical report of its expert who was prepared to testify at trial and who catalogued the connection between Merciful Hands and HTS, and Al Sadaqah and HTS. *See* Exh.3 at pp. 13-20, 43-50. Both entities have verifiable links to Abu Ahmed Foundation ("AAF"), "a self-styled 'charity' in Syria that is dedicated to HTS far above other groups." *Id*. The government's expert details the connection between AAF and Merciful Hands through postings on social media, *id*. at 24-37, as well as the connections between Al Sadaqah and AAF, *id*. at 43-50. The government's expert concludes that "Merciful Hands and Al Sadaqah have both held verifiable links to HTS, as seen in their publicly stated partnerships with AAF. Such connections considered, both Merciful Hands and Al Sadaqah must be understood as components of a larger network of entities directly and/or indirectly aiding HTS and other terrorist entities in Syria." *Id*. at 51.

Paragraph 16 of the PSR simply states that "[t]he investigation revealed Giampietro made multiple financial donations, via Western Union, to support terrorist groups. As noted in the chart below, Giampietro donated a total of $850." While the defendant denies that she has sent funds to HTS and notes that the Court must affirmatively rule on controverted matters in the PSR (D.E. 396, at 2), the government notes that the PSR does not assert that the defendant specifically provided financial support to HTS, but rather more broadly to terrorist groups. However, insofar as the defendant objects to the statements in paragraph 16, government submits the record will establish, based on her background and the circumstances at the time, that the defendant donated

funds on at least three occasions in 2018 intending to support terrorist groups in Syria, which would include HTS, and that she encouraged others to do so as well. The government submits that the defendant's argument in her filing attempts to minimize the significance of each of the documented transfers of funds and should be scrutinized carefully at a sentencing hearing. Contemporaneous with this filing, the government is submitting the reports of its experts who undercut the defendant's claims.

The defendant maintains that despite her education and her specific research into the use of charities by terrorist organizations to fund their activities, she did not intend to support terrorist groups when she sent money on three separate occasions to recipients connected to FTOs. (D.E. 396, at 6.) The defendant's cherry-picking of statements critical of HTS ignores the extensive conversations she had with numerous other people on-line since 2015 establishing her support of ISIS, then Al-Nusra Front, then HTS, as the geo-political situation evolved in Syria. She fails to mention that she connected on-line with foreign fighters she sought to marry, first Abu Talha, who fought for ISIS, and then Abu Abdullah, who fought for JBS/Jabhat al-Nusrah and then HTS. While the defendant attempts to interpret the significance of her own research, the government respectfully submits that the Court should review the defendant's graduate student research paper filed in response to the Court's request, to make an independent evaluation of whether that research, together with her discussions with others on-line concerning radical Islamic literature, put her on notice that charitable organizations could be vehicles for terrorist organizations to raise funds for their illicit activities.

III.    Defendant's Objections to Finding of Obstruction – Paragraph 23

Finally, the defendant objects to statements in paragraph 23 applying an adjustment to her sentence for obstructing justice. (D.E. 396, at 7.) The defendant does not dispute the statement

in the PSR that she admitted to deleting social media accounts that she used to communicate with others in a chat group, even after she became aware of federal investigations. The defendant characterizes as misleading the fact that agents found messages on her cellphones that indicates she was deleting messages and applications due to her possible pending indictment. The defendant states that the discovery by law enforcement of these messages is somehow misleading because the deletion of messages occurred before and during the time she was charged with concealing her material support to foreign terrorist organizations. While the defendant would like to limit consideration of evidence of her conduct to the timeframe when she has admitted to criminal activity, the Court is not so limited in its consideration of the circumstances of her conduct. *See Watts*, 519 U.S. at 151; 18 U.S.C. § 3661; U.S.S.G. § 1B1.4.

