**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19-cr-00013** |
| | ) | |
| **GEORGIANNA A.M. GIAMPIERTRO,** | ) | **Chief Judge Waverly D. Crenshaw, Jr.** |
| **Defendant.** | ) | |
| | ) | |

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

<u>*Charles D. Swift*</u>
*Pro Hac* Attorney for Giampietro
Constitutional Law Center for Muslims in America
100 N. Central Expy, Suite 1010
Richardson, TX 75080
972-914-2507
cswift@clcma.org

Peter Strianse
Attorney for Giampietro
TUNE, ENTREKIN & WHITE, P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
(615) 244-2770 (o) Ext. 2234
pstrianse@tewlawfirm.com

Linda G. Moreno
*Pro Hac* Attorney for Giampietro
Constitutional Law Center for Muslims in America
100 N. Central Expy, Suite 1010
Richardson, TX 75080
972-914-2507
lindamoreno.esquire@gmail.com

1

# TABLE OF CONTENTS

**DEFENDANTS SENTENCING MEMORANDUM**…………………………………………...6

**I. SENTENCING ANALYSIS** .................................................................................................7

**II. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)** ...............................................7

  **A. History and Personal Characteristics** .........................................................................7

  **B. Nature and Circumstances of the Offense** .................................................................9

  **C. Guidelines Sentencing Range** ...................................................................................12

    1. The Terrorism Enhancement's 12-level increase treats all offense conduct the same ... 13

    2. The Terrorism Enhancement's criminal history category increase to level VI is arbitrary and unwarranted .................................................................................................................... 15

    3. The empirical evidence does not support treating and sentencing first-time, non-violent terrorism-related offenders like career armed criminals. .................................................... 15

    4. Sentencing first-time, terrorism-related offenders like career offenders causes similar harm to that of comparable sentencing in the War on Drugs. ........................................... 17

  **D. The Need to Avoid Unwarranted Sentencing Disparity** ...........................................17

    1. Samantha El Hassani, pled to 18 U.S.C. 2339C(c), traveled with children to join ISIS and to transported $30,000, sentenced to 78 months. ............................................................... 19

    2. Sultane Salim, plead to 18 U.S.C. § 2339C( c), raised and concealed $22,000 for Al-Qaeda leader, sentenced to 60 months ................................................................................ 20

    3. Cases where the only potential victim is the brutal regime of Bashar Al-Assad............ 21

    4. Material Support of Terrorism cases under 18 U.S.C. § 2339B and 18 U.S.C. § 2339A with serious conduct have resulted in much higher sentences............................................. 21

**III. NEED FOR THE SENTENCE IMPOSED UNER 18 U.S.C. 3553(a)**…………………...22

  **A. Seriousness of the Offense, Promote Respect for the Law, and To Provide Just Punishment for the Offense**..............................................................................................22

  **B. Deterrence and Protection of the Public** ..................................................................23

  **C. The Need for Care, Treatment or Training of Defendant**........................................25

**IV. MS. GIAMPIETRO'S SENTENCING RECOMMENDATIONS**...............................25

  **A. Term of no more than 48 months is the Appropriate Sentence**.....................................25

  **B. No Fine Should Be Imposed** ....................................................................................26

**V. CONCLUSION**…………………………………………………………………………...26

**CERTIFICATE OF SERVICE**……………………………………………………………..27

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*United States v. Booker*
    543 U.S. 220 (2005)…………………………………………………………………7, 12, 13

*Gall v. United States*
    552 U.S. 38 (2007)........................................................................................13

*Kimbrough v. United States*
    552 U.S. 85 (2007).........................................................................................7

*Nelson v. United States*
    129 S. Ct. 890 (2009)...................................................................................13

*Nichols v. United States*
    511 U.S. 738  (1994)....................................................................................15

*Rita v. United States*
    551 U.S. 338 (2007)....................................................................................13

**Circuit Court Cases**

*United States v. Crosby*
    397 F.3d 103 (2d Cir. 2005)........................................................................13

*United States v. Lake*
    419 F.3d 111 (2d Cir. 2005)........................................................................13

*United States v. Menyweather*
    431 F.3d 692 (9th Cir. 2005) ......................................................................13

*United States v. Meskini*
    319 F.3d 88 (2d Cir. 2003)..........................................................................18

*United States v. Stewart*
    590 F.3d 93 (2d Cir. 2009)..........................................................................14

**District Court Cases**

*United States v. Alhaggagi*
    2019 U.S. Dist. LEXIS 37889 (N.D. Cal. March 8, 2019)......................................17

*United States v. Elhassani II*
    2019 WL 11318371 (N.D. Ind. Nov. 25, 2019)...............................................20

3

*United States v. Elhassani*
   No. 2:19-cr-00159-PPS-JEM, 2020 WL 7082758 (N.D. Ind. Nov. 17, 2020) ......................20

*United States v. Hodzic*
   355 F. Supp. 3d 825 (E.D. Mo. 2019)......................................................................................21

*United States v. Jumaev*
   2018 WL 3490886, CR 12-0033 JLK (D. Colo. July 18, 2018)...............................................16

*United States v. Mehanna, Transcript of Disposition*
   No. 09-10017-GAO (D. Mass. 2012) .....................................................................................16

*United States v. Nayyar*
   2013 U.S. Dist. LEXIS 79002 (S.D.N.Y. June 4, 2013)........................................................14

*United States v. Willis*
   479 F. Supp. 2d 927 (E.D. Wis. 2007)...................................................................................14

**Statutes**

18 U.S.C. § 2339A ......................................................................................................................21

18 U.S.C. § 2339B ......................................................................................................................21

