IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

UNITED STATES OF AMERICA    )
    )    No. 2:19-cr-00013
    )
    v.    )    CHIEF JUDGE CRENSHAW
    )
GEORGIANNA A.M. GIAMPIETRO    )

**GOVERNMENT'S SENTENCING MEMORANDUM AND POSITION REGARDING
SENTENCING FACTORS AND INCORPORATED RESPONSE TO DEFENDANT'S
MOTION FOR DOWNWARD DEPARTURE**

I. <u>Introduction</u>

The United States of America, by and through its attorneys, the United States Attorney for the Middle District of Tennessee and the Chief of the Counterterrorism Section of the National Security Division, United States Department of Justice, hereby files its sentencing memorandum and incorporated response to defendant's motion for downward departure (Doc. 397). For the reasons described below, the government recommends that the defendant receive a sentence that reflects the seriousness of her offense of conviction, which carries a guideline term of imprisonment of 120 months, for concealment of material support and resources intended to be provided to a foreign terrorist organization, in the violation of 18 U.S.C. § 2339C(c). The government submits that defendant's concealment activities in September and October 2018 were the culmination of years of research, study, and involvement with individuals affiliated with or supportive of, the activities of designated foreign terrorist organizations. A sentence that reflects the seriousness of her offense of conviction, given the nature of the defendant's conduct, which should be considered in the context of her longstanding commitment to assist foreign terrorist organizations. Another member of the defendant's chat group, who was also the subject

of the broader law enforcement investigation into the on-line support of terrorist organizations, was recently sentenced to 90 months imprisonment and a 10-year term of supervised release following her guilty plea to a violation of 18 U.S.C. § 2339C for assisting an undercover employee to send funds to a designated foreign terrorist organization. The government respectfully submits that the Court should take that sentencing into account in determining the appropriate sentence to impose in this case.

On June 24, 2022, the Court held a lengthy hearing to consider objections to the revised Presentence Report that had been filed with the Court on June 14, 2022. The defense presented testimony from a proffered expert, Aymenn Jawad Al-Tamimi, in support of the defendant's challenge to the application of the terrorism enhancement, U.S.S.G. § 3A4.1 and the application of the obstruction of justice enhancement, U.S.S.G. § 3C1.1. After considering the testimony and arguments of counsel, the Court issued an oral ruling concluding that the factual basis of the plea agreement and other evidence in the case supported application of both enhancements in this case. The Court determined that the defendant had committed significant obstruction and after acting to conceal criminal conduct, she continued to conceal that conduct, meriting application of the obstruction of justice adjustment to the offense conduct under the Sentencing Guidelines. The Court further ruled that the government had established, by a preponderance of the evidence, that the terrorism enhancement applied to this case. The Court determined that 18 U.S.C.
§ 2339C is a listed offense under the definition of "federal crime of terrorism" enumerated in 18 U.S.C. § 2332b(g)(5), is an offense of conviction calculated to affect or influence the conduct of government, and the defendant had the specific intent to affect or influence the conduct of the Syrian government by helping the undercover employees to travel to Syria to join Hayat Tahrir al-Sham ("HTS"), a designated foreign terrorist organization fighting the Syrian government.

The Court specifically noted that pursuant to the plea colloquy, the defendant knew that HTS was a designated foreign terrorist organization; she knew that the undercover employees wanted to travel to join HTS, and she knew that the undercover employees would provide funds to HTS.

The Court then calculated the Sentencing Guidelines for the defendant applying the two enhancements[1] and instructed the parties to submit sentencing memoranda, by July 6, 2022, addressing the factors to be considered pursuant to 18 U.S.C. § 3553. The Court has scheduled the sentencing hearing for July 15, 2022.

II.  Factual Background

On January 18, 2022, the defendant pled guilty to a Superseding Information, charging her with knowingly concealing and disguising the nature, location, source, ownership, and control of material support and resources, knowing and intending that the support and resources, including currency, personnel and services, were provided and intended to be provided in violation of Title 18, United States Code, Section 2339B. In support of her plea, the defendant admitted numerous facts demonstrating the scope and extent of assistance she gave to a female undercover agent ("UCE") who expressed interest in traveling to Syria to join Hayat Tahrir Al-Sham ("HTS"), a foreign terrorist organization designated by the United States Department of State. *See* Doc. 390.

Defendant's admissions in connection with her plea leave no doubt that she was aware that the UCE and her husband (also an undercover agent, referred to here as "UCE-2") wanted to join a designated foreign terrorist organization, and the defendant fully intended to help the UCEs in their efforts. The defendant's admissions establish her knowledge that her actions were a violation of federal law and, if discovered, could subject her to prosecution. Rather than refuse

---

[1]  Insofar as the calculation under the Sentencing Guidelines exceeds the 10-year statutory maximum stated in 18 U.S.C. § 2339C, the Revised Presentence Report properly noted that the sentence would be limited to the statutory maximum pursuant to U.S.S.G. § 5G1.1(a). *See* Revised Presentence Report at p.21.

3

to help the UCE in her plans to travel to join HTS, the defendant provided practical advice in numerous ways, to the UCE to help the UCEs accomplish their goal. The defendant's advice was based upon her knowledge of others who had been investigated and/or arrested by law enforcement for illegal material support activities.[2] In order to protect herself from investigation and prosecution, the defendant did everything in her power to conceal her assistance to the UCE and cautioned the UCE to do the same.

The defendant admitted that she and the UCE used an end-to-end encrypted social media platform to communicate throughout the duration of their relationship. She admitted that they used self-destruct timers when they communicated electronically so that the communications would automatically delete after a specified time, eliminating the potential to recover those conversations. The use of self-destruct timers offered an additional protection against discovery of the nature of the communications by law enforcement. Using the end-to-end encrypted social media platform, on September 23, 2018, the UCE told the defendant that the UCE's husband had sworn an oath of allegiance to HTS and that the couple intended to travel to Syria to join HTS so that UCE-2 could fight on behalf of the organization. When the UCE told the defendant about the couple's plans to travel to Syria via London, the defendant expressed concern about this itinerary, explaining in part, "This is scaring me. Many people in London get caught..." This statement reflected the defendant's knowledge that it was a crime to travel to Syria to join a foreign terrorist organization.

