UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:19-cr-00013 |
| | ) | |
| GEORGIANNA A.M. GIAMPIETRO | ) | |

**SENTENCING MEMORANDUM OPINION AND ORDER**

On January 18, 2022, Defendant pled guilty to a Superseding Information filed four days earlier. It reads:

> Between on or about September 23, 2018, and on or about October 23, 2018, in the Middle District of Tennessee and elsewhere, GEORGIANNA A.M. GIAMPIETRO, a national of the United States, did knowingly conceal and disguise the nature, location, source, ownership, and control of material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b)(1), knowing and intending that the support and resources, including currency, personnel, and services, were provided and were intended to be provided in violation of Title 18, United States Code, Section 2339B.
>
> All in violation of Title 18, United States Code, Section 2339C(c).

(Doc. No. 381 at 1).

In anticipation of sentencing set for July 15, 2022, the United States Probation Office has submitted a Presentence Report ("PSR") that contains an adjustment for obstruction of justice pursuant to Section 3C1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), and the terrorism enhancement under U.S.S.G. § 3A4.1. With those additions, the Guidelines call for 235-294 months of imprisonment based upon an offense level of 33 and a Criminal History Category of VI. However, the statutory maximum limits the term to 120 months. In start contrast, without those additions, Defendant faces a Guidelines range of 30 to 37 months based upon a total offense level of 19 and a Criminal History Category of I.

Defendant has filed objections to both the obstruction of justice adjustment and the terrorism enhancement. (Doc. No. 396). On June 24, 2022, the Court held a hearing and overruled Defendant's objections. Although the Court provided an oral ruling, it also indicated that a written memorandum would follow. This is that opinion.

### A. Adjustment for Obstruction of Justice – U.S.S.G. 3C1.1

Section 3C1.1 of the Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. "The government bears the burden of proving obstruction of justice by a preponderance of the evidence." United States v. Amerson, 886 F.3d 568, 578 (6th Cir. 2018).

Application Note 4 of the Guidelines provides a non-exhaustive list of examples of conduct to which the adjustment generally does not apply. In turn, Application Note 5 provides examples of conduct not normally covered by the adjustment.

As a preliminary matter, the Government argues that Section 3C1.1 clearly applies based upon Application Note 4, that, among other things, states the adjustment is applicable in cases that involve "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence)[.]" U.S.S.G. § 3C1.1, cmt. n. 4(D). Because, however, obstruction is to some degree embedded into certain crimes by their very nature, Application Note 7 provides for the "Inapplicability of Adjustment in Certain Circumstances," as follows:

> If the defendant is convicted for an offense covered by § 2J1.1 (Contempt), § 2J1.2 (Obstruction of Justice), § 2J1.3 (Perjury or Subornation of Perjury; Bribery of Witness), § 2J1.5 (Failure to Appear by Material Witness), § 2J1.6 (Failure to Appear by Defendant), § 2J1.9 (Payment to Witness), § 2X3.1 (Accessory After the Fact), or § 2X4.1 (Misprision of Felony), this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense).

U.S.S.G. § 3C1.1 cmt. n. 7.

Application Note 1 to Section 2X3.1 provides that "in the case of a violation of 18 U.S.C. 2339C(c)(2)(A), 'underlying offense' means the violation with respect to which the material support or resources were concealed." U.S.S.G. § 2X3.1, cmt. n. 1. Here, Defendant pled guilty to violating 18 U.S.C. 2339C(c) and this necessarily includes subsection (c)(2)(A). Accordingly, the Probation Office was correct in using this Guideline, and Defendant does not argue otherwise. The question thus becomes whether Defendant committed significant further obstruction within the meaning of Application Note 7 to the obstruction of justice during the investigation. She did.

