1    IN THE UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF TENNESSEE
2            NASHVILLE DIVISION

3    UNITED STATES OF AMERICA,      )
                                    )
4                 Plaintiff,        )
                                    ) Case No.
5         v.                        ) 2:19-cr-00013
                                    )
6    GEORGIANNA A.M. GIAMPIETRO,    ) CHIEF JUDGE CRENSHAW
                                    )
7                 Defendant.        )

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9                    BEFORE THE HONORABLE

10   CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

11             TRANSCRIPT OF PROCEEDINGS

12                SENTENCING HEARING

13                 July 15, 2022

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19

20

21

22

23   PREPARED BY:
                  LISE S. MATTHEWS, RMR, CRR, CRC
24                   Official Court Reporter
                   719 Church Street, Suite 2300
25                    Nashville, TN 37203
                  lise_matthews@tnmd.uscourts.gov

```
1   APPEARANCES:

2
    For the Plaintiff:
3
    Philip H. Wehby
4   Kathryn Risinger
    U. S. Attorney's Office (Nashville)
5   Middle District of Tennessee
    719 Church Street
6   Nashville, Tennessee 37203

7   Jennifer E. Levy
    U.S. Department of Justice-National Security Division
8   Counterterrorism Section
    950 Pennsylvania Ave., NW
9   Washington, DC 20530

10
    For the Defendant:
11
    Charles D. Swift
12  Constitutional Law Center for Muslims in America
    100 N. Central Expy
13  Suite 1010
    Richardson, Texas 75080
14
    Linda Gail Moreno
15  100 N. Central Expy.
    Suite 1010
16  Richardson, Texas 75080

17

18

19

20

21

22

23

24

25
```

1          The above-styled cause came on to be heard on

2    July 15, 2022, before the Honorable Waverly D. Crenshaw, Jr.,

3    Chief District Judge, when the following proceedings were

4    had, to-wit:

5          THE COURT:  All right.  Be seated.

6          So we're here on Case 19-13, *United States of*

7    *America versus Georgianna Giampietro*.  And Mrs. Giampietro is

8    here in the courtroom.

9          If counsel can introduce yourselves on the record.

10          MR. WEHBY:  Good afternoon, Your Honor.  Phil

11    Wehby, Jennifer Levy and Katy Risinger for the United States.

12          MR. SWIFT:  Good afternoon, Your Honor.  Charles

13    Swift and Ms. Linda Moreno on behalf of the defendant.  With

14    me at counsel table is my law clerk, Sufia Khalid, who is

15    pending her bar admission.  And Mr. Strianse has been

16    previously excused with the Court's permission.

17          THE COURT:  All right.  And Ms. Moreno, you have a

18    motion?

19          MS. MORENO:  Yes, Your Honor.  May I approach?

20          THE COURT:  Sure.

21          MS. MORENO:  Thank you.

22          Thank you very much, Your Honor.  My apologies.  I

23    did not file a motion before.  Excuse me.

24          I'm requesting that the Court allow me -- excuse

25    me at 3:30 today so I can make the last flight back to New

1  York, JFK, the direct flight.  Otherwise, I'll have to stay

2  an extra night, pay more tomorrow for another flight in the

3  morning.  And I do apologize to the Court.  Mr. Swift is

4  handling the entire sentencing hearing.  That would be --

5          THE COURT:  No problem.  And I did change the time

6  so --

7          MS. MORENO:  I'm so sorry?

8          THE COURT:  I changed the time for the sentencing,

9  so that probably added to your confusion.

10          MS. MORENO:  I'm sorry, Your Honor.

11          THE COURT:  No problem.  You're excused.

12          MS. MORENO:  Thank you, Your Honor.

13          THE COURT:  So Ms. Giampietro, we're here today

14  for sentencing because on January the 18th you and your

15  attorney entered a plea of guilty to the single count in the

16  superseding information that charged you with violating 18,

17  U.S.C., Section 2339C(c) by concealing and disguising the

18  nature, location, source, ownership, and control of material

19  support and resources knowing, intending that support and

20  resources to be provided to a foreign terrorist organization,

21  all in violation of 18, U.S.C., Section 2339B.

22          When I accepted your plea, I told you, and remind

23  you this afternoon, that the statutory penalty is up to ten

24  years' imprisonment, supervised release up to life, a fine up

25  to $250,000, and the mandatory $100 special assessment.

1          Do you understand you could be sentenced to the

2     statutory maximums today?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  So in preparation for sentencing, I

5     reviewed the plea, your plea petition, your sentencing

6     memorandum, the government's sentencing memorandum, your

7     motion for downward departure, your college paper about

8     "Money in All the Wrong Places, Corruption in Financing

9     Terrorist Organizations."

10          I also, Ms. Giampietro, obtained and read the

11     sentencing transcript, the judgment, and other documents

12     associated with *United States versus Alaa Abusaad*,

13     A-b-u-s-a-a-d, Case Number 19-cr-475, Northern District of

14     Alabama.

15          I've also read again the October 23, 2018,

16     statement you gave to law enforcement on the day the search

17     warrant was executed on your residence.  And I also read the

18     joint filing of the proffer summary, Document 432.

19          Are you familiar with all those documents?

20          THE DEFENDANT:  Yes, I am.

21          THE COURT:  And have you had enough time to talk

22     to Mr. Swift and ask him any questions in preparation for

23     sentencing?

24          THE DEFENDANT:  Yes, I have.

25          THE COURT:  Okay.  And I don't think your mic is

1 on.

2 THE DEFENDANT:  Oh.  Yes, I have.

3 THE COURT:  It's not on.

4 MR. SWIFT:  It's actually on here.  She needs to

5 speak up.

6 THE DEFENDANT:  Yes, I have.

7 THE COURT:  Much better.  That's okay.  That's

8 okay.

9 Did you ask him questions, to the extent you had

10 questions?

11 THE DEFENDANT:  Yes.

12 THE COURT:  And was Mr. Swift responsive to any

13 questions you had?

14 THE DEFENDANT:  He answered all of them.

15 THE COURT:  All right.  And do you have any

16 complaints or grievances about his services, or the services

17 of any of your lawyers, to this point in time?

18 THE DEFENDANT:  No grievances or complaints.

19 THE COURT:  Did you receive a copy of the June

20 14th presentence report?

21 THE DEFENDANT:  Yes.

22 THE COURT:  And did you have a chance to read that

23 document?

24 THE DEFENDANT:  I have.

25 THE COURT:  And go over it with Mr. Swift and your

1  other lawyers?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Did you read every page of the

4  document?

5          THE DEFENDANT:  Yes, I did.

6          THE COURT:  And every word on every page?

7          THE DEFENDANT:  Yes, I have.

8          THE COURT:  Do you want any more time to review

9  it?