Here, as the PSR makes clear, the relevant Guidelines provision is U.S.S.G. § 3C1.1 (Obstructing or Impeding the Administration of Justice). That provision provides -

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

The commentary to that provision provides a non-exhaustive list of examples of obstructive activity that the Court should consider in determining whether to impose this enhancement. Pertinent here, the commentary cites the following –

> (D) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender;

8

U.S.S.G. § 3C1.1, n.4(D).  Here, given the conduct outlined herein and that admitted to by the defendant herself, this enhancement was properly applied by the Probation Office.

The defendant admitted in the statement of facts in support of her guilty plea that she and the UCE used an end-to-end encrypted social media platform to communicate throughout the duration of their relationship.  She admitted that they used self-destruct timers when they communicated electronically so that the communications would automatically delete after a specified time, eliminating the potential to recover those conversations.  The use of self-destruct timers offered an additional protection against discovery of the nature of the communications by law enforcement.  The defendant was so concerned that her connection with travelers to Syria would become known and make her complicit in their plans that she stated to the UCE in September 2018, ".  .  .  I need you to unfollow the [social media platform] channel [that the defendant was operating] . . . I need you to delete my name and phone number from your phone and all pictures and text messages."  *See* Exh. 4 at 40-50.  Despite the defendant's concern about being identified with the UCE's plans, defendant admitted that in subsequent communications, she gave the UCE specific advice about how the UCE and her husband should travel to Syria to avoid detection by law enforcement authorities.  The defendant counseled the couple not to take their phones with them to Syria, recommending that they acquire new phones and new phone numbers before traveling.  The defendant noted that when she developed her own plan for traveling to Syria, her plan "was to delete everyone 6 to 8 months before leaving and have no contact with anyone.  Bc [because] one wrong move," indicating her knowledge that if anyone knew of her plans, she could be discovered by law enforcement.  *Id*. at 42.

Aside from those admissions directly related to her guilty plea, the defendant was interviewed by agents of the FBI on October 23, 2018.  She agreed to speak with the FBI

voluntarily before and after she was given *Miranda* warnings. The interview was audio-taped and transcribed. A copy of the transcript is attached to this response as Exhibit 5. During the interview, the defendant admitted that she supported ISIS two years earlier, and that she communicated in code with people about ISIS, Turkey, Syria, Anwar Al Awlaki and Hijrah. She admitted that she used self-destruct timers for on-line messages when she communicated with the UCE, because she didn't want anyone to know what they were discussing, and because she knew that what they were discussing was wrong. She admitted to using secret chats and destructive timers for messages with Alaa Abusaad, a young woman in Alabama who was subsequently charged with attempting to provide material support to an FTO, who thereafter pled guilty to violating 18 U.S.C. § 2339C, and who has recently been sentenced to 90 months imprisonment for this offense. When she learned of the investigation of Albusaad in October of 2018, the defendant deleted social media accounts connected to Abusaad. *See* Exh.6. The defendant later admitted in an interview with law enforcement that she deleted social media accounts connected to Abusaad. Additionally, the defendant admitted to deleting her Instagram account after learning that another on-line friend, S.Y., warned the defendant that she was being questioned by the FBI and the defendant feared that the investigation could lead to her. Text messages and a Telegram chat on April 24, 2018 between the defendant and an on-line undercover employee reflect that the defendant deleted her Telegram account following the FBI interview of another "sister." *See* Exh. 7 to this Response[4]. On October 9, 2018, the defendant posted a warning about spies to her Telegram Channel "Islamic Literature," stating,

> "For security reasons we will be leaving this channel. We will no longer be posting anymore. We would like to leave with some advice. Be careful who you trust and what you say. A sister may wear niqab and pray beside you and remind you of Allah, yet

---

[4] On April 24, S.Y advised the defendant in a social media chat that she had been questioned by the FBI. *See* Exh. 8.

they're spies. Brothers and sisters don't shre your "future plans" with anyone whether you trust them or not. Sadly, in these times you just don't know. May our meeting place be in Jannah. May Allah protect you and us from the Kuffar and May Allah forgive us of our sins Allahumma Ameen. Since the main admin of the channel left. We cannot delete this channel. Please unfollow as we will be unfollowing and not posting anymore. Jazakum'allahu khayran wa barak Allahu feekum."