18 U.S.C. § 2339C(c)(2)……………………………………………………………………6, 25

18 U.S.C. § 2339C(c)(2)(A) ......................................................................................................19

18 U.S.C. § 3553(a) ........................................................................................................... passim

18 U.S.C. § 3553(a)(6)...........................................................................................................7,19

18 U.S.C. § 4A1.1 ......................................................................................................................15

U.S.S.G § 3C1.1 .........................................................................................................................12

U.S.S.G. § 3A1.4 ........................................................................................................................12

**United States Sentencing Guidelines**

U.S.S.G. APP. C, AMEND. 526 ................................................................................................14

U.S. SENT'G GUIDELINES MANUAL § 5A……………………………………………...15

U.S. SENT'G COMM'N 2015……………………………………………………………...15

4

**Other Authorities**

James Forman, Jr., *Exporting Harshness: How the War on Crime Helped Make the War on Terror Possible*, 33 N.Y.U. REV. L. & SOC. CHANGE 331, 359-60 (2009); Aziz Z. Huq & Christopher Muller, *The War on Crime as Precursor to the War on Terror*
36 INT'L J.L. CRIME & JUST. 215, 218-19 (2008). ....................................................................17

*James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations,* 28 Law & Ineq. 51 (2010) (available at: http://scholarship.law.umn.edu/lawineq/vol28/iss1/2)..............14

*Punishment and Prejudice: Racial Disparities in the War on Drugs*
HUM. RTS. WATCH (May 2000), http://www.hrw.org/legacy/reports/2000/usa/Rcedrg00-04.htm [http://perma.cc/ JB4C-EUQP]. ...............................................................................................18

*Punishing Terrorists: Congress, The Sentencing Commission, The Guidelines, And The Courts,*
*23 Cornell J.L. & Pub. Pol'y 517 (2014)……………………………………………………………14*

*Recidivism and the "First Offender"* U.S. SENT'G COMM'N 26 (May 2004),
http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/20040 5_Recidivism_First_Offender.pdf [http://perma.cc/MLD8-RQU8].16

Sameer Ahmed, *Is History Repeating Itself: Sentencing Young American Muslims in the War on Terror* 126 Yale L. J. (2017), https:// digitalcommons.law.yale.edu/ylj/vol126/iss5/5.............16

*Syria Timeline: Since the Uprising Against Assad*. United States Institute of Peace. January 1, 2021. (Available at: https://www.usip.org/syria-timeline-uprising-against-assad)....................9

The Changing Nature of Youth Violence: Hearing Before the Subcomm. on Youth Violence of the S. Comm. on the Judiciary, 104th Cong. 1, 24 (1996) (statement of John J. Dilulio, Jr.)...17

Defendant Georgianna A. Giampietro ("Ms. Giampietro"), through counsel, respectfully submits this Sentencing Memorandum in connection with her sentencing by this Court on July 15, 2022. On January 18, 2022, Ms. Giampietro pled guilty before this Honorable Court to one count of concealing the provision of material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339C(c)(2). Ms. Giampietro accepts full responsibility for her actions, and through this memorandum seeks to provide the Court with information pertinent to her sentencing in the interests of justice under 18 U.S.C. § 3553(a).

Ms. Giampietro stands convicted of concealment of the provision of material support to a terrorist organization. Individuals convicted of terrorism offenses are presumed to be irredeemably committed to violent extremism and therefore unable to be rehabilitated, warranting a maximum sentence. The defense respectfully submits that Ms. Giampietro is a different kind of defendant, one who has demonstrated in her life, and even while incarcerated, that she deserves a chance to contribute to her family and society, and to show that she will not be before any court in the future.

Ms. Giampietro is personally non-violent. She has overcome significant obstacles in her life. She has no previous offenses. Over the course of her conduct, she moderated her beliefs and by the time of her offense of conviction, she no longer supported any of the terrorist organizations in Syria. After entering a plea in this case, Ms. Giampietro cooperated with the government—with no promise of benefit. In short, she is capable of rehabilitation. The defense respectfully submits, for this Court's consideration, that a sentence of no more than 48 months (with extended probation) is sufficient, but not greater than necessary, to serve the needs of this defendant and society.

# I.    SENTENCING ANALYSIS

In accordance with *United States v. Booker*, 543 U.S. 220 (2005), the Court is directed to impose a sentence in accordance with 18 U.S.C. § 3553(a). In so doing, the Court is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2). *Id.* (emphasis added); *see, e.g., Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overarching instruction" of § 3553(a)). Those purposes include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," *id.* § 3553(a)(2)(C); and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2)(D). In determining a sentence "sufficient, but not greater than necessary" to accomplish these purposes, courts must consider a number of factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, *id.* § 3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* at § 3553(a)(6).

# II.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

## A. History and Personal Characteristics

Ms. Giampietro is a 37-year-old mother of two children. Her daughter is now 15 years old and lives with Ms. Giampietro's mother, Maria Williams. Her son is now 13 years old and lives with his father. Prior to her arrest, Ms. Giampietro worked multiple jobs as a therapist to support herself, her daughter, and her elderly mother. She was working for a couple of years to fulfill the

7

requirements to become a Master Licensed Social Worker, and she achieved that in September of 2018.

Ms. Giampietro's father abandoned the family when she was young. Before he left, he was abusive; after he left, he did not provide financial support to the family. Ms. Giampietro's mother later remarried, and Ms. Giampietro did not have a very good relationship with her stepfather. Still, when her stepfather became ill, Ms. Giampietro helped her mother take care of him. Ms. Giampietro's mother is 72 years old, and she was dependent on Ms. Giampietro to take care of her, run errands, clean the house, cook, maintain the home, and provide for the family. Exhibit 1 – Mother's Letter. Exhibit 2- Daughter's Letter. Exhibit 3- Brother's Letter.