The defendant questioned the UCE about the overseas contact in London whom the couple was using to assist their travel overseas. After learning from the UCE about the contact, The defendant admitted that she offered to reach out to one of her contacts, whom she claimed

---

[2]    Searches of defendant's electronic devices revealed that she had reviewed a number of court filings in cases brought against individuals charged with providing material support to terrorists.

could better assist UCE's husband in the travel plan. The defendant told the UCE, "I don't want [your husband] to go with that brother yet. Bc I know ppl who I trust more than myself." The defendant admitted that when the UCE asked if her "husband" "should just talk to your people??" the defendant said "Yes." The defendant admitted that after the UCE told her that her "husband" wanted to use the defendant's contact, the defendant indicated that she would attempt to contact someone she knew and get back to the UCE. The defendant admitted that she subsequently communicated with the Telegram channel for Al-Sadaqah Syria, knowing that this Telegram channel raised funds for unidentified combatants in Syria (mujahideen), namely HTS. Doc. 390 at p.5. The defendant reported to the UCE on September 30, 2018, that she had spoken with one of her contacts, who claimed that there was presently no jihad in Syria. As a result of her conversation with her Al Sadaqah Syria contact, the defendant asked the UCE, "Have you thought about Afghanistan? They're still fighting there." This colloquy demonstrates that the defendant remained committed to helping the UCE and her "husband" travel to a place where they could engage in active combat for a foreign terrorist organization, even if that location was not Syria.

In a conversation with the UCE on October 2, 2018, the defendant again expressed concern about the contacts whom UCE and her "husband" wanted to use in London to travel to Syria, and thereafter gave UCE the Telegram name "@alsadaqahsyria," instructing the UCE to "[h]ave your husband message this account." Through this action, the defendant clearly intended the UCEs to use the defendant's contact to help them to travel to Syria, a contact whom the defendant trusted. The defendant admitted that when she provided her contact to the UCE, she knew that HTS was a designated foreign terrorist organization, that the UCE and her "husband" intended to travel to Syria to serve as personnel for HTS, working under the direction and control

of HTS, and that the defendant's contact would assist them in their travel. The defendant further admitted that she intended the UCE and her husband to provide funds to "@alsadaqahsyria," who would, in turn, provide funds to HTS. In providing funds to "@alsadaqahsyria," the defendant intended the UCE and her "husband" to provide material support to a designated foreign terrorist organization, disguised as a charitable contribution.

In a conversation on October 4, 2018, the UCE thanked the defendant for providing the contact information for @alsadaqahsyria. UCE's "husband" had reached out to the contact, telling the contact that he had been given the contact's information by "Umm Roses." "Umm Roses" was a social media moniker used by the defendant. UCE's "husband" asked the contact if the contact had helped people make hijrah before and if it was still possible to do so. The contact acknowledged that the contact had helped people make hijrah, said it was still possible, but advised UCE's husband that it was "safest to wait," explaining, "There isn't any fighting at the moment. So you will not be doing much. Mainly guard duty 5 or 7 days a month. The rest you at home unless you have other skills." UCE's husband asked if the contact could help the couple across the border if they made it to Turkey, and the contact responded, "Yes I can inshallah." When UCE's "husband" stated that he had heard it was very difficult to cross now, the contact responded, "It depends bro. Look. It's important you have a cover story. Get Turkish visa. Message some charitys. Ask you want to volunteer. Make it look like you're an aid worker. Then you have a good defence." The contact advised UCE's "husband" to take these steps so that they would have "evidence to support your story" if they were stopped by Turkish authorities asking why they were in Turkey. Clearly, this guidance reflects an intention to conceal the true nature and purpose of the UCEs' travel to Syria.

6

After the UCE thanked the defendant for providing the contact, defendant claimed that she had "no clue" who the contact was, said that she did not want to discuss the matter further and stated, "you're going to get me arrested." The defendant's response to UCE-2's outreach to the contact understandably made the defendant nervous, since the defendant was fully aware of the activities of Alsadaqahsyria when she gave the UCE the contact information for the individual at that Telegram channel. Her knowledge and intent was further evidenced by her subsequent communications with Syria Care Turkey on Telegram, during which she stated, "Nothing wrong if they're actually real and truthful. But me and some sisters had our doubts for awhile about them. Like how they always asked bait questions. So we all decided to block her. Even the sister that introduced us to this sister is ajeeb [strange] too. I don't know I completely came off social media hard to trust anyone . . . I don't know I just don't want to go to jail for 30 yrs and leave my son in the hand of the Kuffar. Bc they could say she helped us she gave us the contacts." (*See* Doc. 144-4, PageID# 1931-1932; Doc.403, PageID # 4567; Amended Exhibit 17.)[3]

Additionally, open-source information about the @Alsadaqahsyria Telegram channel established that while it purported to be an "independent charity organization," it also advertised its purpose as providing "the mujahideen in Syria with weapons, financial aid[.] and other projects relating to the jihad." This channel encouraged donations for fighters in Syria to be sent using cryptocurrencies. Photographs and memes posted on the channel between May and June

---

[3]     During that lengthy backchannel Telegram exchange between the defendant and an associate of "Individual A" who operated the Syria Care Turkey channel, the associate of "Individual A" sent the defendant a verbatim copy of the message that the UCE's "husband" had sent to "Individual A" advising "Individual A that he had arrived in London and thanking "Individual A" for his help. The associate of "Individual A" sent the defendant the verbatim copy of that message with the accompanying comment, "The brother [Individual A] sent this message." The defendant then expressed concern about being connected to the travel plans, and the associate of "Individual A" advised the defendant to accounts and factory reset her phone. *See* Doc. 144-4, PageID # 1927-1930. This evidence demonstrates that while the defendant did not admit to directly contacting Alsadaqahsyria, she did communicate directly with Syria Care Turkey and she was made aware that the two organizations collaborated to assist the UCEs in their travel to Syria.

of 2018 showed masked men wearing military fatigues with text seeking requests for donations to benefit foreign fighters. The FBI found images such as these on the defendant's cellphone, along with many images and communications in support of the activities of more than one designated foreign terrorist organization.

The defendant was so concerned that her connection with travelers to Syria would become known and make her complicit in their plans that she stated to the UCE in September 2018, ". . . I need you to unfollow the [social media platform] channel [that the defendant was operating] . . . I need you to delete my name and phone number from your phone and all pictures and text messages." Despite the defendant's concern about being identified with the UCE's plans, defendant admitted that in subsequent communications, she gave the UCE specific advice about how the UCE and her "husband" should travel to Syria to avoid detection by law enforcement authorities. The defendant counseled the couple not to take their phones with them to Syria, recommending that they acquire new phones and new phone numbers before traveling, The defendant noted that when she developed her own plan for traveling to Syria, her plan "was to delete everyone 6 to 8 months before leaving and have no contact with anyone. Bc [because] one wrong move," indicating her knowledge that if anyone knew of her plans, she could be discovered by law enforcement. The defendant also advised the UCE and her "husband" to purchase roundtrip airline tickets, rather than one-way tickets, that they should consider traveling to Turkey before entering Syria, and first travel to Italy before proceeding to Turkey. All of this advice was designed to conceal the true purpose of the travel of the UCEs, along with their intended destination.