Contrary to Defendant's assertion at the hearing, Section 3C1.1 does not require that the obstructive conduct occur *after* commission of the offense. Instead, in cases under Section 2X3.1 where Application Note 7 applies, the obstruction must occur during the investigation or prosecution. Indeed, Section 2X3.1 has "only two requirements. First, the defendant's obstructing conduct must be 'significant,' that is, meaningful or notable," and "[s]econd, the conduct must be 'further,' that is, in addition to the underlying offense." United States v. Johnson, 812 F.3d 757, 762 (9th Cir. 2016). The preponderance of the evidence shows Defendant's conduct met both requirements.

Defendant pled guilty to knowingly concealing and disguising "the nature, location, source, ownership, and control of material support and resources," but she committed "notable" acts "in

3

addition" to her underlying offense – she destroyed evidence by deleting accounts and messages. More specifically, within the period of the investigation of Defendant's and other's potential links and/or support for designated terrorist organizations, at a minimum the following occurred:

> On April 24, 2018, after online friend Shirin Yusupova (who had the moniker "Notebook") said she had been approached by the F.B.I., Defendant informed an online undercover employee acting as a "sister" in the cause that she (Defendant) had "to delete everything asap," and that she had "deactivated" her Instagram account. (Doc. No. 403, Ex. 7 at 2-3).
>
> In early October 2018, upon learning that Alaa Abusaad was being investigated by the FBI in Alabama, Defendant deleted her social media accounts connected to Abusaad. (Id., Ex.6 at 4739)
>
> On October 9, 2018, Defendant posted a warning about "spies" to her Telegram Channel "Islamic Literature," stating that she "cannot delete this channel" because "the main admin of the channel left," and therefore requested that others "unfollow" her. (Id. Ex. 9 at 1).
>
> In an interview with FBI agents on October 23, 2018, Defendant admitted that she deleted both Instagram and Telegram accounts when she learned of investigations and that she "delet[ed] things to hide things." (Id., Ex. 4 at 57).

Such conduct goes beyond concealing and disguising the nature of material support by taking it up a notch. This includes activity that was within the timeframe of the Superseding Information (*i.e.*, between September 23 and October 23, 2018). During this period, Defendant was not just hiding her support; she was taking affirmative steps to thwart an ongoing investigation. In short, she was concealing her concealment.

At the hearing, albeit in the context of the terrorism enhancement, counsel repeatedly asserted that the actions Defendant took were to avoid getting caught, yet that is the very essence of obstruction of justice. On this score and unlike the Government, the Court does not quarrel with the notion that the routine use of self-destruct timers on accounts may be part-and-parcel of attempting

4

to conceal or disguise activity. It is quite another thing, however, to proactively delete or destroy potential evidence upon learning that law enforcement may be poking around because it is an "attempt[] to obstruct or impede the administration of justice with respect to [an] investigation [or] prosecution." U.S.S.G. § 3C1.1. In fact, both the Superseding and Second Superseding Indictment charged that between March 2018 and October 28, 2019, Defendant "did knowingly alter, destroy, mutilate, conceal, and cover up a record and document, including, but not limited to, social media accounts, text messages, chat conversations, and other electronic communications, with the intent to impede, obstruct, and influence the investigation [of] a matter within the jurisdiction of the Federal Bureau of Investigation[.]" (Doc. No. 77 at 2; Doc. No. 255 at 2). That Defendant ultimately pled only to concealing and disguising material support in violation of 18 U.S.C. § 2229C(c) in no way means that the obstructive conduct did not occur.

Accordingly, for these reasons and those stated at the hearing, Defendant's objection to the Section 3C1.1 obstruction of justice adjustment is without merit and overruled.

## II. Terrorism Enhancement § 3A1.4

Also without merit is Defendant's objection to the PSR's recommendation that the terrorism enhancement under Section 3A1.4 be imposed. For felony offenses, that enhancement requires the offense be raised by 12 levels to at least a level 32, and the Criminal History Category be VI, regardless of a Defendant's true criminal history. U.S.S.G. § 3A1.4.