10          THE DEFENDANT:  No, I do not.

11          THE COURT:  So previously I ruled on the two

12  substantive objections presented at the hearing back on June

13  24th.  I've ruled on those.  I ruled orally, and I've also

14  issued a memorandum opinion and order that addresses the

15  guideline calculation.

16          Mr. Swift, are there any other objections to the

17  PSR that I have not addressed?

18          MR. SWIFT:  No, Your Honor.

19          THE COURT:  All right.  Any objections from the

20  government to the PSR that I have not addressed?

21          MR. WEHBY:  No, Your Honor.

22          THE COURT:  Okay.  And Mr. Swift, would you -- do

23  you believe there's anything before the Court that -- that

24  the Court should not consider as we approach imposition of

25  sentencing here today?  Because the record -- you and the

```
 1   government have filed a lot of material.  I've read it all,
 2   but I want to be sure that in reaching my decision today I'm
 3   not looking at something you don't want me to look at, or
 4   consider.
 5               MR. SWIFT:  I don't believe there is.
 6               THE COURT:  And how about the government?  You,
 7   likewise, have filed a lot of things.  Is there something
 8   that has been filed that the government believes I should not
 9   consider in imposing sentencing?
10               MR. WEHBY:  No, sir.
11               THE COURT:  So I'm going accept the facts
12   contained in the presentence report as true and rely upon
13   them for sentencing here today.
14               Previously, on June the 24th, and subsequent to
15   the 24th we've calculated the guideline.  I don't think I
16   need to do that again.  Suffice it to say that the guideline
17   range is 253 to 294 months.  However, that number's capped at
18   120 months because that's the statutory maximum for the
19   offense of conviction.
20               Supervised release is authorized up to life.  A
21   fine range is up to $250,000, and the mandatory assessment.
22               Just to put it on the record again, do you -- does
23   the defense have any objections that haven't otherwise been
24   stated to the presentence report?
25               MR. SWIFT:  None that have not otherwise been
```

1  stated.

2          THE COURT:  To the guideline range.

3          And the Government?

4          MR. WEHBY:  That's correct, Your Honor.

5          THE COURT:  All right.  So that takes us to

6  argument on sentencing.

7          Does Mr. -- I'm sorry.  Does Ms. Giampietro intend

8  to allocute?

9          MR. SWIFT:  She does.

10          THE COURT:  All right.  Do you have any witnesses?

11          MR. SWIFT:  No, I do not.

12          THE COURT:  Or the government?

13          MR. WEHBY:  No, Your Honor.

14          THE COURT:  Okay.  So I would just suggest let me

15  ask my questions to both the government and you, Mr. Swift,

16  and then I'm going to let you make your argument, and then

17  let the government respond.  Then you and Mrs. Giampietro can

18  have the last word.  That way, Ms. Giampietro, you know what

19  everybody else thinks and then you can tell the Court what

20  you think.

21          Is that fair?  Is that okay?

22          MR. WEHBY:  Yes, sir.

23          THE COURT:  So the first thing -- all right.  So

24  both sides were a little vague about the -- what term of

25  supervised release you think is appropriate.  So let's start

1    with the government.  And then I'm going to ask you,
2    Mr. Swift.
3              What's your recommendation for supervised release?
4              MR. WEHBY:  Your Honor, our recommendation --
5    obviously it carries up to life, as the Court indicated.  I
6    believe a period of supervised release similar to the period
7    of supervised release imposed in the Abusaad case --
8              THE COURT:  Ten years.
9              MR. WEHBY:  -- would be appropriate.
10             THE COURT:  All right.  And Mr. Swift?
11             MR. SWIFT:  I believe a period of -- given the
12   history of this defendant, five years is sufficient in the
13   part to ensure compliance with parts -- I would point out
14   that my client is currently in her mid-30s.  And part of this
15   is dependent upon sentencing, quite honestly, Your Honor.  I
16   believe that 3553 factors have some concerns in them.  And so
17   I was vague in part because I don't know where you're going
18   to go.  Would I -- if we were giving a lower sentence, would
19   I disagree with ten years?  No, I wouldn't.  Because I know
20   that statistically on part that the risk of further criminal
21   activity drops dramatically with age and by adding a -- a
22   longer term of supervised release in this case would take her
23   to her 50s or 60s where the risk has -- the government is now
24   paying for supervision that isn't really necessary.  That
25   being said, I'm -- I also am very mindful that if it's really

1  not necessary we can come back to court and talk to it again.
2  So from the defendant -- and I've spoken with her about it.
3  She is one of those -- she has no objection; she -- to any
4  term of supervised release on the part because she intends to
5  live a lawful life and she does not view this as an over
6  intrusion.
7          THE COURT:  Okay.  So with that said, does
8  Ms. Giampietro have any objections or want to be heard about
9  the restriction of the condition regarding internet use?  On
10 supervised release.
11         MR. SWIFT:  Yes.  Ms. Giampietro concerns on
12 internet -- the only concerns -- she has no objection to
13 having it monitored, et cetera.  She does, because of the
14 modern need of a human being to function professionally
15 without the internet, she would object to an absolute ban.
16 She has no objections to being monitored in it, in part on
17 this.
18         THE COURT:  No objections to the probation
19 department inspecting --
20         MR. SWIFT:  That's correct.
21         THE COURT:  -- her computer, hardware, software,
22 what have you?
23         MR. SWIFT:  None.  None on that.  Because in part
24 is Ms. -- and I spoke to her at length about what that might
25 entail.  And she would -- she has absolute intent to live a

1 lawful life.  She is also mindful that having people come and
2 look is helpful on the part on that.

3              THE COURT:  And, likewise, she wouldn't have any
4 objections to only using those electronic internet services
5 that are allowed by the Court and probation?  In other words,
6 I agree with you that you've -- to live today you've got to
7 have access to the internet.  Although, it was easier to live
8 without the internet.  But she can only use those devices
9 authorized by the Court.

10             MR. SWIFT:  Absolutely, Your Honor.  And work in
11 coordination on that.  There is no -- again, Ms. Giampietro
12 intends on living in this local area, returning to her life
13 when she is released, trying to go forward on it, and these
14 would not create work or difficulties on imbalance.  And if
15 for some reason it did -- we can't foresee it -- we can come
16 back.

17             THE COURT:  Sure.  You can always come back.

18             So while you're there, one thing that's referenced
19 in all the papers but I never do see an answer to, why did
20 she lose custody of the son?

21             MR. SWIFT:  She did lose custody of her son in
22 part because of the statements she had made concerning
23 planning, quite frankly.  Where she had said or talked about
24 taking her son to Syria.  Those came out after the original
25 request.  And the Court took custody away from her.