*See* Exh. 9 to this Response.

While the defendant argues that her efforts and advice to others to delete communications on social media accounts and on her phones that would reflect illegal material support activity did not succeed (relying in part on statements in a report of a defense expert who was never subjected to any examination) (D.E. 396, at 7-8), this does not make the PSR statements in paragraph 23 inaccurate or misleading. The evidence obtained from the defendant's devices and social media accounts clearly establish her concern that her conduct could "get her arrested" and sentenced to 30 years in prison for violating federal law. In order to avoid that fate, she attempted to obstruct justice in several ways, by taking steps to delete her social media presence and incriminating material, including text exchanges, on her phones. The government submits that the defendant's efforts to delete her social media connections to people under investigation by law enforcement, to delete the content of her social media accounts reflecting her support for foreign terrorist organizations, and to urge other people (including UCE-1, and thereafter, other contacts on social media whom the defendant warned about spies) establishes, by a preponderance of the evidence, that application of the obstruction of justice enhancement is appropriate in this case to increase the defendant's offense level.

IV. <u>Defendant's Objections to Sentencing Guidelines Calculations in the PSR</u>

The defendant objects to the application of the terrorism enhancement, pursuant to U.S.S.G. §3A1.4 and the obstruction of justice enhancement, pursuant to U.S.S.G. § 3C1.1, the latter of which is discussed above. (D.E. 396, at 8-16.) The defendant then proposes her own

11

Guideline calculation, not applying either of those enhancements, arriving at a Guidelines range of 30-37 months. (D.E. 396, at 17.) As stated in the government's original filing with respect to sentencing, the government agrees with the calculation made in the PSR, applying the two enhancements to this case. As a result of application of these enhancements, the applicable Guidelines range would be 235-293 months. The sentence in this case, however, is limited to 120 months because the statutorily authorized maximum sentence for a violation of 18 U.S.C. § 2339C is less than the minimum of the applicable Guideline range. *See* U.S.S.G. § 5G1.1(a).

Section 3A1.4 of the Sentencing Guidelines states that if the felony involved or was intended to promote a federal crime of terrorism, the base offense level is increased to level 32 and the defendant's criminal history category is calculated to be Category VI. A "federal crime of terrorism" has the same definition as is included in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) defines the term as an offense "that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of certain enumerated federal statutes, including 18 U.S.C. § 2339C, the offense to which the defendant has pled guilty.

In order for the court to apply the terrorism enhancement, the government must establish, by preponderance of the evidence, that the defendant committed a covered offense and that her actions were calculated to influence or affect the conduct of government or to retaliate against government conduct. *See United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014); *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001). The terrorism enhancement can be applied to inchoate offenses, such as attempt and conspiracy. *Id*. at 516-17.

In interpreting the meaning of the phrase, "calculated to influence or affect the conduct of government," this Circuit has observed that a defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind. *Wright*, 747 F.3d at 408. The Circuit has explained that long term planning is not required to establish the requisite intent, "[n]or is it necessary that influencing the government be the defendant's ultimate or sole aim." *Id.*; *see also United States v. Stafford*, 782 F.3d 786, 792 (6ᵗʰ Cir. 2015). The Second Circuit observed,

> Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive. 'Motive' is concerned with the rationale for an actor's particular conduct. . . . 'Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance. . . Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object.

*United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). The *Wright* court specifically observed, "[f]or example, a defendant who provided material assistance to terrorist organizations, but claimed that his goal was to assist an oppressed group of Muslims, is eligible for the enhancement regardless of his purportedly benign motive." *Id.* (citing *United States v. Jayyousi*, 657 F.3d 1085, 1114-15 (11ᵗʰ Cir. 2011). Moreover, specific intent may be found even if the record does not contain direct evidence of the defendant's particular frame of mind. 747 F.3d at 408. The enhancement can be applied based on its "natural inference" that the defendant's offense illustrated that he or she had the necessary intent. *See United States v. Dye*, 538 Fed. Appx. 654, 666 (6ᵗʰ Cir. 2013). Even without an admission from the defendant, intent can be established through circumstantial evidence. *Id.* A defendant's stated expectation that his or her criminal conduct would be perceived as an act of terrorism is evidence of intent. *See Stafford*, 782 F.3d at 792.