Ms. Giampietro is a soft, caring, maternal, sensitive, woman who is deeply affected by human suffering. This is what led her to pursue a career as a Licensed Clinical Social Worker. These traits also pushed her to agree to take care of her mother, care for her ill stepfather, and nurse her mother when she had surgery and multiple serious health issues. When her grandmother was about to pass in New York, Ms. Giampietro's mother called her at work in despair because she was too afraid to fly but needed to see her mother before she passed. Ms. Giampietro came home, rented a car, and drove to New York that night in time for her mother to say goodbye to her mother. Exhibit 1- Mother's Letter.

Ms. Giampietro worked as a server at local restaurants throughout college to support herself. She pursued her continued education, relying on student loans for her tuition. Throughout the online conduct described in this case, Ms. Giampietro was working to secure a better future for herself, her children, and her mother in her real life. Before her arrest, she had just received a raise at her new job using her Master Social Worker license.

8

### B. Nature and Circumstances of the Offense

Ms. Giampietro's crime was conducted largely online. It was the result of years of befriending people on social media to discuss the situation in Syria. In this world, Ms. Giampietro was exposed to jihadist propaganda, rebel fighters, Syrian charities and refugees, and many different groups. Ms. Giampietro's concern for children drew her into the Syrian Conflict.

In the beginning, the Syrian Conflict and the rebellion against Syrian President Bashar Al-Assad was celebrated across the world. It is important to understand that the divisive Syrian civil war presented the world with serious humanitarian questions. Beyond dispute—the Assad regime brutally retaliated against its own people using battlefield tactics that transgressed the modern norms of armed conflict, especially the indiscriminate bombing of civilians and the repeated use of chemical weapons. In August 2013, one of the Syrian government's chemical weapon attacks, killed more than 1,000 civilians. The Assad government used various chemical weapons—from sarin, a toxic nerve agent banned by international law, to chlorine—at least 50 times, according to U.S. government sources.[1] This resulted in massive numbers of Syrian refugees and humanitarian needs that overwhelmed the international assistance infrastructure and imperiled neighboring countries that tried to host refugees. The humanitarian disaster engendered sympathy, anger, charity, and condemnation from the international community. To fight Assad's Syrian government, several rebel groups were formed, and then disbanded. During this time it was confusing and difficult to follow the Syrian political landscape.

Then, ISIS formed in 2014, as a force ostensibly fighting the Assad regime. Online, ISIS used propaganda that quoted jihadist ideology with images of the human suffering in Syria to gain support for the group.

---

[1] *Syria Timeline: Since the Uprising Against Assad*. United States Institute of Peace. January 1, 2021. (Available at: https://www.usip.org/syria-timeline-uprising-against-assad).

Initially, Ms. Giampietro absorbed ISIS's propaganda which took her deeper into this internet rabbit hole. On the internet, it is easy to anonymously share, like, or to post one's own comment. Ms. Giampietro started to see these ISIS internet posts and liked or shared them. In 2015, she was vocal in her approval of ISIS's fight against Assad. On the internet, she used the name "UmmRoses" or "Ameera" in lieu of her own name. In this early online world, UmmRoses was pro-ISIS and extoled their virtues.

Over time, ISIS soon showed that it was not a righteous force fighting Assad. The beheading videos of the Jordanian pilot and journalists shocked the international community. More information came out revealing the murderous, and terroristic nature of ISIS. By 2016, it was clear that ISIS was not like the other rebel groups, instead they were killing, torturing, and raping civilians. Ms. Giampietro soon went from support of ISIS, to being critical of ISIS.

In her online conversations, Ms. Giampietro, however, remained supportive of jihad in Syria. She began an internet romantic relationship with a man she believed was not aligned with ISIS and was fighting against the Assad regime. Online, she expressed her desire to go to Syria to be with him. Online, she thought of how she could take her son to Syria with her, if she ever went. Online, she stated a desire to die while praying in a mosque that was being bombed. None of this happened, and over time she decided going to Syria at all was a bad idea for any Muslim.

Online, she was in contact with people who claimed to support men fighting against Assad. As a result, Ms. Giampietro's online channel ultimately grew to 1,200 followers. Ms. Giampietro's statements, however, did not just get her like-minded followers, they drew concern from the FBI. Thereafter FBI undercovers were among Ms. Giampietro's followers. In late 2017, a female undercover agent contacted Ms. Giampietro and asked to meet. Ultimately, the two would meet four times. In those meetings, Ms. Giampietro extolled jihad, talked of her past plans to travel to

Syria, and did nothing to discourage the undercover's travel plans to go to Syria so her husband could join Hayat Tahrir Al-Sham ("HTS"). However, what she did not do in those meetings was move beyond just talk. In her real life, she was working hard and taking care of her family, buried in debt, and securing a better future for the family.

In the spring and summer of 2018, Ms. Giampietro learned that HTS had been designated as a terrorist group. She began to share articles critical of HTS. She quoted Islamic teachings that warned about times of infighting, the punishment for those who kill their brothers in faith, those who kill the innocent, and shared the advice that during such times it is better for one to stay in their homes rather than to join in the fighting.

Ms. Giampietro also made clear that she had no plans to travel to Syria in the foreseeable future. In response to the undercover agent's and the FBI fraudulent "sheikh"'s suggestion that Ms. Giampietro was not obligated to repay her debts before going to Syria, Ms. Giampietro conducted her own research of the Islamic faith and rejected the idea that she could travel without repaying her debts. She concluded that she would likely never be able to pay off her over $200,000 of loans.