The defendant's criminal conduct in September and October 2018 should be considered in the context of her activities beginning in at least late 2015. She was actively posting on social

media in support of the Islamic State of Iraq and Syria ("ISIS") when the government became aware of her.[4]  On September 16, 2015, the defendant posted, "IS (Islamic State) are the ones fighting for us." On September 21, 2015, the defendant posted "subhanallah (praise be to Allah) America can burn loool"  On July 13, 2017, the defendant posted, "We don't need America to accept us we only need (Allah)…The US are terrorists killing innocent Muslims daily."  The defendant had also posted numerous images espousing support for terrorist attacks against the United States.  Among these images were:

- A photograph of a headless Statue of Liberty waving an ISIS flag and captioned, "One of my favorite pictures that keeps getting deleted," posted on September 7, 2015;

- A photograph of a jihadi fighter pointing a gun at the reader with the words, "Rivers of Blood Await America," posted on September 9, 2015;

- A photograph of the burning remnants of the Statute of Liberty, captioned, "The head of ISIS Sheikh Abu Bakr al-Baghdadi said 'Our Appointment in New York," posted on September 11, 2015, the 14th anniversary of the September 11, 2001 attack on the World Trade Center;

- A photograph of a pistol and swore and the words, "And kill them wherever you find them," and captioned with words purportedly from the Quran, including the phrase, ". . . fight with them until there is no persecution, and religion should only be for Allah, but if they desist, then there should be no hostility except against the oppressors," posted on September 15, 2015;

- A photograph of a jihadi fighter holding the head of former President Barack Obama and an unknown person, posted on September 21, 2015

- A photograph of an ISIS fighter preparing to behead a prisoner, with the phrase, "A Message to America" and the comment made by the defendant, "Dear US, Russia, Turkey, Saudi and NATO allies . . . . I hate you for what you put my

---

[4]	In the Defendant's Motion for Downward Departure, Doc. 397, she claims that she was not predisposed to supporting HTS years before she met the UCE.  Doc. 397 at p.10.  Her postings establish, however, that she was supporting ISIS as far back as 2015.  This predisposition to support a designated foreign terrorist organization was a sufficient predicate for the FBI's investigation into the defendant's activities.  Contrary to the defendant's description of herself as simply a "pro-jihad, keyboard political and religious internet forum user," *Id*. at p.11, the investigation revealed that she was not simply a passive consumer of internet information, but rather, she created a social media platform that disseminated radical Islamic teachings justifying proactive support of violent terrorist activity overseas.  She also developed relationships with minors on-line and encouraged them to support jihadis overseas.

9

brothers and sisters through . . . . you will fail and Islam will prevail . . . . may Allah destroy you all . . . . Ya Allah protect my brothers and sisters . . #deathtousa #deathtonato #deathtothewest," posted on September 21, 2015; and

- A photograph of the U.S. Capitol engulfed in flames and triumphant ISIS supporters waving ISIS flags, posted on September 22, 2015

The defendant used several social media accounts in multiple platforms, some of which were open to public access, through which she communicated about radical Islamist ideology and plans to travel abroad to support Islamic fighters overseas. An on-line undercover employee of the Federal Bureau of Investigation ("FBI") began communicating with the defendant in late October 2015 and documented the defendant's frequent account name changes as well as her postings of Quranic verses, quotes, citations and references that are popular with extremist interpretations of Islam. In June 2016, the defendant communicated with the on-line undercover employee about her plan to marry a person named Abu Talha that month. According to the defendant, they were supposed to travel to Libya together, but then he traveled there alone. She was aware that he had traveled to join ISIS, and informed the on-line undercover employee that ISIS cuts off all communication for the first three months. She said that she wished that Abu Talha had joined JN ("Jabhat Al Nusra") or AQ ("al-Qaeda") instead of ISIS. Both of those groups are also designated foreign terrorist organizations.

By November 2016, the defendant was engaged to a different individual overseas, a man she identified as "Abu Abdullah." The defendant told the on-line undercover employee that he was with a different group, known as JFS (an alias for Jabhat Al Nusra), and that the defendant planned to eventually travel to be with him in Syria. The on-line undercover employee eventually introduced the defendant to the UCE who stated to the defendant that she wanted to travel with her husband to Syria to join HTS. On November 28, 2017, the UCE met defendant face to face. At this meeting, the defendant told the UCE that she wanted to travel to Syria with

10

her son and marry "Abu."  She told the UCE that her new fiancé would arrange for them to receive false identity documents in Turkey so they could thereafter enter Syria and live there permanently.  At a second meeting held on February 22, 2018, the defendant repeated her desire to travel to Syria to join her fiancé.  She said that it is every Muslim man's duty to fight jihad, and their women should support them, fighting alongside their husbands, carrying bodies, providing food and water.  The defendant said that she and Abdullah had discussed bringing defendant's son to Syria, and in furtherance of this plan, the defendant told the UCE that she would tell her son's father that she was only taking her son on a trip to Italy.  In additional discussions that day about traveling to Syria, the defendant provided UCE with directions on how to travel there without raising the suspicion of the authorities.  When the UCE asked if her fiancé had contacts who could obtain false documents to help the UCE to travel and enter Syria, the defendant said "yes."   Thus, as early as February 2018, the defendant was providing UCE with guidance and advice on traveling to Syria to join a designated foreign terrorist organization. During that February meeting, the defendant also invited the UCE to join a private chat group on social media with other "girls" who also wanted to travel to Syria.  The participants in that private chat group included a young woman living in Alabama and a 16-year old girl in Ohio.

Electronic communications from the defendant's social media accounts established that the defendant had been developing her own plans to travel to Syria long before she met the UCE, and her advice to the UCE was the result of research she had done, communicating with other like-minded individuals.  On July 12, 2016, the defendant communicated with a minor located in the United Kingdom, discussing the size of the backpack she should bring and what luggage she should pack, assuming that her luggage might be searched when she left the United States.  The defendant discussed whether she should bring cash with her, and if so, how much she should

bring. In November 2017, the defendant communicated with another on-line contact, asking the contact to take her to Pakistan so that she could backpack her way to Syria. The defendant explained to a minor in the United States that the two of them could travel to Italy and thereafter, go on to Turkey. In January 2018, at a time when the defendant had not communicated with Abdullah, she told the minor living in the United States that if she could not get in contact with Abdullah, she would travel to Syria and find or make her own weapons to search for him.