Two things are required for the terrorism enhancement to apply. First, the underlying offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and second, the underlying act must be included in a list of eligible offenses. 18 U.S.C. § 2332b(g)(5)(B). While the terrorism enhancement might be viewed

5

by some "to be a tail which wags the dog of the substantive offense," McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986), the Sixth Circuit has found that the Government need only "show by a preponderance of the evidence that the two requirements of § 2332b have been met," United States v. Wright, 747 F.3d 399, 409 (6th Cir. 2014). But see United States v. Alhaggagi, 978 F.3d 693, 700 (9th Cir. 2020) (requiring clear and convincing evidence where terrorism enhancement raised defendant's potential sentence by 22 years).

Giampietro pled guilty to violating 18 U.S.C. 2339C(c). This is a listed crime for purposes of the enhancement, and she does not argue otherwise. 18 U.S.C. § 2332b(g)(5)(B). Instead, the dispute is whether her conduct was calculated to influence or affect government conduct within the meaning of the enhancement.

The terrorism enhancement "does not automatically apply to all material support offenses," because "[i]t is possible for a defendant to provide material support to a terrorist group in violation of 18 U.S.C. § 2339B(a)(1) without intending that the support or resources would influence, affect, or retaliate against government conduct to satisfy the first prong of the definition of federal crime of terrorism." Alhaggagi, 978 F.3d at 699. Instead, "[a]pplication of the enhancement requires proof of the defendant's specific intent[.]" United States v. Stafford, 782 F.2d 786, 792 (6th Cir. 2015) (citation omitted). "A defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." Wright, 747 F.3d at 408 (citing United States v. Siddiqui, 699 F.3d 690, 709 (2d Cir. 2012)).

As noted, Defendant's offense of conviction spans the time period between September 23 and October 23, 2018. The Court need go no further than Defendant's Plea Agreement to find that the terrorism enhancement applies. During the Information's timeframe, Defendant knowingly and

6

intentionally rendered advice and offered assistance to an undercover agent ("UCE-1") whose husband ("UCE-2") had purportedly sworn an oath of allegiance to Hay'at Tahrir al-Sham (or "HTS") and who intended to travel to Syria to join HTS and fight on its behalf. This, coupled with the surrounding circumstances, is more than enough.

On May 31, 2018, the United States State Department designated HTS as a known terrorist organization in accordance with Executive Order 13224. https://www.state.gov/executive-order-13224/#state (all websites last visited on 7/11/22). https://cisac.fsi.stanford.edu/mappingmilitants/profiles/hayat-tahrir-al-sham. HTS "is a Sunni opposition umbrella group that aims to overthrow the Assad regime and establish an Islamic Emirate in Syria." It has been characterized as "one of the strongest insurgent groups in Syria," responsible for the murder of combatants and civilians, assasinations, kidnappings, and torture. https/www.counterextremism.com/threat/al-nusra-front-hayat-tahrir-al-sham. Indeed, at the evidentiary hearing, Plaintiff's expert, Aymann Jawad, in response to questioning by the Court, conceded both that HTS was deemed a foreign terrorist organization by the United States and that it committed such atrocities. More importantly, in her plea agreement, Defendant admitted that she knew HTS was a designated terrorist organization at the time of her communications with UCE-1.

Defendant and UCE-1 utilized Telegram, an encrypted social media platform along with self-destruct timers so that their communications would be automatically deleted. With regard to those communications, Defendant admitted in her Plea Agreement that it is true and correct that the following occurred after she learned that UCE-1 and her husband wanted to travel to Syria via London:

7

Giampietro initially told UCE-1 that "HTS is no good," and Giampietro also expressed concerns about their plan to travel via London and the husband's contacts in London. Giampietro explained in part, "This is scaring me. Many people in London get caught. . ." Giampietro further explained, ". . . I need you to unfollow the [social media platform] channel [that Giampietro was operating] . . . I need you to delete my name and phone number from your phone and all pictures and text messages."