1          THE COURT:  And I gather that was done, what, in

2     the juvenile court somewhere in Cookeville?

3          MR. SWIFT:  Yes, it was.

4          THE COURT:  Then that takes me to your argument

5     about -- that is -- your argument based on what's in the

6     presentence report, that her -- that she experienced some

7     abuse:  verbal, emotional, physical from her biological

8     father.  And accepting that as true, help me make the link

9     between what occurred to her around ages 11, 12, 13, and her

10    crime of conviction here, essentially an ideological crime,

11    after she got her BA, one master's, well on her way to a

12    second master's.  Help me make the link between any abuse

13    with her biological father and the offense of conviction.

14         MR. SWIFT:  There's -- and there was abuse

15    afterwards.

16         The link, actually, was provided in one of the

17    government's experts.  That government expert set out -- she

18    looked at women who were particularly susceptible to

19    recruitment.  And one of the factors that she found

20    universally on that was abuse:  significant abuse in their

21    life made them more susceptible.  What we find -- and that's

22    not just in Islam.  That's in these internet rabbit holes and

23    cults that it's opened up an area, and they are more

24    susceptible.  And that's what she found in her research.  And

25    I believe it is relevant that she was --

1          THE COURT:   Why?   Why are they more susceptible?

2          MR. SWIFT:   Paraphrasing the government -- you

3    know, in part on the expert on it is that they become

4    searchers.   The easiest way to put on it is that they're

5    susceptible to these cult-like activities because of the

6    abuse.   And I am not the person -- I looked at it, and I

7    concluded it and put it in in part, and I think it's

8    relevant, because I looked at what the government's expert

9    said.

10          THE COURT:   Okay.   So let's assume the expert

11   knows what the expert's talking about and it has some logical

12   merit.   Nevertheless, she's 37 years old.   She's highly

13   educated.   One of the most educated criminal defendants I've

14   probably ever sentenced.   Well, other than a medical doctor.

15   I'm just having a hard time using that as you want me to use

16   it for any kind of substantial variance.

17          MR. SWIFT:   Well, I think that it plays in part

18   because a highly educated person can remain a very

19   emotionally vulnerable person.   The two parts on it -- and

20   this part is -- because -- and I'll talk about this in --

21   maybe it's time to talk about it.   There really are two

22   Georgianna Giampietro's.   There's the Georgianna Giampietro

23   in her daily life who is a mom, who works three jobs, gets

24   her education, gets her master's in social work, and

25   accomplishes all these things against a difficult background.

Then there's the Georgianna Giampietro on the internet who is
Abu Umm Roses, who is a jihadist, who is arguing for all
these things and saying all these things.  In part goes in
that there's an emotional lack of development that occurs
here from trauma.  And trauma lasts.  And, you know, part --
a large part of this case is following a -- part that keeps
her in this thing is becoming -- falling in love with
somebody on the internet who claims to be Abu Abdullah, who
she then becomes devoted to.  And for a highly educated
person -- putting aside everything else -- that doesn't make
sense.  That's a dumb thing to do.  Okay?  No crime at all,
it's dumb.  And abuse apparently has a link to that.  And I
did note that in the government -- in the government's expert
that she saw a link to that.  And so I think it has some
relevance.  And -- you know, the Court will give it what it
will.  But that's why -- I think there is a logical part to
it, but that's why.

          THE COURT:  Then in your brief you say that she's
in the process -- excuse me -- quote, She's in the process,
quote, of moderating her beliefs.  But as I -- one reading of
the presentence report is she's actually, during the period
that she was under surveillance by the government, she went
from an online activity on the internet, I guess sitting in
Cookeville, to in-person activity, meeting with the UCEs,
communicating directly with them about how to go to Syria,

1  et cetera.  So I don't see that as moderating.  I see that
2  as, you know, her activity actually --
3         MR. SWIFT:  Well, in part -- and what part on it
4  is they sought her out, and she did meet with them.
5         What I'm talking about is her overall beliefs.
6  Even in December of 2017, when they first meet, she refers to
7  going to Syria in the past tense:  When I was going.
8         During this entire time she doesn't change her
9  position with respect to that.  She continues to keep it in
10  "she's not going."  The other thing that I found I think is
11  very important during her period of time with the undercover
12  is that she starts to argue against the idea of going at all.
13  This part that it's a time of fitna.  And that's important
14  inside Islam.  She's starting to make a change from where she
15  was in looking at it as religiously justified the way to
16  heaven, to not being required.  And that to me is a
17  moderating force.  She is not at -- in as strong a position
18  as she had been previously.  She's starting to ask questions.
19  And that questioning inside it is part of moderating her
20  beliefs.  Now, she is meeting with the undercovers, but they
21  are the ones setting up meetings.  She's not the one calling
22  them saying please come meet with me.
23         THE COURT:  And I get you on that.  And I accept
24  that.  But I analogize this all to -- it's just like child
25  porn.  It's just like child porn.  That's online.  Some

1  people look at it -- which is illegal.  Some people
2  distribute it, and that's illegal.  But essentially it's an
3  online crime.  And, yeah, she was just online, but she was
4  doing some things online that are very problematic.
5              MR. SWIFT:  I --
6              THE COURT:  And, secondly, when I read the
7  proffer, which I did, and I appreciate and give you credit
8  for doing it.  That -- I do.  I don't see her moderating.
9              MR. SWIFT:  Well, let me go on on the part of
10 moderating.  If you still want to do it, if you want to
11 support, if you want to do all those things, you don't do a
12 proffer.  She wasn't promised anything for this.  She's
13 cutting herself from it.
14             THE COURT:  So is that when the moderation
15 started?
16             MR. SWIFT:  I believe that it started before with
17 the defense; her life was getting better and that she was
18 unlikely to ever go to Syria or do anything at that point.
19             THE COURT:  So did she start moderating before or
20 after she pled guilty?
21             MR. SWIFT:  No.  I think before.
22             THE COURT:  When before?
23             MR. SWIFT:  When before?  In September of the year
24 when she actually commits the crime.
25             She's also -- let's look at this part on the part,

```
1   Your Honor.  If she's strongly in support, where she was once
2   at, why does she say don't go?  Why does she pull back on all
3   this stuff?  I look at that --
4               THE COURT:  Why does she suggest they go to
5   Afghanistan if they can't get to Syria?
6               MR. SWIFT:  Well, Your Honor, I would say to the
7   part on it is Afghanistan would have required them to pre-do
8   a whole lot of planning.  She isn't involved in Afghanistan,
9   et cetera, on it.  To me she's panicking.  Your Honor can see
10  it differently on the part, but I view her as moderating in
11  that period of time.  I look at it, I don't see an
12  acceleration toward violence.  I don't see an acceleration
13  toward these ideas.  And I do see her actively discouraging,
14  which is different than actively encouraging, which had been
15  earlier.  I also see over the period of time, Your Honor, in
16  part that at the same time her life was changing
17  significantly.  She had finally gotten degrees.  She gotten
18  part -- so where the professional part is starting to pull
19  her even more toward, hey, you can be a success here, you
20  have these things.  And that's a moderating force as well.
21              THE COURT:  Okay.  So -- I mean, accepting that as
22  true, that's September.
23              MR. SWIFT:  Yeah.
24              THE COURT:  And, of course, the offense of
25  conviction occurs in October.
```