In the instant case, there is ample evidence for the court to conclude that the terrorism enhancement should apply to the sentencing of the defendant for her conviction of concealment of material support and resources intended to be provided to a designated foreign terrorist organization. The defendant's offense of conviction is the culmination of years of support of foreign terrorist organizations dedicated to violence against the United States. Her support of these organizations since at least 2015 – first ISIS, then Al Nusra, then HTS -- reflect her intent to influence or affect the conduct of government in Syria or her intent to retaliate against government conduct in Syria.

A. <u>Defendant's Statements in Support of the Violence of Designated Foreign Terrorist Organizations Support Application of the Terrorism Enhancement.</u>

The investigation of the defendant was triggered by discovery of her concerning conduct on social media that was noted beginning in late 2015. On September 21, 2015, the defendant posted, "subhanallah [praise be to Allah] America can burn loool." On September 12, 2016, the defendant posted, "there is no ceasefires all lies . . . may AllA h (subhanu wa ta'ala) destroy the US, Russia, Assad and his regime ameen thumma ameen. On July 13, 2017, the defendant posted, "We don't need America to accept us we only need AllA h. The US are terrorists killing innocent Muslims daily." The defendant also posted numerous images espousing support for terrorist attacks against the United States on her Telegram Channel. Those images included:

- A photograph of a headless Statue of Liberty waving an ISIS flag and captioned, "One of my favorite pictures that keeps getting deleted," posted on September 7, 2015;

- A photograph of the burning remnants of the Statue of Liberty, captioned, "The head of ISIS Sheikh Abu Bakr al-Baghdadi said 'Our Appointment in New York,' posted on September 11, 2015 (the anniversary of the September 11, 2001 attack on the World Trade Center);

- A photograph of a jihadi fighter pointing a gun at the reader with the words, "Rivers of Blood Await America," posted on September 9, 2015;

14

- A photograph of a jihadi fighter holding the head of former U.S. President Barack Obama and an unknown person, posted on September 21, 2015;

- A photograph of an ISIS fighter preparing to behead a prisoner, with the phrase "A Message to America" and the comment [made by the defendant], Dear US, Russia, Turkey, Saudi, and NATO allies . . . . . I hate you for what you put my brothers and sisters through . . . . you will fail and Islam will prevail . . . . may Allah destroy you all [two images of knives, one image of a bomb]. Ya Allah protect my brothers and sisters . . #deathtonato #deathtothewest," posted on September 21, 2015; and

- A photograph of the U.S. Capitol engulfed in flames and triumphant ISIS supporters waving ISIS flags, posted on September 22, 2015.

In addition to posting content on her Telegram Channel demonstrating support for terrorist activity against the United States, the defendant kept content on her cell phones supporting terrorist causes. She retained photographs of images of foreign fighters and accompanying phrases urging people to engage in violent jihad. She saved photographs of what appear to be explosive devices. She kept photographs of statements of Anwar al Awlaki, a radical Islamic cleric who preached that Muslims have a religious duty to kill Americans. She posted on her Telegram Channel, "Islamic Literature," Anwar al Awlaki's directive entitled, "44 Ways to Support Jihad." *See* Exh. 10 at 2-3, 5, 8. The defendant also retained images related to organizations encouraging contributions to the cause of foreign fighters. One of those retained images was captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in FIGHTING."

### B. The Defendant's Financial Contributions to Foreign Terrorist Organizations Support Application of the Terrorism Enhancement.