Shortly after, in September 2018, her friend (the undercover) told her that she would be traveling to Syria to join HTS with her husband. Initially Ms. Giampietro tried to convince them not to go. When that did not work, Ms. Giampietro tried to stall the undercover by telling her not to do anything and to wait a few weeks until they could meet. She then offered to get an alternative contact for them. Instead of providing the name immediately, Ms. Giampietro indicated that there was no fighting in Syria, instead trying to divert the undercovers' interest towards Afghanistan.[2]

---

[2] Ms. Giampietro knew the undercovers had no plan to travel Afghanistan and it would take months to plan. Further, Ms. Giampietro had no contacts in Afghanistan allowing her to completely disassociate from the undercovers' travel.

When all that failed, Ms. Giampietro sent the contact information to the undercover. Immediately after sending the information, Ms. Giampietro thought better of it and tried to withdraw the contact telling the undercover minutes later, "Nevermind… Na forget it… I don't want to talk about this anymore…you're going to get me arrested".

At this point, it was too late; Ms. Giampietro's online world had invaded her real life. Ms. Giampietro's involvement in online chat groups about the Syrian Conflict and the various ideologies and groups that were discussed had crossed the line from protected speech to criminal activity. Instead of reporting to the authorities, and out of fear, Ms. Giampietro deleted her social media accounts and hoped none would know.

### C. Guidelines Sentencing Range

At the evidentiary hearing held on June 24, 2022, this Court determined that Ms. Giampietro's offense level is 33, and her criminal history score is VI, finding that the obstruction of justice enhancement (§ 3C1.1) and the Terrorism Enhancement (§ 3A1.4) apply to her offense as a matter of law. The resulting sentencing guidelines range is 235-293 months (capped at 120 months maximum by the statute). The injustice of simply awarding a maximum sentence for the offense conduct is a text book example of why *United States v. Booker,* 543 U.S. 220, 259-60 (2005), and its progeny, hold that the Guidelines are merely one factor for the Court to consider at sentencing, along with the other factors enumerated in § 3553(a). This discretion to vary from the Guidelines is important so as to impose a just sentence in accordance with 18 U.S.C. § 3553(a). Indeed, as the Supreme Court emphasized in *Nelson v. United States*, 129 S. Ct. 890 (2009), "[t]he

Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." 129 S. Ct. at 892.[3]

While the Court must still consider the Guidelines, *see* 18 U.S.C. § 3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court must consider under § 3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), explaining *United States v. Crosby*, 397 F.3d 103, 11113 (2d Cir. 2005).

## 1. The Terrorism Enhancement's 12-level increase treats all offense conduct the same

Relying on the Guideline sentence with the Terrorism Enhancement in all cases would result in a default sentence of the maximum statutory term, regardless of the conduct. A defendant who provided flowers to a terrorist organization would face the same sentence as a defendant who provided a bomb to the same organization. The Terrorism Enhancement's twelve-level increase fails to make any distinction between the types of conduct. For this reason, it provides this Court little, if any, guidance. This structure is unique inside the Guidelines. For instance, fraud crimes are enhanced based on a sliding scale dependent on the amount of funds in question. *See* U.S.S.G. § 2B1.1. Victim enhancements are also based on sliding scales, or based on the number of victims, the vulnerability of the victims, or what danger was posed. *See e.g.* U.S.S.G. §§§ 3A1.1, 3A1.2,

---

[3] While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within Guidelines sentence can be presumptively reasonable, *Id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005). *See Nelson*, 129 S. Ct. 890, 892 (wherein the Court twice remanded the Fourth Circuit's decision(s) that affirmed a sentence even though the District Court had stated that while the Guidelines were not mandatory, they enjoyed a presumption of "reasonableness" and reiterated "district judges, in considering how the various statutory sentencing factors apply to an individual defendant 'may not presume that the Guidelines range is reasonable.'" 129 S. Ct. at 892, quoting *Gall v. United States,* 552 U.S. 38 (2007); *see also id.* ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").

13

3B1.4. Based on this evidence, for non-terrorism defendants without a criminal history, courts regularly impose sentences below the advisory Guidelines range because they recognize that a lesser prison sentence is nonetheless a significant punishment and deterrent for someone who has never experienced prison.[4] Courts have struggled with the application of the terrorism enhancement for this reason.[5] As Judge Robert Sweet observed, the 12-level enhancement is not backed by empirical evidence. Instead,

> [T]he 12-level enhancement in overall offense level is the result of a congressional directive to the Sentencing Commission, rather than an organic outgrowth of the Commission's own empirical studies. *See* U.S.S.G. App. C, Amend. 526. Second, the language of the enhancement is so broad so as to encompass virtually every terrorism—related case, without distinguishing between those cases in which harm occurred and cases in which it did not.

*United States v. Nayyar*, 2013 U.S. Dist. LEXIS 79002, at *20 (S.D.N.Y. June 4, 2013).

Judge Sweet further observed that the,

> [A]pplication of the Terrorism Enhancement to the calculation of [the defendant's] offense level has the effect of obscuring the differences between [the defendant's] offense conduct, which did not result in any actual harm, and an instance where such conduct did result in actual harm. Such a distinction has been found to be a legitimate basis for imposing a lower sentence, even in a case involving terrorism offenses." *See* United States v. Stewart, 590 F.3d 93, 139 (2d Cir. 2009).

*Nayyar*, 2013 U.S. Dist. LEXIS 79002, at *21. The same is true here. The enhancement treats Ms. Giampietro's conduct the same as if she had personally internationally transported and concealed tens of thousands of dollars of aid to a terrorist organization, rather than simply providing a contact.