Numerous electronic communications obtained from a review of the defendant's social media accounts corroborated the relationship between the defendant and Abdullah. The communications confirmed that the defendant wanted to travel to Syria to assist foreign fighters there. Abdullah told the defendant that he had killed a lot of people in villages near Aleppo. In a conversation on July 10, 2016, the defendant asked Abdullah about traveling to see him in Syria and asked whether she could get a gun if she traveled with him. Abdullah responded that she could get a gun, but that she could pass through checkpoints without being stopped if she were with him. The defendant stored photographs of Abdullah on her phone. Abdullah was depicted wearing military fatigues and posing with various weapons, including what appear to be high-powered rifles.

The defendant's commitment to Abdullah reflected her commitment to terrorist causes. The defendant kept content on her cell phones evincing support for such causes. She kept photographs of images of foreign fighters and accompanying phrases urging others to engage in violent jihad. She retained photographs of dead bodies, including what appear to be photographs of victims of foreign fighters. The defendant kept a photograph depicting a foreign fighter with his boot on a victim, holding up his index finger in a symbol commonly used by ISIS, meaning "There is only one God and his name is Allah." On her Telegram Channel, "Islamic Literature,"

12

the defendant posted Anwar Awlaki's directive entitled, "44 Ways to Support Jihad," in which

Awlaki wrote,

> "In times like these, when Muslim lands are occupied by the kuffar, when the jails of tyrants are full of Muslim POWs, when the rule of the law of Allah is absent from this world and when Islam is being attacked in order to uproot it, Jihad becomes obligatory on every Muslim. Jihad must be practiced by the child even if the parents refuse, by the wife even if the husband objects and by the one indebt even if the lender disagrees."

Doc. 403-10 at p.26. Awlaki includes in his directive the following ways to support jihad: spend money to support jihad ("the reward for money given as Sadaqah is multiplied by ten, but the reward for money spent in Jihad is multiplied by 700!"); raise funds for the mujahideen ("In addition to paying from your own money you should also encourage others to do the same."); finance a mujahid; take care of a family of a mujahid; arms training; become "internet mujahideen;" raise children on the love of Jihad and the mujahideen; join groups that work for Jihad and prepare for hijrah ("Muslims living amongst non-Muslims have put themselves at the mercy of the kuffar. . . . Muslims should therefore prepare themselves to leave when the opportunity arises."). *Id.* at pp.29, 38, 40.

Significantly, the defendant also kept images relating to organizations seeking contributions to the cause of foreign fighters, including an image captioned, "He who Equips a FIGHTER in Allah's Cause Has taken part in the FIGHTING." A search of information in the defendant's on-line accounts confirms the defendant's commitment to supporting such organizations. Her online accounts revealed that the defendant sent $150.00 by Western Union to an individual in Turkey, identified as "Muhammed Muhammed."[5] Western Union records of transactions involving the defendant established that she sent money on three occasions to

---

[5] The defense offered a copy of this wire transfer as Exhibit A during the June 24, 2022, hearing. The Court admitted this exhibit into evidence as Defense Exhibit 2.

individuals based in Turkey and on one occasion, to an individual based in Egypt.[6]  The Western

Union records corroborated the transmission of $150.00 to "Muhammed Muhammed" on June

14, 2018.    The Western Union records reflected an international telephone number for

"Muhammed Muhammed," which was the identical telephone number for an individual

identified as "Muhammed Tenbe," an individual identified as a recipient of Western Union

money transfers in Turkey for the account @alsadaqahsyria.[7]

Open-source information demonstrates that the account @alsadaquahsyria operates a

Syrian based organization that solicits funds online to aid the mujahideen in Syria.    The

defendant was well aware of this purpose, as there was a screenshot recovered from her Google

Cloud account of a post from @alsadaquahsyria's Telegram channel, describing the purpose of

the organization as "providing brand new military boots to front line mujahideen."    That

screenshot further indicates that "Anonymous donation methods [are] available."[8]    At the June

24, 2022 hearing, the government offered several exhibits that established a connection between

---

[6]    The defense offered a document reflecting these Western Union transfers as Exhibit Z, page 12, during the June 24, 2022, hearing.  The Court admitted this exhibit into evidence as Defense Exhibit 3.

[7]    Defense Exhibit 3 also reflects that the defendant sent $200 to "Omar Ali" on June 20, 2018, and sent $500 to "Ahmet Hayek" on June 25, 2018.  *See also* Defense Exhibit B and C, admitted into evidence as Defense Exhibits 5 and 6.  The defendant admitted that these contributions were made to an entity identified as Merciful Hands.  *See* Revised Presentence Report at ¶ 18.  At the June 24, 2022 hearing, the government submitted direct evidence of the connection between The Merciful Hands and The Abu Ahmad Foundation, an entity that solicits contributions exclusively to assist mujahideen jihadists fighting in Syria, such as HTS.  Government Exhibit 6.  Moreover, the defendant herself expressed a concern during her interview with the FBI on October 23, 2018 that the FBI would discover on her phone evidence of her contact with the person overseas who was associated with Merciful Hands.  *See* Doc. 403-5 at pages 72-74.

[8]    The defense offered a copy of this screen shot as Exhibit E during the June 24, 2022, hearing.  The Court admitted this exhibit into evidence as part of Defense Exhibit 9.

On May 25, 2018, the "Al-Sadaqah" Telegram channel posted a table reflecting how funds could be used. The table estimated that $6,000 would benefit 100 fighters for 30 days; $1,800 would benefit 30 fighters for 30 days; $600 would benefit one fighter for 30 days; and $2 would benefit one fighter for one day.  The poster gave the price of a pair of combat boots as $50 and the price of a military uniform as $50.  The poster informs donors that the donation is a valid form of zakat ("Almsgiving").  On June 1, 2018, the Al-Sadaqah Telegram channel posted a photograph showing six packaged military uniforms, each topped by a picture bearing Al-Sadaqah's emblem, a call for donations, and the Al-Sadaqah Bitcoin account number.  The text on the photograph reads, "providing brand new military suits [uniforms] to mujahideen."

14

Al Sadaqah and an entity identified as the Abu Ahmed Foundation ("AAF"), an organization that clearly publicized its support for HTS.  The Court admitted these exhibits into evidence.  *See* Government's Exhibits 2-5.  These on-line posts demonstrated that donations to Al Sadaqah, sponsored by AAF, were intended to support the "Ribat Project," rather than any charitable endeavor.  The defendant's own expert testified at the June 24, 2022 hearing that "ribat" means frontline combat.  The AAF Media Centre confirmed and explained why AAF only solicits donations for those "on active ribath":

> "AAF from day one made a firm vow inshaaAllah that we would focus to the active Mujahedeen on ribath, this is because the donations that come in are from people Wanting to do jihad but for many reasons can't do that yet, …Amanah, we have made the promise that AAF focuses to active mujahideen not just those who hijra (may Allah ease them also) after years we now see, ribath in the way of Allah increases the rizki from Allah and Allah will sustain them and their family's….AAF takes it's instructions from the donor, we always ask? What do you wish us to do with this? And if it corresponds with our obligation then we 'within two days' usually inshaaAllah get the aid to where it was designated, if the donor wishes for a more humanitarian (like refugee camps etc) we give them contacts with those NGOs we trust and let them distribute…."