In subsequent communications, Giampietro also provided UCE-1 with specific advice as to how UCE-1 and UCE-2 should travel to Syria in order to avoid detection by law enforcement authorities. Giampietro explained, for example, that UCE-1 and UCE-2 should not take their phones with them, and that they ought to acquire new phones and new phone numbers before they traveled. Giampietro referenced her own plan for traveling to Syria, which included cutting ties with other persons before leaving, explaining that, "[w]hen I was planning my plan was to delete everyone 6 to 8 months before leaving and have no contact with anyone. Bc [because] one wrong move." Giampietro explained further that UCE-1 and UCE-2 should purchase roundtrip airline tickets, rather than one-way tickets, and that they should consider traveling to Turkey (prior to entering Syria) by traveling first to Italy, and then by traveling from Italy to Turkey.

In the course of their communications, Giampietro asked UCE-1 about the overseas contact UCE-1 claimed UCE-2 was using to assist UCE-1 and UCE-2's travel overseas. Giampietro offered to reach out to one of Giampietro's contacts instead, whom Giampietro claimed could better assist UCE-2. In this regard, Giampietro told UCE-1, "I don't want him to go with that brother yet Bc I know ppl who I trust more than myself.' The undercover responded, "Should [UCE-2] just talk to your people??". Giampietro said, "Yes." UCE-1 then told Giampietro that her husband (UCE-2) wanted to use Giampietro's contact. Giampietro indicated that she would attempt to contact someone she knew and get back to UCE-1. Giampietro subsequently communicated with the Telegram channel for AI-Sadaqah Syria. When Giampietro reached out to @alsadaqahsyria, via Telegram, she was aware that @alsadaqahsyria raised funds for unidentified combatants in Syria (mujahideen), namely HTS. Giampietro's contact, @alsadaqahsyria, however, did not immediately respond.

On September 26, 2018, and again on September 30, 2018, Giampietro communicated to UCE-1 that she had not heard back from her contact yet. Later on September 30, 2018, Giampietro engaged in a Telegram chat with @alsadaqahsyria. Also, in an online conversation on that date, Giampietro informed UCE-1 that Giampietro had spoken with one of her contacts, who claimed that there was presently no jihad in Syria, and asked UCE-1, "Have you thought about Afghanistan? They're still fighting there."

8

> On October 2, 2018, Giampietro messaged UCE-1. During this conversation, Giampietro again expressed concern regarding UCE-1 and UCE- 2as London contacts and then, after expressing this concern, Giampietro told UCE-1 "Have your husband message this account" and gave UCE-1 the Telegram name "@alsadaqahsyria". Giampietro messaged the contact's Telegram name "@alsadaqahsyria" with the intent that UCE-1 and UCE-2 use that contact as a contact to aid them in their travel to Syria. Giampietro was concerned that UCE-1 and UCE-2 would be stopped by law enforcement if they attempted to travel via London and that her association with them would be discovered.
>
> When Giampietro provided the contact, she knew that HTS was a designated terrorist organization and believed that UCE-1 and UCE-2 intended to travel to Syria to work under the direction and control of HTS and believed that the contact would substantially assist them in this effort. In addition, Giampietro intended that UCE-1 and UCE-2 would provide funds to "@alsadaqahsyria," who in turn would provide funds to HTS, thereby providing material support to HTS disguised as a charitable contribution.

(Doc. No. 390, Plea Agreement at 3-5).