1          MR. SWIFT:  Yes.  Yeah.  But I do see -- if you
2    see it before -- you see it to start to modify.  You see an
3    acceptance of responsibility by pleading guilty.  You see the
4    proffer sessions, by doing all these things --
5          THE COURT:  Okay.  So I'm mixed up then.  Are you
6    talking about September of 2018?
7          MR. SWIFT:  Yes.
8          THE COURT:  Okay.  And she didn't plead until this
9    year.
10         MR. SWIFT:  No.  It's over a period of time.
11   You've asked me, and I say I see this as a moderating force.
12         THE COURT:  If we go from September of 2018 to
13   January of 2022?
14         MR. SWIFT:  Yes.
15         THE COURT:  Okay.  I'm with you now.
16         MR. SWIFT:  Yes.
17         THE COURT:  So why did she go in and do the
18   proffer since you're getting no credit from the government?
19         MR. SWIFT:  She wanted to.
20         THE COURT:  Because?
21         MR. SWIFT:  The government asked and she felt that
22   she could help them.
23         THE COURT:  Oh.
24         MR. SWIFT:  She was under -- yeah.  You know, one
25   of the ironies on proffers --

```
 1            THE COURT:  So the government approached
 2   Ms. Giampietro?
 3            MR. SWIFT:  They approached me.
 4            THE COURT:  Well, of course.
 5            MR. SWIFT:  Yes.
 6            THE COURT:  But the government approached you and
 7   said would -- after she pled, would she be willing to give a
 8   proffer?
 9            MR. SWIFT:  Yes.
10            THE COURT:  And she gave two days' worth?
11            MR. SWIFT:  Yes.  And other part on this is, well,
12   note, there's no 5K here.
13            THE COURT:  Yeah.
14            MR. SWIFT:  There's no chance for a 5K.  It's one
15   of the great ironies.  The less she's done, the less she can
16   give in these (indiscernible), but she goes down and does it
17   anyway.  They ask her to do it again.  Spends a whole day.
18   New agents come down from New York or DC.  She spends another
19   half day with them.  What I say on the part is that's not
20   somebody whose tied to their conduct.  That's individually
21   breaking away from it.  And it has --
22            THE COURT:  And that's a good time to break away
23   from it.
24            MR. SWIFT:  You know, I haven't had a client who
25   didn't have it as part of their agreement that they had to
```

1   ever do it.  So we can -- if we hit to a point -- at some
2   point everything can be cynically viewed and everything she
3   does is wrong.  Everything.
4              THE COURT:  Well, pleading guilty wasn't wrong.
5              MR. SWIFT:  Every -- you know, in part in this is
6   -- but, you know, in this part on it is when we sit inside
7   it, I do look that there are a lot of moderating things about
8   her.  I believe that absolutely.  I've sat with a lot of
9   different clients in this national security part, and she's
10  different.  She's not violent.  She's a peaceful person.  I
11  see a woman who went down a rabbit hole.  And it's hard to
12  get out.  The internet is a bad place.  You're right.  You
13  know, the Court made a statement that I had to nod my head
14  at.  It was a better world.  And I guess I've gotten old
15  because I believe it was a better world.  But --
16             THE COURT:  Well, the proffer certainly helps her
17  in my eyes.  It's -- it seemed like it was cathartic for her.
18  And it put in place a lot of the old arguments that you've
19  been making here in terms of what she did and didn't do and
20  why she did it.
21             MR. SWIFT:  Yes.
22             Well, we were willing to go in on part on that and
23  waive part on it.  So I did see that.  I see it as moderating
24  conduct over time.
25             THE COURT:  Okay.

1           All right.  So let me ask Mr. Wehby.  Why did you

2   all call her in twice to proffer?  What -- did you think she

3   knew something that was going to be helpful to the

4   government?

5           MR. WEHBY:  Your Honor, just --

6           THE COURT:  Well, I'm sorry.  My first question

7   is, does the government believe she was truthful during the

8   proffer?

9           MR. WEHBY:  I would say we believe that there were

10  instances within the proffer that she probably minimized some

11  of her conduct still.

12          THE COURT:  In respect to what?

13          MR. WEHBY:  Some of her own conduct.

14          THE COURT:  Her own conduct?

15          MR. WEHBY:  But --

16          THE COURT:  In terms of people, contacts?

17          MR. WEHBY:  Yeah.  One of the reasons, like, she

18  was brought in was -- I know there was some -- ended up being

19  in the second interview there were some agents I think from

20  out of state who wanted to speak with her about her knowledge

21  regarding matters of interest to them.

22          THE COURT:  Uh-huh.

23          MR. WEHBY:  I will note for the record, Judge, we

24  don't -- like, based on the information provided, and to

25  Mr. Swift's credit, he acknowledged that, based on the

1  information provided there's simply nothing provided that
2  merited a -- some sort of motion for downward departure.
3           THE COURT:  Did she provide anything that's aiding
4  the government in other investigations?
5           MR. WEHBY:  Not at this point.  No, Your Honor.
6  If --
7           THE COURT:  But that final decision hasn't been
8  made?
9           MR. WEHBY:  If something were to develop, then we
10 would you know potentially come back before the Court with an
11 appropriate filing.  But there wasn't anything provided that
12 I guess has been useful to this point in terms of any
13 other -- aiding any other investigations.  That's my
14 understanding.
15          THE COURT:  And as to some of the -- setting aside
16 how she describes her own conduct, as you found to be
17 minimizing, did you find that any of the other substantive
18 information she provided was inaccurate?
19          MR. WEHBY:  Can I have one moment just to speak
20 with the agent?
21          THE COURT:  Sure.
22          MR. WEHBY:  I would say no, Your Honor, to that.
23          THE COURT:  Okay.  It does appear -- correct me if
24 I'm wrong now -- she does look like she volunteered
25 unnecessarily her conduct or behavior toward ISIS.