The defendant not only retained images of organizations soliciting contributions to help foreign fighters. She contributed to them herself and encouraged others to do so. On March 17, 2018, UCE-1 told the defendant that her husband was interested in "helping some of the mujuhideen." The defendant told UCE-1 that if her husband was on

15

Telegram, the defendant could "give him some brothers" whose Telegram channel the defendant followed. The defendant vouched for these contacts as being "over there" and "trustworthy." On March 18, 2018, the defendant followed up by sending UCE-1 contact information that included a message from "Al Maqalaat," describing the needs of the mujahideen, and the number "+90 537 822 0931" accompanied by the message, "I use to know this brother the owner of this channel from FB/He's trustworthy." On June 20, 2018, the defendant sent $200 by Western Union to "Omar Ali" at the number "+90 537 822 0931." *See* Exh. 11. On June 25, 2018, the defendant sent $500 to "Ahmet Hayek" at the number "+90 537 822 0931." *See* Exh. 12. The two cash transmissions were sent to the same phone number as the number that the defendant had provided to UCE-1 to support the mujahideen. Moreover, the phone number is identified by the government's expert witness as the Whats App number for Merciful Hands. *See* Exh. 3 at 15.

A few days before those donations, on June 14, 2018, the defendant sent $150 to "Muhammed Muhammed" in Turkey. *See* Exh. 13-15. On the top of the receipt for this donation appears a reference to Syria Care Turkey. A screenshot saved to one of the defendant's cell phones on June 15, 2018 depicts the Telegram Channel name "Al Sadaqah;" a photo of men holding a pair of boots, with the caption, "Al Sadaqah providing brand new military boots to front line mujahideen/Anonymous donation methods available;" There is also a quote in support of sending donations to Alsadaqahsyria, using the handle @alsadaqahsyria: "Whoever dies without having gone out for jihad or having thought of doing so, dies on a branch of hypocrisy." *See* Exh. 16.

16

The defendant's financial contributions and the advice she gave to UCE-1 identifying a recipient of funds to support the mujahideen were not simply donations to be made to humanitarian charities. The defendant was not an uneducated, naïve person unable to discern legitimate charities from those operated or supporting terrorist causes. Her graduate level focus in Middle Eastern studies, including research she conducted into the specific topic of the use of "charitable organizations" by terrorist groups to solicit and obtain funds for other purposes, is powerful evidence of her knowledge and intent to support terrorist operations against the United States.

C. Defendant's Proactive Assistance to UCE-1 to Travel to Syria Demonstrates Her Intent to Influence or Affect the Conduct of Government or to Retaliate Against Government Conduct that Merits Application of the Terrorism Enhancement.

By the time the defendant met UCE-1 on February 22, 2018, she had formulated a desire to travel to Syria to join her fiancé, identified as "Abu Abdullah," who was affiliated primarily with "JFS," an alias for Jabhat al-Nusrah, an affiliate of Al Qaeda in Iraq. The defendant had discussed details of her plans to travel to Syria with multiple other persons on social media, as reflected in communications from her social media accounts. The defendant explained to UCE-1 that she believed it to be every Muslim man's duty to wage "jihad," and that it was the duty of women to support them by fighting alongside their husbands, carrying bodies from the battlefield and providing food and water for the mujahideen. The defendant expressed her desire to UCE-1 to cook for the "brothers" who were fighting jihad. She said that she hoped to die alongside her husband in Syria, in an airstrike, on a Friday during Ramadan while she and her husband

17

were praying. She said that she had discussed with Abu Abdullah a plan for her to bring her young son to Syria with her, telling the boy's father that she was only taking him on a trip to Italy. During this meeting with UCE-1, the defendant gave UCE-1 directions on how to travel to Syria without drawing suspicion from law enforcement. She told UCE-1 that Abu Abdullah had contacts who could obtain false documents to facilitate UCE-1's travel to and entry into Syria.