---

[4] *See, e.g.*, *United States v. Willis*, 479 F. Supp. 2d 927, 937 (E.D. Wis. 2007) (varying downwards because the "sentence recommended by the guidelines was greater than necessary, exaggerated the seriousness of the offense…").

[5] *See* James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Ineq. 51 (2010) (available at: http://scholarship.law.umn.edu/lawineq/vol28/iss1/2).
*See also* Punishing Terrorists: Congress, The Sentencing Commission, The Guidelines, And The Courts, 23 Cornell J.L. & Pub. Pol'y 517 (2014).

14

## 2. The Terrorism Enhancement's criminal history category increase to level VI is arbitrary and unwarranted

The Guidelines classify defendants by Criminal History Category based on their number of past offenses in order to "protect the public from further crimes of the defendant" (18 U.S.C. § 3553(a)), and "repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." 18 U.S.C. § 4A1.1. "Prior convictions . . . serve under the Guidelines to place the defendant in one of six 'criminal history' categories; the greater the number of prior convictions, the higher the category. . . . the Guidelines seek to punish those who exhibit a pattern of 'criminal conduct.'" *Nichols v. United States*, 511 U.S. 738, 751 (1994) (Souter, J., concurring). In other words, the Criminal History Category is intended to increase sentences for "career offenders."

The Terrorism Enhancement, however, modifies the Criminal History Category so that defendants who have no criminal history are placed in Category VI instead of Category I, increasing their Guidelines sentence by a minimum of fifteen years.[6] Treating first-time offenders as career offenders ignores their personal background facts and paints an inaccurate picture of their risk of recidivism.

## 3. The empirical evidence does not support treating and sentencing first-time, non-violent, terrorism-related offenders like career armed criminals

The Supreme Court has repeatedly claimed that the reason courts should and do look to the Guidelines in imposing fair sentences is because the Guidelines are developed using empirical data. *See Rita*, 551 U.S. at 349; *see also Kimbrough,* 552 U.S. at 108-09. However, when the Sentencing Commission ("Commission") promulgated the Terrorism Enhancement there was in fact little evidence available to them. The evidence obtained since 1994 strongly discredits the

---

[6] For example, the Guidelines range for an individual with an offense level of thirty-six would be reduced from 324-405 months to 188-235 months. U.S. SENT'G GUIDELINES MANUAL § 5A, sentencing tbl. (U.S. SENT'G COMM'N 2015).

logic of the enhancement's blanket increase in Criminal History Category, particularly where the defendant is a first-time offender. According to the Commission, individuals with no criminal record have the lowest rate of recidivism.[7] One study cited by the Commission in 2004 determined that 93.2% of first-time offenders did not reoffend.[8] The Commission has not, however, provided any evidence that terrorism-related defendants are an exception or reoffend at higher rates. To the contrary, the available data shows that individuals convicted of terrorism offenses do *not* reoffend at higher rates than those convicted of other crimes. Of more than 300 prisoners who have completed terrorism sentences since 2001, "Justice Department officials and outside experts could identify only a handful of cases in which released inmates had been rearrested, a rate of relapse far below that for most federal inmates . . ." *Id*. Thus, "it appears extraordinarily rare for the federal prison inmates with past terrorist ties to plot violence after their release." *Id*.

Courts have noted the lack of empirical evidence supporting the Terrorism Enhancement.[9] The Court in *United States v. Jumaev* recently refused to apply the enhancement because it "is not backed by any empirical evidence" and because "treating all 'terrorists' alike is impermissible under our sentencing paradigm." 2018 WL 3490886, *10, CR 12-0033 JLK (D. Colo. July 18, 2018).[10] Courts applying the Terrorism Enhancement, on the other hand, conspicuously fail to cite

---

[7] *See* Sameer Ahmed, *Is History Repeating Itself: Sentencing Young American Muslims in the War on Terror*, 126 Yale L. J. (2017), https://digitalcommons.law.yale.edu/ylj/vol126/iss5/5.

[8] *Recidivism and the "First Offender*," U.S. SENT'G COMM'N 26 (May 2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/20040 5_Recidivism_First_Offender.pdf [http://perma.cc/MLD8-RQU8].

[9] Senior Judge George O'Toole, Jr., presiding over *United States v. Mehanna, Transcript of Disposition*, No. 09-10017-GAO (D. Mass. 2012), criticized the mandatory Criminal History Category VI as "too blunt an instrument to have any genuine analytical value" and "fundamentally at odds with the design of the Guidelines" because it "imputes a fiction into the calculus." *Mehanna*, Sentencing Transcript (Doc. 480) at 8-9.

[10] The Court also explained in *United States v. Alhaggagi*:
     [T]he enhancement's treatment of criminal history-automatically assigning to all terrorism
     defendants a criminal history category of VI is inappropriate based on the seriousness of

16

any evidence to justify imposing the Guidelines' harsh sentences in terrorism-related cases, resulting in disproportionate and inconsistent sentences across jurisdictions, a violation of the Sentencing Reform Act. [11]

### 4. Sentencing first-time terrorism-related offenders like career offenders causes similar harm to that of comparable sentencing in the War on Drugs.

The Terrorism Enhancement's harsh sentences resemble the now-denounced sentencing policies imposed during the "War on Drugs".[12] In response to the crack-cocaine epidemic and gang violence in the 1980s and 1990s, the Commission developed significant increases in the Guidelines range that did not consider the seriousness of the defendant's conduct or circumstances. This stripped away the discretion judges had when accounting for defendants' unique characteristics, because of a concern that judges were imposing lenient sentences.[13]

These Guidelines ranges were also not based on evidence, but on the narrative that young African Americans were a type of defendant unable to be rehabilitated.[14] The problem: in reality, most drug offenders were not violent, hardened criminals, but were in fact capable of rehabilitation and reintegration into society.[15]

---

the crime, inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant, warranting a downward departure. 2019 U.S. Dist. LEXIS 37889, 2019 WL 1102991 at *16 (N.D. Cal. March 8, 2019).