Government Exhibit 1, admitted into evidence at June 24, 2022 hearing.

Other screenshots recovered from the defendant's online account reflected a contact card for the individual whose information she provided to the UCE to assist the UCE in traveling to Syria.  The individual's contact information was @alsadaquahsyria.  He describes his organization as "An independent [sic] charity [sic] organization supporting the Mujhideen in Syria."

The defendant was aware of other entities soliciting funds for the mujahideen in Syria and provided the UCE with contact information to help the UCE send money to such entities. During a recorded meeting between the defendant and the UCE on March 17, 2018, the UCE told the defendant that the UCE's "husband" was interested in "helping some of the mujahideen." The defendant told the UCE that if her "husband" was on Telegram, the defendant

could "give him some brothers" whose Telegram channel the defendant followed. The defendant told the UCE that these brothers were "over there" and were "trustworthy." On March 18, 2018, the defendant provided the UCE with contact information for one of the "trusted brothers." The defendant sent the UCE the phone number "+90 537 822 0931," accompanied by the message, "I use to know this brother the owner of this channel from FB/He's trustworthy." That phone number is the same number associated with "Omar Ali" and "Ahmet Hayek" on the Western Union transfer receipts reflecting the defendant's transmission of funds in June 2018, individuals whom the defendant acknowledged were associated with receiving funds for Merciful Hands.[9] While the defendant stated to the Probation Office that the money she sent to "Omar Ali" and "Ahmet Hayek" was for charitable purposes, Merciful Hands is not registered as a charity nor does it have a website where registrant information can be found. As discussed in the government's expert report submitted in advance of trial, the on-line postings of The Merciful Hands establishes a strong collaboration with AAF, an entity that publicized direct financial and ideological support for designated foreign terrorist organizations operating in Syria, particularly HTS. *See* Doc.403-3 at pp.12-20, 52-53.

The defendant was certainly aware that organizations seeking money for terrorist groups operating in Syria and elsewhere often generate funds by purporting to collect money for charitable purposes. In 2014, the defendant wrote a research paper for a graduate level class describing this method of fundraising used by terrorist organizations. *See* Doc. 398-1.

---

[9] While the defendant attempts to argue that her transmission of money to these recipients does not establish that she was providing funds to a member of an FTO, caselaw is clear that a violation of the material support statute does not require actual interaction between the defendant and members of an FTO. *See, e.g., United States v. Hammadi*, 737 F.3d 1043, 1045 (6th Cir. 2013) (affirming conviction under 18 U.S.C. § 2339B where the defendant believed he was donating to a third-party fundraising group that supported various FTOs, but was actually interacting with a confidential human source); *United States v. Jones*, 383 F.Supp.3d 810, 816 (N.D.Ill. 2019); *United States v. Jumaev*, 2018 WL 3490886 at *1 (D.Colo. July 18, 2018) (upholding conviction where defendant believed his was donating $300 to an FTO even though he had "no direct contact with the members of any terrorist organization … never committed any act of violence, nor did he advocate for any particular violent act.").

16

III. <u>Applicable Law</u>

The Supreme Court has stated that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). In this case, the Court has already calculated the applicable Guidelines range. While the Guidelines are now advisory rather than mandatory, the court's sentencing determination is subject to appellate review of whether that determination is reasonable. *Id.* at 46. The Supreme Court has noted:

> "It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications. For even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."

*Id.* This Circuit has held that sentences properly calculated under the Guidelines are credited with a rebuttable presumption of reasonableness. *United States v. Moon*, 513 F.3d 527, 543 (6th Cir. 2008); *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). While the standard of appellate review of a sentence "does not change based on whether a sentence is inside, just outside, or significantly outside the Guidelines range, the greater the district court's variance, the more compelling the evidence must be." *United States v. Peppel*, 707 F.3d 627, 635 (6th Cir. 2013) (quoting *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010); *see also Gall v. United States*, 552 U.S. at 50 ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.").

After calculating the applicable Guidelines range, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a), imposing "a sentence sufficient, but not greater than necessary, to comport with the purposes" for the sentence, as stated in 18 U.S.C. §

17

3553(a)(2). *United States v. Davis*, 458 F.3d 505, 510 (6th Cir. 2006). The seven factors established in 18 U.S.C. § 3553(a) require the court to consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed –
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for –
   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines --
      (i)    issued by the Sentencing Commission…and
      (ii)   that … are in effect on the date the defendant is sentenced; or

               *               *               *

(5) Any pertinent policy statement –
   (A) issued by the Sentencing Commission . . . and
   (B) that . . . is in effect on the date the defendant is sentenced.
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

In considering these factors, it is well established that the sentencing court has broad discretion to consider various kinds of information. *United States v. Watts*, 519 U.S. 148, 151 (1997); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted on an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4. The Court should not give unreasonable weight to a particular factor. *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005) (sentence may be substantively unreasonable if court gives unreasonable weight to any one factor). Although the Court must consider all of the factors identified in 18 U.S.C. § 3553, the government submits that in this case, the most

18

pertinent ones are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to provide just punishment, promote respect for the law, protect the public, afford adequate deterrence and the kinds of sentences available for this offense. These factors are discussed below.

**A.** <u>**Nature and Circumstances of the Offense**</u>

In this case, the crime committed by the defendant – attempting to provide material support and resources to a designated foreign terrorist organization by providing personnel and services and attempting to conceal that support from law enforcement – is extremely serious. *See United States v. Taleb-Jedi*, 566 F.Supp.2d 157, 167-69 (E.D.N.Y. 2008) (noting that "the provision of personnel, like the provision of money, acts to free up others in a terrorist organization to engage in violence and other acts of terrorism"). In her written plea agreement, the defendant admitted that she was aware that HTS is a foreign terrorist organization designated by the United States government. That designation is a confirmation that the Secretary of State considers HTS to be a terrorist organization that commits, or poses a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy and economy of this country. *See generally* 83 Fed. Reg. 25496-97, citing Executive Order 13224, Section 1(b) (September 23, 2001). In fact, HTS was also designated as a terrorist organization by Turkey on August 31, 2018, and was reportedly designated by Russia on May 20, 2020. Hay'at Tahrir al-Sham is an alliance of at least five militant groups that was created on January 28, 2017. Years earlier, on May 16, 2013, its military leader, Muhammad al-Jawlani, was designated by the Secretary of State as a Specially Designated Global Terrorist pursuant to Executive Order 13224, as amended. There is an outstanding State Department reward of up to $10 million for Jawlani, under the Rewards for

Justice program, relating to his leadership of HTS's predecessor organization, Al Nusra Front, in the commission of kidnappings and massacres in Syria.