Given Defendant's agreement with these facts under oath and in open court, and given counsel's confirmation at the evidentiary hearing that Defendant was not back-tracking on her admissions, one might conclude that the terrorism enhancement is an all but foregone conclusion. After all, "a guilty plea is a grave and solemn act," Brady v. United States, 397 U.S. 742, 748 (1970), and a defendant's "[s]olemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). Furthermore, a defendant is "'bound to the answers [s]he provides during a plea colloquy.'" Porter v. United States, No. 19-5843, 2020 WL 4463419, at *3 (6th Cir. Feb. 6, 2020) (quoting Ramos v. Rogers, 170 F.3d 560, 566 (6th Cir. 1999)). Certainly, the last paragraph excerpted above is indicative of Defendant's intent because she agrees she "knew" or "believed" that (1) HTS was a terrorist organization; (2) UCE-1 and her husband intended to travel to Syria so that the husband could fight on behalf of HTS; and (3) UCE-1 and UCE-2 would provide funds "disguised as a charitable contribution" that would be funneled to HTS.

9

Notwithstanding her admissions, Defendant insists that she had no intention of supporting HTS, materially or otherwise. Quite the contrary, Defendant claims she disguised and concealed her communication with UCE-1 in an effort to avoid being detected by the authorities. The Court is unpersuaded by this argument for a number of reasons.

As a preliminary matter, the Second Circuit has held that "the terrorism enhancement's motivational requirement . . . is not an 'act' or 'omission'" for purposes of the relevant conduct guideline found in U.S.S.G. § 1B1.3, United States v. Stewart, 590 F.3d 93, 139 (2d Cir. 2009), and the Ninth Circuit has carried that a step further by stating that "specific intent from other unrelated offenses is not sufficient to trigger the enhancement under § 3A1.4." Alhaggagi, 978 F.3d at 700, n.6. For its part, the Sixth Circuit in Wright, after citing Stewart, left open the question of how intent may be shown or inferred and what "might, or might not, [be] sufficient to find . . . the required intent" necessary for the terrorism enhancement. Wright, 747 F.3d at 407. Regardless, the past often informs the present, and the Sixth Circuit has repeatedly held that prior bad act evidence may be admissible "to show intent when the defendant is charged with a crime containing a specific intent element." United States v. LaVictor, 848 F.3d 428, 446 (6th Cir. 2017) (citing United States v. Clay, 667 F.3d 689, 695 (6th Cir. 2012)).

Defendant has a history of espousing support for terrorism, even if only from afar and on the sidelines. She first came on the F.B.I.'s radar in late 2015 after making certain online posts to her Telegram channel and elsewhere. From September 7, 2015 to July 13, 2017, Defendant made several posts denouncing the United States, including: writing (after praising Allah in Arabic) "America can burn loool"; "may Allah . . . destroy the US, Russia, Assad and his regime"; and "We don't need America to accept us we only need Allah. The US are terrorists killing innocent Muslims

10

daily."  She also posted images espousing support for terrorist attacks against the United States on her Telegram Channel, including (1) a photograph of a headless Statue of Liberty waving an ISIS flag, with the caption "One of my favorite pictures that keeps getting deleted"; (2) a photograph of the Statute of Liberty burning, with the caption "Our Appointment in New York" (on the September 11 anniversary no less); (3) a photograph of a jihadi fighter pointing a gun accompanied by the words, "Rivers of Blood Await America," posted on September 9, 2015; (4) photograph of a jihadi fighter holding the head of then-President Barack Obama; (5) another photograph of a fighter standing next to a prisoner on his knees "A Message to America" and Defendant's comment, "Dear US, Russia, Turkey, Saudi, and NATO allies . . . . . I hate you for what you put my brothers and sisters through . . . . you will fail and Islam will prevail . . . . may Allah destroy you all"; and (6) a photograph of the United States Capitol engulfed in flames with individuals triumphantly waiving the ISIS flag.  (Doc. No. 156-4).[1]

Defendant's support of terrorism went beyond mere words, and included sending money to questionable organizations.  Leaving aside a contribution to Syria Care on June 14, 2018, Defendant made three financial contributions to an organization called "Merciful Hands" in 2018. Defendant insists that Merciful Hands is a charitable organization engaged in providing clothing and support to the widows and orphans of the Syrian conflict.  The preponderance of the evidence shows

---

[1] These examples are set forth in the Government's sentencing memorandum (Doc. No. 403 at 14), some of which are contained in Docket No. 156-4.  Others the Court has viewed either in chambers, or as part of classified hearings under the Classified Information Procedures Act, 18 U.S.C. App. III, §§ 1-6. Defendant does not dispute that she made such postings.