1          MR. WEHBY:  Yes.  I mean that was well
2    established.
3          THE COURT:  Yeah.
4          MR. WEHBY:  But, yes --
5          THE COURT:  She didn't have to say that.
6          MR. WEHBY:  We had reached out to Mr. Swift, and
7    to their credit, she agreed to meet with us in these two
8    proffers.  One thing I do want to correct is the length of
9    the proffers.  I know Mr. Swift had indicated I think eight
10   hours.
11         THE COURT:  Less than eight hours.
12         MR. WEHBY:  In total I would estimate it was
13   roughly four hours, the two meetings.  So I just point that
14   out for the record.  It just didn't take that --
15         THE COURT:  It may have felt like eight hours to
16   Mr. Swift.
17         MR. WEHBY:  Now, by the time Mr. Swift may have
18   met with his client and we had the meetings and so forth, but
19   I would point that out.
20         THE COURT:  All right.
21         MR. WEHBY:  And, Judge, on the supervised release
22   issue, just if you wanted us to weigh in on that.
23         THE COURT:  I thought you told me ten years.
24         MR. WEHBY:  Well, no.  In terms of the internet
25   usage.

1          THE COURT:  Oh.

2          MR. WEHBY:  I think the monitoring that Your Honor

3    had suggested, I think that's -- that would be appropriate.

4          THE COURT:  Sure.

5          MR. WEHBY:  As long as probation can monitor.

6          THE COURT:  Okay.  Let me look at my notes real

7    quick.  Oh, what does the government -- you sort of. . .  So

8    what does the government say -- what's the government's take

9    of the October 23rd, 2018, interview?  I've read it over and

10   over.  And I just want to -- what's your -- what -- how did

11   the government view that information, and the way she

12   presented herself?  On October the 23rd, 2018.

13         MR. WEHBY:  Well, she -- with the FBI she

14   acknowledged certain things, but I don't think she was --

15   obviously, from the entirety of that interview she wasn't

16   completely candid with the agents about her level of

17   involvement.  But she did acknowledge I think taking

18   obstructive steps I think as part of that interview.  But she

19   didn't disclose the full -- her full conduct.  I mean --

20         THE COURT:  Okay.  And then all of this -- and

21   Mr. -- Mr. Swift makes a good point.  All of this is really

22   at the behest of the government.  So what -- was there a real

23   threat because of her activity?  This was never going to

24   materialize into UCE1 and 2 traveling to Syria to join HTS to

25   fight in -- that was never going to occur with UCE1 and 2.

1  Right?  That just wasn't going to occur?

2          MR. WEHBY:  Well, obviously, they weren't going

3  to.

4          THE COURT:  Yeah.  Your people weren't going to

5  all of a sudden be double agents and start going to Syria.

6          MR. WEHBY:  But I think we've indicated in our

7  filings -- I mean, what precipitated this is FBI getting

8  involved was based on online activity.

9          THE COURT:  But this wasn't --

10         MR. WEHBY:  In terms --

11         THE COURT:  All this together wasn't a real threat

12 to the security of the United States of America?  Or for

13 Syria.

14         MR. WEHBY:  Well, no, it -- it -- it certainly

15 could have evolved --

16         THE COURT:  It could have been.

17         MR. WEHBY:  -- into that.  Obviously with the

18 undercovers --

19         THE COURT:  It wasn't.

20         MR. WEHBY:  But it was nonetheless serious conduct

21 that could have been carried out with other individuals.

22         THE COURT:  Unlike other cases, I don't have a

23 real bombing here.

24         MR. WEHBY:  That's true.

25         THE COURT:  Other cases that you -- Mr. Swift

1    sites, I don't have a real defendant here who actually took
2    $30,000 in gold bullion and went to give it to a foreign
3    terrorist.  There's no real harm here.  There's the threat of
4    harm, but that just didn't occur.
5              MR. WEHBY:  Well, we do also have -- may I have
6    one second?
7              Well, one of the things in these types of cases
8    it's incumbent upon the law enforcement, FBI here, to be
9    proactive, as opposed to reactive.  Because you want to
10   prevent certain things from happening.  So I do think that's
11   obviously significant.  And she did have a network of people
12   with whom she was communicating.
13             THE COURT:  Right.  But the preventative would be
14   if she was talking to people other than the UCE.
15             MR. WEHBY:  Right.
16             THE COURT:  And you all come in, get involved, and
17   stop that from happening.  That's not the case.
18             MR. WEHBY:  But I think in terms of what the Court
19   is asking -- obviously, we don't have her -- there was
20   discussion about her wanting to travel, but she did not
21   travel over to Syria.  So you don't have that that you see in
22   some of the other cases.  I acknowledge that.  But that
23   doesn't make it any less serious.
24             THE COURT:  And you wouldn't take -- you wouldn't
25   disagree with me that that's something I should consider in

1  the 3553(a) --

2          MR. WEHBY:  I think Your Honor should consider the

3  entire universe of information.

4          THE COURT:  Including the -- how this all came to

5  light?

6          MR. WEHBY:  I think you should consider it all

7  because I think in terms of reaching a fair and just result,

8  as I know this Court will do, you should consider the entire

9  universe of information that's before you.

10         THE COURT:  And what's your number for sentencing?

11 Your brief says between 60 and 90.

12         MR. WEHBY:  No, that wasn't our position.  I will

13 tell the Court this -- and the Department's position on this

14 case would be that an appropriate sentence would be 120

15 months.

16         THE COURT:  What does Mr. Wehby think?

17         MR. WEHBY:  Beyond that -- beyond that, the

18 government doesn't make a specific recommendation.

19         THE COURT:  Okay.  So I'm going to ask Mr. Wehby

20 what he thinks as an officer of the Court.

21         MR. WEHBY:  I think as an officer of the Court,

22 mindful that I'll be bound by what the Department is

23 recommending --

24         THE COURT:  Well, you'll be -- you'll at least be

25 protected from retaliation.

1          MR. WEHBY:  As an officer of the Court, I would

2     believe a sentence in the neighborhood of where Ms. Abusaad

3     was sentenced would be appropriate, would be supported by

4     the --

5          THE COURT:  When I read that -- have you read it?

6     I'm sure you read it.

7          MR. WEHBY:  I'm aware of it.

8          THE COURT:  It -- it was unique.  I read the

9     sentencing colloquy and -- the whole thing.  I don't know.

10    It just seemed a bit of an aberration.  But I don't have

11    anything much to compare it to.

12         MR. WEHBY:  Yes, sir.

13         THE COURT:  All right.  So that -- anything else

14    from the government?  I'll stop at this point.  Anything more

15    the government wants to add?