In late September 2018, when UCE-1 told the defendant that her husband had sworn allegiance to HTS on their behalf and that they were preparing, imminently, to travel to Syria to join HTS, the defendant expressed reservations about their plans, as well as concerns that the authorities might trace those plans back to the defendant. In spite of these reservations, the defendant gave UCE-1 more advice about traveling to Syria undetected, ostensibly to avoid detection by law enforcement. The defendant counseled them based on her own previously formulated plans to travel there. She advised them not to take their phones with them, acquire new phones and new phone numbers before traveling, cut ties with other people before leaving the United States, buy roundtrip airline tickets rather than one-way tickets, consider traveling to Italy first, then on to Turkey and ultimately to Syria. In an on line chat on September 30, 2018, the defendant told UCE-1 that she had spoken with one of her contacts who claimed that there was presently no jihad in Syria, and consequently, the defendant asked UCE-1, "Have you thought about Afghanistan? They're still fighting there." Apparently not comfortable with the plans that UCE-1 described to her for the trip to Syria, the defendant ultimately offered to reach out to one of her contacts whom the defendant claimed could

18

better assist UCE-1. On October 2, 2018, the defendant provided UCE-1 with contact information for Individual A (@alsadaqahsyria) and told UCE-1 to message that person.

On October 4, 2018, after UCE-1's husband contacted Individual A and received detailed advice on traveling to Syria, UCE-1 thanked the defendant for providing Individual A's contact information. The defendant claimed not to know who that person was, said she no longer wanted to discuss the matter, and stated, "You're going to get me arrested." In a separate outreach to a contact at an entity identified as Syria Care Turkey, the defendant reiterated her concern that she could be criminally liable for providing material support to a designated foreign terrorist organization because she helped UCE-1 and her husband travel to Syria. Syria Care Turkey knew @alsadaqahsyria and was aware of @alsadaqahsyria 's communications with UCE 1's husband. The person at Syria Care Turkey actually sent the defendant a verbatim copy of the message that UCE-1's husband had sent to Individual A on October 10, 2018, when he reported arriving in London. The defendant stated to Syria Care Turkey, "Nothing wrong if they're actually real and truthful. But me and some sisters had our doubts for awhile about them. Like how they always asked bait questions. So we all decided to block her. Even the sister that introduced us to this sister is ajeeb [strange] too. I don't know I completely came off social media hard to trust anyone . . . I don't know I just don't want to go to jail for 30 yrs and leave my son in the hand of the Kuffar. Bc they could say she helped us she gave us the contacts." *See also* Exh. 17.

The defendant's long history and commitment to supporting foreign terrorist organizations dedicated to the destruction of the United States, reflected in statements,

financial contributions, encouraging others to act and ultimately assisting the UCEs to travel to Syria to join the fight with a designated foreign terrorist organization, all support application of the terrorism enhancement in this case. Her intent to influence or affect the conduct of the United States internationally, or to retaliate against perceived injustices suffered by Muslims at the hands of the United States abroad, can be established both directly and circumstantially. The Probation Officer properly applied the terrorism enhancement in this case, and the government respectfully submits that the Court should apply the terrorism enhancement, based upon preponderance of the evidence in this case.

The defendant also attempts to limit the application of the lifetime supervised release provision codified in 18 U.S.C. § 3583(j). Doc. 399. The government submits that the statute permits the Court to impose a more lengthy term of supervised release, based upon the nature of the offenses enumerated as federal crimes of terrorism. The Court is encouraged to consider all relevant information in fashioning the appropriate term of supervised release for this defendant at the time of sentencing, particularly the nature and circumstances of her offense and her associated conduct.[5]

---

[55]     For the reasons discussed at pages 7-11 of this Response, the government submits that the Court should also apply the obstruction of justice enhancement in this case, increasing the defendant's offense calculation by two levels.

## CONCLUSION

Accordingly, for the reasons stated herein, the government submits that the defendant's listed objections in her Position with Respect to Sentencing should be denied.

Respectfully Submitted,

MARK H. WILDASIN
United States Attorney
Middle District of Tennessee

By: /s/ *Philip H. Wehby*
PHILIP H. WEHBY
KATHRYN RISINGER
Assistant United States Attorneys
110 9th Avenue South
Nashville, Tennessee 37203
Phone: (615) 736-5151

/s/ *Jennifer E. Levy*
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Ste. 7600
Washington, D.C. 20530
(202) 514-1092

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2022, I am electronically filing a copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record for the defendant in this case.

/s/ *Philip H. Wehby*
PHILIP H. WEHBY
Assistant United States Attorney