[11] McLoughlin, *supra* note 6, at 112-15.

[12] *See* Ahmed, *supra*, note 17 at 1524.

[13] James Forman, Jr., *Exporting Harshness: How the War on Crime Helped Make the War on Terror Possible*, 33 N.Y.U. REV. L. & SOC. CHANGE 331, 359-60 (2009); Aziz Z. Huq & Christopher Muller, *The War on Crime as Precursor to the War on Terror*, 36 INT'L J.L. CRIME & JUST. 215, 218-19 (2008).

[14] *See* Ahmed, *supra* note 17, at 1554-1555. S*ee also* The Changing Nature of Youth Violence: Hearing Before the Subcomm. on Youth Violence of the S. Comm. on the Judiciary, 104th Cong. 1, 24 (1996) (statement of John J. Dilulio, Jr.).

[15] *Punishment and Prejudice: Racial Disparities in the War on Drugs*, HUM. RTS. WATCH (May 2000), http://www.hrw.org/legacy/reports/2000/usa/Rcedrg00-04.htm [http://perma.cc/ JB4C-EUQP].

Similarly, courts that apply the Terrorism Enhancement seek to justify its steep increase by arguing, with no evidence, that "terrorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Jayyousi*, 657 F.3d at 1117; *see also United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). This belief is premised on "a type of visceral outrage at all conduct linked to terrorists that can taint the individualized and careful process that is supposed to go into a criminal sentencing" and, despite the lack of evidence, is used to "justif[y] a departure from the normal standards."[16] The same reasons that the Guidelines' harsh drug sentences were eventually decried as unfair, ineffective, and disproportionate, also counsel against giving the Terrorism Enhancement significant weight.

The circumstances in Ms. Giampietro's criminal and personal history make clear it would be a miscarriage of justice to consider her the equivalent of an armed career criminal utterly without redeemable value. Her history shows that she is a productive member of society who sought to help people, was moved by the Syrian Conflict, and sought to give aid to an individual she believed was her friend and who was possibly in great danger. This is not an irredeemable woman.

**D. The Need to Avoid Unwarranted Sentencing Disparity**

The harsh impact of the Terrorism Enhancement and its inability to account for each individual defendant's section 3553(a) factors have resulted in a wide deviation in sentencing.

---

[16] Said, *supra* note 8, at 521.

1. **Samantha ElHassani, pled guilty to 18 U.S.C. § 2339C(c), traveled with children to join ISIS and to transported $30,000, sentenced to 78 months.**

Section 3553(a)(6), directs district court judges to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Ms. Giampietro submits that several recent cases involving individuals who concealed financing to terrorist organizations or attempted to provide material support to terrorist organizations in Syria to aid their fight against Bashar Al-Assad, constitute the most appropriate comparable sentencing outcomes and support the sentence requested here.

The most similar case to Ms. Giampietro's is that of Ms. Samantha ElHassani in the Northern District of Indiana. Ms. ElHassani pled guilty to a single count of concealing the provision of financial support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339C(c)(2)(A). In her Plea Agreement, Ms. ElHassani admitted the following facts:

> a. In November 2014, I was informed by my husband, Individual A [Moussa], that he and his brother, Individual B [Abdelhadi], wanted to travel to Syria to live in the Caliphate and join ISIS.
>
> b. Between November 2014 and April 2015, I helped Individuals A and B join ISIS, by making three trips abroad to Hong Kong.
>
> c. During the first two trips, I transported more than $30,000 in cash and gold from the United States and deposited these items in a safe deposit box in Hong Kong. At the time I transported the funds and gold, I knew that Individuals A and B had expressed an interest in joining ISIS and that Individuals A and B intended to use these resources to support ISIS.
>
> d. I concealed the support and resources described above by: (1) transporting gold that was melted down to look like jewelry and (2) not disclosing the cash and gold on customs declaration forms.
>
> e. I performed these acts knowingly and willingly and with the knowledge that ISIS was a foreign organization involved in terrorist activities.

*See United States v. Elhassani II*, 2019 WL 11318371 (N.D. Ind. Nov. 25, 2019). Ms. ElHassani was held in an ISIS prison and Syrian Defense Forces camp; she was still with her children in a Kurdish refugee camp when she was first indicted. Ms. ElHassani was sentenced to 78 months in prison. *See* Amended Judgment, *United States v. Elhassani*, No. 2:19-cr-00159-PPS-JEM, 2020 WL 7082758, at *1 (N.D. Ind. Nov. 17, 2020). Ms. ElHassani's conduct is significantly more serious than any of Ms. Giampietro's conduct.

Ms. Giampietro did not send any funds to HTS. Ms. Giampietro did not travel to Syria, or anywhere else, to support a terrorist organization. Ms. Giampietro did not involve her children in her online activities. Ms. ElHassani traveled around the world to provide over $30,000 to ISIS, to help her husband and brother-in-law join ISIS, and she and children were provided to ISIS. In comparison Ms. ElHassani's sentence, a sentence of no more than 48 months is not disproportionate.