As the investigation of the defendant's conduct established, she spent a great deal of time communicating with individuals on-line, reading, posting material and discussing current events in Syria. Having initially supported ISIS, she was clearly aware of what HTS was, how it operated and its specific activities in Syria. The defendant was in touch with individuals overseas who were affiliated with organizations that provided assistance to HTS, and whom the defendant considered "trusted brothers." The defendant had discussed with others her own plans to travel to Syria. She was aware that one particular contact could help the UCE and her "husband" travel to Syria to join HTS, despite the fact that she initially told the UCE that "HTS is no good." She admitted in her plea agreement that she offered to reach out to this contact for the UCE to use instead of the people whom the UCE said were going to assist in the travel. The defendant discouraged the UCE from using the UCE's contacts, stating, "I don't want [UCE's "husband"] to go with that brother yet. Bc I know ppl who I trust more than myself." Doc. 390 at p.5. Not only did the defendant give the UCE the contact information of a "trusted brother" to use to facilitate travel to Syria, but she also admitted that she expected and intended that the UCE and her "husband" would provide funds to "@alsadaqahsyria," who would in turn provide funds to HTS. *Id.* at p.6. The defendant clearly knew that @alsadaqahsyria actively raised funds for the benefit of the mujahideen fighting in Syria, and was aware that donating funds to the mujahideen was one of the 44 ways to support jihad identified by Anwar Awlaki.

The defendant also understood that her advice and assistance to the UCE was illegal, as was the UCE's intention to travel to Syria. Consequently, the defendant and the UCE communicated on an end-to-end encrypted social media platform. In addition, the defendant

admitted that they used self-destruct timers within the communications so that the communications could not be recovered. *Id*. As to her assistance, the defendant admitted that she provided the UCE with specific guidance on how to travel to Syria in order to avoid detection by law enforcement: leave phones in the United States, acquire new phones and new phone numbers before traveling, cut ties with other people before leaving the United States, purchase round trip tickets, consider traveling first to Italy and from there, on to Turkey and ultimately to Syria. *Id*. at p.4. The defendant told the UCE to "unfollow" the social media channel that the defendant was operating, delete the defendant's name and phone number from the UCE's phone along with all pictures and text messages. *Id*. These concealment activities are undisputed. Additionally, as noted above, the defendant also expressed concern in her communications that her conduct could "get her arrested" and sentenced to 30 years in prison for violating federal law. She also warned others on Telegram to be wary of spies.

B. **History and Characteristics of the Defendant**

According to the Revised Presentence Report, the defendant is a 37-year old United States citizen who, until her arrest, lived in Sparta, Tennessee with her mother and her 15-year old daughter. She also has a 13-year old son who lives with his father. The defendant has been detained in federal custody since her arrest. She graduated with honors from high school, is a college graduate, earning a Bachelor of Science degree in Sociology with a concentration in Social Work. She earned a Master's Degree in Social Work in 2011 and was seeking a Master's Degree in International Affairs with a minor in Middle Eastern Studies at Middle Tennessee State University in Murfreesboro at the time of her arrest. The defendant was a licensed Master Social Worker until the license expired in 2021.

According to the Revised Presentence Report, the defendant advised that she worked as a volunteer behavioral counselor for approximately six months, beginning in July 2017. Thereafter, she advised that she worked as a therapist in a school, as an in-home therapist, and as a therapist for an outpatient program.

The defendant is a self-professed Muslim convert. Her mother apparently was unaware of the defendant's conversion. The defendant has no known criminal history.

## C. Need for Just Punishment to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Deterrence and Protect the Public

The indisputably serious nature of the defendant's conduct and the need to impose just punishment weigh decidedly in favor of a Guidelines sentence. The defendant is a college-educated woman with a Master's Degree in Social Work, working toward a second Master's Degree in International Affairs, with a focus on Middle Eastern Studies. She engaged in extensive communications with at least one minor on-line, who, in the words of the minor, felt brainwashed by the defendant in her discussions of the need to support jihadists in Syria. The defendant's experience and training in social work undoubtedly helped her to communicate encouragement to the minor to support jihadists overseas. The defendant told the UCE that she intended to take her minor son with her when she traveled to Syria to join her fiance, Abu Abdullah, knowing full well the danger of living in war-torn Syria.[10] While the defendant did not ultimately attempt to travel to Syria, she supported the UCE in the UCE's plan to travel there, and even told the UCE that she would give the UCE money to buy the defendant a house in Syria once the UCE arrived there.

---

[10] In fact, the defendant told the UCE that she hoped to die alongside her husband, identified as Abu Abdullah, in an airstrike on a Friday during Ramadan while she and her husband were praying.

22

The defendant was well aware that her actions in support of the UCE's plan to travel to Syria to join HTS were illegal. She was aware of people being investigated and criminally prosecuted for such conduct. Instead of abandoning this conduct, she took extra measures to conceal her criminal conduct and counseled others to do the same. As she decided for whatever reason that she could not travel to Syria herself, she chose to send money to organizations that were affiliated with HTS and other mujahideen to support the fight against the Syrian government, claiming that these contributions were charitable donations. Yet, she was well aware, based on her research for her Master's Program in International Affairs, as well as her on line activity, that terrorist organizations solicit funds for combatants purporting to use such donations for charitable endeavors. As the radical Islamic cleric Anwar Awlaki instructed in 44 Ways to Support Jihad, a publication posted on the defendant's own Telegram channel, "Probably the most important contribution the Muslims of the West could do for Jihad is making Jihad with their wealth since in many cases the mujahideen are in need of money more than they are in need of men." Doc. 403-10 at p.29.

Insofar as the defendant is an educated person, with advanced training, who created a Telegram channel on-line through which she posted radical Islamic literature and encouraged discussion of methods to support the fighters in Syria[11], it is extremely important that the

---

[11]    On October 9, 2018, the defendant sent a message to followers on her Telegram channel, warning them about the potential for being discovered by law enforcement:

> "For security reasons, we will be leaving this channel. We will no longer be posting anymore. We would like to leave with some advice. Be careful who you trust and what you say. A sister may wear niqab and pray beside you and remind you of Allah, yet they're spies. Brothers and sisters don't share your 'future plans' with anyone whether you trust them or not. Sadly, in these times you just don't know.
>
> May our meeting place be in Jannah [Heaven], May Allah protect you and us from the Kuffar [non-Muslims], and May Allah forgive of us our sins Allahumma ameen
>
> Since the main admin of the channel left. We cannot delete this channel. Please

sentence for her crime promote respect for the law and provide deterrence for her future conduct and those similarly situated. Deterring such conduct is particularly important, recognizing that many young people in the West, including the United States, have become radicalized by jihadist propaganda on the Internet and have been encouraged through this propaganda to travel overseas to join a foreign terrorist group or commit attacks where they live. It is essential for those who support foreign terrorist organizations, whether financially, or by assisting others to travel to join those organizations, to know that there are serious consequences for this conduct. It is also important for the public to know that those who support such terrorist organizations will face serious punishment for their actions.