Further, a search of Defendant's cellphone showed that she retained photographs of images of foreign fighters and accompanying phrases urging people to engage in violent jihad; photographs of what appear to be explosive devices; statements from Anwar al Awlaki, a radical Islamic cleric who preached that Muslims have a religious duty to kill Americans; and images relating to organizations encouraging contributions to the cause of foreign fighters.

otherwise.

According to Catherine Schreck of the SITE Intelligence Group who submitted an expert report on behalf of the Government, donations made to Merciful Hands go towards supporting militant jihad in Syria and aiding HTS. Moreover, the way Merciful Hands goes about soliciting donations makes it hard to believe that anyone would think it truly is a charitable organization, let alone "any individual actively engaged in the Syria-focused online extremist communities – in which these fundraising entities make their outreach." (Doc. No. 403-3 at 52). It is even more difficult to accept that Defendant believed her donations to Merciful Hands were going to be earmarked exclusively for charity considering that she wrote a paper while seeking to obtain a Masters Degree in Middle Eastern studies titled, "Money in all the Wrong Places: Corruption and Financing Terrorist Organizations" that contained a section on "Charities and Self-Funders" and began with the sentence "Terrorist organizations for the longest have exploited charities." (Doc. No. 398-1 at 5).[2] Her suggestion that she was somehow naïve and acting with a pure heart when she made the contributions is further belied by her telling UCE-1 and others that she herself planned to travel to Syria to join her fiancé and wage jihad or cook for those who were doing so. (Doc. No. 403 at 18).

The communications between Defendant and UCE-1 do not support an innocent explanation either. While Defendant insists her intention was to avoid getting caught, there clearly was much

---

[2] At the evidentiary hearing, Defendant's expert Jawad testified that, apart from a one month period in India, he could find no basis for the conclusion that Merciful Hands served as a front for funneling money to HTS. The Court was unimpressed with this testimony for the reasons previously stated on the record.

Moreover, the methodology underlying Jawad's methodology was questionable at best. For instance, part of his conclusion was based upon his contact with the Webmaster of Merciful Hands. The purported Webmaster insisted that Merciful Hands was a charitable organization, as if it would make any sense for him to admit otherwise to a total stranger. For all Jawad knew, the person he was communicating with was some random man sitting in the basement of his mother's house in Somerset, New Jersey or rural New Hampshire.

12

more going on.

It is not necessary that Defendant's ultimate or only aim be influencing the Government (or government). "So long as the defendant intended to influence the conduct of government, the terrorism enhancement will apply even if the defendant also harbored other motivations, such as an intent to gain financial reward or impress a sweetheart." Wright, 747 F.3d at 418 (Clay, J., concurring). Thus, for example, "[a] defendant who provided material assistance to terrorist organizations, but claimed that h[er] goal was to assist an oppressed group of Muslims, is eligible for the enhancement regardless of h[er] purportedly benign motive." Id. at 408. This is because a distinction can be drawn between what motivates a person to do an act and what that act is calculated to achieve. Section 2332b(g)(5)(A) focuses on the latter. The Second Circuit has explained:

> Though § 2332b(g)(5)(A) has been referred to as encompassing a "motivational element" or requirement, that characterization is more confusing than helpful. Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive. "Motive" is concerned with the rationale for an actor's particular conduct. "Calculation" is concerned with the object that the actor seeks to achieve through planning or contrivance. Calculation may often serve motive, but they are not, in fact, identical. Section 2332b(g)(5)(A) does not focus on the defendant but on his "offense," asking whether it was calculated, i.e., planned-for whatever reason or motive-to achieve the stated object. Thus, . . . the section is better understood as imposing a requirement "that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Clearly, a person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation. Thus, a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities.