16         MR. WEHBY:  Your Honor, I think the only thing I

17    would further indicate is -- I mean one of the things with

18    regard to this is, obviously, this defendant, who is highly

19    educated, was having these online conversations with minors,

20    and with I think even Ms. Abusaad was much younger.  I don't

21    know her specific age at this point, but she was much

22    younger, probably at least 12 to 15 years younger than this

23    defendant.  So the influence is one of the things that is of

24    concern in these types of incidents, where there's this

25    online communication, there's this radicalization, and what

1    that can lead to is, obviously, a concern.

2              THE COURT:  And when I read Ms. Abusaad's plea

3    agreement and agreed facts, I actually thought I was going to

4    see a reference to Ms. Giampietro.  And I didn't.

5              All right.  So Mr. Swift, that takes us to you and

6    your client.  Do you want some water?

7              THE DEFENDANT:  I'm good.  Thank you.

8              THE COURT:  Okay.

9              THE DEFENDANT:  Your Honor, as I stand before you

10   today, I would like to apologize publicly to the people I

11   have hurt.  I would like to begin with my daughter.  While I

12   was talking with Abu Abdullah and texting him and dreaming of

13   going to Syria, or meeting with Aisha and texting her, I was

14   not thinking about you.  You should have been first in my

15   life, the most important, but I put you last.  I thought Abu

16   Abdullah and his sisters loved me, but it was always you who

17   has loved me.  I was not thinking about you, and you have

18   every right to hate me.  Knowing that you love me and you

19   still want me to be your mother makes me more than anything

20   want to be worthy of your love.  There has not been a day in

21   my incarceration I have not thought about you, worried about

22   you, missing you.  I love you so much.

23             I would like to apologize to my son, who is unable

24   to see me, which is my fault.  The reason I cannot see you is

25   because I was talking about taking you to Syria so I could

marry a man I only knew online.  I stayed up nights messaging
him.  I felt like he listened to me.  I believed he loved me.
I wanted to be with him, but I did not want to leave you.
When I realized I could not take you, I gave up on going.  It
was my love for you that stopped me from doing something
truly stupid.  After I was arrested I learned Abu Abdullah
was not who he said he was.  I pray some day I will be able
to be a part of your life again.

To my mother, thank you for coming today to
support me as you always have.  Thank you so much for taking
care of my daughter.  I am so sorry for putting you through
this.  I apologize for not being there to help you and my
daughter and with the household.  I want you to know this is
not your fault.  You have always shown me what love is.  When
I told you I reverted to Islam, you still loved me.  The FBI
came, you still loved me.  I am sorry I did not trust you
with this.  I know if I would have told you this we would not
be standing here today.

I apologize to my brother.  I am sorry you have to
bear all the burdens I left you.  I apologize I cannot be
there to help you with taking care of my family, and I thank
you for helping in taking care of our mother and my daughter.
I promise to be a better sister to you and be there for you.

To my patients who I had a responsibility to, I
apologize to you for leaving during treatment and care.  My

patients trusted me and expected more from me.  I am sorry I
failed you as a professional.  I promise to do my best as a
professional to better care for you, listen to you, and treat
you.

I apologize to the Islamic community for my
behaviors and actions.  I am sorry that I embarrassed you.  I
am sorry for being a coward and not openly practice Islam
with the Islamic community.  I have failed to be a good
Muslim.  I have failed to be a better sister, friend, and
role model to the young sisters of the community.  I should
have helped them, taught them, instead of misleading them.  I
promise to be a better Muslim, sister, friend of the Islamic
community.

I would like to thank the government for helping
me better understand Islam.

Aisha, I really thought you were my friend.  When
I found out you were an undercover agent, I felt so stupid.
I was angry at you.  Over these past 35 months I had a lot of
time to think.  I believe God put you in my life to start
bringing back the true messages of Islam.  All your questions
allowed me to research more into Islam and to learn the true
meaning of Islam.  Believing in these false profits in Syria
put me at risk in my soul.

Aisha, you helped me to know Islam is of love and
peace and not extremism.  During the research for Islam I

found the Quran has an anti-terrorism law, which states:
"Whoever takes a life it will be as if they killed all
humanity, and whoever saves a life, it will be as if they
saved all of humanity."

        Additionally, I learned that great Jihad means to
strive for a better, more righteous life.  Kindness to
parents is a form Jihad.  A kind word to a stranger is a form
of Jihad.  Also I learned a true Muslim is the one who does
not harm people with their hands or tongues.  Don't respond
to evil by evil but by doing what is good, and to show mercy
to those on Earth and God will show mercy to you.

        To the agents, I am glad we had got to talk after
signing my plea.  I hope what I told you will help you in
stopping others because I do not want to see others fall down
the same road I did.  Thank you.

        Thank you.

        THE COURT:  So I appreciate that, and it's
extremely well stated and -- and sincere.

        So one question I've had for a long time is how
does a young, educated lady like yourself get tied up in this
offense of conviction from Cookeville, Tennessee?

        THE DEFENDANT:  When I reverted to Islam, I turned
to the online community.  And that's all I knew.  They taught
me.  They showed me.  And I didn't look anywhere else.

        THE COURT:  So there was no community within

1  Cookeville or the surrounding county?

2          THE WITNESS:  There is a small mosque there.

3          THE COURT:  I thought --

4          THE DEFENDANT:  But I -- I've been there a couple

5  of times.

6          THE COURT:  October 23, 2018.  I thought you

7  responded cleverly to law enforcement.  Was that -- was that

8  your intent?

9          THE DEFENDANT:  I was just scared.  I was nervous.

10          THE COURT:  But you were thinking throughout the

11  whole question and answer.  Your answers and non answers were

12  quite impressive.  Was that what you were trying to do?

13          THE DEFENDANT:  I just didn't want to get in

14  trouble.

15          THE COURT:  And without talking -- I don't want to

16  know about any attorney/client communication, but I assume

17  you gave Mr. Swift permission to set up the proffer meetings

18  after your plea?

19          THE DEFENDANT:  Yes.  That's correct.

20          THE COURT:  And without sharing with me anything

21  he said, why did you want to do it?

22          THE DEFENDANT:  Because I wanted to help others.

23  I don't want -- I didn't want them to be like me and go just,

24  you know, to the online community and then be brainwashed,

25  you know.  I wanted to just try to help others and let the

1  government know, you know, that some of these charities are

2  undercover.

3              THE COURT:  And you heard me ask Mr. Swift -- I'll

4  give you a chance to respond -- exactly when do you say you

5  started moderating your behavior?

6              THE DEFENDANT:  When I came to jail.

7              THE COURT:  Back in?

8              THE DEFENDANT:  2019, of August.

9              THE COURT:  2019.  Okay.

10             THE DEFENDANT:  I started reading more of the

11  Quran and reading other Islamic books.

12             THE COURT:  Okay.  Anything else, Mr. Swift?

13             MR. SWIFT:  No, Your Honor.

14             THE COURT:  So -- you can remain there.

15             So my responsibility is to impose a sentence

16  that's sufficient but not greater than necessary to

17  accomplish the purposes of the sentencing laws.  And I do

18  that by applying the factors that you've seen your lawyer

19  discuss in the brief, and the government has discussed in the

20  brief.

21             And I've taken into consideration all the

22  arguments.  And I'm going to try to address all of those here

23  now.  But one overarching view I have of this, this is not

24  the typical case that this Court sees, or I have seen.

25  Instead, you're very smart, well educated, and you engaged in

 1   what I continue to call an ideological crime.  You had these
 2   strong beliefs, and those beliefs ran afoul of federal law
 3   that brings you here today.
 4           So what is it that brings us here today?  And I do
 5   think it's extraordinarily serious, even though it's an
 6   ideological crime, and as I found to be unique.  My
 7   understanding is you've pled guilty that between September 23
 8   of 2018 and October 23, 2018, you admit to concealing and
 9   disguising your support, material support and resources, that
10   you provided to these two undercover law enforcement
11   employees, that clearly the lady, Aisha, touched you quite --
12   quite significantly.  And you gave them information on how
13   they could travel to Syria, how they could avoid detection in
14   traveling to Syria from the federal government, how they
15   could join HTS, which the Court has come to learn, and the
16   parties have acknowledged, is a foreign terrorist
17   organization that is engaged in some serious atrocities that
18   I've already written about.  That you thought -- you -- you
19   believed that these two undercover were going to fight for
20   HTS against -- fight HTS against the government of Syria and
21   to provide funds to them.  I was glad to see in your proffer
22   that you expanded a little bit more on the funds.  And I will
23   say that, while you've admitted to doing that, and your
24   proffer gives further information of doing that, the Court
25   notes and takes into consideration the crime is really

providing the funds, or attempting to do that, but I also
take in the fact that the funds you actually did were a very
small amount, nothing like what your lawyer has -- has cited
in other cases.

While this is an ideological crime -- and it was
never completed due to the undercover government employees --
nevertheless, it is clear that you did give specific travel
advice based on your own experience, based upon your own
thoughts, and on your own desires at the time.  You -- you
told them about telephone usage.  You told them about a route
to Syria through Turkey and Italy, et cetera, to arrive in
Italy.  And you offered support to this Individual A in their
travel.

Now, Ms. Giampietro, you are not -- at least in my
opinion -- the ordinary criminal.  And I'm not even sure
you're the ordinary defendant who's facing and has pled
guilty to these charges under this statute.  But you are very
smart I think.  I think you're very sophisticated.  The
reason I focus on the October 23, 2018, is because if I had
to grade who won that Q and A, it would be you and not the
law enforcement.  Because your answers were very, very good
in avoiding providing information.

I know there was several times during October 23
when the lady law enforcement person sort of I think raised
her voice, as best as I can tell from the transcript, and

said, "Georgianna, we know things." So she was trying to get you to come clean. But as the Court explained when I calculated the guideline range, in that -- and I've explained at the time in the memorandum opinion -- you did commit what I call notable acts in addition to your crime of conviction. And that is, and this shows I think some skill, some shrewdness, some sophistication on your part, you did very good in concealing your concealment. And I've spoken to that and written to that. And that says -- that says a lot about you and is something the Court's taking into consideration for sentencing.

Also, the nature of your offense of conviction reflects your desires. The nature of your offense of conviction reflects that you attempted to create a grave threat on the government of Syria and -- and at least indirectly on the government of the United States, even from your outpost in the middle -- in the most rural parts of the Middle District of Tennessee.

And as I've already explained, you've admitted to your knowledge about HTS. You've admitted about what HTS was engaged in doing and its activities. I was glad to read that you have confessed to your concerns and knowledge about ISIS. You tried to send money to HTS to advance that cause. And again, not a lot of defendants come with me having written a college paper on the very topic that brings you here today.

1          So the nature of the offense, however I have to
2    put into context, it does not include recruiting others.
3    Indeed, law enforcement approached you.  It does not include
4    you actually traveling to Syria, even though you at least at
5    one point in time had that thought.  And it does not include
6    any actual violence.  But Mr. Swift writes a really good
7    brief.  You're well represented by him.  Because he points
8    out it's an online crime.  And I think you've got two pages,
9    and each sentence starts off with "online."  And that's true.
10   He's very -- and I take that in consideration.  But the same
11   is true for child porn.  The same is true for child porn.
12   Those who view it and those who distribute it may not ever
13   come in contact with a minor, but that's still illegal.
14          I've already commented on your personal
15   characteristics.  And the record is clear.  You've got one
16   master's.  You're well on your way to having a second
17   master's in licensed master social worker.  And I do take
18   into consideration your biological father engaged in verbal,
19   physical, emotional abuse from age five to 14.  But again, I
20   have to temper how much weight I give that because of your
21   significant work history, as well as your significant
22   education.  Perhaps he did -- not perhaps.  I take it as
23   true.  He may have done all these things.  But I have a hard
24   time linking what happened to you at age five and 14 with the
25   activities and your age and your knowledge and education

1    that -- that -- at the bottom of the offense of conviction.

2           Your family life was stable.  I find your family

3    was financially stable.  You did -- you do have two children.

4    You've lost custody in part due to the activities here.

5    There was some drug abuse as -- as a teenager, but there's

6    absolutely no suggestion of any mental/emotional health

7    diagnosis.  And I'm sure your lawyer told you, I admire your

8    consistent work history.

9           Respect for the law is something here.  And at

10   bottom -- obviously I do not hold against you wanting to

11   proceed to trial.  You had that right to do so.  And I was

12   ready to proceed if you wanted to.  But at the end of the

13   day, you did plea.  That shows some respect for the law.  At

14   the end of the day, you proffered for not quite eight hours,

15   but for a long time.  And that proffer -- that proffer -- the

16   government has not -- the government has put it in

17   perspective, but I consider that.  But I do have to kind of

18   balance that with that October 23rd Q and A with law

19   enforcement, which you were very good at not answering

20   questions.

21          I do see a stronger need in this case toward

22   general deterrence than specific deterrence.  I think I can

23   deter you with some of the conditions -- I don't know if I

24   can deter you, but I can control you with some of the

25   conditions for -- on supervised release.  But I do think this

case, unlike other cases, does send a strong -- there needs
to be a strong message to other young people, be they male or
female, whatever they may be, that they should be weary that
engaging in this online activity and crossing that line
between providing material support directly or indirectly to
a foreign terrorist organization is something they need to
avoid, something they need to be aware of.  And to the extent
any case can send that message, that they -- that if they do
so, then they -- they face potential grave consequences.
Unlike -- I don't really see the need here of vocational or
educational issues I've already expressed.

But let me now turn to the guideline range.  And
that's what -- and that's what most of Mr. Swift's and your
brief -- you know, the guideline here is 235 to 293 months,
which properly calculated, and the objections are raised, but
the first thing is it's capped at 120 months.  And that's
sort of telling.  And much like the child porn guidelines,
this one, too, suffers because the terrorism enhancement is
really a congressional mandate, one without any empirical
evidence to support it.  And the Court accepts that as true.
And Congress has the right to mandate child porn and
terrorism, and that is what it is, and the Court has
calculated the guideline correctly.  Similarly, treating you,
a first-time offender, and putting you at Category VI, which
is the highest, and that -- and one which usually is reserved

1  for those who are repeated offenders, does not advance the

2  Court's ability to tailor, as I'm required to do, to tailor a

3  unique sentence for the defendant that's before me.

4          Notwithstanding what the guideline range is, I

5  need to recognize the reality.  And that is that

6  Ms. Giampietro is a first-time, first-ever any type of

7  criminal behavior, serious criminal behavior that it is, but

8  it's still the first time.  I have to recognize there was no

9  actual violence as a result of her actions.  Although, I've

10 already spoken that it's extraordinarily serious conduct.

11 And I still have to nuance the 3553(a) factors, which I'm

12 trying to do to the best of my ability.  And that requires

13 the Court to impose a sentence that's unique, and recognize

14 that most sentencing judges and courts recognize there is no

15 one-size fits all for any crime, including the one before the

16 Court.

17         I've considered, Ms. Giampietro, your request for

18 departure, and I'm going to decline that.  I recognize that

19 perhaps I could do it.  But even more telling for the Court

20 is I have to deny it because it's apparent from the Sixth

21 Circuit, and especially *United States versus Hammadi*,

22 H-a-m-m-a-d-i, 737 F.3d 1043, Sixth Circuit (2013), it is

23 questionable whether or not I even have the ability to do

24 that according to the Sixth Circuit.  But even if I did, I

25 think you failed to establish by a preponderance of the

     evidence that the government acted so outrageously to violate
     due process.  It's unrebutted in the record before the Court
     that you came to their attention in 2015 through online
     activity, and that piqued their interest, started the
     investigation.
             The Court can't help but note the United States of
     America has spent an incredible amount of money in this
     prosecution.  When I look at all of the investigation that
     took place before your arrest, and all of the things that the
     United States of America has done in prosecuting this case;
     even, indeed, the Court has to have its own confidential
     security person.  The United States has spent an incredible
     amount of money in this case.  But also, you -- you -- I'm
     going to decline the departure because the evidence before
     the Court does reflect that you were a willing participant
     and helpful -- willingly helpful to the UCE's 1 and 2
     activities to travel to Syria, to join HTS, to fight with HTS
     and to fund them money.  So I recognize your request.  And
     for those reasons it will be denied.
             I don't think my sentence is going to create any
     unwarranted sentencing behavior.  The government and
     Mr. Swift cite the Alabama case.  And I've read that.  And it
     just seems from what I've read that that judge did what all
     judges have to do at sentencing, and that is, come up with a
     sentence that's unique and appropriate to that particular

1  defendant.  I do find differences based on what I've said

2  here, that the 90-month sentence there was unique to that

3  case.

4       And while I've considered it carefully, I've

5  decided that, Ms. Giampietro, I'm going to commit you to the

6  custody of the Attorney General to be imprisoned for a total

7  term of 66 months.  That will be followed by 15 years of

8  supervised release.  During that period of time, I'm going to

9  impose all of the internet restrictions recommended in the

10  presentence report; namely, you'll have to disclose all of

11  your electronic devices.  You'll have to allow search of all

12  of your electronic devices.  You will only be allowed to use

13  those electronic devices as -- as the Court permits.

14       You'll need to furnish all financial records to

15  the United States Probation Office.  And you're also

16  prohibited from maintaining and using any social media

17  accounts or platforms, unless approved by the Court.

18       I'm going to impose all the standard conditions of

19  supervised release, which will all be set forth in the

20  judgment, as well as the mandatory conditions:  You must not

21  commit another federal, state, or local crime, or possess any

22  unlawful controlled substance.  And while not an issue thus

23  far, you can't have possession either directly or indirectly

24  with any type of firearms.

25       I will not impose a fine because I determine

```
 1   you're financially unable to pay a fine.  But I do have to
 2   impose the mandatory special assessment of $100.  Neither
 3   restitution or forfeiture are at issue.
 4              Are there any other special requests, Mr. Swift?
 5              MR. SWIFT:  No, Your Honor.
 6              THE COURT:  So do the parties have any objection
 7   to the sentence that have not previously been raised?
 8              By the Government?
 9              MR. WEHBY:  No, Your Honor.
10              THE COURT:  Mr. Swift?
11              MR. SWIFT:  No, Your Honor.
12              THE COURT:  So the sentence is hereby imposed,
13   Ms. Giampietro.
14              Now, you have the right to appeal.  That's usually
15   14 days from when the judgment enters.  And I might -- I
16   probably won't get it done until the first of next week.  But
17   I'll get it done swiftly.  If you tell your lawyer you want
18   to appeal, he will do so.  You can tell the Clerk of Court
19   you want to appeal; she'll do so.  And I'm handing you now a
20   blank form that you can use however you wish, but I strongly
21   urge you to talk to a lawyer.
22              Do you have any questions about your appeal
23   rights?
24              MR. SWIFT:  I would note for the record, Your
25   Honor, as part of her plea agreement we waived almost all
```

```
 1  rights, but we will go back through it.
 2           THE COURT:  And I'm still required to advise her.
 3           MR. SWIFT:  I understand, Your Honor.
 4           THE COURT:  So do you have any questions of your
 5  appeal rights?
 6           THE DEFENDANT:  I do not have any questions.
 7           THE COURT:  Okay.  Anything else from the
 8  government?
 9           MR. WEHBY:  Your Honor, with the Court imposing
10  sentence, the government would move to dismiss the underlying
11  indictments.
12           THE COURT:  Without objection?
13           MR. SWIFT:  Without objection.
14           THE COURT:  Anything else?
15           MR. SWIFT:  No, Your Honor.
16           THE COURT:  All right.  Yeah.  To -- under the
17  direction of the marshal, if you'll give her a few minutes
18  with at least her mother and brother, that would be good.
19  And the Court would like to see Ms. Levy and Mr. Swift, as
20  well as Mr. Wehby in chambers.
21           All right.
22           (Court adjourned.)
23
24
25
```