### 2. Sultane Salim, plead guilty to one violation of 18 U.S.C. § 2339C( c), he raised and concealed $22,000 for Al-Qaeda leader, and was sentenced to 60 months

The most recent conviction in the Sixth Circuit under 18 U.S.C. § 2339C(c) was Sultane Salim's guilty plea in January of 2019 to one count of knowingly concealing the source and payment of funds to designated terrorist, Anwar Al-Awlaki—a key leader of Al-Qaeda. Mr. Salim, along with others, raised over $22,000 to provide to Anwar al-Awlaki for terrorist activities. Mr. Salim was sentenced to 60 months in prison. *United States v. Salim*, No. 3:18-cr-186. January 15, 2019.

Mr. Salim's conduct was more serious than Ms. Giampietro's because he was working together with his co-defendants to open credit cards in the U.S. and withdraw money to collect so that one of the members could travel and provide those funds directly to Anwar al-Awlaki to assist with Al-Qaeda's terrorist activities. There were no undercovers involved as conspirators and Mr. Salim

ideologically supported Anwar al-Awlaki throughout the offense. Ms. Giampietro, on the other hand, did not provide any financial resources directly to HTS. Again, when comparing Ms. Giampietro conduct to Mr. Salim's conduct, a sentence of no more than 48 months is not disproportionate.

### 3. Cases where the only potential victim is the brutal regime of Bashar Al-Assad

Courts have also recognized that lower sentences are appropriate where the government that the defendant "calculated to influence" was that of Bashar Al-Assad. For example, in the Eighth Circuit, a case involving five co-defendants in which all pled guilty to violations of 18 U.S.C. § 2339A or 2339B for attempting to provide material support to jihadists fighting against Assad, resulted in sentences from three years to eight years. The recommended guidelines range was between 240-360 months for each of them. *See United States v. Hodzic*, 355 F. Supp. 3d 825 (E.D. Mo. 2019); *see also United States v. Hodzic*, No. 4:15-cr-49, (E.D. Mo. 2015). *See* Exhibit 4 – Table of Sentences. The defendants were all Bosnian and all were motivate by their own experiences to support those resisting Assad. The sentences of 36 to 96 months recognized the enhancement encompassed a broad range of situations and that resistance to an oppressive regime was quantitatively different from the heartland of terrorism cases.

### 4. Material Support of Terrorism cases under 18 U.S.C. § 2339B and 18 U.S.C. § 2339A with serious conduct have resulted in much higher sentences

The Terrorism Enhancement has also resulted in very high sentences for individuals who were convicted of more serious offenses (violations of 18 U.S.C. § 2339B and § 2339A). These individuals had much more serious conduct and the personal characteristics and nature of the offense warranted a sentence within the guidelines range created by the enhancement. Ms. Giampietro pled guilty to a less serious offense than these cases, and her conduct in comparison is far less serious. *See* Exhibit 1- Table of Comparative Cases.

Case 2:19-cr-00013   Document 425   Filed 07/06/22   Page 21 of 27 PageID #: 5403

## III.    NEED FOR THE SENTENCE IMPOSED UNER 18 U.S.C. § 3553(a)

Counsel respectfully submits that the factors for considering the need for the sentence imposed, listed in 18 U.S.C. 3553(a), support a sentence of no more than 48 months as sufficient, but not greater than necessary in Ms. Giampietro's case.

### A.  Seriousness of the Offense, Promote Respect for the Law, and To Provide Just Punishment for the Offense

Concealment of material support is a serious offense.  A sentence of no more than 48 months in this case, however, is sufficient to promote respect for the law and provide a just punishment for three reasons.  First, it recognizes that Ms. Giampietro was in the process of moderating her beliefs at the time she met the undercover agents. While she ultimately criminally aided them, she did not return to her prior plans to go to Syria.  Ms. Giampietro not only reluctantly entered into the criminal conduct, but she did not seek to join the undercovers in going to Syria—she tried to dissuade them.

Second, a sentence no more than 48 months recognizes that Ms. Giampietro's conduct was motivated by a misperception of what was right.  Ms. Giampietro's beliefs were formed online in response to the horrors about which she read.  The prior trauma Ms. Giampietro suffered made her particularly vulnerable to extreme messages circulating in internet chat rooms.  Even in those chat rooms, her non-violent nature showed itself.  When she too proclaimed a desire for martyrdom, her martyrdom was to die while praying, not while killing.  Finally, a sentence not more than 48 months would be proportional when compared to other similar cases.  Ms. Giampietro did not help raise money to fund a terrorist who inspired attacks in the U.S., as Mr. Salim did. He received a sentence of 60 months for concealing funding for Anwar Al-Awlaki, as outlined above. Ms. Giampietro also did not arrange to deliver money to ISIS to fund its campaign of terror, as Ms.

ElHassani did. ElHassani received a sentence of 78 months for concealing $30,000 in cash and gold and traveling to provide it to fund ISIS, as outlined above.

A sentence not more than 48 months would satisfy these overarching concerns and be proportional punishment. Ms. Giampietro's crime has already carried significant consequences for her, her elderly mother, and her children. In addition to facing additional time in prison, Ms. Giampietro has already spent three years in jail. Her mother is sick and doing her best to take care of her daughter, but their life is much more difficult than what it was when Ms. Giampietro was there to take care of them. Ms. Giampietro worked hard to earn her Master Clinical Social Worker license, and she will likely lose the benefits of much of that work. These three years have brought unwanted attention and scrutiny on the family, financial difficulty and hostility from the community. These consequences have already permanently affected Ms. Giampietro, her children, her mother, and the rest of her family. A sentence greater than 48 months would be disproportionate to Ms. Giampietro's offense conduct and would only result in further crisis and trauma for Ms. Giampietro and her family.

### B. Deterrence and Protection of the Public

A sentence not more than 48 months sentence is sufficient to deter Ms. Giampietro from further criminal activity. As noted in the previous section, Ms. Giampietro's beliefs were moderating prior to her conduct. Further, part of her moderation was the fear of repercussions. Her actions have put in jeopardy all that she had worked so hard to accomplish. During her pre-trial detention, Ms. Giampietro came to realize the hardships that her conduct imposed on those whom she loved the most: her children and her mother. She knows that her shame is not just hers, but theirs as well; her hardships are not just hers, but also theirs now, too. She has lost her parental rights to

her son and she knows personally, what it is like for a child to grow to adulthood without both parents. Her actions have had serious consequences for her family.

After her plea Ms. Giampietro, completed her break from the on-line world she had inhabited by cooperating with the government in giving almost eight hours of interviews. She did this not because her plea agreement required it—it did not. Nor did she do this this out of her belief that it could affect her sentence, as she did not have information that would aid in any ongoing prosecutions. Instead, Ms. Giampietro did this because she did not want others to follow the path she had taken.

Forty-eight months is also sufficient to protect the public. Ms. Giampietro's plans never threatened her community or her country. Nothing in her behavior suggests she was planning to attack anyone. The community or relationships she threatened were herself, her family, and others with whom she interacted. The same is true for those who could have acted on her early encouragement of jihad. These are legitimate concerns; however, the Court has options other than a lengthy period of incarceration.

Since her arrest, Ms. Giampietro has not had the opportunity to re-engage on the internet or had the opportunity to travel. Incarceration ensures that. Incarceration, however, is not necessary to protect the community potentially threatened by Ms. Giampietro. Probation is sufficient and the conditions recommended by Probation, including internet restrictions and monitoring, prohibition of travel, are sufficient to protect both Ms. Giampietro and her family, and potential followers from a reversion by Ms. Giampietro to her advocacy on behalf of extremist causes.

Unlike other offenses, a conviction under § 2339C is not limited to three years of probation. The Court at its discretion may impose probation for life. The PSR recommends three years'

probation.  Ms. Giampietro urges the Court to consider a longer term of probation to allay concerns about protection of the public.

### C.  The Need for Care, Treatment or Training of Defendant

This concern is not implicated in Ms. Giampietro's case, as she has no condition requiring treatment or specialized care, and additional confinement will not result in greater professional and vocational credentials and experience that might reduce her risk of recidivism.

### IV.    MS. GIAMPIETRO'S SENTENCING RECOMMENDATIONS

### A.  A Term of No More than 48 months is the Appropriate Sentence

As outlined above, Ms. Giampietro's offense conduct warrants a sentence in the lower range of sentencing for providing material support of terrorism charges. A term of no more than 48 months is less than the sentence given for other § 2339C(c)(2) offenses, for example the sentence in Mr. Salam's case (60 months), and in Ms. ElHassani's case (78 months).

The defense respectfully submits there are three factors which would warrant a sentence below those received by Ms. ElHassani and Mr. Salim. First, unlike Ms. ElHassani and Mr. Salim, Ms. Giampietro offense arose from a long-term FBI sting operation to which Ms. Giampietro eventually reluctantly succumbed, rather than independent attempts to finance terrorist organizations.  Second, Ms. Giampietro's background, which included abuse in her formative years and her devotion to the protection of children, made her particularly susceptible to the extremist ideology present on the internet.  Finally, the interests of justice are best served by permitting Ms. Giampietro the opportunity to make amends to those whom she harmed the most: her mother and her daughter.  Both her mother and daughter have suffered not only the embarrassment of Ms. Giampietro's conduct, but have also suffered from the lack of her presence.

Before her arrest she was both a provider and caretaker. Justice is served by returning her to those roles, with strict conditions of probation in place, at an appropriate duration to be set by this Court.

### B. No Fine Should Be Imposed

Per the Guidelines, Probation notes that subject to Ms. Giampietro's ability to pay, the Court may impose a fine sufficient to cover the costs of probation, supervised release, and imprisonment. *See* PSR p. 19. Ms. Giampietro has over $200,000 owing in student loans. That amount would be enough to hobble anyone, but as noted above, Ms. Giampietro will be struggling to find employment once she is released. She will not be able to utilize the master's degree in Social Work, which she earned. She will be taking care of her mother and daughter and will no longer be employable as a social worker. She will be unable to afford the costs of probation, supervised release, and imprisonment. Ordinarily, counsel would agree that the cost of probation would be a warranted fine, subject to the ability to pay. In this case, Ms. Giampietro will almost certainly not be employable and providing care for her family with what meager living she can acquire, and is saddled with student loan debts, which are non-dischargeable in bankruptcy. For these reasons, a fine is not warranted or appropriate in this circumstance.

### V.     CONCLUSION

For the reasons set forth above, counsel on behalf of the defendant urges this Court to impose a sentence of no more than 48 months.

Respectfully submitted,

*Charles D. Swift*
*Pro Hac* Attorney for Giampietro
Constitutional Law Center for Muslims in America
100 N. Central Expy, Suite 1010
Richardson, TX 75080
972-914-2507
cswift@clcma.org

26

Peter Strianse
Attorney for Giampietro
TUNE, ENTREKIN & WHITE, P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
(615) 244-2770 (o) Ext. 2234
pstrianse@tewlawfirm.com

Linda G. Moreno
*Pro Hac* Attorney for Giampietro
Constitutional Law Center for Muslims in America
100 N. Central Expy, Suite 1010
Richardson, TX 75080
972-914-2507
lindamoreno.esquire@gmail.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of July, 2022, I electronically filed the foregoing **Defendant's Sentencing Memorandum** with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: /s/ *Charles Swift*
Charles D. Swift, *Pro Hac*
Attorney for Giampietro

27