There is also a need to protect the public from the defendant, trained and previously employed as a social worker who served as an emotional resource for at-risk minors. According to conversations with the UCE, the defendant, at one point, was planning to take her minor son to Syria without the knowledge or permission of the boy's father. The defendant also engaged online with a 16-year old girl whom she befriended on social media. As evident from their text communications, the defendant spoke with the minor often about hijra and traveling to Syria. The defendant's sentence should reflect the need to protect vulnerable members of the public, such as minors, from the influence of the defendant.

### D.  **Kinds of Sentences Available**

The defendant has pled guilty to a violation of concealing material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339C(c). The maximum penalty

---

unfollow as we will be unfollowing and not posting anymore."

Doc. 403-9, PageID# 4755.

for this violation under the statute is ten years imprisonment and a $250,000 fine. There have been few cases in which defendants have been prosecuted for violations of this statute. Sentences following conviction under this statute have ranged from 60-90 months imprisonment, with periods of supervised release ranging from three years to a lifetime of supervised release.[12]

The defendant's punishment for her offense should not create an unwarranted sentencing disparity with a comparable terrorism case recently concluded in the Northern District of Alabama concerning a young woman who was a member of the on-line chat group that included the defendant. On September 13, 2019, Alaa Mohd Abusaad, a 21-year old United States citizen who was part of the same law enforcement investigation as the instant case, pleaded guilty before the Chief Judge in the Northern District of Alabama to a charge of concealing terrorism financing, in violation of 18 U.S.C. § 2339C(c)(2)(A). Ms. Abusaad participated in conversations with a UCE during which they discussed how money could be sent to mujahedeen. Abusaad later introduced the UCE to a person she knew to be a financial facilitator, who could serve as a conduit of funds to a designated foreign terrorist organization. Abusaad coached the UCE on ways to avoid law enforcement detection when sending money to the facilitator. The initial indictment, filed on October 30, 2018, charged her with attempting to provide material support to a designated foreign terrorist organization, Al Qaeda, in violation of 18 U.S.C. §§ 2339B and 2.[13] On April 27, 2022, she was sentenced to 90 months imprisonment followed by 10 years of supervised release for her plea to a violation of 18 U.S.C. § 2339C(c).

---

[12] Conduct similar to the defendant's served as the basis for at least one prosecution for a violation of 18 U.S.C. § 2339B. In *United States v. Young*, 818 F. App'x 185 (4th Cir. 2020), the defendant recruited others to fight for ISIS and advised them how to travel abroad without being detected by law enforcement authorities. He was convicted at trial and sentenced to 15 years imprisonment, the statutory maximum term of imprisonment at the time of the offense.

[13] As previously established, when the defendant became aware of the Abusaad investigation, she attempted to obstruct justice to avoid a similar fate.

**E.** **The Defendant's Motion for a Downward Departure from the Appropriate Sentence Based on a Theory of "Sentencing Entrapment" is Meritless as a Matter of Fact and Law in this Case.**

The defendant once again attempts to relitigate this case, despite her guilty plea, claiming that she was entrapped by the government. *See* Doc. 397. Ignoring the lengthy statement of facts she admitted to in agreeing to plead guilty to concealment of material support to a designated foreign terrorist organization, she urges the Court not to "allow the government to make a mountain out of" her "on line molehill." *Id*. at p.1. Not only does the defendant ignore the factual basis of her plea submitted to the Court, but she also repeatedly misstates the facts revealed in the investigation of her conduct. The defendant asserts that in response to a request made by an online undercover employee ("OCE") for ways to send money to Syria, she sent the OCE "links to well regarded charities based in the UK that worked to help the needy, and raised money to build a complex for orphans and widows in Syria with a school, madrassah, education facilities, playground and would provide food." *Id*. at p.2. According to the defendant, she only provided the OCE with "mainstream charities." *Id*. at p.10. In fact, the defendant did not refer the OCE to any "mainstream charities." The defendant passed the names of two entities to the OCE: "One Nation" and "Save Our Syria." "One Nation," in particular, is a well-known "charity" that has been identified in numerous terrorism investigations. The people administering this "charity" are known to be close with extremist groups in Syria. The United Kingdom opened an investigation of this "charity" in November 2016 based on similar concerns. Information about that investigation is publicly available. *See* https://www.gov.uk/government/publications/charity-inquiry-one-nation/one-nation.

A Muslim convert named Oliver Bridgeman, publicly associated with "One Nation" and shown in videos delivering goods in Syria, has also been filmed working with British Muslim

26

activist Tauqir "Tox" Sharif. Sharif and his wife, who run the unregistered charity, Live Updates From Syria, have had their British bank accounts closed by their financial institution. In a recorded interview in Syria, Sharif said that his desire was to live in a real Islamic State and that it was only logical that Muslims wanted to live under Islamic rule. In March 2016, the Australian Federal Police issued an arrest warrant for Bridgeman relating to "incursions into foreign countries with the intention of engaging in hostile activities." *See* Rodger Shanahan, "Charities and Terrorism: Lessons from the Syrian Crisis" (Lowy Institute, March 2018) at p.4.

The defendant then attempts to minimize the nature of her conversations with the UCE. She repeatedly defines "hijrah" as simply "migration from persecution" or "migration to a Muslim country," a definition that is inaccurate and incomplete even according to the various statements provided by defendant's expert witness, Aymenn al-Tamimi, in this case. *See* Doc. 348-2 at p.9; Doc. 396-8 at p.10.[14] The defendant claims, without any support, that the UCE "created doubt around the contacts" that the UCEs were planning to use for their travel to Syria. Doc. 397 at p.5. She then alleges that she "relayed" the contact information she had to the UCE "to dissuade her from traveling." The falsity of this statement is established by the fact that the defendant actually suggested that the UCE travel to Afghanistan to fight. *See* Doc. 397-1 at p.5.

Finally, the defendant minimizes and mischaracterizes the conversation between "Individual A" and UCE's "husband." According to the defendant, "Individual A" "advised that the undercovers would need a job before going" to Syria. In fact, when UCE's "husband" asked about the difficulty in getting across the border from Turkey to Syria, "Individual A" stated, "It

---

[14]    Significantly, the defendant was concerned to hear from the UCE that her "husband" had contacted the person whom the defendant had identified to help the UCE and her "husband" travel to Syria. According to the conversation on October 4, the defendant wrote to the UCE that the contact "wasn't to make hijrah. But glad he can help you. It was just for charity purposes. And I have no clue who he is. Was just given to me to give to you for charity." Doc. 397-2 at p.23. If "hijrah" simply meant "migration," it is unclear why the defendant would be so concerned that the contact she gave to the UCE could be assisting in this activity.

depends bro.  Look.  It's important you have a cover story.  Get Turkish visa.  Message some charitys.  Ask you want to volunteer.  Make it look like you're an aid worker.  Then you have a good defence."  "Individual A" advised UCE's husband to take these steps so that they would have "evidence to support your story" if they were stopped by Turkish authorities asking why they were in Turkey.

Aside from the lack of factual basis for the Court to consider a downward departure for her authorized sentence, the defendant fails to provide the Court with legal support for such a request.  While the defendant suggests that a downward departure could be based upon "the exceptional circumstances of sentencing entrapment employed by the government in its investigation of Ms. Giampietro," the defendant concedes that the concept of "sentencing entrapment" has been applied only in cases of narcotics offenses, where there is evidence that the government has induced a defendant to deal in a larger quantity of drug, resulting in the application of a higher sentence.  Doc. 397 at p.9.  The defendant further concedes that a downward departure does not exist for a similar "entrapment in terrorism-related cases."  *Id*.  Nor could it, since the critical question is whether a defendant had the intent to provide material support to a designated foreign terrorist organization, not the amount of support provided.

The defendant also concedes that even if some courts may recognize the concept of "sentencing entrapment" in the context of a narcotics prosecution, this Circuit has not adopted this basis for a downward departure.  *Id*. at p.7-8.  Notably, the defendant cites the case of *United States v. Hammadi*, 737 F.3d 1043 (6th Cir. 2013) for this proposition.  The facts and appellate analysis of the sentencing decision are instructive.  In *Hammadi*, the government caught the defendant as part of a sting operation.  The defendant and another individual became involved in a scheme developed by a confidential human source ("CHS") to send money and weapons to

insurgents in Iraq, and the CHS advised that the weapons were intended for al Qaeda in Iraq, a designated foreign terrorist organization. Among the weapons that the defendant helped to transport were rocket propelled grenade launchers and Stinger missiles. The defendant ultimately pled guilty to providing material support to a designated foreign terrorist organization, but at sentencing, sought a departure from the recommended sentence based upon the concepts of sentencing entrapment and sentencing manipulation. The district court did not adjust his sentence downward.

On appeal, the Sixth Circuit affirmed the sentence, finding that the defendant would not qualify for a departure under either theory. The *Hammadi* court observed that this Circuit has never before recognized these theories as valid reasons to depart downward. 737 F.3d at 1046 (citing cases). The *Hammadi* court noted that the defendant's guilty plea foreclosed his argument that he was entitled to such a departure. In the words of the Court -

> "Hammadi's sentence is not the result of the government tricking him into trafficking in a greater *quantity* of contraband. Instead, Hammadi's sentence is the result of his conspiring to traffic in a different kind of contraband at different times, which serves as the basis for a separate crime that requires a longer sentence. If he lacked the intent to deal in surface-to-air missiles as charged . . ., he needed to assert the substantive defense of entrapment. He did not. Rather, he pleaded guilty, waiving any substantive entrapment defense. *United States v. Cottage,* 307 F.3d 494, 499 (6th Cir. 2002) ("A voluntary and unconditional guilty plea generally waives any non-jurisdictional claims that arose before the plea, including the defense of entrapment."). Hammadi now claims, under the guise of sentencing entrapment and manipulation, that he lacked the requisite intent to deal in Stinger missiles. However, this argument undercuts his guilty plea and is identical to a substantive entrapment defense. Hammadi has already waived that defense and cannot relitigate it at sentencing or on appeal."

737 F.3d at 1048-49 (emphasis in original). In addressing the specific claim that the government's conduct in the case was somehow subject to challenge and should be the basis for a reduction in the defendant's sentence, the Sixth Circuit affirmed the use of sting operations by

law enforcement, noting that the government's conduct in the case was "not irregular." As the

Court reasoned:

> "Since September 11, 2001, the government has maintained that these sting operations are necessary to root out potential domestic terrorists, and part of those investigations is 'testing to see how far these defendants would go in committing acts of terrorism.' *United States v. Cromitie*, 727 F.3d 194, 227 (2d Cir. 2013). While the judiciary should not rubberstamp executive conduct based on blanket claims of necessity, the Supreme Court has recognized that the entrapment defense 'was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve.' *United States v. Russell*, 411 U.S. 423, 435 … (1973). As a result, courts have given the government 'wide latitude … in conducting sting operations…,' remembering that '[w]here the [g]overnment simply gives the defendant '[the] opportunity to commit a crime,' and the defendant accommodates by committing a crime, the entrapment claim is unavailable.' . . . Here, the government's conduct fits squarely within this latitude; its tactics do not shock the conscience. *Cf. Rochin v. California*, 342 U.S. 165, 172 … (1952). The government provided Hammadi with an opportunity to commit a crime, and he took it."

*Id*. at 1049-50 (citations omitted).

The Court, therefore, has neither the factual nor legal basis in this case for considering a downward departure from an authorized sentence as proposed by the defendant. Clearly, there are no "unidentified circumstances" not adequately taken into account by the Sentencing Guidelines that warrant such a departure in this case, particularly in view of the detailed factual basis for the plea agreed to by the defendant and presented to the Court.

## IV. Conclusion

Wherefore, for all of the foregoing reasons, the government recommends that, after the Court fully evaluates the factors identified in 18 U.S.C. § 3553, the Court should impose a substantial sentence that particularly reflects the seriousness of the defendant's offense of conviction and her conduct in this case, which carries a guideline term of imprisonment of 120 months, for concealment of material support and resources intended to be provided to a foreign terrorist organization, in the violation of 18 U.S.C. § 2339C(c).

30

Respectfully Submitted,

MARK H. WILDASIN
United States Attorney
Middle District of Tennessee

By: /s/ *Philip H. Wehby*
PHILIP H. WEHBY
KATHRYN RISINGER
Assistant United States Attorneys
719 Church Street, Suite 3300
Nashville, Tennessee 37203
Phone: (615) 736-5151


/s/ *Jennifer E. Levy*
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Ste. 7600
Washington, D.C. 20530
(202) 514-1092


## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2022, I am electronically filing a copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record for the defendant in this case.

/s/ *Philip H. Wehby*
PHILIP H. WEHBY
Assistant United States Attorney