United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010) (internal citations omitted).

To paraphrase the Sixth Circuit in Wright, Defendant had the "requisite intent" because she acted with the purpose of influencing or affecting government conduct and planned her actions with

13

this objective in mind. 737 F,3d at 408. Indeed, it is hard to read her plea agreement otherwise.

If, as Defendant claims, her concealment and disguise was an effort to avoid being caught, why communicate with UCE-1 in the first place? Better yet, if she felt compelled to carry on communicating with UCE-1 once travel to Syria became – as Defendant suggests – a *fait accompli*, why offer Afghanistan as an alternative venue if there was no fighting in Syria? The answer is in keeping with her earlier posts from Imaam Anwar al-Awlaki titled "44 Ways to Support Jhaad" that included "protecting the mujideen and supporting them" when they "are in danger," even when "such a protection could be very costly" just as it was for "the Taliban [who] paid a price for offering a safe haven for the foreign Mujdeen[.]" (Doc No. 403-10 at 10). It is also in keeping with a posting from Al Sadaqah (and Defendant's apparent belief) that "whoever dies without having gone out for jihad or having thought of doing so, dies on a branch of hypocrisy." (Id., Ex. 16-10).

Whatever her motivation(s), there is no question that Defendant's disguise and concealment were geared towards getting UCE-1 and UCE-2 to Syria so that UCE-2 could join and support HTS.; not only in HTS' violent activities in Syria but also to channel funds to HTS disguised as charitable contributions. Defendant's calculated acts included providing and vouching for contacts "over there" that were "trustworthy," insisting that those contacts be used, suggesting routes of travel so as to lessen the chance of detection, and providing advice in order to assist safe travel. All of this was calculated to influence or affect the conduct of the Syrian government (and perhaps the United States Government) through Defendant's material support of HTS. Accordingly, the Presentence Report properly includes the terrorism enhancement under § 3A1.4.

### III. Sentencing Guideline Calculations

Based upon the foregoing, Defendant's Guidelines calculations are as follows:

| | |
|---|---:|
| Base Offense Level Pursuant to § 2X3.1 | 22 |
| Victim Related Adjustment Pursuant to § 3A1.4 (Terrorism Enhancement) | +12 |
| Adjustment for Obstruction of Justice Pursuant to § 3C1.1 | + 2 |
| Acceptance of Responsibility Pursuant to §§ 3E1.1(a), (b) | - 3 |
| TOTAL OFFENSE LEVEL | 33 |

Defendant has no criminal history points. Ordinarily this would place her in Criminal History Category of I, but, because of the Terrorism Enhancement, her Criminal History Category is VI. With an Offense Level of 33 and a Criminal History Category of VI, the Guidelines range is 253-294 months imprisonment. However, the statutory maximum limits this number at 120 months. The Supervised Release term is from 1 year to life. The fine range is $35,000 to $250,000. In addition, there is a mandatory Special Assessment of $100.

Of course, calculation of the Guidelines does not end the matter because they are only advisory after United States v. Booker, 543 U.S. 220 (2005). "Once the appropriate advisory Guideline range is calculated, the district court throws this ingredient into the section 3553(a) mix." United States v. McBride, 434 F.3d 470, 476 (6th Cir. 2006). This can be particularly important in cases such as this because "[t]he terrorism enhancement under U.S.S.G. § 3A1.4 is 'steep,'" United States v. Kourani, 6 F.4th 345, 360 (2d Cir. 2021) (citation omitted) and "when applied, 'takes a wrecking ball' to the initial Guidelines range," United States v. Jumaev, No. 12-CR-00033-JLK, 2018 WL 3490886, at *5 (D. Colo. July 18, 2018) (citation omitted). As such, the Court will hear argument on whether a variance is appropriate at the sentencing hearing set for July 15, 2022.

15

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE